## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | |
|---|---|
| ) | |
| DONALD P. SPEAKMAN, STEPHEN H. ) | |
| WEDEL, and MARK L. ROBARE, ) | |
| Individually and On Behalf of All Others ) | |
| Similarly Situated, ) | |
| ) | |
|        Plaintiffs, ) | |
| ) | Civil Action No. 4:04-cv-40077-FDS |
| v. ) | |
| ) | |
| ALLMERICA FINANCIAL LIFE INS. &, ) | |
| ANNUITY CO., FIRST ALLMERICA ) | |
| FINANCIAL LIFE INS. CO., and ) | |
| ALLMERICA FINANCIAL CORP., ) | |
| ) | |
|       Defendants. ) | |
| ) | |

## DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION TO DISMISS

Andrea J. Robinson (BBO No. 556337)
Jonathan A. Shapiro (BBO No. 567838)
Eric D. Levin (BBO No. 639717)
Brett R. Budzinski (BBO No. 655238)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Allmerica Financial Life Insurance &
Annuity Co., First Allmerica Financial Life
Insurance Co., and Allmerica Financial Corp.*

Dated: November 1, 2004

# CONTENTS

INTRODUCTION. ...................................................................................................1

ARGUMENT . .........................................................................................................3

I.  PLAINTIFFS FAIL TO STATE A BREACH OF CONTRACT CLAIM. ........................2

    A.  Plaintiffs Still Do Not Identify Any Term of the Trail Agreement That AFLIAC Allegedly Breached. ...............................................................2

    B.  The DAC Notes are Irrelevant to the Motion to Dismiss. .......................5

    C.  Plaintiffs Cannot "Imply" Contractual Duties to Sue AFLIAC for a "Breakdown" of the Insurance and Annuity Business. ...........................7

        1.  Plaintiffs Cannot Renegotiate a Written Contract in Federal Court ...........7

        2.  Plaintiffs' "Implied" Terms are Too Vague to Be Enforced and Do Not Allow them to Sue their Former Employer for Allegedly "Imprudent" Business Judgment ...............................................10

        3.  Plaintiffs Cannot Avoid Dismissal with Divorce Cases and Other Inapplicable Authority. ...............................................12

II.  PLAINTIFFS DO NOT SAVE THEIR CHAPTER 93A CLAIM ...............................16

    A.  Chapter 93A Does Not Cover Employment-Related Disputes (Regardless of How Plaintiffs Characterize Them). ...............................16

    B.  Even if not a Workplace Dispute, Plaintiffs Fail to State A Chapter 93A Claim.......................................................................19

        1.  Deficient Breach of Contract Allegations Do Not Amount to "Rascality".................................................19

        2.  Plaintiffs Cannot State a Chapter 93A Claim for "Misrepresentation".....20

CONCLUSION.......................................................................................................22

# <u>AUTHORITIES</u>

<u>Federal Cases</u>

*Accusoft Corp. v. Palo*,
   237 F.3d 31 (1st Cir. 2001)..................................................................................8, 10

*Ahern v. Scholtz*,
   85 F.3d 774 (1st Cir. 1996)......................................................................................19

*Allapattah Servs., Inc. v. Exxon Corp.*,
   61 F. Supp. 2d 1308 (S.D. Fla. 1999) ......................................................................5

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................................20

*Bellino v. Schlumberger Tech., Inc.*,
   944 F.2d 26 (1st Cir. 1991) ......................................................................................9

*Bolen v. Paragon Plastics, Inc.*,
   754 F. Supp. 221 (D. Mass. 1990) ..........................................................................18

*Catex Vitol Gas, Inc. v. Wolfe*,
   178 F.3d 572 (1st Cir. 1999) ...................................................................................18

*Citigroup N. Am., Inc. v. Ogden Martin Sys. of Haverhill*,
   8 F. Supp. 2d 72 (D. Mass. 1998) ...........................................................................19

*Downey v. Vernitron Corp.*,
   559 F. Supp. 1081 (D. Mass. 1982) .........................................................................12

*Doyle v. Hasbro, Inc.*,
   103 F.3d 186 (1st Cir. 1996).....................................................................................5

*Elias Bros. Rests., Inc. v. Acorn Enters., Inc.*,
   831 F. Supp. 920 (D. Mass. 1993) ...........................................................................5

*Fenoglio v. Augat, Inc.*,
   50 F. Supp. 2d 46 (D. Mass. 1999) .........................................................................10

*Glaros v. Perse*,
   628 F.2d 679 (1st Cir. 1980).................................................................................7, 17

*Hillson Partners Ltd. Partnership v. Adage, Inc.*,
   42 F.3d 204 (4th Cir. 1994) .....................................................................................21

*Holland v. Brean*,
   623 F. Supp. 284 (D. Mass. 1985) ...........................................................................17

*In re Boston Tech., Inc. Sec. Litig.*,
  8 F. Supp. 2d 43 (D. Mass. 1998) ....................................................................3, 21

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) ................................................................................20

*Konior v. Kanan, Corbin, Schupak & Aronow, Inc.*,
  Civ. A. No. 92-10816-Z, 1993 WL 259460 (D. Mass. July 2, 1993) ....................13

*Lander v. Hartford Life Ins. Co.*,
  251 F.3d 101 (2d Cir. 2001) .............................................................................21

*Lincoln House, Inc. v. Dupre*,
  903 F.2d 845 (1st Cir. 1990)...............................................................................7

*Macfadden Holdings, Inc. v. JB Acquisition Corp.*,
  802 F.2d 62 (2d Cir. 1986) ...............................................................................21

*Mass Cash Register, Inc. v. Comtrex Sys. Corp.*,
  901 F. Supp. 404 (D. Mass. 1995) .....................................................................11

*Mobil Oil Corp. v. Auto-Brite Car Wash, Inc.*,
  615 F. Supp. 628 (D. Mass. 1984) .....................................................................20

*Powderly v. Metrabyte Corp.*,
  866 F. Supp. 39 (D. Mass. 1994) ..................................................................16, 18

*RCI Northeast Servs. Div. v. Boston Edison Co.*,
  822 F.2d 199 (1st Cir. 1987).............................................................................9

*Ries v. Allmerica Fin. Corp.*,
  Civ. A. No. 04-40179 (FDS) (D. Mass.) .............................................................21

*Smart v. Gillete Co. Long-Term Disability Plan*,
  70 F.3d 173 (1st Cir. 1995).................................................................................9

*Tagliente v. Himmer*,
  949 F.2d 1 (1st Cir. 1991)................................................................................20

*Teletronics, Inc. v. Janko*,
  Civ. A. No. 87-2336-Z, 1988 WL 15519 (D. Mass. Feb. 4, 1988) .........................18

*Tompkins v. United Healthcare of New England, Inc.*,
  203 F.3d 90 (1st Cir. 2000).................................................................................5

*Trent Partners & Assocs., Inc. v. Digital Equip. Corp.*,
  120 F. Supp. 2d 84 (D. Mass. 1999) ..............................................................15, 16

- iii -

*Vosgerichian v. Commodore Int'l,*
  862 F. Supp. 1371 (E.D. Pa. 1994) ........................................................21

*Winter Parrel Corp. v. Reichhold Chems., Inc.,*
  823 F. Supp. 963 (D. Mass. 1993) ........................................................20

State Cases

*Anthony's Pier Four, Inc. v. HBC Assocs.,*
  411 Mass. 451 (1991) ........................................................19

*Atkinson v. Rosenthal,*
  33 Mass. App. Ct. 219 (1992) ........................................................19

*Benoit v. Landry, Lyons & Whyte Co.,*
  31 Mass. App. Ct. 948 (1991) ........................................................17, 18

*Bernard v. Cameron & Colby Co.,*
  397 Mass. 320 (1986) ........................................................14

*Chokel v. Genzyme Corp.,*
  No. 032520BLS, 2003 WL 23016549 (Mass. Super. Ct. Nov. 12, 2003) ........................................................10

*Cordoba v. Ricciardelli,*
  No. CIV.A. 01-3388, 2003 WL 831760 (Mass. Super. Ct. Mar. 6, 2003) ........................................................10

*Dennis v. Dennis,*
  29 Mass. App. Ct. 161 (1990) ........................................................13

*George W. Wilcox, Inc. v. Shell Eastern Petroleum Prods., Inc.,*
  283 Mass. 383 (1933) ........................................................11

*Goodridge v. Department of Public Health,*
  440 Mass. 309 (2004) ........................................................13

*Gram v. Liberty Mut. Ins. Co.,*
  384 Mass. 659 (1981) ........................................................15, 16

*Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College,*
  413 Mass. 66 (1992) ........................................................4

*Heacock v. Heacock,*
  402 Mass. 21 (1988) ........................................................13

*Informix v. Rennell,*
  41 Mass. App. Ct. 161 (1996) ........................................................16

*Krapf v. Krapf,*
  439 Mass. 97 (2003) ........................................................12, 13, 14

*Kroutik v. Momentix, Inc.*,
No. 012895BLS, 2003 WL 1962486 (Mass. Super. Ct. Apr. 2, 2003) ......................................8

*Larson v. Larson*,
37 Mass. App. Ct. 106 (1994) ...........................................................................................12, 14

*Levings v. Forbes & Wallace, Inc.*,
8 Mass. App. Ct. 498 (1979) ...................................................................................................19

*Linkage Corp. v. Trustees of Boston Univ.*,
425 Mass. 1, (1997) ................................................................................................................17

*Manning v. Zuckerman*,
388 Mass. 8, (1983) ..........................................................................................................16, 18

*National Med. Care, Inc. v. Zigelbaum*,
18 Mass. App. Ct. 570 (1984) ................................................................................................10

*Starr v. Fordham*,
420 Mass. 178 (1995) ..............................................................................................................15

*Stop & Shop, Inc. v. Ganem*,
347 Mass. 697 (1964) .........................................................................................................14, 15

*Szalla v. Locke*,
421 Mass. 448, (1995) .............................................................................................................17

*Tiffany v. Sturbridge Camping Club, Inc.*,
32 Mass. App. Ct. 173 (1992) ................................................................................................13

*Tufankjian v. Rockland Trust Co.*,
57 Mass. App. Ct. 173 (2003) ................................................................................................19

*Uno Rests., Inc. v. Boston Kenmore Realty Corp.*,
441 Mass. 376 (2004) ................................................................................................................8

*Winsmann v. Choate Health Mgmt. Inc.*,
No. CIV. A. 97-6561, 1998 WL 282901 (Mass. Super. Ct. May 29, 1998)..........................4-5

Federal Statutes

15 U.S.C. § 78bb(f)(1) ...............................................................................................................21

State Statutes

Mass. Gen. Laws ch. 208 ...........................................................................................................13

Mass. Gen. Laws ch. 93A...........................................................................................................20

<u>Federal Rules</u>

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1

<u>Other Authorities</u>

Wright & Miller, Federal Practice and Procedure § 3532.2 ...........................................7

Defendants Allmerica Financial Life Insurance & Annuity Company ("AFLIAC"), First Allmerica Financial Life Insurance Company ("AFLI"), and Allmerica Financial Corporation ("AFC") submit this Reply Brief in further support of their Motion to Dismiss plaintiffs' First Amended Class Action Complaint ("Amended Complaint") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## INTRODUCTION

Plaintiffs' breach of contract claim fails as a matter of law for the simple reason that plaintiffs got what they bargained for in the Trail Agreement. Massachusetts law does not allow them, after the fact, to alter their bargain under the guise of the implied covenant of good faith and fair dealing to capture terms that the parties could have agreed to, but did not. At bottom, plaintiffs' complaint is that they did not receive the amount of commissions they had hoped to earn under the Trail Commission Program. However, the Trail Agreement does not contain any term guaranteeing plaintiffs any particular amount of trail commissions. Nor does the Trail Agreement require AFLIAC to continue selling life insurance and annuities over a particular period of time (20 years according to plaintiffs) regardless of the cost to the company and its employees and investors. Thus, although the parties easily could have included such terms in the Trail Agreement, they did not do so and plaintiffs cannot retroactively impose them on defendants by "implying" them into the Trail Agreement.

Plaintiffs' Opposition to the Motion to Dismiss ("Opposition") does not change the three reasons why plaintiffs' claim under Section 11 of Chapter 93A fails as a matter of law. First, Chapter 93A's "trade or commerce" requirement limits the statute's reach to "commercial transactions." Chapter 93A does not extend to "intra-enterprise disputes," such as those arising from an employment relationship or other workplace setting. The Supreme Judicial Court has made clear that plaintiffs' title -- whether it be "career agent" or "independent contractor" -- is

irrelevant to this determination.  Second, plaintiffs' deficient breach of contract allegations do not involve "extortionate" conduct, and thus cannot satisfy the "rascality" requirement of Section 11.  Third, plaintiffs' theory that defendants violated Chapter 93A by failing to disclose the potential that a "substantial downturn in the stock market" might adversely affect AFLIAC's business is not actionable.  Defendants had no legal duty to disclose that (obvious) information, and in any event that threadbare theory is not supported by allegations of the egregious (or "rancid") conduct necessary to convert a misrepresentation claim into one actionable under Chapter 93A.

## ARGUMENT

## I.     PLAINTIFFS FAIL TO STATE A BREACH OF CONTRACT CLAIM.

### A.     Plaintiffs Still Do Not Identify Any Term of the Trail Agreement That AFLIAC Allegedly Breached.[1]

Plaintiffs assert in broad terms that they are suing for a "breakdown" of the Trail Agreement but have never identified any actual term that was broken.  Compare Opp. at 1, with Def. Mem. at 7.  The Opposition concedes that the Amended Complaint contains no allegation that AFLIAC breached an express term of the Trail Agreement.  See Opp. at 10-11 ("claim arises out of breach of implied duty of good faith and fair dealing, and alternatively, implied provisions").  The Trail Agreement was a voluntary program whereby AFLIAC agreed to pay trail commissions to plaintiffs based on one of two formulas (selected by each individual plaintiff).  See Trail Agreement § IV, attached as Exhibit A to Defendants' Memorandum in Support of their Motion to Dismiss ("Def. Mem.").  The Amended Complaint does not allege that AFLIAC miscalculated those commissions, failed to pay the proper amounts due to plaintiffs

---

[1]     AFLIAC is the *only* defendant to the breach of contract claim.  Plaintiffs now admit that they have no contract with AFLI (referred to as "Allmerica Life" in the Opposition), and no longer seek recovery for breach of contract as to AFLI.  See Opposition ("Opp.") at 19 n.4.  Plaintiffs never sued AFC for breach of contract.

under the selected formulas, or failed to pay promptly.  <u>See</u> Def. Mem. at 8-10.  Simply put, plaintiffs received the commissions due them under the terms of the Trail Agreement they signed.

The Opposition cannot cure this deficiency by relying on "specific provisions" that plaintiffs claim are in the Trail Agreement but do not exist in the actual document, which is before the Court.  <u>See</u> Trail Agreement; <u>In re Boston Tech, Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 62 (D. Mass. 1998) (dismissing complaint where, as here, plaintiffs opposed motion by mischaracterizing plain meaning of documents that were before court).  There is *nothing* in the Trail Agreement to "contemplate" that defendants "remain in business during the pendency" of the Agreement, or to remain in business for any particular period of time.  <u>Compare</u> Opp. at 3, <u>with</u> Trail Agreement.  There certainly is nothing in the Trail Agreement to require AFLIAC to "update products that already had been sold" to include whatever (unspecified) new features that plaintiffs think are necessary to keep pace with the competition over the indeterminate future. <u>Compare</u> Opp. at 2.  The notion that AFLIAC is required to offer the same product line for twenty years because the Agreement includes annuities "that are sold prospectively" is also an invention.  <u>Compare</u> Opp. at 3, <u>with</u> Trail Agreement § I.2 (Agreement pays commissions on annuities "issued prior to January 1, 1996").[2]

Plaintiffs similarly state no claim by asserting that commissions were based on "future production."  Opp. at 13 n.6.  Nowhere does the Amended Complaint allege that plaintiffs were paid lower commissions on the annuities covered by the Trail Agreement due to a lack of future

---

[2]    Plaintiffs' suggestion that the Trail Agreement "contemplates" imposing future obligations on AFLIAC is a long stretch from the actual text because, by its own terms, the Trail Agreement applies only to annuities "issued prior to January 1, 1996."  <u>Compare</u> Trail Agreement § I.2(a), <u>with</u> Opp. at 18-19.  Although plaintiffs were entitled to earn commissions on annuities sold to "replace" the pre-1996 annuities (essentially an exchange of the pre-1996 product with a newer version), those are not "prospective" obligations or "future" events because those commissions were calculated based on the premiums paid up through December 31, 2000, <u>i.e.</u>, *before* the Agreement.  <u>See</u> Trail Agreement § III(b)(iii).

sales. Moreover, although some (not all) plaintiffs selected a trail commission option that potentially allowed for a higher percentage payment if new sales targets were achieved, the Trail Agreement (on page nine) is crystal clear that if the agent dies, retires, or is terminated by AFLIAC -- and plaintiffs concede they all were terminated by no later October 2003, see Am. Compl. ¶ 26 -- that "productivity" variable becomes irrelevant and instead all trail commissions are based exclusively on their pre-termination percentage (i.e., based on their performance *before* the lawsuit was filed). See Trail Agreement at 9.

Having misconstrued those provisions, plaintiffs cannot avoid dismissal with their vague suggestion that "additional terms" of the Trail Agreement may somewhere exist in unspecified "additional written documents" that are nowhere alleged in the Amended Complaint. See Opp. at 6 n.2. *To state a breach of contract claim, plaintiffs must identify the contractual terms that they have sued defendants for allegedly breaching.* See Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 71-72 (1992) (affirming dismissal of contract claim where, as here, complaint failed to identify terms plaintiffs relied on for contractual relationship); Winsmann v. Choate Health Mgmt. Inc., No. CIV. A. 97-6561, 1998 WL 282901, at *2 (Mass. Super. Ct. May 29, 1998) (granting motion to dismiss where, as here, plaintiff failed to allege terms of contract or explain obligations imposed on parties).

It also is not true that the Rule 12(b)(6) standard of review allows plaintiffs to file (and amend) a breach of contract lawsuit if they cannot articulate the "breach." See Opp. at 4 n.1. Plaintiffs always bear the burden to plead facts to establish each element of their claim. See, e.g., Tompkins v. United Healthcare of New England, Inc., 203 F.3d 90, 93 (1st Cir. 2000) (dismissal appropriate where, as here, the complaint does not allege "sufficient facts to warrant recovery on any *cognizable* theory of the case") (emphasis added). Thus, no matter how

- 4 -

generously Rule 12(b)(6) is construed, it does not tolerate such non-specific contract claims.  See

Elias Bros. Rests., Inc. v. Acorn Enters., Inc., 831 F. Supp. 920 (D. Mass. 1993) (denying

motion to add contract claim where, as here, party failed identify any provision of the contract

that allegedly was breached); Doyle v. Hasbro, Inc., 103 F.3d 186, 194-95 (1st Cir. 1996)

(affirming dismissal of contract claim where, as here, complaint contained only "conclusory

statements" that defendants "failed to meet their contractual requirement" and nowhere stated

"what obligations were imposed on each of the parties by the alleged contract").[3]

### B.    The DAC Notes are Irrelevant to the Motion to Dismiss.

Throughout the Opposition, plaintiffs argue that their "DAC Notes," and/or something

that defendants did with respect to those notes, somehow preclude dismissal of their contract

claim.  See Opp. at 2, 3, 10, 12, 13.  This is an attempt to confuse.  Plaintiffs do not allege that

AFLIAC (or anyone) breached any DAC Note.  Nor could they.  AFLIAC already fully

performed (by loaning plaintiffs the money secured by the DAC Notes), meaning that the only

parties who have unfulfilled obligations under the DAC Notes are a subset of the plaintiff class

who have not yet paid back the loan.

Plaintiffs misconstrue the relationship between the DAC Notes and the Trail Agreement

by suggesting that "outside the terms" of the Trail Agreement "plaintiffs had no obligation" to

repay Allmerica for the loan.  See Opp. at 2.  The Trail Agreement was a *voluntary* contract

under which plaintiffs agreed to make an upfront cash payment to AFLIAC (calculated as a

---

[3]    Plaintiffs cannot sidestep Elias on the ground that the written contract at issue in that case
contained an integration clause, whereas the Trail Agreement does not have such a clause.  See Opp. at 21 n.10.
This is a red herring.  Elias held that a contract claim fails as a matter of law where -- just as here -- plaintiffs "do
not identify any term or provision in the [contract] that allegedly was breached."  See 831 F. Supp. at 927.  Although
Elias also refused to consider alleged oral representations because the written contract had an integration clause, that
analysis is irrelevant here because plaintiffs do not allege the breach of *any express* term (oral or written), but
instead rely on an impermissible attempt to sue for *implied* terms that are not in the Trail Agreement.  Therefore, the
presence or non-presence of an integration clause in the Trail Agreement is wholly irrelevant.  See also Allapattah
Servs., Inc. v. Exxon Corp., 61 F. Supp. 2d 1308, 1317 (S.D. Fla. 1999) ("parties cannot avoid the consequences of a
breach of the implied covenant of good faith merely by including an integration clause in their agreement").

portion of commissions they had previously received on some annuities sold prior to 1996) in exchange for AFLIAC's agreement to pay additional future, or "trail," commissions on those same annuities (which otherwise AFLIAC had no obligation to do).  See Am. Compl. ¶¶ 3, 13, 17; Trail Agreement.  Each plaintiff who elected to sign the Trail Agreement had the *option* of making his or her upfront payment in cash, or to finance it through a ten-year loan from AFLIAC -- hence the "DAC Note."  See Trail Agreement; Am. Compl. ¶ 17.F.  Thus, contrary to plaintiffs' argument, the Trail Agreement did not in any sense require them to sign the DAC Notes.  See Trail Agreement at 10 ("AFLIAC and Agent each understand and agree" that financing through DAC Notes "*not required* as a precondition for the Agent to participate").

Plaintiffs cannot avoid dismissal by complaining that AFLIAC has threatened to take action under the DAC Note against one plaintiff (Robare) because he has not repaid the money he decided to borrow (and received) years ago.  See Opp. at 13.   AFLIAC, of course, is not obligated to forgive the DAC Notes or, for that matter, any other loans it has extended (and especially need not forgive the debts of those who file class action lawsuits against the Company).  Although plaintiffs contend in the Opposition that AFLIAC has made "demands" of plaintiffs and "sought to require Robare to make the DAC Note payments," Opp. at 13, there is no allegation in the Amended Complaint that AFLIAC has sued to enforce any Note against any plaintiff.  See Glaros v. Perse, 628 F.2d 679, 681 (1st Cir. 1980) (court must disregard factual allegations that do not appear in complaint).[4]   Thus, plaintiffs' assertion that the DAC Notes are not enforceable, and/or that plaintiffs are somehow excused from paying off the loans, would (if

_____

[4]         The bald assertion in the Opposition that AFLIAC has taken action against Robare or that it "continues to demand that plaintiffs perform their obligations" under the DAC Notes, is *not even close* to the paragraphs of the Complaint to which plaintiffs cite.  Compare Opp. at 2, 13, with Am. Compl. ¶ 36 (alleging that once Robare "notified" defendants that he no longer considered himself "liable under the terms of the DAC Note," AFLIAC then "responded by claiming [he] was liable").

anything) constitute a "defense" to a non-existent claim which is not -- and may never be -- ripe for review.  See Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990) (dismissing as not ripe claim that defendant fraudulently transferred assets that plaintiff hoped to reach in pending suit; dismissal on ripeness grounds appropriate where claim involves "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all") (quoting Wright & Miller, Federal Practice and Procedure § 3532.2, at 141 (1984)).

> ### C.    Plaintiffs Cannot "Imply" Contractual Duties to Sue AFLIAC for a "Breakdown" of the Insurance and Annuity Business.

The Opposition leaves no doubt that plaintiffs' "contract" claim is a mislabeled attempt to sue AFLIAC for having shut down the business that employed them.  See Opp. at 2, 3, 9, 11-13, 21.  Plaintiffs admit that the "thrust of the Complaint is that Allmerica (and its predecessors), which had been in the life insurance business for 150 years, unilaterally and unexpectedly abandoned their life insurance and annuity business" some 20 months after they signed the Trail Agreement.  See Opp. at 2.   As a matter of law, however, plaintiffs cannot invoke the covenant of good faith to "thrust" that grievance -- essentially a challenge to a public company's business judgment to close part of the business -- into a claim that defendants breached a contract that says nothing of the terms plaintiffs seek to imply.

> ### 1.    *Plaintiffs Cannot Renegotiate a Written Contract in Federal Court.*

Plaintiffs have no response to the established line of Massachusetts cases holding that the implied duty of good faith and fair dealing "is circumscribed by the obligations . . . *actually contained in the agreement*."  See, e.g., Accusoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001) (emphasis added); Def. Mem. at 9-11.  The doctrine should not be used to impose *additional* obligations to which the parties did not agree.  See Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 386-88 (2004) (SJC rejected claim that defendant had implied duty

requiring a particular allocation of offer to purchase leased unit where, as here, the alleged duty appeared nowhere in parties' lease agreement; "we are reluctant to conclude that the covenant of good faith and fair dealing has, sub silento, provided a specific form of protection that is not mentioned in the parties' agreement").

Simply put, "*because there was no breach of the underlying Agreement, there was no breach of the implied covenant of good faith and fair dealing.*" See Cordoba v. Ricciardelli, No. CIV.A. 01-3388, 2003 WL 831760, at *6 (Mass. Super. Ct. Mar. 6, 2003); Chokel v. Genzyme Corp., No. 032520BLS, 2003 WL 23016549, at *4 (Mass. Super. Ct. Nov. 12, 2003) (granting motion to dismiss where, as here, defendants performed "in accordance with the provisions of the contract" and were not liable for breaching never-negotiated additional terms); Fenoglio v. Augat, Inc., 50 F. Supp. 2d 46, 52 (D. Mass. 1999) (under Massachusetts law, "[a] court 'cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its terms'") (quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575-76 (1984)).

Instead of addressing this and other precedent, plaintiffs transparently rely on terms that are not in the Trail Agreement, such as the "specific provisions" requiring defendants to sell annuities during the "pendency" of the twenty-year contract and to provide certain non-specified customer service levels. See Opp. at 3; supra § I.A. Plaintiffs do not dispute that in 2001 they "could have negotiated for . . . the terms [they] now" seek to "imply" into the Trail Agreement, but having failed to do so the "covenant of good faith and fair dealing shall not substitute for [their] failure to negotiate those terms." See Uno Rests., 441 Mass. at 389; Kroutik v. Momentix, Inc., No. 012895BLS, 2003 WL 1962486, at *6 (Mass. Super. Ct. Apr. 2, 2003) ("[T]here must be a contractual duty to do something, or to refrain from doing something, to

trigger the implied covenant of good faith and fair dealing. The Court, cannot, through the vehicle of the implied covenant, add obligations to a contractual undertaking that the parties did not impose on themselves.").

Plaintiffs cannot brush aside the doctrine of *expressio unius est exclusio alterius* as a "mere aid to construction and not an inflexible rule." Compare Opp. at 17, with Def. Mem. at 17 n.8. Although the doctrine is "not always dispositive," according to the Court of Appeals there is *"no reason why [it] should not be controlling"* where, as here, there is "absolutely nothing in the agreement's text that hints" at the additional obligations that plaintiffs seek to impose through after-the-fact litigation. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (emphasis supplied).[5]  Nor can plaintiffs turn the doctrine on its head by suggesting that AFLIAC had a duty to continue to sell annuities because the Trail Agreement didn't include a provision that allowed the Company to "abandon[] the retail annuity market." See Opp. at 16. The law is clear: contracts create affirmative duties, and the absence of a term means that the parties did not agree to it. See RCI Northeast Servs. Div. v. Boston Edison, 822 F.2d 199, 204 (1st Cir. 1987) (where parties failed to include term in contract, it is "unbefitting that [the court] accomplish by judicial fiat what [parties] neglected to achieve contractually"); see Def. Mem. at 9-10. (The notion that Allmerica was forbidden from closing the business or

_____

[5]     Plaintiffs similarly cannot overcome the *expressio unius* doctrine on the ground that it will "not further the intent of the parties." See Opp. at 17. Courts do not divine subjective intent when the contract language is clear, and, in any event, there is absolutely nothing in the Trail Agreement that reflects an intent to include plaintiffs' proposed implied terms. See Bellino v. Schlumberger Tech., Inc., 944 F.2d 26, 32 (1st Cir. 1991) (uncommunicated intent irrelevant where agreement is clear and unambiguous). Plaintiffs certainly cannot elevate unexpressed "intent" over the plain meaning of the document with a "straw-man" argument regarding the effect of the termination clause in the Trail Agreement. See Opp. at 19. Even if plaintiffs were correct that AFLIAC could not terminate, the circumstances under which a Trail Agreement could be terminated are irrelevant to the legal question of whether the Agreement contains provisions that are not in the document. Nor do defendants contend that the termination clause gives AFLIAC the unfettered ability to change the terms of, or terminate, in-force Trail Agreements, but rather that the existence of a termination clause (whereby AFLIAC retained flexibility with respect to future obligations) is inconsistent with plaintiffs' implied theory that AFLIAC "intended" to bind itself to continue to sell life and annuity products in the future. See Def. Mem. at 11.

making any other business decision not expressly authorized by the Trail Agreement also

disregards that it already had the statutory authority to do so, see infra.) [6]

> **2.**    ***Plaintiffs' "Implied" Terms are Too Vague to Be Enforced and Do Not Allow them to Sue their Former Employer for Allegedly "Imprudent" Business Judgment.***

The contract claim against AFLIAC is particularly unfounded because the unwritten

terms that plaintiffs propose to "imply" into and/or claim were "contemplated" would be too

vague to enforce even if they were supported by the actual text.  Courts are particularly loathe to

allow plaintiffs to sue for breach of "implied duties" that are indefinite in time or scope.  See

Chokel, 2003 WL 23016549, at *5 (granting motion to dismiss breach of implied covenant of

good faith and fair dealing claim where plaintiff failed to identify scope of implied terms);

George W. Wilcox, Inc. v. Shell Eastern Petroleum Prods., Inc., 283 Mass. 383, 390 (1933) ("It

is essential to the existence of a contract that its nature and the extent of its obligations be

certain."); see also Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F. Supp. 404, 417-18

(D. Mass. 1995) (alleged agreement between parties held unenforceable due to indefiniteness;

"axiomatic that a contract's essential terms must be sufficiently definite so that the nature and

extent of the obligations of the parties are ascertainable").

Here, even plaintiffs cannot articulate with any degree of precision the unwritten terms

they have sued defendants for violating.  They complain, for example, about AFLIAC's

"unilateral and voluntary decision" to stop selling annuities and also criticize the "manner in

---

[6]    Plaintiffs completely misconstrue the implied covenant of good faith and fair dealing by attempting to distinguish Chokel v. Ricciardelli, No. 03250BLS, 2003 WL 23016549 (Mass. Super. Ct. Nov. 12, 2003) on the ground that there is no provision in the Trail Agreement that expressly allowed AFLIAC to cease selling new annuity products and reduce certain service offerings to the Eligible Annuities.  See Opp. at 16; see also id. at 3 (arguing that "there is no Program provision that remotely contemplates or permits Defendants to curtail material services and benefits to annuities in the Program").  However, the implied covenant is not breached where a defendant is unable to point to a provision of the contract that allows it to take a certain action; rather, it is breached *only where the defendant takes some action that is inconsistent with a right provided to the plaintiff under the agreement*.  See, e.g., Accusoft, 237 F.3d at 45 ("the requirement of good-faith performance is circumscribed by the obligations . . . *actually contained in the agreement*") (emphasis added).

which it has withdrawn from that market," but nowhere define the performance standard they claim defendants should have satisfied.  See Opp. at 12, 13; Am. Comp. ¶ 21.  Did the Trail Agreement imply that AFLIAC continue sales of every life insurance and annuity product it was offering at the time?  Would selling 75% of the product line have been enough to satisfy the implied term?  Plaintiffs also do not specify the "manner" with which they contend the business should have been closed, nor why it was a breach for Allmerica to have made a "voluntary" decision to restructure (as opposed to what? Bankruptcy?).  The lack of definiteness of these new terms would be fatal to their enforcement even if they did exist in the contract that plaintiffs claim was breached.  See Wilcox, 283 Mass. at 390; Mass Cash Register, 901 F. Supp. at 417-18.[7]

Moreover, plaintiffs' proposed new terms are an impermissible attempt to convert a claim for breach of a commission contract into a challenge to the business judgment of the Board of Directors and senior management.  AFC is a public company that is run by a shareholder-elected Board of Directors and its Board-appointed officers.  See Am. Compl. ¶ 8.  Both AFC and AFLIAC are Delaware corporations.  Under Delaware law, the directors and officers are authorized and obligated to make business decisions deemed to be in the best interests of their shareholders, including whether to grow and restructure the company, and modify its business plan.  See Del. Code tit. 8, § 141 (amended by 2004 Delaware Laws ch. 326); Revlon, Inc. v. MacAndrews & Forbes Holding, Inc., 506 A.2d 173, 179 (Del. 1986) ("The ultimate responsibility for managing the business and affairs of a corporation fall on its board of directors.

---

[7]    Plaintiffs similarly have sued defendants for breaching an implied term to "properly service and offer updates" to annuities, but again *do not articulate any performance standard that the Court could apply even if such an obligation could be retroactively imposed on defendants*.  See Opp. at 13; Am. Comp. ¶ 28.  (Do plaintiffs propose that AFLIAC was prohibited from reducing *any* service offerings?  Would it have been "proper" to replace some services with different but comparable services?  How about switching computer systems?)

In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders.").

Thus, plaintiffs run afoul of the Company's statutory and contractual right to run (or close) the business by requesting that the Court imply into the Trail Agreement a never-written "contemplated" requirement that Allmerica "remain" in the life and annuity business "during the pendency" of the Trail Agreement (i.e., 10 or 20 *years*).  See Opp. at 3.  It would be irrational to conclude that Allmerica implicitly delegated that responsibility to a group of insurance agents when it executed a Trail Agreement that says nothing of the sort -- because all it says is how to calculate commissions on a handful of products.  Plaintiffs provide no legal basis (because there is none) that allows insurance agents to state a contract claim under a commission agreement with hindsight criticism of their employer's supposed subpar customer service, "imprudent" business judgment, and ineffective hedging of financial instruments.  Compare Downey v. Vernitron Corp., 559 F. Supp. 1081, 1086 (D. Mass. 1982) ("suits challenging alleged corporate mismanagement must be brought as derivative actions").

### 3.    *Plaintiffs Cannot Avoid Dismissal with Divorce Cases and Other Inapplicable Authority.*

Plaintiffs certainly do not save their "implied" theory with two inapposite *divorce* cases.  See Opp. at 14-15 and n.7 (citing Krapf v. Krapf, 439 Mass. 97 (2003); Larson v. Larson, 37 Mass. App. Ct. 106 (1994)).  First, the at-will employment relationship between a publicly-traded insurance company and its terminated insurance agents is not in any respect analogous to a marriage.  See Goodridge v. Department of Public Health, 440 Mass. 309, 312 (2004) ("social institution of the highest importance").  Estranged spouses who enter into a "separation agreement *stand as fiduciaries to each other*" and thus "are held to standards higher than those . . . [in] arm's-length transactions," such as a Trail Agreement that provides the formula for

- 12 -

calculating commissions paid to insurance agents.  See Krapf, 439 Mass. at 103 (emphasis added).

Second, the separation agreements in Krapf and Larson were incorporated into a divorce judgment, whereby the court approved the terms as fair and maintained jurisdiction to modify them whenever necessary to ensure that the parties (and their children) are treated equitably.  See Mass. Gen. Laws ch. 208, § 34; Heacock v. Heacock, 402 Mass. 21, 24 (1988) (purpose of alimony is "to provide economic support to a dependent spouse"); Krapf, 439 Mass. at 104 ("In deciding whether to approve a separation agreement, judges have their own independent duty to ensure that the division of the marital estate is fair and reasonable").  There is no Court pre-approval, supervision, and modification of a Trail Agreement.  Compare Dennis v. Dennis, 29 Mass. App. Ct. 161, 162-63 (1990) (affirming court's modification of separation agreement to increase husband's support obligations).  Instead, Massachusetts courts resolve after-the-fact litigation over business or employment contracts by holding the parties to the documents they sign, see Tiffany v. Sturbridge Camping Club, Inc., 32 Mass. App. Ct. 173, 175 n.5 (1992) ("a person who signs a written agreement is bound by its term whether he reads and understand them or not"), and without retroactively changing the deal by rewriting existing terms or implying new ones.  See Konior v. Kanan, Corbin, Schupak & Aronow, Inc., Civ. A. No. 92-10816-Z, 1993 WL 259460, at *2 (D. Mass. July 2, 1993) ("when sophisticated business entities freely enter contracts that are reasonably clear, the Court should not rewrite or imply terms").[8]

Third, unlike the Trail Agreement, the separation agreements at issue in Krapf and Larson each contained an explicit term *guaranteeing* the ex-spouses a particular amount of

---

[8]     This is not the atypical case where the commercial contract was allegedly the result of an unconscionable bargain.  There is no such allegation.  Any such theory would be bizarre.  The Trail Agreement was voluntary.  It allowed plaintiffs to earn additional commissions on products they sold years earlier.  See Trail Agreement §§ I.2, IV.

- 13 -

alimony.  See Krapf, 439 Mass. at 100 (defendant violated separation agreement by improperly waiving military retirement benefits to reduce spouse's alimony under the separation agreement by 86%); Larson, 37 Mass. App. Ct. at 106 (enforcing separation agreement that expressly guaranteed plaintiff set amount of alimony by requiring defendant to pay "thirty percent of his annual gross earned income").  As noted, plaintiffs were not guaranteed *any* specific amount of trail commissions under the Trail Agreement.

The non-divorce cases that plaintiffs cite also go against them.  The claim that the Trail Agreement includes an "implied covenant" to maintain "financial and other commitments" to the annuity business for 10-20 years is not supported by Bernard v. Cameron & Colby Co., 397 Mass. 322 (1986), where the SJC refused to imply a far less onerous term into an employment agreement.  Compare id. at 322-23 (no implied duty for smoke-free workplace).  Moreover, Stop & Shop, Inc. v. Ganem, 347 Mass. 697 (1964), supports defendants' argument that the Court *should not* import such terms into the Trail Agreement.  There, Stop & Shop leased a building under a lease that called for a fixed base rent plus a percentage of the store's gross sales, which the plaintiff landlord claimed was breached when Stop & Shop later closed the store and therefore stopped paying rent as a percentage of sales.  See id. at 700.  The Court rejected plaintiff's argument that Stop & Shop had an implied duty to keep the store open to provide plaintiff with the fruits of the percentage rent, just as plaintiffs claim that AFLIAC had a duty to keep selling annuities for 20 years.  See id. at 699-701 ("An omission to specify an agreement in a written lease is evidence that there was no such understanding.  Covenants will not be extended by implication unless the implication is clear and undoubted.") (citations omitted).[9]

_____

[9]    If anything, the implied covenant theory rejected in Stop & Shop was stronger than that proposed here (because a commitment to pay percentage of sales during a 13 ½ year lease is a going-forward obligation, whereas the Trail Agreement only paid commissions on *past* sales).  See id. at 699.

Plaintiffs' other authority has nothing to do with this case. For example, they cite <u>Starr v. Fordham</u>, 420 Mass. 178 (1995), for the unremarkable proposition that "a contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." Opp. at 19. The Trail Agreement sets forth the terms of the Trail Commission Program -- in particular, how plaintiffs' trail commissions were to be calculated. Plaintiffs do not allege, however, that their trail commissions were miscalculated. Rather, they attempt to impose duties on AFLIAC that are nowhere referred to in the Trail Agreement. This attempt, not defendants' interpretation of that document, is inconsistent with the plain language of the Trail Agreement.

Plaintiffs also cite to <u>Gram v. Liberty Mut. Ins. Co.</u>, 384 Mass. 659 (1981), and <u>Trent Partners & Assocs., Inc. v. Digital Equip. Corp.</u>, 120 F. Supp. 2d 84 (D. Mass. 1999), for the notion that AFLIAC "could not effect a termination or amendment that divested plaintiffs of the right to commissions for services rendered prior to that date." Opp. at 20. These cases are not on point. In <u>Gram</u>, the SJC held that an at-will employee discharged without good cause (which these plaintiffs do not even allege) may recover "identifiable, reasonably anticipated" lost compensation *if* the withheld compensation is "clearly" tied to "past services" (and here plaintiffs do not allege anything has been withheld). <u>See</u> 384 Mass. at 660. <u>Trent</u> is similarly inapplicable; it involved a dispute over the language of a contract (whether plaintiff received commissions on all orders placed pre-termination, or only those that actually shipped), which the Court allowed to go forward in part on a good faith and fair dealing theory because defendants allegedly did not act in good faith by terminating plaintiffs to avoid paying them a commission on a "sale that was on the brink of completion." The <u>Gram</u> and <u>Trent</u> test is not satisfied here because plaintiffs *(i)* do not allege they were terminated without good cause and certainly do not

claim that Allmerica stopped selling new annuities to avoid paying commissions; and *(ii)* do not allege they were "divested" of any commissions they already earned for pre-1996 annuities. In fact, AFLIAC continues to pay trail commissions to plaintiffs, and they do not allege otherwise.

## II.    PLAINTIFFS DO NOT SAVE THEIR CHAPTER 93A CLAIM.

### A.    Chapter 93A Does Not Cover Employment-Related Disputes (Regardless of How Plaintiffs Characterize Them).

Plaintiffs do not deny that "disputes arising from an employment relationship between an employee and the organization that employs him . . . are not covered by the c. 93A remedies afforded in commercial transactions." See Manning v. Zuckerman, 388 Mass. 8, 12-14 (1983) ("reference in § 11 to unfair or deceptive acts committed by 'another person who engages in any trade or commerce' refers to marketplace transactions and not to claims arising from the ordinarily cooperative circumstances of the employment relationship"); see also Def. Mem. at 12-13. Nor do they attempt to address the other cases cited by defendants that require dismissal. See Informix v. Rennell, 41 Mass. App. Ct. 161, 162-63 (1996) (reversing judgment for employer on Chapter 93A claim based on alleged breach of confidentiality and non-competition agreements); Powderly v. Metrabyte Corp., 866 F. Supp. 39, 44 (D. Mass. 1994) (granting motion to dismiss; "any claim arising from the employee/employer relationship [is] not actionable under G.L. c. 93A").

Instead, plaintiffs try to sidestep this precedent by arguing (for the first time) that they can sue under Chapter 93A because they are "independent contractors" as opposed to

"employees." See Opp. at 22.[10]  The debate over how the employment relationship is structured

(for tax, benefits or whatever reason) is *irrelevant*.  Section 11 only governs disputes involving

"*a commercial transaction* between a person engaged in trade or commerce [and] another person

engaged in trade or commerce."  See Szalla v. Locke, 421 Mass. 448, 451-52 (1995) (emphasis

added).  By contrast, it is immediately apparent from the Amended Complaint that plaintiffs

worked for defendants, and the dispute is over what defendants needed to pay them under a

commission arrangement -- a quintessential employment claim.   Plaintiffs alleged that they were

"long-time career agents" of AFLIAC.  Am. Compl. ¶¶ 30, 37, 43.  Plaintiffs signed "career

agency agreements."  Id. ¶ 24.  AFLIAC provided office space and staff for plaintiffs.  See id. ¶

14.  Plaintiffs' relationship with AFLIAC continued "in many cases over a 20-year time frame"

and was one where "the agents reposed substantial trust in Allmerica Companies." Id.[11]  Further,

the Amended Complaint contains employment-related allegations that the entire sales force was

"dismantled" and the "agency and broker force" was "terminated."  Id. ¶¶ 25-26.  As a matter of

law, then, plaintiffs' grievance with AFLIAC "stems from an employment relationship" that, just

as in Linkage Corp. v. Trustees of Boston Univ., cannot be litigated under Chapter 93A

regardless of how they characterize their employment.  See 425 Mass. 1, 23 n.33 (1997) (Chapter

93A "exclude[s] *intra-enterprise disputes* because they are more similar to purely private

_____

[10]    Even if mechanistic distinctions between "employee" and "contractor" mattered, there is no
allegation in the Amended Complaint that plaintiffs were independent contractors -- only that they were "long-time
career agents" who were "terminated when the "agency and broker force" was "dismantled."  Am. Compl. ¶¶ 25-26,
30, 37, 43.  They cannot defeat the allegations that are in the Amended Complaint by relying on facts that exist only
in the brief.  See Glaros, 628 F.2d at 681 (court must disregard factual allegations that appear only in brief and not in
complaint); Holland v. Brean, 623 F. Supp. 284, 290 (D. Mass. 1985) (refusing to consider allegations in plaintiffs'
brief which did not appear in complaint).

[11] Moreover, the Amended Complaint differentiates plaintiffs (and other agents) from "'select producers'
who were independent broker dealers and financial advisors that [sic] sold the products of other companies."  Id. ¶
12.  In their Original Class Action Complaint, plaintiffs alleged that they "were career agents" . . . *who sold only
Allmerica Life Products*.  Original Compl. ¶ 17 (emphasis added).  Although plaintiffs do not include this allegation
in their Amended Complaint, they nowhere allege that they sold anything other than AFLIAC products.

disputes and are not 'commercial transactions in the sense required'") (quoting <u>Szalla</u>, 421 Mass. at 452) (emphasis added).

For this reason, Massachusetts Courts have *flat-out rejected* plaintiffs' attempt to expand Chapter 93A into workplace disputes involving "independent contractors."   The Chapter 93A claim is foreclosed by <u>Benoit v. Landry, Lyons & White Co.</u>, 31 Mass App. Ct. 948 (1991), where the Appeals Court ruled that a real estate agent could not sue his employer under the statute even though the parties' written agreement expressly provided that plaintiff was an "Independent Contractor and not the Company's employee." <u>See</u> <u>id.</u> at 948-49.  The court was clear:  "whatever the consequences of independent contractor status elsewhere in the law," the plaintiff was "not engaged in the conduct of any trade or commerce even if the salesman is not the broker's employee."  <u>Id.</u>; <u>see also</u> <u>Teletronics, Inc. v. Janko</u>, Civ. A. No. 87-2336-Z, 1988 WL 15519, at *3 (D. Mass. Feb. 4, 1988) (granting motion to dismiss Chapter 93A counterclaim by "independent contractor" as outside "arms-length commercial transaction between distinct business entities").[12]

Plaintiffs cannot avoid dismissal now by asserting it is "certainly premature" and that "any challenge concerning Plaintiffs' employment status is a factual issue which cannot be decided on a Motion to Dismiss basis."  <u>See</u> Opp. at 22.  This is wrong.  Massachusetts Courts -- including in the seminal <u>Manning</u> decision -- routinely have dismissed Chapter 93A claims under Rule 12(b)(6) where, as here, it is clear from the complaint that the parties dispute arises in an

---

[12]       Plaintiffs cite to <u>Bolen v. Paragon Plastics, Inc.</u>, 754 F. Supp. 221 (D. Mass. 1990), where the court denied a motion for summary judgment because of a factual dispute over whether the plaintiff salesman was an employee or an independent contractor.  Respectfully, the court's analysis in that case is contrary to Massachusetts law as construed by the Massachusetts Appeals Court in a subsequent case.  <u>See</u> <u>Benoit</u>, 31 Mass. App. Ct. at 948-49 (dismissing Chapter 93A claim because plaintiff "independent contractor" was "not engaged in the conduct of any trade or commerce").  In any event, even if there were a conflict between <u>Bolen</u> and the several decisions cited by defendants, a federal court sitting in diversity applies state law in accordance with the decisions of the state courts.  <u>See</u> <u>Catex Vitol Gas, Inc. v. Wolfe</u>, 178 F.3d 572, 576-77 (1st Cir. 1999) (task of federal court sitting in diversity is to ascertain the rule the state court would follow under the circumstances).

employment context.  See Manning, 388 Mass. at 15; Powderly, 866 F. Supp. at 44 (granting

motion to dismiss Chapter 93A claim on ground that "any claim arising from the

employee/employer relationship [is] not actionable").  For this reason, the "possibility" that a

plaintiff "was an independent contractor rather than an employee" was deemed irrelevant and no

reason to delay dismissal in Teletronics, where, on the face of the Amended Complaint, this

Court entered judgment against plaintiff because workplace disputes are not "an arms-length

commercial transaction between distinct business entities" and thus was not the "kind of case"

that could be litigated under Chapter 93A.  See 1998 WL 15519, at *3.

**B.      Even if not a Workplace Dispute, Plaintiffs Fail to State A Chapter 93A
         Claim.**

### 1.      *Deficient Breach of Contract Allegations do not Amount to "Rascality."*

Plaintiffs acknowledge that a breach of contract claim does not ripen into a Section 11

claim unless the defendants intentionally breached "in disregard of known contractual

arrangements."  See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475 (1991); Opp.

at 24; Def. Mem. at 13-15.  Although plaintiffs claim that high standard has been "readily

satisfied," they nowhere point to any allegation in the Amended Complaint that would "attain a

level of rascality that would raise an eyebrow of someone inured to the rough and tumble world

of commerce."  See Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979).

At most, plaintiffs allege that one of three defendants (AFLIAC) breached various

"implied" contractual terms that even plaintiffs admit were not written in the Trail Agreement.

A business decision to "cease" unwritten "commitments" -- even if true and even if it led to a

predictable result of "reducing commissions" -- hardly constitutes "disregard of *known*

contractual arrangements," see Anthony's Pier Four, 411 Mass. at 475, much less malfeasance of

an "extortionate quality that gives it the rancid flavor of unfairness."  See Atkinson v. Rosenthal,

- 19 -

33 Mass. App. Ct. 219, 226 (1992); <u>Ahern v. Scholtz</u>, 85 F.3d 774, 799-800 (1st Cir. 1996).[13]

> **2.    *Plaintiffs Cannot State a Chapter 93A Claim for "Misrepresentation"***

Plaintiffs cannot resuscitate their Chapter 93A claim by complaining about defendants' supposed "failure to disclose certain material facts" at the time of the Trail Agreement.  <u>See</u> Opp. at 23 (citing Am. Comp. ¶¶ 62(1)-(3)).  Most notably, plaintiffs now claim that defendant should have predicted that in the future there could be a "substantial downturn in the stock market" which, in turn, might have an effect on AFLIAC's and AFLI's business, and if severe that it may not "remain a viable company."  <u>See</u> Am. Compl. ¶¶ 62(1), 62(2), 62(3).

For starters, plaintiffs have never alleged a garden-variety misrepresentation claim.  They certainly have not pleaded an intentional fraud of the sort that would rise to the level of Chapter 93A "rascality."[14]  Moreover, plaintiffs have never identified any duty to disclose the potential effect of a "substantial downturn in the stock market."  <u>See generally</u> <u>Basic, Inc. v. Levinson</u>,

---

[13]    Fairly read, the opinion denying a motion to dismiss the Chapter 93A claim in <u>Citigroup N. Am., Inc. v. Ogden Martin Sys. of Haverhill</u>, 8 F. Supp. 2d 72 (D. Mass. 1998), *confirms* the inadequacy of plaintiffs' claim here because <u>Citigroup</u> involved truly "eyebrow-raising" allegations that are fatally absent from the Amended Complaint.  In <u>Citigroup</u>, the plaintiff alleged that the defendant miscalculated payments under a *formula explicitly provided in the parties' written agreement* in a manner that the Court found was "sufficiently implausible to raise questions about whether it [was] asserted in good faith."  <u>See</u> <u>id.</u> at 75.  By contrast, here plaintiffs at most allege breach of an unwritten "implied term" that even they cannot articulate, <u>see</u> <u>supra</u>, not a borderline absurd interpretation of an explicit, written term.

Plaintiffs' citation to <u>Tufankjian v. Rockland Trust Co.</u>, 57 Mass. App. Ct. 173 (2003) is inapposite.  In <u>Tufankjian</u>, that Appeals Court affirmed a jury's finding of a Chapter 93A violation where the defendant bank had promised the plaintiff a 6.5% interest rate on a small business loan and then reneged on that promise.  By contrast, plaintiffs in this case were not promised or guaranteed *any* amount of trail commissions, nor allege that AFLIAC miscalculated commissions under the formula established in the Trail Agreement.

[14]    Absent more, run-of-the-mill misrepresentation theories (just like run-of-the-mill contract claims) cannot be litigated under Chapter 93A.  <u>See</u> <u>Tagliente v. Himmer</u>, 949 F.2d 1, 7-8 (1st Cir. 1991) (affirming summary judgment for defendant where alleged misrepresentation did not satisfy "rascality" standard; "the record shows, without meaningful dispute, that the defendant committed no acts so misleading or deceptive to warrant recovery . . . under Chapter 93A"); <u>Mobil Oil Corp. v. Auto-Brite Car Wash, Inc.</u>, 615 F. Supp. 628, 633 (D. Mass. 1984) ("While Mobil's alleged misstatement indeed could have caused injury to Auto-Brite . . . in the circumstances here it does not amount to the sort of 'immoral' or 'oppressive' conduct (or the level of 'rascality') 93A was designed to prevent; it does not as a matter of law amount to a violation of Mass. Gen. Laws ch. 93A"); <u>Winter Parrel Corp. v. Reichhold Chems., Inc.</u>, 823 F. Supp. 963, 975 (D. Mass. 1993) ("Simply neglecting to discuss Loh and Lum's lack of practical experience with the precise methods of production . . . however, does not at present seem to be the kind of knowing omission that achieves the level of rascality necessary to find a violation of Chapter 93A").

485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading").  AFLIAC

certainly had no duty to tell plaintiffs -- who claim to be "career" agents who sold variable

policies and annuities, i.e., securities -- that the sale of securities products could be negatively (or

positively) affected by a "substantial downturn" in the market, or by the always-present risk that

there are "structural weaknesses" in the business that employs them.  See In re Donald J. Trump

Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993) (no need to disclose "obvious implications of

the already weakened economic conditions in the Northeast" because no duty to "state the

obvious").[15]  For the same reason, plaintiffs did not need to be annuity experts to realize that, if

their employer ceased to be "viable" and stopped selling annuities, it would not need a national

sales force to sell annuities.

Finally, if the gravamen of plaintiffs' Chapter 93A claim is now an alleged "failure to

disclose" information relating to sales of variable annuities, i.e., securities,[16] Opp. at 23, then

they have pleaded themselves into preemption by the Securities Litigation Uniform Standards

Act of 1998 ("SLUSA"), requiring dismissal of the claim.  See 15 U.S.C. § 78bb(f)(1) ("[n]o

covered class action based upon the statutory or common law of any State . . . may be maintained

in any State or Federal court by any private party alleging . . . a misrepresentation or omission of

a material fact" in connection with covered securities); Ries v. Allmerica Fin. Corp., Civ. A. No.

---

[15]    See also Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 213 (4th Cir. 1994) (no duty to disclose that construction project may run into unforeseen delays, which was obvious); Macfadden Holdings, Inc. v. JB Acquisition Corp., 802 F.2d 62, 70 (2d Cir. 1986) (press release did not misrepresent that tender offer would remain open until FCC approval where "obvious import" of press release was that offer would close if majority of shares were tendered); In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 61-62 (D. Mass. 1998) (dismissing claim that defendants omitted to disclose possibility of new product failure because announced product trials "are well understood to be unpredictable"; "issuers are not required to disclose the obvious"); Vosgerichian v. Commodore Int'l, 862 F. Supp. 1371, 1377 (E.D. Pa. 1994) (alleged omission of drop in sales price not actionable as it was implicit based on drop in earnings and sales; "when the undisclosed elements of a company's financial situation are obvious from that which the company does disclose, the company cannot be held liable for a material omission").

[16]    Variable annuities are "covered securities" under SLUSA.  See Lander v. Hartford Life Ins. Co., 251 F.3d 101, 109 (2d Cir. 2001).

04-40179-FDS (D. Mass), Order denying Motion to Remand at 4 (state law claims by former Allmerica agents to recover commissions from variable products covered by SLUSA because the "suit arises out of the sale of annuities and variable life insurance products, both of which are 'covered securities' for purposes of the SLUSA").

## CONCLUSION

For the foregoing reasons as well as those set forth in defendants' prior brief, this Court should dismiss the Amended Complaint, with prejudice.

Respectfully submitted,

ALLMERICA FINANCIAL LIFE INSURANCE &
ANNUITY CO., FIRST ALLMERICA
FINANCIAL LIFE INSURANCE CO., and
ALLMERICA FINANCIAL CORP.

By their attorneys,

/s/ Eric D. Levin
Andrea J. Robinson (BBO No. 556337)
Jonathan A. Shapiro (BBO No. 567838)
Eric D. Levin (BBO No. 639717)
Brett R. Budzinski (BBO No. 655238)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Dated:  November 1, 2004

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true copy of the above document was served on this 1st day of November, 2004 on:

Nancy Freeman Gans
Moulton & Gans, P.C.
33 Broad Street
Boston, MA 02109-4216

Stephen L. Hubbard
Robert W. Biederman
David M. Grossman
Hubbard & Biederman, LLP
1717 Main Street, Suite 4700
Dallas, TX 75201

                    /s/ Eric D. Levin

BOSTON 2306528v5