## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| **DONALD P. SPEAKMAN, STEPHEN H.** | ) | |
| **WEDEL, and MARK L. ROBARE,** | ) | |
| **individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | **Civil Action No.** |
| | ) | **04-40077-FDS** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALLMERICA FINANCIAL LIFE INS. &** | ) | |
| **ANNUITY CO., FIRST ALLMERICA** | ) | |
| **FINANCIAL LIFE INS. CO., and** | ) | |
| **ALLMERICA FINANCIAL CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER ON MOTION TO DISMISS

**SAYLOR, J.**

This is a claim for breach of the implied covenant of good faith and fair dealing and for unfair and deceptive trade practices in violation of Mass. Gen. Laws. ch. 93A. Plaintiffs are insurance agents who sold variable annuities on behalf of defendant Allmerica Financial Life Insurance & Annuity Company ("AFLIAC"). According to the complaint, plaintiffs contractually agreed to repay past commissions to AFLIAC on certain variable annuities in return for a stream of future, potentially higher, "trail" commissions on those annuities. Plaintiffs financed their repayment obligation by signing ten-year notes for substantial sums payable to AFLIAC. Under the agreement, the "trail" commissions would be used to offset the loan payments, and the agents would keep the excess.

Less than two years later, in late 2002, AFLIAC stopped accepting applications for new

variable annuity business and severely curtailed its services to existing annuity accounts. That action caused much of the annuity business to disappear, as existing customers moved to other companies, which in turn caused trail commissions to plummet.

Plaintiffs contend that AFLIAC thus destroyed most of the potential value of their trail commissions, making it virtually impossible to earn enough to offset the loan obligations—which AFLIAC has refused to cancel. AFLIAC contends that under the Trail Agreement it had no obligation to remain in the annuity business or to provide any minimum level of service, and that it was not required to cancel the loan obligations or reimburse the agents for their losses.

Plaintiffs have brought suit, individually and on behalf of a putative class, against defendant AFLIAC for breach of the implied covenant of good faith and fair dealing,[1] and against all defendants for violation of Mass. Gen. Laws ch. 93A. Jurisdiction in this Court is based on diversity of citizenship.

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion will be denied.

---

[1] The First Amended Class Action Complaint ("Complaint") appears to contain claims for breach of contract against both AFLIAC and First Allmerica Financial Life Insurance. Plaintiffs have clarified in their Opposition Memorandum that their breach of contract claim is brought only against AFLIAC.

## Factual Background

The following facts are as alleged in the complaint.[2]

### A.     The Parties

Defendant AFLIAC is a Massachusetts-domiciled insurance company with a principal place of business in Worcester, Massachusetts.  Defendant Allmerica Financial Corporation ("AFC") is its publicly-traded parent company.  Defendant First Allmerica Financial Life Insurance Company ("AFLI"), during much of the relevant time, was the immediate parent of AFLIAC; it is now its subsidiary.[3]

As of the fall of 2000, AFLIAC marketed and sold life insurance and annuity products. Other subsidiaries of AFC sold property and casualty policies.  AFLIAC concentrated its business in the sale of variable annuities and was one of the largest sellers of such products in the country.

Plaintiffs Donald P. Speakman, Stephen H. Wedel, and Mark L. Robare are three former insurance agents who sold life insurance and variable annuities issued by AFLIAC until it ceased to offer those products in the fall of 2002.  Plaintiffs were among the approximately 700 career agents who sold AFLIAC life insurance and annuity products, including variable annuities.  The parties dispute whether plaintiffs were independent contractors or employees; the complaint alleges that plaintiffs were "career agents" of AFLIAC, and that the company provided them with "office space and certain staff."

### B.     The Variable Annuity Business Prior to 2001

---

[2]  This recitation of facts is, of course, plaintiffs' version of events, as set forth in the complaint.  The issue here is the sufficiency of the proposed pleading, not whether the evidence actually supports those allegations.

[3] Prior to 2003, AFLI was the parent of AFLIAC; that year, AFLIAC became the parent of AFLI.  The record does not indicate the regulatory or business reasons behind the reorganization.

The variable annuities sold by AFLIAC allowed the purchaser to direct the money deposited into the annuity into separate investment accounts similar to mutual funds. An annuity owner's account value fluctuated according to the performance of funds. AFLIAC guaranteed purchasers a minimum death benefit ("GMDB"), regardless of the actual performance of the annuity's investments.

AFLIAC offered purchasers a variety of accounts and investment managers from which to choose, and paid an experienced investment consultant to assist them in the selection of managers and to monitor the performance of managers and funds.[4] AFLIAC touted the number and choices of investments and investment managers and the experience of the consultant. The company received high ratings from agencies such as Standard & Poor's, Moody's, and A.M. Best. Because of the strong market competition, high ratings from these agencies are essential to the acquisition and retention of market share in the sale of life insurance and annuities.

A purchaser who terminated, or partially terminated, a variable annuity during its initial years (usually the first nine years) was required to pay surrender charges. The charges varied, depending on the time of termination; charges were highest for new annuities and decreased substantially over time.

AFLIAC received ongoing fees on the annuity accounts, which it treated as income. It also incurred both commission and underwriting expenses at the time of sale. Prior to January 1, 2001, plaintiffs were paid a one-time, lump-sum commission on sales of variable annuities in the first year, and did not receive any additional commissions during the period that those annuities

---

[4] Agents, such as plaintiffs, also assisted purchasers in the process of selecting accounts and fund managers.

4

remained in force.  In accordance with generally accepted accounting principles, AFLIAC did not

immediately recognize these expenses, but treated them as an "asset" and amortized them over

time.  Those "assets" were referred to as deferred acquisition costs ("DAC").

C.    The Trail Commission Program

In late 2000, AFLIAC became concerned about certain of its older variable annuity

policies.  Those annuities generally had little or no remaining surrender charges, but DAC from

their sale was still being amortized.  AFLIAC was concerned that their customers might surrender

those policies in substantial numbers and take their business to competitors.  On top of the loss of

business, AFLIAC would have to realize as an expense the remaining unamortized DAC, with no

offsetting surrender charges.[5]

Accordingly, AFLIAC approached its agents with a proposal to reduce its financial

exposure.  In exchange for a promise by the agents to return fixed one-time commissions on

certain older accounts, AFLIAC would pay them future fixed or variable trail commissions.  This

_____

[5] According to the complaint:

The financial statements of the Allmerica Companies[,] prepared in accordance with generally accepted accounting principles ("GAAP"), allowed DAC to be treated as an asset amortized over time in proportion to the variable annuity profits.  Profitability is related in large part to the performance of the underlying investments, which generate fees in proportion to the size of the Account Value.  Under GAAP, the Allmerica Companies annually had to determine whether or not to increase or decrease the amount of amortization of DAC based upon the then existing profitability of the variable products.  The amortization of DAC in any given year effected a reduction in earnings of the Allmerica Companies.  Generally, an increase in profitability resulted in greater amortization (and a greater offset to earnings) while conversely a decrease in profitability resulted in less amortization (and a lesser offset to earnings), with the following exception.  If Allmerica Companies determined that there was an overall impairment in profitability derived from the variable annuities, then the amount of corresponding DAC that could not be recovered had to be amortized or treated as an expense in that year, resulting in a substantial decrease in earnings.  If an annuity were surrendered during its early years, the imposition of surrender charges would partially offset any outstanding DAC but the Allmerica Companies would be forced to recognize as an expense the remaining amount of unamortized DAC.

*Id.*, ¶ 10.

5

would permit, among other things, AFLIAC to extend the time to amortize the remaining DAC.

Agents could elect to have their repayment obligation take the form of a note payable to the company. The commissions paid were designed to offset the note obligation, with any excess paid to the agents. If, however, there were substantial surrenders of annuities, or the account values of the annuities were to fall, the commissions would not be adequate to repay the notes. Although the complaint does not state what financial incentives were given to the agents to give back income that had already been earned, presumably they exchanged the certainty of fixed, up-front commissions for the risk, but potentially greater reward, of future trail commissions.

On January 1, 2001, AFLIAC formally launched the Agent In-Force Trail Commission Program ("Trail Program"). The Trail Program was voluntary and available to all agents who agreed to enter into an Agent-In-Force Annuity Trail Commission Agreement ("Trail Agreement").[6] The Trail Agreement obligated AFLIAC to pay ongoing "trail commissions" on certain in-force annuity contracts sold by plaintiffs, consisting principally of annuities issued prior to 1996 and replacements for those accounts (the "Eligible Annuity Contracts").[7]

---

[6] Because the Trail Agreement is integral to the complaint, the Court may consider the Agreement in ruling on the motion to dismiss. *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

[7] Under the Trail Agreement, Eligible Annuity Contracts included:

. . . individual variable and fixed annuity contracts issued by AFLIAC which:

    a.      except as provided in (c) below, were issued prior to January 1, 1996;

    b.      were solicited by the Agent, who is listed as the writing agent on the contract application (or, in the case of a contract, with a commission split, who is listed on the contract application as one of the writing agents);

    c.      in the case of a replacement contract that was issued after December 31, 1995, such contract replaced an annuity issued by AFLIAC described in (a) above and the Agent was listed as the writing agent on both the original and replacement contract (or, in the case of an original or replacement contract with a commission

Agents who executed the Trail Agreement could elect to receive fixed or variable trail commissions over an extended period of time.[8]  Under the Fixed Commission Option, commissions were calculated based upon a fixed annual percentage (0.70%) of the value of the annuities.  Under the Variable Commission Option, commissions were calculated at a variable annual rate (0.55% to 1.00%) based upon the agent's "Persistency Rate" and certain "Production Requirements."  The Persistency Rate measured the net increase or decrease in total account values of Eligible Annuity Contracts issued by the agent.  A higher rate of surrender of, or withdrawal from, annuity accounts resulted in a lower Persistency Rate and a lower commission, and vice versa.  An agent's Production Requirements were based on future sales of AFLIAC variable annuities and other products.[9]  Commissions would be increased for agents who maintained an average or above average Persistency Rate and sold enough products to meet yearly Production Requirements.[10]

---

split, the Agent was listed as one of the writing agents); and

d.       were not generating a trail commission to the Agent on the effective date of this Agreement.

Trail Agreement at 2.

[8] The trail commissions were paid out over the life of the Eligible Annuity Contracts or twenty years, whichever was shorter.

[9] All first-year commissions received on sales of AFLIAC life insurance policies or annuity contracts, mutual funds placed through AFLIAC, and eligible insurance products of other life insurance companies in selling agreements with AFLIAC and its affiliates counted toward the Production Requirement.  Trail Agreement at 7 n.133.  The Production Requirement for 1999 (trail commission payable in 2000) was $200,000; the Production Requirement for 2000 (trail commission payable in 2001) was $225,000; and the Production Requirement for 2001 (trail commission payable in 2002) was $225,000.  *Id.* at 7.  Production Requirements for 2002 and thereafter (trail commissions payable in 2003 and thereafter) were adjusted according to a cost of living index.  *Id.* at 7 & n.133.

[10] In addition, the Trail Agreement provided:

[I]n order to be eligible to receive the higher trail [commission] percentage (i) at least 25% of net FYC [first year commissions] received during a production year must be attributable to sales of

7

Trail commissions were payable for any calendar quarter for which an agent had satisfied the eligibility requirements for the Trail Program.[11]  Trail commissions were also payable to agents who retired or left the company or to their beneficiaries if they died.[12]

In exchange for the trail commissions, the Trail Agreement obligated participating agents to repay "the unamortized DAC allocated to the Eligible Annuity Contracts."  Trail Agreement at 2.  The Trail Agreement gave each agent the option to finance the repayment obligation with a 10-year loan from AFLIAC ("DAC Note"), payable on a quarterly basis.  The Agreement also provided that "[t]o the extent permitted under applicable law, Trail Commission payments shall

---

> qualifiable AFLIAC life insurance policies and annuity contracts and (ii) at least $25,000 in net FYC received during a production year must be attributable to sales of qualifiable AFLIAC life insurance policies.  Provided, however, that if an Agent fails to meet the $25,000 minimum life insurance Net FYC Requirement, the shortage can be made up through commissions received on sales of other eligible products equal to at least three times the shortfall.

Trail Agreement at 7 n.133 (emphasis omitted).

[11] In order to be eligible for the Trail Program, the Agreement provided that an agent must

> (i) have a minimum of (5) years of service as an Agent of AFLIAC, determined as of December 31, 2000, (ii) have [met certain production requirements] and (iii) have agreed in writing that no commissions, other than trail commissions described in this Agreement, shall be payable by AFLIAC on premiums received by AFLIAC after December 31, 2000 on Eligible Annuity Contracts . . .

Trail Agreement at 1.

[12] The Trail Agreement provided:

> . . . if an agent receives a Trail Commission for a calendar quarter and thereafter voluntarily terminates, is terminated by AFLIAC other than for cause, dies, retires or becomes Totally Disabled, the Agent or his or her beneficiary shall be entitled to receive Trail Commissions for succeeding calendar quarters, based on the Agent's assigned Eligible Annuity Contract book of business accumulated value determined as of the last day of the calendar quarter for which the Trail Commission is payable."

Trail Agreement at 9.  Agents terminated for cause were entitled to no further trail commissions following the date of termination.  *Id.*  Agents who elected the Variable Commission Option, and who voluntarily terminated, were terminated by AFLIAC other than for cause, died, retired or became totally disabled, would receive future Trail Commissions based on their Persistency Rate and production prior to termination.  *See* Trial Agreement at 9.

8

first be applied by AFLIAC to pay any Program loan [DAC Note] payments due and unpaid as of the last day of the calendar quarter for which the Trail Commission is payable." *Id.* at 10.[13]

By its terms, the Trail Agreement "automatically terminate[s] following payments of Trail Commissions for the third quarter of calendar year 2020." *Id.* The Trail Agreement also provided as follows:

> AFLIAC reserves the right to terminate or amend the Program at any time. <u>Provided,</u> <u>however</u>, that any such amendment or termination shall not affect any In-Force Annuity Trail Commission Agreement in effect on the date of the amendment or termination.

*Id.* (emphasis in original).

### D.    <u>Plaintiffs' Participation in the Trail Program from Early 2001 through Fall 2002</u>

In early 2001, plaintiffs agreed to participate in the Trail Program and executed the Trail Agreement.[14] The named plaintiffs selected the Variable Commission Option and also opted to finance their repayment obligations with DAC Notes from AFLIAC. The amount of the notes was substantial: Speakman signed a note in the amount of $3,138,457.48; Wedel signed a note in the amount of $1,178,538.46; and Robare signed a note in the amount of $832,318.39.[15]

Plaintiffs state that "throughout 2001 and up until the fall of 2002, the Trail Program functioned as . . . designed." *Id.* at ¶ 18. The complaint indicates that plaintiff Robare maintained

---

[13] The complaint alleges that, if an agent was terminated for cause, his participation in the Trail Program ended and the agent no longer had any obligation to make payments on the DAC Note. *Id.* at ¶ 17(H).

[14] Each plaintiff executed an essentially identical Trail Agreement. For the sake of convenience, the Trail Agreements will be referred to in the singular.

[15] The Court assumes, for present purposes, that no actual cash was exchanged as part of these transactions, and that therefore (for example) plaintiff Speakman was not presented with a check for $3.1 million upon execution of the note.

a high Persistency Rate and met Production Requirements.[16]  During this period, AFLIAC

continued to receive high ratings from prominent agencies and to concentrate its business in the

variable annuity market.

### E.    AFLIAC's Withdrawal from the Annuity Market

Plaintiffs allege that defendants were aware, when they introduced the Trail Program, that

AFLIAC's variable annuity business was extremely vulnerable to stock market fluctuations and

plagued with structural weaknesses that could potentially lower the company's agency ratings and

force it to withdraw from the market.  Specifically, they allege that defendants lacked adequate

resources and strategies to meet AFLIAC's GMDB obligations[17] and to absorb DAC in the event

of a downturn in the stock market.[18]  Plaintiffs allege that these problems were never disclosed to

---

[16] The complaint does not specify the performance of the other named plaintiffs in terms of Persistency Rate and Production Requirements, other than to state that they were satisfied with the results of the Program during this time frame.

[17] According to the complaint:

Although undisclosed to Plaintiffs and similarly situated agents until the public pronouncements beginning in the Fall of 2002, the exposure of Allmerica Companies for GMDB in connection with the variable annuities was in direct relationship to the size of the Account Values.  The gap between the GMDB and the amount of the Account Value is referred to as "net amount of risk."   When the Account Value falls below the GMDB, the insurance company has to make adequate provisions to assure payment of the GMBD.  Defendants first publicly disclosed in March 2003 that the "net amount of risk" or GMDB exposure as of December 31, 2002, was approximately **$4.6 billion**.  These disclosures also revealed that the Allmerica Companies and the Individual Defendants had failed to take prudent measures, such as obtaining reinsurance for GMDB or other appropriate strategies to hedge against the GMDB risk.  By not taking such actions, Defendants imperiled the financial stability and essential ratings of [AFLIAC] and [AFLI] when the market began its downturn from historical highs.

*Id.*, ¶ 19 (emphasis in original).

[18] According to the complaint:

Concurrent with the problems . . . in connection with its GMDB exposure, Defendants faced an enormous acceleration of the amortization of the outstanding DAC.  Because DAC amortization is directly related to gross profits, a material decline of the Account Values materially reduced its income.  In turn, this required a recognition in 2002 of hundreds of millions of dollars of DAC as

10

agents participating in the Trail Program.

Less than two years after the execution of the Trail Agreements, and in the wake of a downturn in the market, AFLIAC began to pull out of the variable annuity business. In September 2002, defendants announced that AFLIAC and its affiliates would significantly reduce sales of variable annuity and life insurance products as a result of declining income and increased expenses. The companies subsequently announced that, effective October 16, 2002, AFLIAC would no longer accept new applications for annuity and life products.

The cessation of new business in the life and annuity market created a "closed" book of business. AFLIAC then began to curtail the services it provided for existing products, including Eligible Annuity Contracts in the Trail Program. For example, the company reduced the number of investment funds available to annuitants and discharged the investment consultant responsible for assisting annuitants in selecting and monitoring funds and fund managers. It also stopped providing updates to Eligible Annuity Contracts, such as guaranteed living benefit riders.[19]

These actions, and the company's simultaneous drop in rating by the agencies, caused large numbers of clients to terminate or withdraw their annuities. Competitors have lured substantial numbers of annuity owners away from AFLIAC, including owners of Eligible Annuity Contracts.

---

an expense that materially reduced the earnings of the Allmerica Companies.

*Id.*, ¶ 20.

[19] The complaint lists multiple examples of the "deterioration in services" after AFLIAC's decision to leave the market, including such items as causing "significant processing errors" in client accounts and failing to "timely process service requests by clients." *Id.*, ¶ 28.

F.    __The Impact of AFLIAC's Withdrawal on Plaintiffs__

As a result of AFLIAC's actions in the fall of 2002, Robare's "Production" fell dramatically, causing him to fall short of Production Requirements for higher Trail Commissions. Moreover, the company's curtailment of services and loss of competitive position have sparked withdrawals from, and surrenders of, his Eligible Annuity Contracts, resulting in a decrease in his Persistency Rate.[20]  The account values in his Eligible Annuity Contracts have, as a result, decreased sharply from $32 million to $4.8 million, and his trail commission percentage has dipped from 1.07% annually to .55% annually.  Robare's trail commissions are currently below the amount necessary to offset the quarterly installments due under the terms of his DAC Note.

In the aftermath of the fall 2002 announcements, plaintiffs were given a "take it or leave it" offer to sign new employment agreements with entirely different terms from the Trail Agreement.  Robare refused, but Speakman and Wedel signed the new contracts.

In October 2003, defendants terminated all sales of life and annuity products and AFLIAC discharged its entire sales force, including Speakman and Wedel.  According to the complaint, in 2004, defendants publicly declared that the life and annuity business was not their priority, and that their goal was to become a world class regional property and casualty company.

In 2004, Robare notified AFLIAC that, as a result of its conduct, he was not liable for the DAC Note.  However, AFLIAC claims that Robare and the other plaintiffs remain liable on those obligations nonetheless.

---

[20] The complaint also states that "Speakman's clients have requested to transfer their accounts, many of which are in the Trail Program, to other more stable companies with better guarantees."  *Id.* at ¶ 42.

<u>Discussion</u>

## I.    <u>Standard of Review</u>

A court may not dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) "unless it appears, beyond doubt, that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief." *Judge v. City of Lowell*, 160 F.3d 67, 72 (1st Cir. 1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and matters of which judicial notice can be taken.  *Nollet v. Justices of the Trial Court of Mass.*, 83 F. Supp. 2d 204, 208 (D. Mass. 2000), *aff'd*, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).

## II.    <u>The Breach of Contract Claim</u>

Plaintiffs advance a single count for breach of contract against AFLIAC.  They contend that AFLIAC's retreat from the annuity market and discontinuation of competitive services to Eligible Annuity Contracts, while the Trail Program was in effect, breached the implied covenant of good faith and fair dealing in the Trail Agreement.[21]

A covenant of good faith and fair dealing is implied in every contract.  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  The covenant provides that

---

[21] In their Opposition Memorandum, plaintiffs argue, in the alternative, that these actions breached an implied provision of the Trail Agreement.  However, this theory of liability is duplicative of the claim for breach of the implied covenant of good faith and fair dealing.  *See, e.g., Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984) ("Whether pursued under the rubric of 'good faith' or the more traditional rubric (for most contracts) of 'implied limitation,' the object of our inquiry is whether it was reasonably understood by the parties" that the contract permitted defendant's actions); *Hall v. Earthlink Network, Inc.,* 396 F.3d 500, 508 (2d Cir. 2005).

13

"neither party shall do anything that will have the effect of destroying or injuring the rights of the

other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*,

411 Mass. 451, 471-472 (1991) (quotations omitted).  "[T]he purpose of the covenant is to

guarantee that the parties remain faithful to the intended and agreed expectations of the parties in

their performance." *Uno Restaurants*, 441 Mass. at 385.

A party may breach the covenant of good faith and fair dealing implicit in every contract

without breaching any express term of that contract. *Marx v. Globe Newspaper Co., Inc.*, 13

Mass. L. Rep. 190, *10-11 (Mass. Super. 2001); *see Fortune v. National Cash Register Co.*, 373

Mass. 96, 101, 105 (1977).  Otherwise, the implied covenant would be a mere redundancy.  The

essential inquiry is whether the challenged conduct conformed to the parties' reasonable

understanding of performance obligations, as reflected in the overall spirit of the bargain, not

whether the defendant abided by the letter of the contract in the course of performance.  *Marx*, 13

Mass. L. Rep. at *10-11; *Larson v. Larson*, 37 Mass. App. Ct. 106, 110 (1994).

The requirement of good faith performance is, however, circumscribed by the obligations

in the contract.  *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).  Thus, the covenant may

not be invoked to create rights and duties not contemplated by the provisions of the contract or

the contractual relationship.  *Uno Restaurants*, 441 Mass. at 385-386.  Nor does the covenant

apply where the defendant has exercised an express contractual power in good faith – that is, in a

manner that comports with the parties' reasonable expectations as to performance.  *Compare*

*Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 156 (D. Mass. 2001) (no

breach of covenant where franchise agreement expressly gave defendant the right to terminate the

contract under the circumstances, and there was no evidence of fraud, deceit, or misrepresentation

by defendant) *and Chokel v. Genzyme Corp.*, 17 Mass. L Rptr. 83, at *10 (Mass. Super. 2003) (no breach of covenant where defendants adhered to specific contract provisions in calculating stock transfer price, there was no evidence of bad faith, and defendants disclosed pertinent information to plaintiffs) *with Anthony's Pier Four*, 411 Mass. at 471-473 (covenant breached where one party used a discretionary right under the contract as pretext to extract price concessions) *and Fortune*, 373 Mass. at 104-105 (covenant breached where employer discharged employee under an at-will employment contract before employee could collect a portion of the sales commissions owed to him).

A party's decision to discontinue a line of business may, in certain circumstances, violate the implied covenant of good faith and fair dealing in a commercial contract. *See Eastern Massachusetts St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass. 329 (1929); *Diamond Alkali Co. v. P.C. Tomson, Co.,* 35 F.2d 117 (3d Cir. 1929); *see also DiGennaro v. Rubbermaid, Inc.*, 214 F. Supp. 2d. 1354 (S.D. Fla. 2002). In *Eastern Massachusetts St. Ry.* the parties, both street railway companies, agreed to the joint use of one another's freight facilities for a period of a five years. *Id.* at 330. Either party had the right to terminate the contract within six months of furnishing notice to the other. *Id.* Plaintiff then voluntarily discontinued its freight business without giving the requisite notice. *Id.* When plaintiff sued to recover money collected for its benefit under the terms of the contract, defendant refused to pay, arguing that it was entitled to withhold the funds as compensation for the profit it would have earned in freight charges had plaintiff remained in the freight business for the entire six-month period following the notice of termination. *Id.* at 330-331.

In upholding a lower court ruling for defendant, the Supreme Judicial Court explained that

"[t]he defendant assumed the risk of the volume of the plaintiff's normal freight business but did not assume the risk of its voluntarily giving up that business." *Id.* at 332.

> The provisions of the contract, when interpreted in the light of the circumstances and purpose to be accomplished, mean that the plaintiff was under an obligation to carry on a freight trolley business during its term and not voluntarily to stop the normal flow of that business. The continuation of that business was essential to the carrying out of the terms of the contract and hence an agreement to that effect is implied.
>
> . . . The implied obligation, of the plaintiff not voluntarily to give up its freight business[,] was a part of the consideration of the contract . . . .

*Id.* at 332-333 (citations omitted). Accordingly, although no contractual provision forbade plaintiff's conduct, it was "to be assumed that the parties would carry out the contract in good faith and that during its life the plaintiff would do nothing to interfere with the normal flow of freight to the [defendant's] terminals." *Id.* at 334.[22]

The same principle of good-faith performance has been applied in Massachusetts in cases involving the rights of former spouses under a separation agreement. In *Larson v. Larson*, 37 Mass. App. Ct. at 109-110, a separation agreement allotted the former wife a portion of the husband's earnings; the husband then retired early, reducing his earned income to zero. The Massachusetts Appeals Court held that the husband violated the implied covenant by retiring early

---

[22] The principle that a voluntary abandonment of a line of business may constitute a breach of the implied covenant of good faith and fair dealing is not, of course, absolute. Thus, in *Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 703-05 (1964), a tenant operated a supermarket under a 13 ½ year lease that provided for a base rental of $22,000 per year and an additional rental payment of 1.25% of all gross annual sales above a certain amount. In the first nine years of occupancy, additional rental payments had been required only twice, and then only in relatively minor amounts ($2,288 and $377). The tenant then closed the supermarket, although it continued to pay the base rent. The Supreme Judicial Court held that the landlord had not established a basis for implying a covenant to continue operations of the supermarket, because he had not shown that a reasonable person in his position would have been justified in understanding that such a covenant was intended by the parties. The SJC observed that the result might have been different had the store been closed "for spite or to inflict harm," as opposed to business reasons. *Id.* at 704-05. Furthermore, and unlike the present case, the discontinuance of supermarket operations did not entirely vitiate the contract; the landlord's rental income was diminished, if at all, by a very small fraction of the total.

because "that decision deprived the wife of her reasonably anticipated fruits of the separation

agreement and amounted to an evasion of the spirit of the bargain." *Id.* at 110 (citations omitted).

Similarly, in *Krapf v. Krapf*, 439 Mass. 97, 106 (2003), the separation agreement provided that

the former husband would allocate half of his pension rights with the U.S. Army to the wife. The

husband then applied for and received Veterans' Administration disability benefits, which reduced

his army pension; the result was that the husband's service-related income doubled, while his

former wife's pension allocation fell by approximately 86%. The Supreme Judicial Court

observed that the wife did not negotiate the separation agreement with the intent to "give the

[husband] carte blanche to reduce the value of her pension to a pittance in order to benefit

himself." *Id.* at 105. Rather, "the agreement gave her a reasonable expectation that she would

receive pension income in her later years," and that the husband would refrain from taking steps

to make this benefit "essentially worthless." *Id.* at 105-106. By applying for VA benefits,

therefore, the husband denied the wife "the fruits of her bargain in breach of his continuing duty to

exercise the utmost good faith and fair dealing" in the performance of the contract. *Id.* at 106; *see

also Nile v. Nile*, 432 Mass. 390, 398-399 (2000).[23]

     Here, AFLIAC took unilateral, voluntary action that advanced its own self-interest and

prevented or hindered plaintiffs from reaping substantial benefits of the contract. The agents

could not earn sufficient commissions to offset their loan obligations, much less earn higher

---

[23] AFLIAC argues that "divorce cases" such as *Krapf* and *Larson* are "not in any respect analogous" to the present matter, which involves a contract executed in a commercial setting. The *Krapf* court did note that contracting spouses are held to higher standards of good-faith performance than parties to an arm's-length transaction in the marketplace. 439 Mass. at 103. However, this observation only bolstered the court's holding that the defendant's conduct violated the implied covenant of good faith and fair dealing. The court did not intimate that analogous conduct in a commercial setting would be proper. Indeed, Massachusetts courts have repeatedly emphasized that the covenant is implied in every contract. *See Anthony's Pier Four*, 411 Mass. at 473.

amounts, if AFLIAC discontinued competitive services to Eligible Annuity Contracts and disavowed generally its commitment to the annuity business.[24]  The predictable effect of those actions was to trigger large-scale surrenders of annuities, which reduced the gross amount of annuities subject to trail commissions and correspondingly reduced those commissions.

The contract therefore necessarily contemplated performance duties on the part of AFLIAC to remain in the annuity business and to service existing customers during the pendency of the Trail Program.  *See Union St. Ry.*, 269 Mass. at 332.  To hold otherwise would require the Court to assume that the agents intended to negotiate away their previously-earned commissions, and borrow huge sums of money, with the understanding that the company had "carte blanche" to take self-interested actions at any time that reduced their future commissions to the vanishing point.  *See Krapf*, 439 Mass. at 105.  The Court cannot ascribe such irrational intentions to the plaintiffs.  *See Tymshare*, 727 F.2d at 1154 (where challenged conduct amounts to "retroactive reduction or elimination of a central compensatory element of the contract – a large part of the *quid pro quo* that induced one party's assent – it is simply not likely" that the conduct conformed to the parties' reasonable expectations as to performance; "agreeing to such a provision would require a degree of folly on the part of [plaintiffs]" that a court should "not . . . posit where another plausible interpretation of the language is available").

AFLIAC does not contest that plaintiffs' commissions have been severely curtailed by its withdrawal from the market, nor does it appear to contest that plaintiffs have incurred huge debt obligations that are unlikely to be repaid from that reduced stream of commissions.  Nonetheless,

---

[24] The announcements of the fall of 2002 also lowered AFLIAC's ratings, making it less attractive to prospective and existing annuitants.

18

AFLIAC argues that "plaintiffs got what they bargained for under the Trail Agreement." Reply Memorandum at 1. It essentially makes six interrelated arguments in support of that position.

First, AFLIAC argues that there is nothing in the Trail Agreement that expressly *prohibited* its actions. The short answer to that argument is that the covenant of good faith and fair dealing is—by definition—implied, not express. *See Marx*, 13 Mass. L. Rep. at *10-11; *Diamond Alkali*, 35 F.2d at 119-120. The covenant would be pointless if the parties to a contract were free to do anything not expressly prohibited by its terms.

Second, AFLIAC argues that there is nothing in the Trail Agreement that expressly *guaranteed* plaintiffs a particular amount of commissions. That statement is true, as far as it goes. There would have been no breach of the implied covenant if the plaintiffs had received low trail commissions in the normal course of business; plaintiffs bargained for that possibility. *See Union St. Ry.*, 269 Mass. at 332 ("defendant assumed the risk of the volume of plaintiff's normal freight business"). Put another way, plaintiffs assumed the risk of the ordinary vicissitudes of the annuity market. If the commissions were low because variable annuities fell out of favor with the public, or because competitors offered better products or rates – or even because AFLIAC was not competent at operating a variable annuity business – plaintiffs likely would have been without a remedy. However, plaintiffs did not bargain for *deliberate* actions on the part of AFLIAC that made it impossible, or nearly impossible, for them to earn the commissions contemplated by the contract.

Third, AFLIAC argues that the doctrine of *expressio unius est exclusio alterius* (the "expression of one thing is the exclusion of another") precludes the implication of the covenant in the circumstances of this case. The company does not point to particular terms that it claims

imply the exclusion of others; instead, it simply argues that the contract is "exceptionally detailed" as to the obligations imposed on the parties, but does not require AFLIAC to sell particular products or provide "continued employment" to the plaintiffs. Again, that argument misconstrues the nature of the implied covenant. This is not an instance where a contract enumerates certain specific terms (e.g., A, B, C, D, and F), and plaintiff seeks to interpret the contract to include a non-expressed term (e.g., E). Rather, plaintiffs argue simply that the contract (like all contracts) contained an implied covenant that AFLIAC would not attempt to destroy the fruits of their bargain.[25]

Fourth, AFLIAC argues that, by its terms, the Trail Agreement applies only to annuities issued prior to January 1, 1996, and that therefore it imposes no future obligations as to the sale or servicing of annuities. It is true, of course, that the Agreement applies principally to annuities issued before 1996 (and replacements for those annuities). However, for the Agreement to operate as contemplated, it is obvious that a substantial portion of that book of business had to remain at Allmerica into the future, in order to generate commissions sufficient to offset the debt obligations and (possibly) generate an excess to be paid to the agents. The amount of those commissions for the named plaintiffs was also dependent, in part, on future sales as well as maintaining the existing business.[26] AFLIAC's decision to abandon the market and withdraw its

---

[25] In support of its position, defendants cite *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997) and *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173 (1st Cir. 1995), two decisions in which the *expressio unius* doctrine was used to resolve competing contractual interpretations. However, neither case involved a claim under the implied covenant of good faith and fair dealing, and thus neither controls the present matter. In both cases, the court ruled against the party claiming that the contract contained an unwritten term, reasoning that, because certain provisions were set forth expressly, similar matters not mentioned in the contract were intentionally excluded. *See Institut Pasteur*, 104 F.3d at 495; *Smart*, 70 F.3d at 179.

[26] Defendants point out that AFLIAC terminated its entire sales force by October 2003, and that, by the terms of the Trail Agreement, the formula for trail commissions paid to terminated agents does not take into

support services for the pre-1996 annuities triggered large-scale surrenders by customers, which completely undercut plaintiffs' ability to earn substantial trail commissions.

Fifth, AFLIAC argues that the Trail Agreement expressly provided that it could "terminate or amend the [Trail Commission] Program at any time." However, its selective quotation of the termination provision is misleading: AFLIAC had the "right to terminate or amend the Program at any time"—"[p]rovided, however, that any such amendment or termination shall not affect any [Trail Agreement] in effect on the date of the amendment or termination." Trail Agreement at 11 (emphasis omitted).

The exact meaning of that provision is not free from doubt. The term "Program" is defined elsewhere in the Trail Agreement to mean "a voluntary program . . . for maintaining the persistency of [AFLIAC's] variable and fixed annuity block of business." *Id.* at 1. At least in the absence of a developed factual record, it is difficult to see how AFLIAC's withdrawal from the variable annuity business constitutes termination or amendment of the "Program," as defined. Indeed, it appears that while the business assumptions underlying the Program changed dramatically, the Program itself did not change at all.

Even if the Court assumes that the decision to exit the business was a termination or amendment of the "Program," defendants still do not prevail, at least based on the text of the contract. The plain meaning of the provision appears to be the following: "We can do what we like with the Trail Program, so long as it does not affect any Trail Agreements." The termination of the annuity business obviously affected the Trail Agreements profoundly, to the point that it

---

account future sales. *See* Trail Agreement at 9. Defendants thus contend that future sales are entirely irrelevant. That argument, however, ignores the fact that the agents (presumably) would not have been terminated but for AFLIAC's decision to withdraw from the annuity and life insurance market.

virtually eviscerated them.[27]

Finally, AFLIAC argues, in substance, that the implied duty is too vague or inequitable to be enforced, claiming that plaintiffs "nowhere define the performance standard they claim defendants should have satisfied."  Reply Memorandum at 11.  To underscore the point, defendants pose the following series of rhetorical questions:  "Did the Trail Agreement imply that AFLIAC continue sales of every life insurance product it was offering at the time?  Would selling 75% of the product line have been enough to satisfy the implied term? . . . Do plaintiffs propose that AFLIAC was prohibited from reducing any service offerings?"  *Id.* at 11 & n.7 (emphasis omitted).  Indeed, AFLIAC goes so far as to claim that a ruling in plaintiffs' favor would amount to a wholesale abrogation of the ordinary rules of corporate governance, because it would effectively mean that the company could be forced to remain in the annuity market against the business judgment of its management and at the insistence of a small group of disgruntled agents.

Again, AFLIAC entirely mischaracterizes the nature of the obligation it undertook. AFLIAC was not literally required to remain in an unprofitable line of business, or refrain from restructuring its product lines, under any and all circumstances.  It was free at all times to structure and operate its business as it chose.  What it could *not* do is voluntarily abandon a line of

---

[27]  Arguably, another potential construction of the provision is the following:  "We can do what we like with the Trail Program, but the Trail Agreements will remain in effect regardless of what we do."  That construction, however, is problematic.  It is substantially less faithful to the actual words used in the agreement, and is therefore a disfavored construction.  *See B & T Masonry Construction Co., Inc. v. Public Service Mutual Insurance Co.*, 382 F.3d 36, 39 (1st Cir. 2004) (applying Massachusetts law; "the first principle [of contract interpretation] is to afford the language of the [contract] its plain meaning"); *Burnham v. The Guardian Life Insurance Co. of America*, 873 F.2d 486, 489 (1st Cir. 1989) ("courts have no right to torture [contractual] language in an attempt to force particular results or to convey delitescent nuances the parties neither imagined nor intended.  To the exact contrary, straightforward language . . . should be given its natural meaning").  Furthermore, the Court must interpret the contract in accordance with justice and common sense, and avoid, where possible, any construction that is unreasonable or inequitable.  *Clark v. State St. Trust Co.*, 270 Mass. 140, 153 (1930).  A construction that would permit one party to destroy unilaterally the other party's benefit of the bargain, without recourse, is hardly a sensible or equitable construction.

business at the expense of its agents, with whom it had express and implied contractual obligations. Simply put, if AFLIAC decided to get out of the annuity business, it had to pay the price.

Likewise, the scope of the obligation, while not precisely defined, is not infinite or unmeasurable. Plaintiffs argue that the implied duty to sell annuities was coextensive with the duration of the Trail Agreement, which had a term of 20 years, or, in the alternative, coextensive with the duration of the DAC Notes, which was 10 years. The scope of defendants' implied duties ordinarily must be measured in accordance with the parties' reasonable expectations as to performance. *See Krapf*, 439 Mass. at 105, 106. The Agreement is rational only if AFLIAC was obligated to, at the very least, afford plaintiffs a reasonable opportunity to offset their loan obligations to AFLIAC through commission income. *See DiGennaro v. Rubbermaid, Inc.*, 214 F. Supp. 2d. at 1359 (pursuant to a commission agreement for 10% of sales revenue, plaintiff agent invested large sums of money in selling principal's product and were unable to profit from the agreement or even recoup costs incurred in good faith because principal stopped selling the products of value in plaintiff's territory; principal liable under the covenant of good faith and fair dealing for unilaterally discontinuing sales before plaintiff had a "sufficient opportunity to recoup costs").

The length of the DAC Notes is, at a minimum, a starting point for considering whether plaintiffs were given a reasonable opportunity to recover their expenditures and otherwise reap the benefit of their bargain. *See id.*; *Diamond Alkali*, 35 F.2d at 118-119 (defendant's five-year note obligation to plaintiff "seem[ed] to indicate that it was anticipated, intended, or implied that the operating contract between [the parties] was to continue for at least five years"). However,

23

AFLIAC's implied performance duties are not necessarily coextensive with the term of the DAC

Note, or with the 20-year term of the Trail Agreement for that matter; discovery may reveal that,

had AFLIAC remained in the business and serviced annuitants, plaintiffs' could have offset their

debt to the company, and earned a reasonable amount, well ahead of the DAC Note repayment

deadline.  Exactly how close (or far) AFLIAC actually came to honoring the parties' performance

expectations cannot be ascertained until the factual record is fully developed.[28]

    The Court also notes that these issues have been raised in the context of a motion to

dismiss, not after development of a factual record.  The Court is therefore required to make all

reasonable inferences in plaintiffs' favor, and to dismiss the action only if there is no set of facts

under which plaintiffs could recover.  Under the circumstances of this case – where the plaintiffs

allege that defendants undertook voluntary action to undermine their contracts and saddle them

with enormous debt obligations – the Court is unwilling to hold that there is no possibility of

relief.

    The allegations of the complaint are therefore adequate to show that AFLIAC interfered

with plaintiffs' right to reap the benefits of the Trail Agreement, in contravention of the plaintiffs'

---

[28] It may prove difficult to compute damages resulting from plaintiffs' inability to sell AFLIAC products for the time period that the company's performance obligations were in force.  However, even if expectancy damages are too uncertain to measure, plaintiffs' reliance damages should be easily ascertainable and recoverable. *See Brennan v. Carvel Corp.*, 929 F.2d 801, 811 (1st Cir. 1991) ("Contract damages may be measured by the injured party's reliance interest, which may include expenditures made in preparation for performance or in performance . . . . Damages based on the injured party's reliance interest are often granted when the party's damages based on lost expectations are uncertain or cannot be measured"); *DiGennaro*, 214 F. Supp. 2d. at 1362-1364 (declining to award plaintiffs damages for the reasonable value of their services, because the value was too speculative, but granting them monetary relief for the reasonable value of their expenses).  Thus, at a minimum, plaintiffs would be able to recover (or cancel) the amount of the outstanding debt they incurred in performance of their obligations on the Trail Agreement.  *See also Gram v. Liberty Mutual Insurance Co.*, 391 Mass. 333, (1984) (damages should be awarded to insurance agent for renewal commissions so as to "deny [the insurance company] any readily definable, financial windfall resulting from the denial to [the agent] of compensation for past services . . . Attrition in the block of business produced by [the agent] should be determined for each future year of his future employment . . .").

reasonable expectations regarding performance. Accordingly, plaintiffs have stated a claim that AFLIAC breached the implied covenant of good faith and fair dealing in the Trail Agreement, and defendants' motion to dismiss the breach of contract claim against AFLIAC will be denied.

## III.    The Chapter 93A Claim

Plaintiffs further allege that all three defendants engaged in unfair and deceptive trade practices in violation of Mass. Gen. Laws. ch. 93A §§ 2, 11. Plaintiffs proffer two grounds for Chapter 93A liability: (1) AFLIAC's breach of the implied covenant of good faith and fair dealing in the Trail Agreement, and (2) defendants' failure to disclose to plaintiffs, at the time they launched the Trail Program, certain material facts regarding the structural weakness of AFLIAC's life and annuity business.

Defendants argue that the Chapter 93A claim should be dismissed as to all defendants because (1) it arises out of an employment dispute, and as such, is not cognizable under section 11 of chapter 93A; and (2) defendants' alleged conduct does not rise to the necessary level of unfairness or deception required for a claim under Chapter 93A. Furthermore, defendants assert that the claim should be dismissed as to AFLI and AFC for the additional reason that those companies played no active role in the complained-of conduct. The Court will address each argument in turn.

### A.    Whether Plaintiffs' Claims Arise out of an Employment Dispute

Mass. Gen. Laws ch. 93A, § 2(a) generally prohibits any "[un]fair or deceptive acts or practices in the conduct of any trade or commerce." Section 11 allows recovery of damages for "any person who engages in the conduct of any trade or commerce and who suffers any loss . . . as the result of the use or employment by another person who engages in any trade or commerce

25

of an unfair method of competition or an unfair or deceptive act . . . ."  Mass Gen. Laws. ch. 93A,

§ 11.

In *Manning v. Zuckerman*, the Supreme Judicial Court held that the unfair or deceptive

practices prohibited by section 11 are "those that may arise in dealings between discrete,

independent business entities, and not those that may occur within a single company."  388 Mass.

8, 12 (1983).  Thus, Chapter 93A does not cover employment contract disputes between

employers and the employees who work in the employer's organization, or disputes between

members of that organization arising out of the employment relationship.  *Id.*[29]

Although the Supreme Judicial Court has not addressed the issue, other courts have held

that independent contractors, as opposed to employees, may bring Chapter 93A actions against

organizations with which they are affiliated.   *See Bolen v. Paragon Plastics, Inc.*, 754 F. Supp.

221, 228 (D. Mass. 1990) (denying summary judgment on Chapter 93A claim because there was

conflicting evidence on the issue of whether plaintiff was an employee or an independent

contractor); *Trent Partners and Associates, Inc. v. Digital Equipment Corp.*, 120 F. Supp. 2d 84,

107 & n.26 (D. Mass. 1999) (denying summary judgment on a Chapter 93A claim and stating that

"where, as here, the plaintiff is an independent contractor, Chapter 93A claims are available");

*Marx*, 13 Mass. L. Rep. at *16, *22 (denying motion to dismiss Chapter 93A claim of

independent contractors terminable at-will); *but see Benoit v. Landry, Lyons & White, Co., Inc.*,

31 Mass. App. Ct. 948, 949 (1991) (licensed real estate salesman could not sue licensed real

---

[29] The *Manning* court noted that, among other things, the statutory definition of "trade or commerce" included the act of "offering for sale . . . any services."  *Id.* at 13.  Nonetheless, it held that employment contracts fell outside the ambit of the definition because "the services contemplated are those offered generally by a person for sale to the public in a business transaction, not those services sold by an employee to an employer within the same organization."  *Id.*

estate broker under Chapter 93A, based on Mass. Gen. Laws ch. 112, § 87RR).[30]

Here, the complaint alleges that plaintiffs were "career agents" of AFLIAC, which provided them "office space and certain staff."  Complaint, ¶¶ 14, 30, 37, 43.  No other material information on that subject is provided.  In their motion to dismiss, defendants apparently contend that plaintiffs were employees; in the opposition to that motion, plaintiffs contend that they were independent contractors.  Whether plaintiffs were truly independent entities, however, cannot be ascertained from the allegations of the complaint.

The Court thus cannot find as a matter of law that plaintiffs could prove no set of facts establishing that the parties were "independent business entities" within the meaning of Chapter 93A.  Accordingly, the claim will not be dismissed on that basis.

### B.    Whether AFLIAC's Conduct Was "Unfair" or "Deceptive"

Chapter 93A provides no definition of an "unfair or deceptive act or practice."  *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503 (1979).  As a general principle, conduct that comes "within any recognized common law or statutory concept of unfairness" is actionable under section 11.  *Vmark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1993).

"[A] simple breach of contract is never enough, by itself, to constitute a violation of Chapter 93A."  *Trent Partners*, 120 F. Supp. 2d 84, 106 (D. Mass. 1999); *Pepsi-Cola Metro.*

---

[30] In *Benoit*, the Appeals Court held that, although a written agreement between plaintiff, a licensed real estate salesman, and defendant, a licensed real estate broker, provided that plaintiff was an independent contractor, plaintiff was nonetheless barred from suing defendant under Chapter 93A.  31 Mass. App. Ct. at 949.  The court based this decision on Mass. Gen. Laws ch. 112, § 87RR, which provides, among other things, that real estate salesmen cannot operate independently of licensed brokers.  The court explained that "the rationale of *Manning* [*v. Zuckerman*] require[d] the conclusion that a real estate salesman licensed under § 87RR is not engaged in the conduct of any trade or commerce" within the meaning of section 11 because they are not "discrete, independent" business entities.  *See id.* at 948-949.  The court did not address the question of whether other independent contractors, not covered by similar licensing statutes, would be sufficiently discrete and independent under *Manning*.

*Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985). However, courts have held that claims of violation of the implied covenant of good faith and fair dealing are not simple breach of contract claims for purposes of Chapter 93A. *See Trent Partners*, 120 F. Supp. 2d at 106-107; *Tufankjian v. Rockland Trust Co.*, 57 Mass. App. Ct. 173, 178-179 (2003); *Anthony's Pier Four*, 411 Mass. at 476. Inherent in such claims is "an element of either bad faith and improper motive or a breach of fair dealing . . ." that clearly falls within "'established common law . . . concept[s] of unfairness.'" *Trent Partners*, 120 F. Supp. 2d at 107 (quoting *Vmark*, 37 Mass. App. Ct. at 620); *see Tufankjian*, 57 Mass. App. Ct. at 179 ("The same evidence that supported the jury's findings of a breach of the covenant of good faith and fair dealing . . . also supported the [judge's] finding that [the Bank's] conduct amounted to an unfair or deceptive act . . . .") (internal citations omitted); *Anthony's Pier Four*, 411 Mass. at 476 ("The judge's extensive findings as to Anthony's violation of the implied covenant of good faith and fair dealing . . . established as a matter of both fact and law that Anthony's actions were unfair or deceptive"). Accordingly, because plaintiffs' allegations support a claim for breach of the implied covenant of good faith and fair dealing, they have also sufficiently alleged "unfair" or "deceptive" conduct on the part of AFLIAC.

In addition, the complaint alleges that defendants failed to disclose to plaintiffs, "at the time of entering into the Trail Program," that in the event of a substantial downturn in the stock market, AFLIAC "could not continue to sell variable annuity products and remain a viable company"; "did not have adequate resources or strategies to meet its GMDB obligations"; and "did not have adequate resources or strategies to absorb the recognition of DAC, without placing AFLIAC in peril." Complaint, ¶ 62. Defendants argue that plaintiffs do not allege that they had a

duty to disclose the potential effect of a downturn in the stock market, and that in any event the

potentially negative effects of such a downturn were obvious.[31]

Allegations sounding in fraud and misrepresentation can form the basis for a claim of

unfair and deceptive trade practices. *See Vmark*, 37 Mass. App. Ct. at 620 ("a misrepresentation

in the common law sense would . . . be the basis for a c. 93A claim"); *Levings*, 8 Mass. App. Ct.

at 504 (same); *Winter Panel Corp. v. Reichhold Chemicals*, 823 F. Supp. 963, 974 (D. Mass.

1993) ("Knowing non-disclosure of information necessary to make affirmative statements

complete or non-misleading will give rise to . . . an action under chapter 93A"). However, it is

not necessary to state a common-law claim in order to maintain a cause of action under Chapter

93A based on conduct sounding in fraud, deceit, or misrepresentation. *See V.S.H. Realty, Inc. v.*

*Texaco, Inc.*, 757 F.2d 411, 417 (1st Cir. 1985) ("We are not convinced that [a party] needs to

allege more than a failure to disclose a material fact to state a cause of action under chapter 93A .

. . 'the definition of an actionable unfair or deceptive act or practice goes far beyond the scope of

the common law action for fraud and deceit'; a section 11 "'claim for relief is not subject to the

traditional limitations of preexisting causes of action such as tort for fraud and deceit'") (quoting

*Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703-704 (1975)).

Read in the light most favorable to the plaintiffs, the complaint does not simply allege that

defendants failed to advise them of potential future risks, or of risks that were obviously inherent

---

[31] Defendants also argue that "if the gravamen of plaintiffs' Chapter 93A claim is . . . an alleged 'failure to disclose' information relating to sales of variable annuities, i.e., securities . . . then they have pleaded themselves into preemption by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), requiring dismissal of the claim." Reply Memorandum at 21. However, plaintiffs' non-disclosure theory of Chapter 93A liability stems from defendants' failure to be forthright about AFLIAC's finances, and its ability to remain in the life and annuity business, *in connection with the execution of the Trail Agreement*. It is not a state-law claim of "misrepresentation or omission of material fact *in connection with the purchase or sale of a covered security*," which would be preempted under the SLUSA. *See* 15 U.S.C. § 78bb(f)(1) (emphasis added).

in the situation.  Rather, the complaint alleges, in substance, that at the time the parties entered

into the Trail Agreement, defendants knew that AFLIAC's annuity business could not survive a

substantial downturn in the stock market and failed to disclose that fact.  Read broadly, the

complaint thus alleges that the risk to plaintiffs was far greater than what they could reasonably

anticipate under the circumstances, and that defendants knew of the magnitude of that risk and

elected not to reveal it.

    The ultimate viability of plaintiffs' non-disclosure theory is far from obvious at this stage

of the proceedings.  Indeed, it may well prove to be the case that defendants made appropriate

disclosures to the plaintiffs, or that they had no duty to disclose, or that the risks were obvious

and voluntarily assumed.  The Court, however, cannot make those determinations solely upon the

pleadings, without any factual record.  Furthermore, causes of action under Chapter 93A are

notoriously amorphous, and not necessarily tied to common law rights of action.  Plaintiffs have

sufficiently "raised the specter of unethical conduct" to defeat a motion to dismiss based on

defendants' alleged withholding of material information.  *See Bradley v. Dean Witter Realty*, *Inc.*,

967 F. Supp. 19, 29 (D. Mass. 1997) (summary judgment).

### C.    Whether AFLI and AFC Can Be Held Liable under Chapter 93A

    Finally, defendants argue that the complaint fails to state a claim against defendants AFLI

and AFC.  As noted, during most of the relevant period, AFLI was the immediate parent

corporation of AFLIAC, and eventually became its subsidiary; AFC is the publicly-traded parent

of both.

    While the plaintiffs had a contractual relationship only with AFLIAC, that fact alone is not

sufficient to warrant dismissal of the complaint.  It is well-settled that "privity is not required to

30

maintain a[n] . . . action under [Chapter] 93A," except in actions based on breach of warranty. *Standard Register Co. v. Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995). Thus, a Chapter 93A action can be brought against a party with which the plaintiff had only an indirect legal or business relationship. *See Nei v. Boston Survey Consultants, Inc.*, 388 Mass. 320, 324 (1983).

Nonetheless, liability under Chapter 93A does not attach to a party simply because it had a relationship to the defendant that engaged in the complained-of conduct; each defendant must have taken an "active role" in that conduct. *See id.*; *Standard Register*, 38 Mass. App. Ct. at 551 (although defendants did not sign an agreement with plaintiffs, they took an active role in the dealings with plaintiff by fraudulently negotiating and inducing the contract and orchestrating misrepresentations); *Reisman v. KPMG Peat Marwick LLP*, 781 N.E.2d 821, 838-839 (2003) (active role where, among other things, defendant was in direct contact with plaintiff during transaction in question, was responsible for structuring the transaction and reviewed documents related to it, and served as plaintiff's auditor of record).

In particular, a corporation's parents, subsidiaries, and other affiliates are not liable for the actions of the corporation under Chapter 93A unless they played an active role in the alleged wrongful conduct. *See Omni-Wave Electronics Corp. v. Marshall Industries*, 127 F.R.D. 644, 650 (D. Mass. 1989). Furthermore, claims against such corporate affiliates may not be based on conclusory allegations, but must include specific allegations of alleged misconduct. *See id.* ("the plaintiff must delineate the factual basis for holding [related companies] independently liable under Chapter 93A").

Here, while the great bulk of the factual allegations in the complaint are directed to

31

AFLIAC, plaintiffs also make a number of allegations against all defendants.  They assert that the Trail Program was initiated so that all defendants could avoid impairment of profitability, prevent reduction of statutory surplus, and maintain high ratings from the rating agencies, and that all defendants curtailed the sale of new annuities and servicing of the existing book of business to maintain financial viability of the enterprise as a whole.  *See, e.g.,* Complaint, ¶¶ 10, 11, 15, 18, 21, 22, 27.  Further, plaintiffs contend that all defendants knew of the instability in AFLIAC's annuity business at the time the company executed the Trail Agreements.  *Id.* ¶ 5.  And plaintiffs contend that all defendants participated in the withdrawal from the annuity business, which was undertaken for the benefit of the enterprise as a whole.  *See, e.g.,* Complaint, ¶¶ 19-27.[32]

At this stage of the proceedings, plaintiffs' allegations are adequate to support their claim that one or both of AFLIAC's corporate affiliates played an active role in the complained-of conduct.  *See Bump v. Robbins*, 24 Mass. App. Ct. 296, 314 (1987) (upholding finding that one company exercised control over the other and "the two companies operated so closely at the time of the conduct giving rise to the liability, that, in the circumstances, [one company] was liable on agency principles for the conduct of [the other] in violation of 93A"); *Eldridge v. Provident Companies*, Inc., 2001 Mass. Super. LEXIS 5, at *18-*19 (January 4, 2001) (denying summary judgment motion on Chapter 93A claim as to all defendants; plaintiff had introduced evidence that his commissions had been reduced in knowing violation of his commission agreement with the subsidiary in order to remedy the subsidiary's worsening financial situation, and that individuals

---

[32]  The Court notes that the complaint is not precise as to which allegations apply to all defendants.  For instance, plaintiffs allege both that  " . . . [AFLIAC] unilaterally instituted the Trail Program . . ." (Complaint, ¶ 3) and that " . . . Defendants instituted the Trail Program . . ." (Complaint, ¶ 5).

who made policy decisions were officers of the holding companies and the subsidiary).

Discovery may vindicate defendants' assertion that one company or the other (or perhaps both) played no active role in these decisions – for example, either because a given entity was not the parent company of AFLIAC at the relevant times or because AFLIAC's business decisions were made without substantial input from its corporate affiliates. However, at present, the Court cannot rule as a matter of law that the complaint fails to state a claim as to AFC and AFLI upon which relief can be granted.

Accordingly, plaintiffs will be permitted to proceed with their Chapter 93A claim against AFC and AFLI.

<u>**Order**</u>

For the reasons stated in the foregoing memorandum, defendants' motion to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED.

**So Ordered.**

<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated: April 21, 2005                             United States District Judge