IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

---

| | |
|---|---|
| DONALD P. SPEAKMAN, STEPHEN H. WEDEL and MARK L. ROBARE, Individually and On Behalf of All Others Similarly Situated, § § § § §<br><br>Plaintiffs, §<br>§<br>v. §<br>§<br>ALLMERICA FINANCIAL LIFE INS. & ANNUITY CO., FIRST ALLMERICA FINANCIAL LIFE INS. CO. and ALLMERICA FINANCIAL CORP. § § § § §<br>§<br>Defendants. § | Civil Action No.  4:04-cv-40077-FDS |

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Stephen L. Hubbard
Robert W. Biederman
BBO No. 562279
**HUBBARD & BIEDERMAN, LLP**
1717 Main Street, Suite 4700
Dallas, Texas 75201
Telephone: (214) 857-6000
Facsimile: (214) 857-6001

Nancy Freeman Gans
BBO No. 184540
**MOULTON & GANS, P.C.**
33 Broad Street, Suite 1100
Boston, Massachusetts 02109-4216
Telephone: (617) 369-7979
Facsimile: (617) 369-7980

ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Class Definition And Size . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Facts that are Common to the Class and the Type of Evidence to Establish the Claims . . . . . . . 2

      A.      Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            1.      Type of Evidence to Establish that the Terms of the Trail Program Are Identical . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            2.      Type of Common Evidence to Establish Defendants' Breach . . . . . . . . . 4

            3.      Form of Common Evidence of Damage . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.      Ch. 93A Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.      Type of Common Evidence of Deceptive Act or Practice. . . . . . . . . . . . . 7

                  a.      Breach of the Implied Covenant of Good Faith. . . . . . . . . . . . . . 7

                  b.      Common Evidence of Material Omissions that Induced Plaintiffs and the Class to Enter the Trail Program. . . . . . . . . . . 7

      Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.      Plaintiffs Satisfy the Elements Under Fed. R.Civ. P.23(a). . . . . . . . . . . . . . . . . . . 8

      A.      The Class Is So Numerous that Joinder Is Not Practicable. . . . . . . . . . . 8

      B.      The Claims of Plaintiffs Are Typical. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.      There are Common Questions of Law Or Fact . . . . . . . . . . . . . . . . . . . . 9

      D.      Plaintiffs and Plaintiffs' Counsel Satisfy the Adequacy of Representation Element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.      Plaintiffs Satisfy the Requirement of Fed.R.Civ.P.23(b)(3). . . . . . . . . . . . . . . . . 10

      A.      Questions of Law and Fact Predominate Over Any Individual

Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    1.    The Predominance Standard In the First Circuit . . . . . . . . . . . . 10

    2.    The Underlying Liability Issues . . . . . . . . . . . . . . . . . . . . . . . . 11

    3.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    4.    Defendants' Alleged Affirmative Defenses . . . . . . . . . . . . . . . . 14

    5.    Defendants' Alleged Counterclaims . . . . . . . . . . . . . . . . . . . . . 16

B.    A Class Action is the Superior Means to Resolve the Dispute. . . . . . . . . 17

    1.    The Interest of Members in Individually Controlling the
Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    2.    Pendency of the Other Actions. . . . . . . . . . . . . . . . . . . . . . . . . . 18

    3.    Desirability of Concentrating This Litigation in This Forum. . . . 18

    4.    Manageability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003)
    *aff'd.* ___ U.S.___, 125 S.Ct. 2611(June 23, 2005) . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 17

*Amchem Products. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231 (1997) . . . . . . . . . . . . . . . . . 9, 17

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . 10

*Bussie v. Allmerica Financial Corp.*, 50 F.Supp.2d 59, 70 (D. Mass. 1999) . . . . . . . . 8, 9, 12, 18

*Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54 (D. Mass. 1997) . . . . . . . . . . . 9

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999), *cert. denied*,
    528 U.S.1159 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ortega v. Star-Kist Foods, Inc.*, 370 F.3d 124 (1st Cir. 2004), *rev'd.*
    _____ U.S. ____, 125 S.Ct. 2611(June 23, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21 (D. Mass. 2003) . . . . . . . . . . . . . . . . . 17

*In Re Relafen Antitrust Litigation*, 218 F.R.D. 337 (D. Mass. 2003) . . . . . . . . . . 8, 10, 11, 18, 19

*Rodrigues v. Members Mortgage Co., Inc.*, 226 F.R.D. 147 (D. Mass. 2005) . . . . . . . . . . . . . . 8

*Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181 (N. D. Ill. 1992) . . . . . . . . . . . . . . . . 9

*Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32 (1st Cir. 2003) . 11, 12, 13, 14, 19

*Speakman v. Allmerica Financial Life Ins. & Annuity Co.*, 367 F. Supp.2d 122
    (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Tardiff v. Knox County,* 365 F.3d 1 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 13

*In Re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2nd Cir. 2001),
    *cert. denied*, 536 U.S. 917 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) . 11, 15, 16, 17

*Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505 (1973) . . . . . . . . . . . . . . . . . . . . 12

## STATE CASES

*Aerostatic Engineering Corp. v. Szczawinski,* 1 Mass. App. Ct. 141,
    294 N.E.2d 521 (Mass. App. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Aspinall v. Philip Morris Co., Inc.,* 442 Mass. 381, (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Center Garment v. United Refrigerator Co.,* 369 Mass. 633 (1976) . . . . . . . . . . . . . . . . . . . . . 16

*Economy Grocery Stores Corp. v. McMenamy*, 290 Mass. 549 (Mass. 1935) . . . . . . . . . . . . . 16

*Gram v. Liberty Mutual Ins. Co.*, 391 Mass. 333 (Mass. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

28 U.S.C. §1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. §1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## FEDERAL RULES

Fed. R. Civ. P. 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 17, 18

Fed. R. Civ. P. 26(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATE STATUTES

M.G.L. Ch. 93A, §2 or11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9, 10, 12, 14

## Introduction

Plaintiffs seek to certify a class of approximately 140 individuals who entered into the

20-year Trail Commission Program ("Trail Program") with Defendants that began on January 1,

2001. All class members seek to prosecute two claims against Defendants: breach of the Trail

Program and violation of M.G.L. Ch. 93A, § 11. These types of claims are prototypical ones for

certification, because common questions predominate over individual issues and the prosecution

of the claims as a class would foster judicial economy.

As to the contract action, the terms of the Trail Program are the same as to each member

of the proposed class and the breach emanates exclusively from the conduct of Defendants in

abruptly discontinuing its 150-year life and annuity business within the first 3 years of the Trail

Program. Because the focus of the action will be on Defendants' conduct that was directed

towards the entire Class, common questions predominate.

Similarly, the Ch. 93A claim is based on this same breach and alternatively, material non-

disclosures at the time of entering into the Trail Program on January 1, 2001. As to the

misrepresentation claim under Ch. 93A, because reliance on the Class' part and scienter on

Defendants' part are not elements of that claim, common questions also will predominate.

While Defendants have alleged a myriad of affirmative defenses and counterclaims, the

jurisprudence is well-established that so long as the underlying liability issues on Plaintiffs'

claims predominate, the presence of such defenses and counterclaims does not defeat

certification. Moreover, an analysis of those affirmative defenses and counterclaims

discloses that they are common to the Class and re-enforce the desirability of class certification.


**Class Definition And Size**

Plaintiffs seek to certify a class (the "Class"):

1

> comprising all persons who entered into the Trail Program and
> concurrently executed a Promissory Note payable to Defendant,
> Allmerica Financial Life Ins. & Annuity Co. ("Allmerica Life").
> Excluded from the Class are any general agents, or managing
> directors of Allmerica Life or First Allmerica Life Ins. Co. ("First
> Allmerica") who participated in the Trail Program.

Plaintiffs believe at least 140 individuals are members of the Class who live throughout the

United States in more than 25 states.

**Facts that are Common to the Class and the Type of Evidence
to Establish the Claims**

A.      **Breach of Contract**

1.      **Type of Evidence to Establish that the Terms of the Trail
        Program Are Identical**

Plaintiffs base their claim on the Trail Program, whose terms are identical as to each

class member except that the amount of their Deferred Acquisition Cost ("DAC") obligation

varies.[1] The terms of the Trail Program are embodied in the Agent In-Force Annuity Trail

Commission Agreement[2], the 10-year Promissory Note reflecting the DAC obligation[3], and

certain memoranda that were sent to all participants in the Trail Program that clarified certain

---

[1] The difference in the DAC amounts is purely a result of a calculation: it is the lesser of
the (x)  premiums or deposits paid into the annuities that are part of the trail Program ("Eligible
Annuities") or (y) the account values of the Eligible Annuities as of December 31, 2000,
multiplied by a  percentage ranging from 4%-4.5%. *See* Agent In-Force Annuity Trail
Commission Agreement ("Trail Agreement"), at 2-5, ¶ III, which is attached as Exhibit "A."
The difference in the percentage applied to those amounts is a function of the participant's
"years of service," with Defendants. *Id* at 5, ¶(b)(vii).

[2] The Trail Agreement has no integration clause.

[3] An exemplar of the form of Promissory Note is attached as Exhibit "B" ("DAC Note"),
which is the DAC Note for Plaintiff Speakman.

2

terms of the agreement.[4]

The undisputed terms include that in return for the receipt of certain trail commissions the Class assumed the DAC obligation related to the Eligible Annuities.  In connection with the amount of the trail commissions, the variable rate trail ranged from .55 to 1.0% annually of the account values on the Eligible Annuities. The difference in rate depends principally on the "persistency" (i.e., rate of surrenders or withdrawals) of the Eligible Annuities and to a lesser degree on the "productivity" (i.e. ongoing sales of new Allmerica life and annuity products).[5] While not mentioned in the Trail Agreement itself, a further significant part of the Trail Program was that Defendants agreed to pay at least an additional 7% of the gross trail commissions in the form of a pension plan contribution so that the maximum rate that a participant could receive was at least 1.07% annually.[6]  Accordingly, if the Trail Program had operated as designed, a

_____

[4] *See, e.g.*, Memorandum dated December 14, 2000 from James E. Bellner to Trail Program Qualifier ("12/14/00 Memo"), attached as Exhibit "C," which stated at 1, "The purpose of this memorandum is to provide you with additional information related to the Advisor In Force Trail Program."

[5] Productivity only played a role to the extent the producer was at average or above average persistency so as to increase the rate from .65 to .75 (average persistency) and from .75 to 1.0 (above average persistency). *See Trail Agreement* at 5. The three tiers of persistency were below average (net withdrawals and surrenders were more than 15% of the Eligible Annuity account values); average (net withdrawals and surrenders were between 10-15%); and above average (net withdrawals and surrenders were 10% or below). *Id*.

[6] *See, e.g.*, Sample Projections for the Trail Program reflecting annual retirement plan contribution of 7% of gross trail commissions that are attached to the 12/14/00 Memo, which is Exhibit C.  With the termination of the sales force at the end of 2002, Allmerica Life represented that it had permanently increased the trail rates by .07 or less to compensate for the prospective loss of the future contributions into the retirement plan .  *See* October 17, 2002  Memorandum from Jim Bellner ("10/17/02 Mem), attached as Exhibit "D" ("Effective with the 12/31/02 file-payable March 2003, all Trail Rates have been increased. This increase is meant to compensate for the loss of the Company's pension contribution into the Retirement Plan. Therefore, we will be increasing all Trail Rates by approximately 7%. Please note that this is a permanent change to the plan."). While not pertinent at this stage, this purported replacement for the lost retirement

participant could receive approximately 22% of account values of Eligible Annuity Contracts over a 20-year period, in return for payment of the DAC obligation that was between 4-4.5% of account values as reflected in the DAC Note.[7]

The seminal provision that pertains to this dispute involves an implied covenant or duty of good faith that Defendants remain in the life & annuity business at least during the duration of the 10-year DAC Note obligation , and the 20-year Trail Commission Program, lest the benefits to be derived  under the Trail Commission Program would be eviscerated.

### 2.    Type of Common Evidence to Establish Defendants' Breach

Plaintiffs claim of breach is predicated upon the Defendants' abandonment of the life and annuity business during late 2002 and 2003. Defendants admit that this occurred. *See First Amended Class Action Complaint ("Com."*), ¶¶ 25-26 & *Defendants' Answer to First Amended Class Action Complaint and Counterclaim ("Ans.")*, ¶¶ 25-26.[8] Defendants further acknowledge that their ratings assigned by the rating agencies are a major factor in the highly competitive

---

contribution both was under-inclusive for Trail Program participants, and short-lived. It failed to include participants such as Plaintiff Robare who declined to sign the new 2003 Broker's Agreements, and the across-the-board increase had ended for many rate levels by the end of 2004.

[7] Though immaterial for certification, Defendants have pled that one person paid the DAC amount, and did not finance through a DAC Note. *See Counterclaim*, ¶ 9.

[8] Defendants acknowledge that they terminated the sales force agreements by the end of 2002. *See Com.*, ¶25; *Ans.*, ¶25 ("Defendants admit that Allmerica eliminated the Select and Partners distribution channels and terminated career agent agreements by the end of 2002 . . . ."). Additionally, Defendants admit it proffered new and different agreements to the former career agents at the end of 2002, but then terminated those agreements by the end of 2003. *Id & Com.*, ¶ 26 & *Answer*, ¶ 26 ("Defendants admit that in or about October 2003 Allmerica terminated its agent and broker sales force, and that the (former) agents were required to leave Allmerica's offices.")

4

annuity market. *See  Com.*, ¶ ¶ 1, 23; *Ans.*¶¶ 1, 23.[9] It is further undisputed that the rating

agencies substantially reduced the ratings of the financial strength of Allmerica Life and First

Allmerica due to Defendants' announcements. *See* Excerpt from the Form10-K for Allmerica

Financial for year-ending December 31, 2003, at 57-59 attached as Exhibit "F." As compared

with other rated life insurance companies, Allmerica Life presently has a "Comdex" rating, (a

composite of all the ratings) in the **54th percentile** of all life insurers.  *See* Life Insurer Analysis

for year-end 2004 attached as Exhibit "G" & Vital Signs Comdex Ratings attached as Exhibit

"H."

### 3.     Form of Common Evidence of Damage

As a result of its precipitous drop in rating that led to its withdrawal from the life and

annuity business, there was a drastic increase in the surrender of Defendants' annuities including

those in the Trail Program. *See Com*. ¶ 4; *Ans.* ¶ 4[10] and *see also* Exhibit E.  These surrenders

---

[9] *Ans.*, ¶ 1("Defendants admit . . . that the market for variable annuities was competitive
in the 1990s and early 2000s, that maintenance of high ratings from agencies such as Standard &
Poor's and Moody's is among numerous factors that bear on an insurer's ability to maintain
market share in the variable life insurance and annuity markets"), ¶ 23 ("Defendants admit that
the financial stability of a life insurance company may be reflected in, among other things,
ratings assigned by rating agencies such as Standard & Poor's, Moody's and A.M. Best.").
Parenthetically, Defendants' assertions as to the effect of ratings is an understatement as
reflected in Defendant Allmerica Financial Corp.'s statement in its Form 10-K for year ending
December 31, 2003, at Exhibit 99.2 (IMPORTANT FACTORS REGARDING FORWARD-
LOOKING STATEMENTS) at 9, "During 2002, our ratings were lowered by A.M. Best,
Moody's and Standard & Poor's. As a result of the ratings downgrades in 2002 of the life
insurance companies, we determined not to continue new sales of proprietary products in the
Life Companies and we experienced increased surrender rates in the life insurance and annuity
business." (Emphasis supplied).This excerpt from the 2003 10-K is attached as Exhibit "E."

[10]  *Ans.* ¶ 4 ("Defendants admit that AFLIAC withdrew from the sale of life and annuity
products in the fall of 2002, that there were reductions in personnel, and that some contract
holders surrendered their annuities.").

negatively impacted the Class.  The common evidence of the adverse impact on the Class has manifested itself in the same manner mathematically, although the amounts differ. Under the terms of the Trail Program, as surrenders and withdrawals occurred the account values of the Eligible Annuities, by which the commission rate is multiplied, decreased, and as the persistency rate grew worse as a result of those surrenders and withdrawals, the commission rate fell. An example of this arithmetic downward spiral is Plaintiff Robare's experience. As Defendants acknowledge, during 2001 and 2002 Robare's persistency level "was below 10%" (the highest level); "he was at the highest productivity level"; and "the account values for the Eligible Annuities" were at $32.6 million. *Ans*. ¶ 35. Conversely, since the breach by Defendants, his account values have plummeted to "3.9 million as of December 31, 2004" and his commission percentage had been reduced. *Id*. The reduction in the commission rate was from the then highest rate of 1.0% in 2001, exclusive of the pension contribution payment, to the lowest rate of .55%. *See Com.*, ¶ 35. The effect of this decrease is so severe that "Robare's quarterly trail commissions are not sufficient to cover the quarterly payments due on his Promissory Note." *Id*.

 Based upon this type of historical data that is common to the Class, Plaintiffs seek alternative forms of damages that the Court explicated in *Speakman v. Allmerica Financial Life Ins. & Annuity Co.*, 367 F. Supp.2d 122 , 138 (D. Mass. 2005). Plaintiffs are seeking expectation damages in the form of lost profits in order to place them in the same position if Defendants had not breached.[11] Alternatively, Plaintiffs (and the Class) seek reliance damages in the form of the

---

[11] As to the expectation damages, Plaintiffs submit that these amounts can be arrived at through a series of calculations that use the same methodology, that is set forth in Plaintiffs' Fed. R. Civ. P. 26(a)(1) Disclosures which are attached as Exhibit "I."  While this methodology may be refined or modified following access to information obtained in discovery, the basic concept should remain the same; namely, to determine the difference between the amount of

6

cancellation of the remaining DAC Note obligations. *Mem. Op*. at 24. As to the reliance

damages, Plaintiffs further seek a refund of any amounts that have been paid as a result of either

(a) out of pocket payments in excess of the trail commissions applied to the quarterly note

payment; or (b) offsets taken by Defendants from commissions from sales outside the Trail

Program.

   **B.**  **Ch. 93A Claim.**

    **1.**  **Type of Common Evidence of Deceptive Act or Practice.**

      **a.**  **Breach of the Implied Covenant of Good Faith.**

  The common evidence that is discussed above in connection with the breach of the Trail

Program also will be proffered to establish Defendants' deceptive act or practice.

      **b.**  **Common Evidence of Material Omissions that Induced Plaintiffs and the Class to Enter the Trail Program.**

  A further deceptive act or practice is based upon material omissions of information that

Defendants failed to disclose prior to Plaintiffs and the Class entering into the Trail Program.

The evidence for this alternative Ch. 93A claim will be based solely upon Defendants' conduct.

Specifically, Plaintiffs maintain that Defendants created a financial house of cards by

concentrating the business in the sale of variable annuity products, which had certain features

such as a guaranteed minimum death benefit ("GMDB") as well as certain amortizable deferred

acquisition costs, that made Defendants' financial condition extremely sensitive to the swings in

---

commissions that the Class would have received if Defendants had not breached and what was actually received. As the Court noted in *Speakman*, 367 F. Supp.2d at 138, n. 28, the Massachusetts Supreme Judicial Court in *Gram v. Liberty Mutual Ins. Co.*, 391 Mass. 333, 336-7 (Mass. 1984) generally approved such calculations to recover the loss of renewal insurance commissions in connection with an insurance company that had breached the duty of good faith and fair dealing by terminating the agent.

the equity markets.  *See Com.*, ¶ 4  Plaintiffs maintain that Defendants failed to disclose material facts about the DAC and GMDB risks, of which they were aware, prior to Plaintiffs' and the Class' entering into the Trail Program.  *See Com.*, ¶ 62.  As noted above, the common evidence will show that the ensuing impairment of Defendants' financial condition caused an immediate downgrading by the rating agencies, which had a further deleterious effect on the financial condition of Defendants.

**Argument**

**I.      Plaintiffs Satisfy the Elements Under Fed. R. Civ. P. 23(a).**

To meet the requirements for class certification, Plaintiffs must satisfy the requirements under Fed. R. Civ. P. 23(a); namely, numerosity, typicality, common questions of law or fact, typicality, and adequacy of representation. *See Tardiff v. Knox County,* 365 F.3d 1, 4 (1st Cir. 2004).

**A.      The Class Is So Numerous that Joinder Is Not Practicable.**

Because the Class consists of approximately 140 individuals who reside in more than 25 states, it satisfies the numerosity requirement.  A class of "more than forty individuals generally [has been] found to establish numerosity." *In re Relafen Antitrust Litigation*, 218 F.R.D. 337, 342 (D. Mass. 2003)(class of 60 met numerosity); *see also  Rodrigues v. Members Mortgage Co., Inc.*, 226 F.R.D. 147, 150 (D. Mass. 2005)(class of at least 40 persons satisfied numerosity).

**B.      The Claims of Plaintiffs Are Typical.**

To satisfy the element of typicality merely requires that the Plaintiffs' claims "'arise from the same course of conduct that gave rise to the claims of absent [class members].'" *Bussie v. Allmerica Financial Corp.*, 50 F. Supp.2d 59,70 (D. Mass. 1999) quoting *Duhaime v. John*

8

*Hancock Mutual Life Ins. Co*., 177 F.R.D. 54, 63 (D. Mass. 1997).[12]  In the instant case, the contract claims arise out of the identical contract and are based upon Defendants' identical conduct as to each class member involving their total withdrawal from the life and annuity business. Similarly, the Ch. 93A claims involve the same contractual breaches as well as the alternative basis involving common material non-disclosures to the putative class. Such uniform failures to disclose have been held to satisfy the typicality requirement. *Bussie, id* and *Duhaime, id*.

### C.     There Are Common Questions of Law Or Fact

The commonality element has been described as a "' low hurdle' easily surmounted." *Duhaime*, 177 F.R.D. at 63 quoting *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N. D. Ill. 1992).  In the instant case, there are multiple common questions of law and fact including the following: (i) whether Defendants breached the implied duty of good faith and fair dealing by withdrawing from the life and an annuity business; (ii) whether Defendants' breach caused damage to Plaintiffs and the Class; (iii) whether Defendants' breach constituted a deceptive act or practice within the meaning of Ch. 93A §§ 2,11; (iv) whether Defendants omitted to disclose material facts as to the financial condition of Defendants to Plaintiffs and the putative Class at the time of entering into the Trail Program; and (v) whether Defendants' withholding of material information from Plaintiffs and the Class constituted a deceptive act or

---

[12] While both *Bussie* & *Duhaime* involved certifications of classes concurrently with the presentation of settlements, since *Amchem Prods. v.  Windsor*, 521 U.S. 591, 117 S.Ct. 2231 (1997) in a settlement context all the certification requirements of Fed. R. Civ. P. 23 still must be satisfied, except the "manageability" factor in Fed. R. Civ. P. 23(b)(3), and such requirements "demand undiluted, even heightened attention in the settlement context." *Amchem*, 521 U.S. at 620, 117 S.Ct. at 2248.

practice within the meaning of Ch. 93A §§ 2,11.

**D.     Plaintiffs and Plaintiffs' Counsel Satisfy the Adequacy of Representation  Element.**

There are two facets of the adequacy of representation element: "'the moving party must show first that the interests of the representative party will not conflict with the interests of any of the Class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" *Relafen*, 218 F.R.D. at 343 quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).  In light of the fact that Plaintiffs' claims arise out of the same course of conduct that affected the putative Class as a whole, no conflict exists. *Id*.

In connection with the second element, Plaintiffs' Counsel has attached as Exhibit "J" an affidavit, which reflects the work done in investigating the claims; counsel's extensive experience in handling class actions, particularly involving insurance companies and the claims of the type asserted in this action; counsel's knowledge of the applicable law; and the resources that counsel has and will commit to representing the Class. *See Fed. R. Civ. P.* 23(g).  Plaintiffs' counsel have the requisite experience and resources to represent the Class.

**II.     Plaintiffs Satisfy the Requirements of Fed. R. Civ. P. 23(b)(3).**

**A.     Questions of Law and Fact Predominate Over Any Individual Questions**

**1.     The Predominance Standard In the First Circuit**

Fed. R. Civ. P. 23(b)(3) provides, in part, "that the questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of

10

the controversy." The First Circuit has held that predominance is satisfied, "(a)s long as a sufficient constellation of common issues binds class members together." *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). The Court further noted, "Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test." *Id*. Most recently, the First Circuit noted that predominance and the superiority inquiry "turn largely on the particular facts and issues presented." *Tardiff*, 365 F.3d at 4. "The predominance inquiry accordingly involves an individualized, pragmatic evaluation of the relationship between and the relative significance of the common and individual issues." *Relafen*, 218 F.R.D. at 343.

### 2.    The Underlying Liability Issues

An analysis of the facts and issues in this case, in the context of First Circuit jurisprudence, supports a finding of predominance. As to the contract claim, the First Circuit has noted that the common factual basis to establish predominance is readily found where "the terms of the contract . . . are identical for all class members." *Smilow v. Southwestern Bell Mobile Systems, Inc.* 323 F.3d 32, 38 (1st Cir. 2003). That is the situation in this case where all members of the proposed class have operated under the identical terms of the Trail Program. Similarly, common questions of law are found if the issue of breach is common to the class. *Id*. In the instant case, the issue of breach of the implied duty of good faith and fair dealing inheres in the Trail Program, and turns exclusively on the conduct of Defendants. S*ee, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261(11th Cir. 2003), *aff'd.* ___ U.S___, 125 S. Ct. 2611 (June 23, 2005)[13] (class certification affirmed in a nationwide case where "the dealer

---

[13] The Supreme Court opinion is not directly relevant because the sole issue on which certiorari was granted and the Supreme Court ultimately affirmed was whether in enacting 28 U.S.C.§ 1367, Congress overruled *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505

agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a question common to the class and the issue of liability appropriately determined on a class-wide basis."). Accordingly, the factual and legal issues in connection with the breach of contract claim predominate.

In this situation where the underlying contract action concurrently forms a basis for the Ch. 93A claim, the First Circuit has found predominance is satisfied. *See Smilow,* 323 F.3d at 42. Predominance also is present on the alternative basis for the Ch. 93A claim involving non-disclosures of material facts. The related elements necessary to establish a deceptive act or practice based upon omissions or misrepresentations facilitate a finding as to predominance in connection with a Ch. 93A claim. Specifically, establishing the presence of a deceptive act or practice is done on an "objective basis"; "does not require proof that a plaintiff relied on the representation . . . or that a defendant intended to deceive the plaintiff . . . or even knowledge on the part of the defendant that the representation was false"; and is satisfied by showing a "'tendency to deceive.'" *Aspinall v. Philip Morris Co., Inc.*, 442 Mass. 381, 486-7 (2004) (class certified based on false advertising claim involving "light cigarettes."); *see also, Bussie*, 50 F.

Supp.2d at 71 (predominance found in connection with Class of policyholders against Allmerica asserting common law fraud even though reliance was an element).

_____

(1973), which had required each class member, and not just the class representative, to establish the requisite amount in controversy amount under 28 U.S.C. § 1332. Incidentally, in affirming *Allapattah*, the Court concurrently overruled the First Circuit's opinion in *Ortega v. Star-Kist Foods, Inc.*, 370 F.3d 124 (1st Cir. 2004) that had reached an opposite result of the Eleventh Circuit, albeit in a non-class context.

### 3. Damages

Once underlying liability issues are determined to predominate, the First Circuit recently held that predominance is found even if there are individualized issues of damage such as emotional damage, lost wages, medical treatment etc. *Tardiff*, 365 F.3d at 6-7 (strip search class certified even in the face of individualized damages). As the Court observed:

> Yet the need for individualized damage decisions does not
> ordinarily defeat predominance where there are still disputed
> issues as to liability . . .If the class action resolved liability even
> as to some further narrowed class, this would be a legitimate function.

*Id.*; *see also Allapattah*, 333 F.3d at 1261 (adhering to the consensus that "numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

The damages that Plaintiffs (and the Class) seek, however, can be proved by the use of established objective mathematical models. In such instances, there are not even any individualized issues as to establishing the claims. *See Smilow*, 323 F.3d at 40. For example, the reliance damages that are sought merely involve cancellation of DAC Note balances, and the refund of improper offsets, or out of pocket payments. Similarly, the expectation damages will involve expert testimony generally based upon various mathematical models reflecting the loss of commission income as a result of premature surrenders of Eligible Annuities.

### 4. Defendants' Alleged Affirmative Defenses

Defendants have asserted fifteen affirmative defenses. Such affirmative defenses do not defeat predominance. As the First Circuit has held:

13

> Instead , where common issues otherwise predominated,
> courts have usually certified Rule 23(b)(3) classes even
> though individual issues were present in one or more
> affirmative defenses . . . After all, Rule 23(b)(3) requires
> merely that common issues predominate, not that all
> issues be common to the class . . . If, moreover, evidence
> later shows that an affirmative defense is likely to bar
> claims against at least some class members, then a court
> has adequate procedural mechanisms . . . .

*Smilow*, 323 F.3d at 39-40.

Apart from the above standard, which eschews a finding of a lack of predominance due to the assertion of affirmative defenses, an analysis of the sixteen purported affirmative defenses reveals that they involve strictly legal issues, are not even affirmative defenses, or are applicable to the class as a whole. For example, the first (failure to state a claim), fourth (lack of consideration), sixth (statute of frauds), eleventh (parol evidence), twelfth (economic loss doctrine), and thirteenth (not maintainable as a class action) affirmative defenses on their face are not even affirmative defenses or involve strictly legal issues. There is a further subset that on their face apply to the Class as the whole; namely, the fifth (assumption of risk), fourteenth (no meeting of the minds), fifteenth (failure to state Ch. 93A claim because it arises in an employment relationship); and sixteenth (business judgment rule) affirmative defenses, and would be based on the same facts.

As to the second (estoppel), third (laches), and tenth (waiver) affirmative defenses, at this stage of the case it is unclear how many of these may be asserted against some or all of the class members. What is probable about these defenses, however, is that the same type of proof as to one class member generally will be applicable to the others by virtue of the common underlying facts as to each class member. All members of the Class entered the Trail Program at the same

14

time, have participated during the same period of time, have not been treated differently on an

individual basis, were all terminated as agents at the end of 2002, and for those who signed new

agreements were terminated at the end of 2003. Accordingly, whatever alleged estoppel, waiver,

or laches theory exists seemingly would apply to each class member and would be based on the

same proof. The likelihood of such common proof establishes predominance. *See, e.g.,*

*Mowbray*, 208 F.3d at 297 (predominance established in connection with affirmative defense of

limitations where "a common proffer likely would establish the factual predicate necessary for a

tolling [of the statute of limitations] determination.").

Finally, as to the remaining affirmative defenses of seventh (unclean hands), breach of

contract (eighth) and setoff (ninth), presumably they are based upon the allegations that form the

basis for the counterclaims. The gravamen of the counterclaim is that some of the surrenders of

Eligible Annuities involved situations where plaintiffs and other class members acted as agents

to replace the business with a competitor of Defendants <u>after</u> each member of the class had been

terminated by Defendants, and Defendants had withdrawn from the life and annuity business.

Defendants maintain such actions on the part of Plaintiffs, and other members of the class,

violated a purported implied duty of good faith in the Trail Program and in the terminated sales

agreements with Defendants.

There is a threshold legal question as to the viability of these defenses (and

counterclaims) that likely will be addressed at a summary judgment stage;[14] namely, whether Defendants may terminate without cause each member of the class, breach the Trail Program by withdrawing from the life and annuity business resulting in plummeting ratings, but then concurrently purport to preclude members of the class from acting in the best interest of the annuitants by replacing the business with a higher-rated insurance company. *See*, *e.g. Center Garment v. United Refrigerator Co.,* 369 Mass. 633, 638 (1976) (material breach by Defendant relieved Plaintiff of any further contractual obligations, and entitled Plaintiff to sue for total breach); *Aerostatic Engineering Corp. v. Szczawinski,* 1 Mass. App. Ct. 141, 144, 294 N.E.2d 521, 523 (Mass. App. 1973)(Defendants' substantial breach precluded its claim for breach and setoff); and *Economy Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 552-3 (Mass. 1935) (Court would not enforce a covenant not to compete where the employer-plaintiff had terminated the employee without cause).

### 5.     Defendants' Alleged Counterclaims

Defendants have asserted breach of contract counterclaims against Plaintiffs, and purport to assert them against class members if the Class is certified. The above analysis for purposes of evaluating predominance of the affirmative defenses applies to the counterclaims.  Apart from that fact, Defendants' purported assertion of the counterclaims against absent class members, under Fed.R. Civ. P. 13 is "inapplicable in class action suits, because 'absent class members are not opposing or litigating adversaries for purposes of Rule 13.'" *Allapattah*, 333 F.3d at 1259, n.

---

[14] At the class certification stage, the Court can consider how a particular affirmative defense may be resolved. *See Mowbray*, 208 F.3d at 298 ("After all, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.").

14. While a court has discretion to consider such counterclaims in the form of setoffs, most federal courts have held that occurs "during the damages phase of the action." *Allapatah*, 333 F.3d at 1259. Accordingly, there is nothing in the alleged counterclaims that disturbs a finding of predominance.

### B.    A Class Action is the Superior Means to Resolve the Dispute.

Fed. R. Civ. P. 23(b)(3) sets forth four nonexclusive factors that are relevant to the superiority inquiry:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

An evaluation of each factor supports certification.

### 1.    The Interest of Members in Individually Controlling the Litigation.

While some class members' claims are substantial "the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high." *Amchem*, 521 U.S. at 617, 117 S.Ct. at 2246.  In the First Circuit, classes have been certified where the individual class members have substantial stakes in the controversy. *See, e.g.*, *Mowbray*, 208 F.3d at 294 (class certified involving claims arising out of breaches of warranty involving the sale of businesses to defendant where "the average value of the transactions at issue [were] ...  in excess of $16,000,000."); *Payne v. Goodyear Tire & Rubber* Co., 216 F.R.D.21, 29 (D. Mass. 2003) (class certified involving "claims of many class members are not insubstantial–perhaps tens or even

hundreds of thousands of dollars . . . ."); and *Relafen*, 218 F.R.D. at 347 (certified antitrust suit

includes direct purchasers which are "primarily large businesses with presumably large claims:

'wholesalers, retail chains with their own warehouses, and managed care organizations with their

own warehouses.'").

## 2.    Pendency of Other Actions.

Because there are no other actions concerning the claims in this lawsuit as to the Trail

Program "which might otherwise create a threat of multiplicity and inconsistent adjudications"

this factor is neutral. *See Relafen, id*.

## 3.    Desirability of Concentrating This Litigation in This Forum.

The Court's holding in *Bussie* is directly applicable here: "The Court also finds that it is

in the interests of the Class and justice to have all claims concerning Allmerica's alleged

wrongdoing resolved in one forum, and further, that the District of Massachusetts is a

particularly appropriate venue given that it is the location of Allmerica's principal place of

business." 50 F. Supp.2d at 72.

## 4.    Manageability.

The First Circuit and the district courts in this circuit are in accord with the Second

Circuit Court of Appeals pronouncement concerning the manageability factor:

> Nevertheless, failure to certify any action under Rule 23(b)(3)
> on the sole ground that it would be unmanageable is
> disfavored and 'should be the exception rather than the
> rule.
>
> There are a number of management tools available to a
> district court to address any individualized damages issues
> that might arise in a class action, including (1) bifurcating
> liability and damage trials with the same juries; (2)
> appointing a magistrate judge or special master to preside

18

over individual damage proceedings . . . .

*In re Visa/Check MasterMoney Antitrust Litigation*, 280 F.3d 124, 140-141 (2nd Cir. 2001), *cert. denied*, 536 U.S. 917 (2000); *in accord*, *Smilow*, 323 F.3d at 39-40; *Relafen*, 218 F.R.D. at 347-8.  Because Plaintiffs satisfy the other elements for certification, manageability should not be a significant factor.

In any event, there are no foreseeable manageability issues that cannot be dealt with using the procedural tools identified in *Visa*. At this stage of the case, if any of Defendants' affirmative issues and counterclaims ultimately survive a summary judgment, then the Court can use the tools of bifurcation or special masters to resolve the individual issues. Such procedures satisfy the manageability element, particularly, where as in the instant case, the class size is certainly manageable.  *See, e.g., Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 627 (5th Cir. 1999), *cert. denied*, 528 U.S. 1159 (2000)(no manageability issues existed due to the availability of bifurcation where class consisted of about 300 members claiming that circulatory problems on cruise ship caused personal injuries where first phase of the trial would determine common negligence issue and second phase would determine causation and damage issues).

**Conclusion**

WHEREFORE, this Court should certify this action as a class action on behalf of the

Class defined in paragraph 2 of Plaintiffs' Motion for Class Certification, appoint Plaintiffs as

Class representatives and appoint Hubbard & Biederman, LLP as Class counsel and Moulton &

Gans, P.C. as local counsel.

Dated: July 22, 2005.                    Respectfully submitted,

                                         **MOULTON & GANS, P.C.**

                                         By: /s/ Nancy Freeman Gans
                                             Nancy Freeman Gans, BBO No. 184540
                                         33 Broad Street, Suite 1100
                                         Boston, Massachusetts 02109-4216
                                         Telephone: (617) 369-7979
                                         Facsimile: (617) 369-7980

                                         Stephen L. Hubbard
                                         Robert W. Biederman, BBO No. 562279
                                         **HUBBARD & BIEDERMAN, LLP**
                                         1717 Main Street, Suite 4700
                                         Dallas, Texas 75201
                                         Telephone: (214) 857-6000
                                         Facsimile: (214) 857-6001

                                         ***ATTORNEYS FOR PLAINTIFFS***

                          **CERTIFICATE OF SERVICE**

        I hereby certify that a true and correct copy of the foregoing was served by hand on this
the 22nd day of July, 2005, to Defendants' attorneys, as follows:

Jonathan A. Shapiro
WILMER CUTLER PICKERING
  HALE and DORR LLP
60 State Street
Boston, MA 02109

                                         /s/ Nancy Freeman Gans
                                         Nancy Freeman Gans