# AGENT IN-FORCE ANNUITY TRAIL COMMISSION AGREEMENT

AGREEMENT, effective as of January 1, 2001, by and between Allmerica Financial Life Insurance and Annuity Company, a Delaware Insurance Company ("AFLIAC"), and STEPHEN H WEDEL ("Agent"), a Career Agent or Agent Emeritus of AFLIAC.

## RECITALS:

WHEREAS, AFLIAC has proposed a voluntary program (the "Program") for maintaining the persistency of its variable and fixed annuity block of business; and

WHEREAS, the Program involves the payment of trail commissions based on calendar quarter values of certain eligible variable and fixed annuity contracts (described below); and

WHEREAS, in order to participate in the Program eligible Agents must agree to pay AFLIAC the present value of the remaining unamortized deferred acquisition charges ("DAC") allocated to the annuity contracts on which their Program trail commissions are to be based; and

WHEREAS, as an inducement for eligible Agents to participate in the Program, AFLIAC is willing to finance the required DAC payments described above by means of ten-year loans, as is more fully described below; and

WHEREAS, the Agent is desirous of participating in the Program under the terms and conditions described herein;

NOW, THEREFORE, the parties hereto agree as follows:

## I.   DEFINITIONS.

1.   **Eligible Agents:** In order to be eligible for the Program an Agent must: (i) have a minimum of five (5) years of service as an Agent of AFLIAC, determined as of December 31, 2000, (ii) have qualified for either AFLIAC's Leaders' or President's Educational Conference for production year 1999 or 2000 or for at least two production years between 1994 and 1998 and (iii) have agreed in writing that no commissions, other than trail commissions described in this Agreement, shall be payable by AFLIAC on premiums received by AFLIAC after December 31, 2000 on Eligible Annuity Contracts (described below).

By entering into this Agreement, AFLIAC has determined that the Agent is eligible to participate in the Program.

2.   **Eligible Annuity Contracts**:  Program trail commissions shall be based upon calendar quarter accumulated values of eligible annuity contracts.  For purposes of this Agreement, "Eligible Annuity Contracts" means individual variable and fixed annuity contracts issued by AFLIAC which:

0255 (20 Year Limit)

EXHIBIT

A

(a) except as provided in (c) below, were issued prior to January 1, 1996;

(b) were solicited by the Agent, who is listed as the writing agent on the contract application (or, in the case of a contract with a commission split, who is listed on the contract application as one of the writing agents);

(c) in the case of a replacement contract that was issued after December 31, 1995, such contract replaced an annuity contract issued by AFLIAC described in (a) above and the Agent was listed as the writing agent on both the original and replacement contract (or, in the case of an original or replacement contract with a commission split, the Agent was listed as one of the writing agents); and

(d) were not generating a trail commission to the Agent on the effective date of this Agreement.

The Agent understands and agrees that AFLIAC's determination of Eligible Annuity Contracts shall be final and binding on all persons, including the Agent.

3. **The Program**: The trail commission payment plan set forth in this Agreement.

## II. PROGRAM OVERVIEW.

In order to participate in the Program, eligible Agents must (i) execute this Agreement and agree to be bound by its terms and conditions and (ii) pay AFLIAC the present value of the unamortized DAC allocated to the Eligible Annuity Contracts (as described in Part III below).

As an inducement to Agents to participate in the Program, AFLIAC is willing to finance all or a portion of the Agent's DAC payment. The Program financing plan is described in Part V below.

Once an eligible Agent becomes a participant in the Program, AFLIAC agrees to pay the Agent quarterly trail commissions, subject to the terms and conditions set forth herein.

## III. DAC BUYOUT PAYMENT CALCULATION.

Prior to February 1, 2001, AFLIAC shall calculate the DAC buyout payment. Payment of such amount by the Agent is a precondition of participation in the Program.

The Agent understands and agrees that AFLIAC's calculation of the DAC buyout payment shall be final and binding on all persons, including the Agent. AFLIAC shall calculate the DAC buyout payment as follows:

(a) AFLIAC shall first determine the Eligible Annuity Contracts assigned to the Agent.

(b)     Next AFLIAC shall calculate the aggregate premiums paid for all Eligible Annuity Contracts assigned to the Agent.

    (i)     Except as provided in Paragraphs (b)(ii), (iii), (iv) and (v) below, the aggregate premiums paid for all Eligible Annuity Contracts that are single premium contracts shall be the sum of all the single premiums paid for such contracts and the aggregate premiums paid for all Eligible Annuity Contracts that are flexible premium contracts shall be the sum of all premiums paid for such contracts through December 31, 2000.

    (ii)    In the case of an Eligible Annuity Contract that is a non-qualified complete or partial replacement of a previously issued AFLIAC life insurance or annuity contract ("the replaced contract"), the aggregate premiums paid for such Eligible Annuity Contract shall be deemed to be the aggregate premiums paid on the replaced contract (or a percentage thereof, determined by AFLIAC, in the case of a partial replacement), plus the aggregate premiums paid on any AFLIAC life insurance or annuity contract that was replaced by the replaced contract (or a percentage thereof, determined by AFLIAC, in the case of a partial replacement), plus all additional premiums paid for such Eligible Annuity Contract through December 31, 2000.

    (iii)   In the case of an Eligible Annuity Contract that is a qualified complete or partial replacement of a previously issued AFLIAC life insurance or annuity contract, as determined under AFLIAC's rules (e.g., the Eligible Annuity Contract is an IRA or a contract funding a 401(k) plan), the aggregate premiums paid for such Eligible Annuity Contract shall be deemed to be the cash value of the replaced contract (or a percentage thereof, determined by AFLIAC, in the case of a partial replacement), determined as of the date of the replacement, plus all additional premiums paid for such Eligible Annuity Contract through December 31, 2000.

Provided, however, solely for purposes of calculating the DAC buyout payment for all such Eligible Annuity Contracts that are qualified replacement contracts (as described in this Paragraph (b)(iii)), the deemed aggregate premiums paid for all such contracts (as calculated pursuant to this Paragraph (b)(iii), i.e., the sum of the aggregate cash values of all replaced contracts (or a percentage thereof, determined by AFLIAC, in the case of partial replacements), plus the sum of all additional premiums paid for all such Eligible Annuity Contracts through December 31, 2000) shall be adjusted as follows:

    (A)     First determine the aggregate premiums paid for all Eligible Annuity Contracts that are non-qualified contracts (calculated pursuant to Paragraphs (b)(i), (ii) and (iv)).

(B)    Next determine the aggregate accumulated value as of December 31, 2000 of all non-qualified Eligible Annuity Contracts described in (A) above, adjusted as described in Paragraph (b)(iv) below in the case of contracts involving a commission split.

(C)    Next determine the ratio of (A)/(B) expressed as a decimal – e.g., if (A) is \$10X and (B) is \$15X, the ratio expressed as a decimal is $10/15 = .667$.

(D)    Next determine the deemed aggregate premiums paid for all Eligible Annuity Contracts that are qualified replacement contracts (as calculated pursuant to this Paragraph (b)(iii)), adjusted as described in Paragraph (b) (iv) below in the case of contracts involving a commission split.

(E)    Next determine the aggregate accumulated value as of December 31, 2000 of all qualified replacement Eligible Annuity Contracts described in (D) above, adjusted as described in Paragraph (b)(iv) below in the case of contracts involving a commission split.

(F)    Next determine the ratio of (D)/(E) expressed as a decimal – e.g., if (D) is \$12X and (E) is \$15X, the ratio expressed as a decimal is $12/15 = .800$.

(G)    Next subtract (C) from (F) – e.g., .800 less .667 = .133

(H)    Next multiply (G) by .5 – e.g., .133 x .5 = .0665

(I)    Next subtract (H) from (F)   - e.g., .800 less .0665 = .7335

(J)    Next multiply (I) by the aggregate accumulated value as of December 31, 2000 of all Eligible Annuity Contracts that are qualified replacement contracts – i.e., (I) x (E).

(K)    The product of (I) x (E) is the adjusted deemed aggregate premiums paid on all Eligible Annuity Contracts that are qualified replacement contracts. Such adjusted aggregate premium amount shall be used to calculate the DAC buyout payment for this class of Eligible Annuity Contracts.

(iv)    Notwithstanding Paragraphs (b)(i) through (b)(iii) above, in the case of an Eligible Annuity Contract that provides for a commission split, for purposes of this Section (b) the aggregate premium(s) paid for any such contract shall be deemed to be the percentage of the actual aggregate premium(s) described in Paragraphs (b)(i) through (b)(iii) above equal to

the percentage of the commissions payable on such premium(s) that was paid to the Agent.

(v)     Notwithstanding Paragraphs (b)(i) through (b)(iv) above, in the event that the aggregate premiums paid for an Eligible Annuity Contract (computed in accordance with Paragraphs (b)(i), (ii), (iii) or (iv) above) exceed the Contract accumulated value determined as of December 31, 2000, then solely for purposes of calculating the DAC buyout payment for such Contract, the Contract's accumulated value determined as of such date shall be deemed to be the Contract's aggregate premiums paid. Provided, however, for purposes of performing the calculation described in this Paragraph (b)(v), in the case of an Eligible Annuity contract that provides for a commission split, both the aggregate premiums paid and the Contract accumulated value shall be deemed to be the percentage of such aggregate premiums and Contract accumulated value equal to the percentage of the commissions payable on such premiums that was paid to the Agent.

(vi)    The DAC buyout payment is equal to the aggregate premiums paid for Eligible Annuity Contracts (determined in accordance with Paragraphs (b)(i) through (v) above) multiplied by the DAC Buyout Payment Percentage.

(vii)   For purposes of this Section (b), the DAC Buyout Payment Percentage shall be based upon each Agent's Years of Service with AFLIAC and shall be determined from the following table:

| Agent Years of Service* | DAC Buyout Payment Percentage |
|---|---|
| Less than 10 Years | 4.50% |
| 10-20 Years | 4.25% |
| More than 20 Years | 4.00% |

*"Years of Service" mean full and complete years of service as an Agent of AFLIAC, computed as of December 31, 2000.

## IV.    **TRAIL COMMISSION PAYMENTS.**

Trail commissions shall be payable to an active Career Agent or Agent Emeritus for any calendar quarter for which the Agent has satisfied the Agent Trail Commission eligibility requirements. In order for an active Agent to be eligible to receive Trail Commissions for a calendar quarter, the Agent must have an AFLIAC Career Agent or Agent Emeritus Contract in force on the last day of the calendar quarter for which the Trail Commission is payable and must (i) have qualified for either AFLIAC's Leaders' or President's Educational Conference for production year 1999 or 2000 or (ii) have qualified for either of such Educational Conferences for at least two production years between 1994 and 1998.

By checking the applicable box on the Program Election Form, each eligible Agent shall elect whether Quarterly Trail Commissions are to be payable under Option A or Option B described below. Once made, an Agent's election shall be final and may not be changed.

Option A: Quarterly Trail Commissions payable to an active Agent electing Option A shall be based upon the Agent's Persistency Rate (described below) for the calendar year preceding the calendar year for which the Trail Commission is payable. Each quarterly Trail Commission shall be equal to a percentage (determined from the Table below) of the aggregate accumulated value of all Eligible Annuity Contracts in force on the last day of the calendar quarter for which the Trail Commission is payable. For eligible active Agents electing Option A, Trail Commissions shall be first payable for the last quarter of calendar year 2000 for those eligible Agents who elect to participate in the Program for such calendar year. In the case of an eligible active Agent electing Option A who (i) met the Plan Additional Trail Net First Year Commission ("FYC") Requirement* for the production year preceding the calendar year for which the Trail Commissions are payable, or (ii) for production year 2000 only, qualified for the President's Educational Conference for such production year by September 30, 2000, a higher trail percentage shall be payable if the Agent's assigned Eligible Annuity Contract book of business has Above Average or Average Persistency (as described below) for the calendar year preceding the calendar year for which the Trail Commissions are payable.

Option B: Each quarterly Trail Commission payable to an active Agent shall be equal to 0.1750% (1/4 x 0.70%) of the aggregate accumulated value of the Eligible Annuity Contracts in force on the last day of the calendar quarter for which the trail commission is payable.

Trail Commissions payable under Option B are not dependent upon an Agent's Persistency Rate (described below) or FYC production level.

For active Agents electing Option B, Trail Commissions shall first be payable for the last quarter of calendar year 2000 for those eligible Agents who elect to participate in the Program for such calendar year.

\* For eligible active Agents electing Option A, the Plan Additional Trail Net FYC Requirement for each production year shall be determined as follows:

| Production Year | Year for Which Trail Payable | Net FYC Requirement[133] |
|---|---|---|
| 1999 | 2000 | $200,000 |
| 2000 | 2001 | $225,000 |
| 2001 | 2002 | $225,000 |
| 2002 and thereafter | 2003 and thereafter | See Below[134] |

---

[133] An Agent electing Option A with Above Average or Average Persistency must meet the above minimum Net FYC Requirements to be eligible to receive the higher trail percentage (.75% on an annual basis for Average Persistency and 1.00% on an annual basis for Above Average Persistency). For purposes of this Agreement, FYC means net first year commissions received during a production year from sales of (i) AFLIAC life insurance policies or annuity contracts, (ii) mutual funds placed through AFLIAC's affiliated broker-dealer, Allmerica Investments, Inc. ("A.I.I.") and (iii) eligible insurance products of other life insurance companies that have entered into a selling agreement with either A.I.I. or another affiliate of AFLIAC. For purposes of this Agreement, Net FYC received for a production year means (i) the amount of first year commissions received on sales of eligible insurance, annuity and other financial products, less (ii) first year commissions charged back on said products.

In addition to the foregoing, in order to be eligible to receive the higher trail percentage (i) at least 25% of net FYC received during a production year must be attributable to sales of qualifiable AFLIAC life insurance policies and annuity contracts and (ii) at least $25,000 in net FYC received during a production year must be attributable to sales of qualifiable AFLIAC life insurance policies. Provided, however, that if an Agent fails to meet the $25,000 minimum life insurance Net FYC Requirement, the shortage can be made up through commissions received on sales of other eligible products equal to at least three times the shortfall. For example: During a production year, an Agent receives $20,000 in Net FYC attributable to sales of qualifiable AFLIAC life insurance policies. Thus, the Agent is $5,000 short of meeting the minimum life insurance commission requirement for the production year. Assuming the Net FYC Requirement for the production year is $225,000, if the Agent received $240,000 in Net FYC during the production year, with $20,000 attributable to sales of qualifiable AFLIAC life insurance policies, the Agent would meet the Plan Additional Trail Net FYC Requirement - $240,000 = $225,000 + [($25,000 - $20,000) x 3]. For purposes of the foregoing, "qualifiable AFLIAC life insurance policies and annuity contracts" means AFLIAC life insurance policies and annuity contracts that are distributed exclusively through AFLIAC's Career Agent distribution system, e.g., sales of AFLIAC life insurance policies or annuity contracts distributed primarily through the Kemper, Pioneer or Delaware broker-dealer distribution networks are not "qualifiable AFLIAC life insurance policies or annuity contracts".

[2] For production year 2002 and thereafter, the Net FYC Requirement for the preceding production year (but not the $25,000 minimum life insurance Net FYC Requirement) shall be increased by a cost of living adjustment ("COLA"). For purposes of this Agreement, the COLA for production year 2002 and for each succeeding production year shall be determined as follows:

The COLA for production year 2002 and for each succeeding production year is the percentage (if any), not less than zero, by which:

(i) the CPI for the preceding production (calendar) year, exceeds
(ii) the CPI for the second preceding production (calendar) year.

For purposes of this Agreement, the CPI for any calendar year is the average of the Consumer Price Index as of the close of the twelve-month period ending August 31 of such calendar year.

For purposes of this Agreement, the term "Consumer Price Index" means the last Consumer Price Index for all-urban consumers published by the Department of Labor. For purposes of the preceding sentence, the revision of the Consumer Price Index which is most consistent with the Consumer Price Index for calendar year 1986 shall be used.

## Quarterly Trail Commission Percentage Table
### (Applicable to Agents electing Option A)

Below Average Persistency ....................................0.1375% (1/4 x 0.55%)
Average Persistency ..........................................0.1625% (1/4 x 0.65%)
Average Persistency – for Agents who meet the
    Plan Additional Trail Net FYC Requirement ............0.1875% (1/4 x 0.75%)
Above Average Persistency...................................0.1875% (1/4 x 0.75%)
Above Average Persistency – for Agents who meet the
    Plan Additional Trail Net FYC Requirement ............0.25% (1/4 x 1.00%)

For purposes of the above Table, (i) "Below Average Persistency" means that withdrawals from and surrenders (other than on account of death) of AFLIAC Annuity Contracts comprising an Agent's assigned Eligible Annuity Contract book of business during the calendar year preceding the calendar year for which a Trail Commission is payable are greater than 15% of the aggregate accumulated value of the Agent's assigned Eligible Annuity Contract book of annuity business determined as of December 31 of such preceding calendar year, (ii) "Average Persistency" means that such withdrawals and surrenders are greater than 10% but not more than 15% of such amount and (iii) "Above Average Persistency" means that such withdrawals and surrenders are not more than 10% of such amount. Provided, however, in calculating the Trail Commission Percentage for the last quarter of calendar year 2000 and for the first three quarters of calendar year 2001, it shall be assumed that each eligible Agent has Above Average Persistency, regardless of the Agent's actual persistency Rate.

Notwithstanding the foregoing, for purposes of calculating an Agent's persistency for a calendar year, surrenders of certain Eligible Annuity Contracts, described in (a) and (b) below, shall be excluded.

(a)    Exclusion of Certain Replaced Contracts. In order for a surrender of a replaced Contract to be excluded, (i) the Agent must be listed as a writing agent on the Contract application, but not be the servicing agent for the Contract, (ii) the servicing agent must terminate as a career agent of AFLIAC and cause the Contract to be replaced within twelve months of the date of his or her termination from AFLIAC and (iii) the Agent must furnish AFLIAC written proof, satisfactory to AFLIAC, that the terminating servicing agent caused the replacement.

(b)    Exclusion of Certain Contracts Surrendered in Connection with a Class Action Lawsuit. If an Eligible Annuity Contract is surrendered in connection with the settlement or other disposition of a class action lawsuit involving AFLIAC, such Contract shall be excluded in calculating an Agent's persistency for a calendar year if AFLIAC determines that the Agent acted properly in the sale and servicing of the surrendered Contract. The Agent understands and agrees that AFLIAC's determination as to whether the Agent's sales and servicing activities were proper shall be final and binding on all persons, including the Agent.

As provided in the Program Loan Promissory Note, AFLIAC shall calculate the unrepaid loan principal attributable to any excluded annuity contract surrenders described in (a) and (b) above and shall deduct any such calculated amount from the Agent's loan balance.

In addition to the above payments, if an active Agent receives a Trail Commission for a calendar quarter and thereafter voluntarily terminates, is terminated by AFLIAC other than for cause, dies, retires or becomes Totally Disabled, the Agent or his or her beneficiary shall be entitled to continue to receive Trail Commissions for succeeding calendar quarters, based on the Agent's assigned Eligible Annuity Contract book of business accumulated value determined as of the last day of the calendar quarter for which the Trail Commission is payable. In the case of an Agent who had elected Option B, such continuing quarterly Trail Commissions shall be equal to 0.1750% (1/4 x 0.70%) of the aggregate accumulated value of all Eligible Annuity Contracts in force on the last day of the calendar quarter for which the trail commission is payable. In the case of an Agent who had elected Option A, such continuing Trail Commissions shall be determined from the Table above, based upon the Agent's actual persistency rate for the calendar year preceding the calendar year for which the Trail Commission is payable. Provided, however, that the 1.00% (on an annual basis) Above Average Persistency Rate and .75% (on an annual basis) Average Persistency Rate shall be applicable to Trail Commissions payable on or after the date of termination of an Agent's Career Agent or Emeritus Agent Contract only if (i) the Agent's assigned Eligible Annuity Contract book of business has Above Average or Average Persistency for the calendar year preceding the calendar year for which the Trail Commission is payable and (ii) the Agent produces, through either the Agent or Select Distribution Channel, for the calendar year immediately preceding the calendar year for which the Trail Commission is payable, at a level at least equal to 75% of the then applicable Plan Additional Trail Net FYC Requirement. Notwithstanding the foregoing, no further Trail Commissions shall be paid following the date that AFLIAC terminates a Career Agent's Career Agent or Agent Emeritus Contract for cause.

For purposes of this Agreement "Total Disability" means the inability of an Agent, because of injury or sickness, to perform the duties of any occupation for which he or she is reasonably fitted by training, education or experience. During the first 24 months of total disability, an Agent will be considered to have met the foregoing requirement if he or she is unable to perform the duties of his or her regular occupation and is not performing the duties of any other occupation.

Notwithstanding the foregoing, in the case of an Eligible Annuity Contract that provides for a commission split, for purpose of this Part IV the contract accumulated value on which a Trail Commission shall be calculated shall be determined by multiplying the contract accumulated value on the last day of the calendar quarter for which the Trail Commission is payable by the contract commission percentage payable to the Agent.

Notwithstanding anything in this Agreement to the contrary, the parties understand and agree that no further Trail Commissions shall be payable on Eligible Annuity Contracts covered by this Agreement following the payment of Trail Commissions for the third quarter of calendar year 2020.

Notwithstanding the above, if at any time AFLIAC determines that the present value of an Agent's remaining Program Trail Commissions is less than $10,000, at AFLIAC's option AFLIAC may pay such present value to the Agent or to his or her beneficiaries. The Agent agrees that such one sum payment shall relieve AFLIAC of any further liability to the Agent or his or her beneficiaries under this Agreement. The Agent also understands and agrees that AFLIAC's calculation of the present value of Program Trail Commissions shall be final and binding on all persons, including the Agent.

Trail Commissions will be calculated and paid or applied within 90 days following the end of each calendar quarter for which a Trail Commission is payable.

The Agent understands and agrees that Trail Commissions shall be disbursed as follows:

  (i)     To the extent permitted under applicable law, Trail Commission payments shall first be applied by AFLIAC to pay any Program loan payments due and unpaid as of the last day of the calendar quarter for which the Trail Commission is payable.

  (ii)    Any Trail Commission balance remaining after any Program loan payments are paid shall be paid to the Agent or his or her beneficiary in cash or applied as an additional payment of the loan principal, in the case of an Agent who has elected the accelerated loan repayment option.

## V.    PROGRAM FINANCING PLAN.

In order to encourage eligible Agents to participate in the Program, AFLIAC is willing to loan the Agent 25%, 50%, 75% or 100% of the amount of the Agent's DAC buyout payment amount. The form of Promissory Note to be executed by the Agent is attached hereto as Exhibit A.

With respect to Program financing, AFLIAC and the Agent each understand and agree that participation in the Program Financing Plan is not required as a precondition for the Agent to participate in the Program. The Agent understands that the DAC buyout payment does not need to be financed, in whole or in part, through AFLIAC.

The Agent further understands and agrees that the Promissory Note shall provide:

  (a)     for a loan of ten years, with a level quarterly payment requirement and interest at 7% per annum on the unpaid balance;

  (b)     a loan repayment option (in whole but not in part) at any time;

(c)     a voluntary accelerated loan repayment option;

(d)     to the extent permitted under applicable law, for the application of Trail Commissions to pay outstanding loan payments, as described in Part IV hereof; and

(e)     for a forgiveness of the unpaid loan principal attributable to any replaced Eligible Annuity Contract that is excluded in calculating an Agent's Persistency Rate (as provided in Part IV hereof). AFLIAC's calculation of any principal amount to be forgiven shall be final and binding on all persons, including the Agent.

## VI.    PROGRAM TAX RESULTS TO AGENT.

A summary of AFLIAC's understanding of the federal and state tax results to Agents who choose to participate in the Program is set forth in a Tax Memorandum attached hereto as Exhibit B.

The Agent understands and agrees that AFLIAC is providing no guaranty to its Agents that the tax results described in the attached Tax Memorandum shall be achieved – tax laws may change while the Program remains in effect and the IRS may not agree with AFLIAC's tax analysis. AFLIAC strongly urges its Agents to discuss the Program with their tax advisors before deciding whether to participate.

## VII.   TERMINATION, AMENDMENT, SUBSEQUENT YEARS.

This Agreement shall automatically terminate following payment of Trail Commissions for the third quarter of calendar year 2020. No further Trail Commissions shall be payable on Eligible Annuity Contracts covered by this Agreement after the date this Agreement terminates.

AFLIAC reserves the right to terminate or amend the Program at any time. Provided, however, that any such amendment or termination shall not affect any In-Force Annuity Trail Commission Agreement in effect on the date of the amendment or termination.

While the Program remains in effect a new Agreement, reflecting newly Eligible Annuity Contracts and the terms and conditions of the Program then in effect, will be offered to then eligible Agents.

IN WITNESS WHEREOF, by his or her signature below, the Agent requests to become a participant in the Program and agrees to abide by the terms and conditions of the Program, as set forth in this Agreement. By its execution of this Agreement, AFLIAC agrees to allow the Agent to become a participant in the Program and to offer the Program to the Agent under the terms and conditions set forth in this Agreement.

Allmerica Financial Life
Insurance and Annuity Company

By: _____   Agent: _____

Name:  James E. Bellner          Name: STEPHEN H WEDEL CFP CFS
Title:   Vice President

Date: _____3/26/01_____     Date: ____2-5-01____

## PROMISSORY NOTE - revised 2/28/01

| | |
|---|---|
| NAME OF BORROWER: | DONALD SPEAKMAN |
| LOAN NUMBER | 031 0935 |
| EFFECTIVE DATE: | 03/31/2001 |
| MATURITY DATE: | 12/31/2010 |
| FIRST PAYMENT DATE: | 06/30/2001 |
| PAYMENT FREQUENCY: | Quarterly |
| ANNUAL PERCENTAGE RATE: | 7% |
| NUMBER OF INSTALLMENTS: | 40 |
| FINANCED AMOUNT (LOAN PRINCIPAL): | 3,124,744.19 |
| FINANCE CHARGE: | 1,212,918.55 |
| TOTAL OF PAYMENTS: | 4,337,662.74 |
| AMOUNT OF EACH PAYMENT: | 111,222.12 |

For value received, the receipt of which is hereby acknowledged, I, the undersig
hereby promise to pay Allmerica Financial Life Insurance and Annuity Compan
"Company") the principal sum of $3,124,744.19 together with interest on the ur
thereof, per the above schedule.

I understand and agree that to the extent funds are available that each payment s.... ~~ ..~~~ ~y
deducting the amount of the payment from quarterly Trail Commissions otherwise payable to me
under the Company's In-Force Annuity Trail Commission Program.

_____ (Please initial if you wish to choose this Accelerated Loan Repayment Option.) If
initialed, I hereby elect the Accelerated Loan Repayment Option offered by the
Company. I understand that under this Option, the Company will calculate my
anticipated federal tax liability with respect to each quarterly Trail Commission
payment payable under the Company's In-Force Trail Commission Program. I
understand that the Company will assume a 35% federal tax liability with respect
to each such payment. I further understand that each quarterly Trail Commission
shall be disbursed as follows: (i) the payment amount shall first be applied to
repay any quarterly loan repayment then due and payable; (ii) next, to the extent
that funds are available, the amount of my calculated anticipated federal tax
liability with respect to the Trail Commission shall be paid to me in cash; (iii)
finally, any additional amount available shall be applied as an additional payment
of the loan principal. I understand that the Company's calculation of my
anticipated tax liability is merely an estimate and that my actual federal tax
liability for my Program Trail Commission payments may be more or less than
the Company's estimate.

0271

EXHIBIT



I understand that at any time, I may pay the outstanding loan principal balance, together with the interest thereon to the payment date. I also understand that no partial repayments (other than required installments and payments made pursuant to the Accelerated Loan Repayment Option described above) or change in the scheduled payments will be permitted.

Pursuant to the terms of my In-force Annuity Trail Commission Agreement with the Company, I understand that surrenders of certain replaced annuity contracts and surrenders of certain annuity contracts surrendered in connection with the settlement or other disposition of a class action lawsuit involving the Company shall be excluded in calculating my persistency rate (as defined in the Trail Commission Agreement) for a calendar year. I understand that the Company shall calculate the unpaid loan principal attributable to any such excluded annuity contract surrenders and shall deduct such calculated amount from my loan obligation. I understand that the Company's calculation of any such loan forgiveness amount shall be conclusive and binding on all persons.

I also understand and agree as follows:

(a)     if I default in the payment of any installment and the default continues for 90 days, the unpaid principal balance of the loan, plus interest thereon, will immediately become due and payable; and

(b)     unless my heirs or the executors or administrators of my estate agree to continue to make loan repayments on a basis that is agreeable to the Company, the principal balance of the loan, plus interest thereon, will become due and payable 90 days following the date of my death.

Borrower:       _Donald Speakman_

Print Name:     Donald Speakman

Date Signed:    _March 5, 2002_

Witness:        _David A. Speakman_

Print Name:     _David A. Speakman_



**ALLMERICA**
FINANCIAL®

# M E M O R A N D U M

| | |
|---|---|
| **TO:** | **Trail Program Qualifier** |
| **FROM:** | **James E. Bellner** |
| **DATE:** | **December 14, 2000** |
| **SUBJECT:** | **Advisor In Force Trail Program** |

# IMPORTANT ANNOUNCEMENT!

The purpose of this memorandum is to provide you with additional information related to the Advisor In Force Trail Program. As a result of continued input we have received from your Advisors' Association and from many of you, we have made what we believe are several additional improvements to the program.

**These changes may impact your decision. It is important you read the following carefully.**

### Trail Rate

**A second option has been added to the program!**

**FLAT TRAIL RATE        →    .70%**

If you choose this rate, you will receive a .70% trail on the account value for the life of the contracts that remain active in the program.

Choosing this option eliminates a potential decrease to either .65% or .55% if persistency exceeds the target level for the higher rates. But at the same time, it also eliminates the potential of receiving the higher rates of .75% or 1%.

This new option is being introduced to respond to those Advisors who are considering not participating due to the downside risk of the original option.

The original option, which varies by the level of both persistency and sales, will continue to be available.

*EXHIBIT*

C

The following is a summary of the original option.

### Non-New York Advisors

|  | Leaders' | Presidents' |
|---|---|---|
| Above Average Persistency (Less than 10% outgo rate) | .75% | 1.00% |
| Average Persistency (Greater than 10% but Less than 15%) | .65% | .75% |
| Below Average Persistency (Greater than 15%) | .55% | .55% |

### New York Advisors

|  | In Force Account Value > $5 Million | Presidents' (Additional) |
|---|---|---|
| Above Average Persistency (Less than 10% outgo rate) | .75% | .25% |
| Average Persistency (Greater than 10% but Less than 15%) | .65% | .10% |
| Below Average Persistency (Greater than 15% outgo rate) | .55% | 0% |

**It is important to emphasize that once you have elected one of the two available options – a change will not be permitted. The option you select will impact the first trail payment that will be effective with the 3/15/2001 pay cycle.**

Attached you will find a sample projection using the new .70% option along with one at .75% and 1%.

Your Managing Director has been supplied with a new worksheet that has the new option of .70% incorporated.

## Election Form

Attached you will find a new election form which has the new .70% option.

**Due to the magnitude of the changes to the program, we are requesting that YOU SUBMIT A NEW FORM.**

You will be provided a summary of your election, program and loan agreements for signature. It is anticipated that these will begin to be sent to participants in mid-January. On or about February 1, 2001, you will be provided with the list of policies that will be included in the program.

**The submission date for the program has been extended to January 15, 2001.**

## Subsequent Payments

All subsequent payments to policies within the program will contribute in the following way:

- Payments will reduce outgos, dollar for dollar, in determining your outgo rate.

    **This will thus reduce your outgo rate.**

- Example:    Outgo's = $245,000    Payments = $50,000

    **Net Outgo's = $195,000 ($245,000 – $50,000)**

## Class Action Suit

The following wording has been added to the agreement:

"...If an eligible contract is surrendered in connection with the settlement or other disposition of a class action lawsuit involving AFLIAC, such contract shall be excluded in calculating an Agent's persistency for a calendar year if AFLIAC determines that the Agent acted properly in the sale and servicing of the surrendered contract. In addition, any remaining loan amount on such contract will be subtracted from the Agent's total loan balance due. This will be accomplished by determining the ratio of the total original loan to the then current loan balance. This ratio will be multiplied by the original loan on such contract to determine the amount that will be subtracted from the then current loan balance..."

## Termination for Cause

In the event an Advisor is terminated for cause, all future trail commissions will cease and no further loan payments will be required. This is a change from the former definition.

## Other

**The following items are attached:**

➢     **Election Form** – If you wish to participate in the program, complete the form and return by January 15, 2001.

➢     **Program description** – This has been revised to include the items above.

## Worksheet

Your Managing Director has been provided with an updated worksheet. It has been modified to include the option for early payoff.

## Promissory Note and Annuity Trail Commission Agreement

Once we have received your completed Election form, you will be sent a formal promissory note and annuity trail commission agreement for your signature.

If we can be of any help with your decision by answering questions, I would encourage you to call Phil Alston (ext. 2629), Phyllis Aiello (ext. 2263) or myself (ext. 2259).

# Trail Commission Program - PROJECTION

PREPARED FOR    VARIABLE OPTION - 1.00% SAMPLE



| Total Deposits | $4,200,000 |
| Total Current Account Value | $7,800,000 |
| Buyout Cost | 4.28% of Deposits |
| Trail Rate Year 1 | 1.00% of Account Value |
| Loan Interest Rate | 7.00% |

## Variable Option

| Year | Account Value* | Buyout Cost | Trail Commission | Trail Rate |
|---|---|---|---|---|
| 1 | 7,800,000 | 178,500 | 78,000 | 1.00% |
| 2 | 7,872,275 | | 78,723 | 1.00% |
| 3 | 7,546,641 | | 75,466 | 1.00% |
| 4 | 7,423,066 | | 74,231 | 1.00% |
| 5 | 7,301,513 | | 73,015 | 1.00% |
| 6 | 7,181,960 | | 71,820 | 1.00% |
| 7 | 7,064,346 | | 70,643 | 1.00% |
| 8 | 6,948,667 | | 69,487 | 1.00% |
| 9 | 6,834,863 | | 68,349 | 1.00% |
| 10 | 6,722,962 | | 67,230 | 1.00% |
| 11 | 6,612,873 | | 66,129 | 1.00% |
| 12 | 6,504,567 | | 65,046 | 1.00% |
| 13 | 6,398,075 | | 63,981 | 1.00% |
| 14 | 6,293,306 | | 62,933 | 1.00% |
| 15 | 6,190,253 | | 61,903 | 1.00% |
| 16 | 6,088,888 | | 60,889 | 1.00% |
| 17 | 5,989,182 | | 59,892 | 1.00% |
| 18 | 5,891,109 | | 58,911 | 1.00% |
| 19 | 5,794,643 | | 57,946 | 1.00% |
| 20 | 5,699,765 | | 56,998 | 1.00% |

* Account value assumes:
- No additional policies added
- Credited rate/Market Gain    7.50%
- Outgo rate - Year 1 - 5    8.50%
- Outgo rate - Year 6 - 10    8.50%
- Outgo rate - Year 11 - 15    8.50%
- Outgo rate - Year 16 - 20    8.50%

(1)

## Loan Calculation

| Loan Amount | Loan Interest | Loan Principal | Total Loan Payment* |
|---|---|---|---|
| 178,500 | (12,496) | (12,919) | (25,414) |
| 165,581 | (11,591) | (13,824) | (25,414) |
| 151,757 | (10,623) | (14,791) | (25,414) |
| 136,965 | (9,588) | (15,827) | (25,414) |
| 121,139 | (8,480) | (16,935) | (25,414) |
| 104,204 | (7,294) | (18,120) | (25,414) |
| 86,084 | (6,026) | (19,388) | (25,414) |
| 66,695 | (4,669) | (20,746) | (25,414) |
| 45,950 | (3,216) | (22,198) | (25,414) |
| 23,752 | (1,663) | (23,752) | (25,414) |

* 10 Year payoff option

(2)

## Cash Flow

| Net Cash Flow | Total Tax Impact |
|---|---|
| 52,506 | (20,934) |
| 53,308 | (20,768) |
| 50,052 | (20,669) |
| 48,816 | (20,522) |
| 47,601 | (20,525) |
| 45,229 | (20,517) |
| 44,072 | (20,870) |
| 42,934 | (20,804) |
| 41,816 | (20,800) |
| 66,129 | (20,990) |
| 65,046 | (20,598) |
| 63,981 | (20,197) |
| 62,933 | (19,819) |
| 61,903 | (19,449) |
| 60,889 | (19,077) |
| 59,892 | (18,707) |
| 58,911 | (18,349) |
| 57,946 | (17,995) |
| 56,998 | (17,652) |

(3) = (1) - (2)    (4a) = (4b)    (4c) = (4d)

* All numbers have been calculated based upon values as of 8/31/00

| Annual Retirement Plan Contribution | 36% Income Tax | Interest Tax Credit | Principal Tax Credit | 1.45% Medicare Tax |
|---|---|---|---|---|
| | 27,500 | (4,373) | (3,124) | 1,151 |
| | 26,653 | (4,057) | (3,124) | 1,112 |
| | 26,413 | (3,716) | (3,124) | 1,104 |
| | 25,991 | (3,356) | (3,124) | 1,078 |
| | 25,555 | (2,968) | (3,124) | 1,068 |
| | 25,137 | (2,553) | (3,124) | 1,041 |
| | 24,725 | (2,109) | (3,124) | 1,024 |
| | 24,320 | (1,634) | (3,124) | 1,008 |
| | 23,922 | (1,126) | (3,124) | 991 |
| | 23,630 | (582) | (3,124) | 975 |
| | 23,145 | 0 | (3,124) | 959 |
| | 22,768 | 0 | (3,124) | 943 |
| | 22,393 | 0 | (3,124) | 928 |
| | 22,027 | 0 | (3,124) | 913 |
| | 21,666 | 0 | (3,124) | 898 |
| | 21,311 | 0 | (3,124) | 883 |
| | 20,962 | 0 | (3,124) | 868 |
| | 20,619 | 0 | (3,124) | 854 |
| | 20,281 | 0 | (3,124) | 840 |
| | 19,940 | 0 | (3,124) | 826 |

(4a)    (4b)    (4c)    (4d)

20 Year Cumulative Value of Retirement Plan Contribution =    210,876
- Assumes annual contribution of 7%
- Assumes Annual gain on Cumulative balance of 7.5%



# Trail Commission Program - PROJECTION

## PREPARED FOR   VARIABLE OPTION - .75% SAMPLE

| Total Deposits | $4,200,000 |
| Total Current Account Value | $7,800,000 |
| Buyout Cost | 4.28% of Deposits |
| Trail Rate Year 1 | 0.75% of Account Value |
| Loan Interest Rate | 7.00% |

### Variable Option

| Year | Account Value* | Buyout Cost | Trail Commission | Trail Rate |
|---|---|---|---|---|
| 1 | 7,800,000 | 178,500 | 58,500 | 0.75% |
| 2 | 7,872,276 | | 57,542 | 0.75% |
| 3 | 7,948,641 | | 58,500 | 0.75% |
| 4 | 7,423,005 | | 55,673 | 0.75% |
| 5 | 7,301,913 | | 64,761 | 0.75% |
| 6 | 7,181,950 | | 53,865 | 0.75% |
| 7 | 7,064,346 | | 52,983 | 0.75% |
| 8 | 6,948,697 | | 52,115 | 0.75% |
| 9 | 6,834,983 | | 51,262 | 0.75% |
| 10 | 6,722,062 | | 50,422 | 0.75% |
| 11 | 6,612,973 | | 49,597 | 0.75% |
| 12 | 6,504,587 | | 48,784 | 0.75% |
| 13 | 6,398,076 | | 47,986 | 0.75% |
| 14 | 6,293,306 | | 47,200 | 0.75% |
| 15 | 6,190,253 | | 46,427 | 0.75% |
| 16 | 6,088,888 | | 45,667 | 0.75% |
| 17 | 5,989,182 | | 44,919 | 0.75% |
| 18 | 5,891,109 | | 44,183 | 0.75% |
| 19 | 5,794,643 | | 43,460 | 0.75% |
| 20 | 5,699,755 | | 42,748 | 0.75% |

### Loan Calculation

| Loan Amount | Loan Interest | Principal Payment | Total Payment* |
|---|---|---|---|
| 178,500 | (12,495) | (12,919) | (25,414) |
| 165,581 | (11,591) | (13,524) | (25,414) |
| 151,757 | (10,623) | (14,791) | (25,414) |
| 136,965 | (9,808) | (15,827) | (25,414) |
| 121,139 | (8,480) | (16,935) | (25,414) |
| 104,204 | (7,294) | (18,120) | (25,414) |
| 86,084 | (6,026) | (19,388) | (25,414) |
| 66,695 | (4,669) | (20,746) | (25,414) |
| 45,950 | (3,216) | (22,198) | (25,414) |
| 23,752 | (1,663) | (23,752) | (25,414) |

*10 Year payoff option

### Cash Flow

| Net Cash Flow | Total Tax Impact |
|---|---|
| 33,086 | (13,828) |
| 32,128 | (13,724) |
| 33,086 | (13,780) |
| 30,259 | (13,415) |
| 39,347 | (13,989) |
| 28,450 | (13,867) |
| 27,568 | (14,070) |
| 26,701 | (14,238) |
| 25,847 | (14,439) |
| 25,008 | (14,673) |
| 24,183 | (14,946) |
| 23,370 | (14,888) |
| 22,572 | (14,397) |
| 21,786 | (14,081) |
| 46,427 | (13,799) |
| 45,667 | (13,622) |
| 44,919 | (13,246) |
| 44,183 | (12,981) |
| 43,460 | (12,717) |
| 42,748 | (12,458) |

### Tax Impact

| 35% Income Tax | Interest Tax Credit | Principal Tax Credit | 1.45% Medicare |
|---|---|---|---|
| 20,475 | (4,373) | (3,124) | 848 |
| 20,140 | (4,057) | (3,124) | 834 |
| 19,810 | (3,718) | (3,124) | 821 |
| 19,466 | (3,356) | (3,124) | 807 |
| 19,166 | (2,968) | (3,124) | 794 |
| 18,855 | (2,553) | (3,124) | 781 |
| 18,544 | (2,109) | (3,124) | 768 |
| 18,240 | (1,634) | (3,124) | 755 |
| 17,942 | (1,126) | (3,124) | 743 |
| 17,648 | (582) | (3,124) | 731 |
| 17,359 | 0 | (3,124) | 719 |
| 17,075 | 0 | (3,124) | 707 |
| 16,795 | 0 | (3,124) | 696 |
| 16,520 | 0 | (3,124) | 684 |
| 16,249 | 0 | (3,124) | 673 |
| 15,983 | 0 | (3,124) | 661 |
| 15,722 | 0 | (3,124) | 651 |
| 15,464 | 0 | (3,124) | 641 |
| 15,211 | 0 | (3,124) | 630 |
| 14,962 | 0 | (3,124) | 620 |

*Account value assumes:
- No additional policies added.
- Credited rate/Interest Gain   7.50%
- Outgo rate - Year 1 - 5    8.50%
- Outgo rate - Year 6 - 10   8.50%
- Outgo rate - Year 11 - 15   8.50%
- Outgo rate - Year 16 - 20   8.50%

*All numbers have been calculated based upon values as of 6/31/00

20 Year Cumulative Value of Retirement Plan Contribution =   168,167
- Assumes annual contribution of 7%
- Assumes Annual gain on Cumulative balance of   7.5%



# Trail Commission Program - PROJECTION

## PREPARED FOR

# .70% FIXED OPTION SAMPLE

| | |
|---|---|
| Total Deposits | $4,200,000 |
| Total Current Account Value | $7,800,000 |
| Buyout Cost | 4.28% of Deposits |
| Trail Rate Year 1 | 0.70% of Account Value |
| Loan Interest Rate | 7.00% |

### .70% Fixed Option

| Year | Account Value* | Buyout Cost | Trail Commission | Trail Rate |
|---|---|---|---|---|
| 1 | 7,800,000 | 178,500 | 54,600 | 0.70% |
| 2 | 7,872,276 | | 53,700 | 0.70% |
| 3 | 7,540,841 | | 52,528 | 0.70% |
| 4 | 7,420,085 | | 51,981 | 0.70% |
| 5 | 7,301,613 | | 51,111 | 0.70% |
| 6 | 7,181,950 | | 50,274 | 0.70% |
| 7 | 7,064,346 | | 49,450 | 0.70% |
| 8 | 6,948,667 | | 48,641 | 0.70% |
| 9 | 6,834,883 | | 47,844 | 0.70% |
| 10 | 6,722,962 | | 47,061 | 0.70% |
| 11 | 6,612,873 | | 46,290 | 0.70% |
| 12 | 6,504,597 | | 45,532 | 0.70% |
| 13 | 6,398,075 | | 44,787 | 0.70% |
| 14 | 6,293,306 | | 44,053 | 0.70% |
| 15 | 6,190,253 | | 43,332 | 0.70% |
| 16 | 6,088,899 | | 42,622 | 0.70% |
| 17 | 5,989,182 | | 41,924 | 0.70% |
| 18 | 5,891,100 | | 41,238 | 0.70% |
| 19 | 5,794,643 | | 40,562 | 0.70% |
| 20 | 5,699,765 | | 39,898 | 0.70% |

* Account value assumes:
- No additional policies added

(1)

| | |
|---|---|
| - Credited rate/Market Gain | 7.50% |
| - Outgo rate - Year 1 - 5 | 8.50% |
| - Outgo rate - Year 6 - 10 | 8.50% |
| - Outgo rate - Year 11 - 15 | 8.50% |
| - Outgo rate - Year 16 - 20 | 8.50% |

### Loan Calculation

| Loan Amount | Loan Interest | Principal Payment | Total Payment * |
|---|---|---|---|
| 178,500 | (12,496) | (12,919) | (25,414) |
| 165,581 | (11,591) | (13,824) | (25,414) |
| 151,757 | (10,623) | (14,791) | (25,414) |
| 136,965 | (9,588) | (15,827) | (25,414) |
| 121,139 | (8,480) | (16,935) | (25,414) |
| 104,204 | (7,294) | (18,120) | (25,414) |
| 86,084 | (6,026) | (19,388) | (25,414) |
| 66,695 | (4,669) | (20,746) | (25,414) |
| 45,950 | (3,216) | (22,198) | (25,414) |
| 23,752 | (1,663) | (23,752) | (25,414) |

* 10 Year payoff option

(2)

### Cash Flow

| Net Cash Flow | Total Tax Impact | | | | |
|---|---|---|---|---|---|
| 29,186 | (12,408) | | | | |
| 28,168 | (12,404) | | | | |
| 26,282 | (12,388) | | | | |
| 27,412 | (12,413) | | | | |
| 28,547 | (12,461) | | | | |
| 25,698 | (12,534) | | | | |
| 24,859 | (12,644) | | | | |
| 24,036 | (12,782) | | | | |
| 23,226 | (12,792) | | | | |
| 22,430 | (13,190) | | | | |
| 21,646 | (13,748) | | | | |
| 46,200 | (13,473) | | | | |
| 45,532 | (13,201) | | | | |
| 44,787 | (12,934) | | | | |
| 44,053 | (12,671) | | | | |
| 43,332 | (12,412) | | | | |
| 42,622 | (12,158) | | | | |
| 41,924 | (11,907) | | | | |
| 41,238 | (11,661) | | | | |
| 40,562 | (11,419) | | | | |
| 39,898 | (11,419) | | | | |

(3) = (1) - (2)

(4) =
(4a) + (4b) +
(4c) + (4d)

(5) = (3) - (4)

### Tax Impact

| | 35% Income Tax | Retirement Plan Contribution | Interest Tax Credit | Principal Tax Credit | 1.45% Medicare Tax |
|---|---|---|---|---|---|
| Annual Retirement Plan Contribution | 3,622 | 19,110 | (4,373) | (3,124) | 782 |
| | 3,708 | 18,787 | (4,057) | (3,124) | 771 |
| | 3,898 | 18,489 | (3,718) | (3,124) | 766 |
| | 3,837 | 18,187 | (3,356) | (3,124) | 753 |
| | 17,899 | (2,968) | (3,124) | 741 |
| | 3,519 | 17,596 | (2,553) | (3,124) | 729 |
| | 3,462 | 17,308 | (2,100) | (3,124) | 717 |
| | 3,402 | 17,024 | (1,834) | (3,124) | 705 |
| | 3,341 | 16,745 | (1,128) | (3,124) | 694 |
| | 3,124 | 16,471 | (582) | (3,124) | 682 |
| | 3,240 | 16,202 | 0 | (3,124) | 671 |
| | 3,187 | 15,938 | 0 | (3,124) | 660 |
| | 3,134 | 15,675 | 0 | (3,124) | 649 |
| | 3,094 | 15,419 | 0 | (3,124) | 638 |
| | 3,033 | 15,186 | 0 | (3,124) | 628 |
| | 2,981 | 14,918 | 0 | (3,124) | 618 |
| | 2,931 | 14,673 | 0 | (3,124) | 608 |
| | 2,881 | 14,433 | 0 | (3,124) | 598 |
| | 2,831 | 14,197 | 0 | (3,124) | 588 |
| | 2,763 | 13,964 | 0 | (3,124) | 579 |

(4a)

(4b)

(4c)

(4d)

* All numbers have been calculated based upon values as of 8/31/00

| | |
|---|---|
| 20 Year Cumulative Value of Retirement Plan Contribution = | 147,513 |
| - Assumes annual contribution of 7% | |
| - Assumes Annual gain on Cumulative balance of 7.5% | |

11/22/00

**Exhibit B**
**To Career Agent In-Force Annuity Trail Agreement**


**Tax Memorandum**


This memorandum outlines AFLIAC's understanding of the tax effects of participation in the company's In-Force Annuity Trail Commission Program. It is not intended as tax advice. Participating Career Agents should obtain independent advice regarding the tax treatment of the Program. Note: the discussion below assumes that the participant is a statutory employee.

Like other commissions, trail commissions paid under this Program, including any portion applied to loan payments as described in Part IV of the Agreement, will be ordinary income to the payee Career Agent. For federal and (in most states) state income tax purposes the full amount paid will ordinarily be includible in gross receipts on Schedule C of Form 1040 and on the appropriate schedule of the corresponding state form. Commissions paid under this Program will be reportable on Form W-2 for Social Security purposes and will be subject to the withholding of FICA taxes but not to income tax withholding. For income tax purposes the amounts paid will be shown in Box 1 of Form W-2 as other compensation. (For Social Security benefit purposes there is a fairly good argument that these commissions, like other life and annuity trail commissions, relate to the year in which the contract was sold and should not affect current-year benefits.)

Loan interest may be deductible for the year in which paid, generally on Schedule C (rather than A) in the case of an individual. With a level payment schedule the amount of interest paid will decrease each year, a fact that may affect some participants' financial planning.

The DAC buyout payment made to the company pursuant to Part III of the Agreement is a capital outlay, not an expense. For income tax purposes it may be amortizable (i.e., deductible) on a straight-line basis over the period from the date of the payment to November 29, 2020, the latest possible date on which a trail commission may be paid under the Agreement. (See Part IV.)

Caution: the foregoing discussion assumes that participants are statutory employees (rather than common-law employees) for income tax purposes and are therefore entitled to deduct business expenses on Schedule C in accordance with Rev. Rul. 90-93 (1990-2 C.B. 33). Any participants who are common-law employees will not be able to deduct interest on Program loans and, if they are able to deduct amortization of the DAC buyout at all, will have to do so on Schedule A. Such participants will be subject to income tax withholding.

:O: ━━━━━━━

https://www.allmerica.com/servlet/w...text=fprpWakpjrLm&Item.dm=2106z1z0

**TO: Presidents**

FROM: Jim Bellner

DATE: October 17, 2002

SUBJECT: DAC Trail Program - 2003 Changes

Due to the many issues our Advisors are dealing with related to our organizational changes and actions of the rating agencies, it has been decided to make several liberalizations to the DAC Trail Program during 2003.

The following is a brief explanation of the items that will be impacted:

1. DAC Loan Interest Rate

   Effective with the 12/31/02 file - payable March 2003, the loan interest will be lowered to 5.75%. This will result in a lower quarterly loan payment.

   We will require all participants to sign a new promissory note. This should occur before the end of the year.

   Please note that this is a permanent change to the plan.

2. Trail Rates

Effective with the 12/31/02 file - payable March 2003, all Trail Rates have been increased. This increase is meant to compensate for the loss of the Advisors pension contribution into the Retirement Plan. Therefore, we will be increasing all Trail Rates by 7%.

   Please note that this is a permanent change to the plan.

Please review the new Trail Rates outlined below.

CURRENT TRAIL RATE   NEW TRAIL RATE

| CURRENT TRAIL RATE | NEW TRAIL RATE |
|---|---|
| 1.00% | 1.07% |
| .75% | .80% |
| .70% (Fixed) | .75% (Fixed) |
| .65% | .70% |
| .55% | .60% |

3. Persistency



EXHIBIT



D

11/26/2002 8:45 AM

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: December 31, 2003

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from: _____ to _____

Commission file number: 1-13754

# ALLMERICA FINANCIAL CORPORATION
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3263626** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **440 Lincoln Street, Worcester, Massachusetts** | **01653** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (508) 855-1000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Stock, $.01 par value, together with Stock Purchase Rights** | **New York Stock Exchange** |
| **7 5/8 % Senior Debentures due 2025** | **New York Stock Exchange** |

#### Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒   No ☐

Based on the closing sales price of June 30, 2003 the aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant was $933,661,967.

The number of shares outstanding of the registrant's common stock, $.01 par value, was 53,134,144 shares outstanding as of February 16, 2004.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of Allmerica Financial Corporation's Proxy Statement of Annual Meeting of Shareholders to be held May 4, 2004 are incorporated by reference in Part III.

*EXHIBIT*

**E**

Dated: February 27, 2004

EXHIBIT 99.2

### IMPORTANT FACTORS REGARDING FORWARD-LOOKING STATEMENTS

*We wish to caution readers that the following important factors, among others, in some cases have affected our results and in the future could cause our actual results and needs to vary materially from our past results and needs and from forward-looking statements made from time to time by us on the basis of our then-current expectations. The businesses in which we engage are in rapidly changing and competitive markets and involve a high degree of risk. Accuracy with respect to forward-looking projections is difficult.*

**Risks Relating to Our Property and Casualty Insurance Business**

***Our results may fluctuate as a result of cyclical changes in the property and casualty insurance industry.***

We generate a significant portion of our total revenues through our property and casualty insurance subsidiaries. The results of companies in the property and casualty insurance industry historically have been subject to significant fluctuations and uncertainties. Our profitability could be affected significantly by:

- increases in costs, particularly those occurring after the time our insurance products are priced and including construction, automobile, and medical and rehabilitation costs;

- competitive and regulatory pressures which may affect the prices of our products and the nature of the risks covered;

- volatile and unpredictable developments, including severe weather, catastrophes and terrorist actions;

- legal, regulatory and socio-economic developments, such as new theories of insured and insurer liability and related claims, increases in the size of jury awards, and increases in construction, automobile repair and medical and rehabilitation costs;

- fluctuations in interest rates, inflationary pressures, default rates and other factors that affect investment returns; and

- other general economic conditions and trends that may affect the adequacy of reserves.

The demand for property and casualty insurance can also vary significantly based on general economic conditions, rising as the overall level of economic activity increases and falling as such activity decreases. The fluctuations in demand and competition could produce underwriting results that would have a negative impact on our results of operations and financial condition.

***Actual losses from claims against our property and casualty insurance subsidiaries may exceed their reserves for claims.***

Our property and casualty insurance subsidiaries maintain reserves to cover their estimated ultimate liability for losses and loss adjustment expenses with respect to reported and unreported claims incurred as of the end of each accounting period. Reserves do not represent an exact calculation of liability. Rather, reserves represent estimates, involving actuarial projections at a given time, of what we expect the ultimate settlement and administration of claims will cost based on facts and circumstances then known, predictions of future events, estimates of future trends in claims frequency and severity and judicial theories of liability, costs of repair and replacement, legislative activity and other factors.

The inherent uncertainties of estimating reserves are greater for certain types of property and casualty insurance lines. These include workers' compensation, where a longer period of time may elapse before a definitive determination of ultimate liability may be made, and environmental liability, where the technological, judicial and political climates involving these types of claims are changing.

We regularly review our reserving techniques, reinsurance and the overall adequacy of our reserves based upon:

- our review of historical data, legislative enactments, judicial decisions, legal developments in imposition of damages, changes in political attitudes and trends in general economic conditions;

- our review of per claim information;

- historical loss experience of our property and casualty insurance subsidiaries and the industry as a whole; and

- the form of our property and casualty insurance policies.

Because setting reserves is inherently uncertain, we cannot provide assurance that the existing reserves or future reserves established by our property and casualty insurance subsidiaries will prove adequate in light of subsequent events. Our results of operations and financial condition could therefore be materially affected by adverse loss development for events that we insure.

### Due to our geographical concentration in our property and casualty business, changes in the economic, regulatory and other conditions in the regions where we operate could have a significant negative impact on our business as a whole.

We generate a significant portion of our property and casualty insurance net premiums written and earnings in Michigan, Massachusetts and other states in the Northeast, including New Jersey, New York, Maine, Connecticut, New Hampshire, Rhode Island and Vermont. For the year ended December 31, 2003, approximately 38% and 17% of our net written premium in our property and casualty business was generated in the states of Michigan and Massachusetts, respectively. Massachusetts and New Jersey, in particular with respect to private passenger automobile insurance, are highly regulated, impose significant rate control and residual market charges, and restrict a carrier's ability to exit such markets. The revenues and profitability of our property and casualty insurance subsidiaries are subject to prevailing economic, regulatory, demographic and other conditions, including adverse weather, in Michigan and the Northeast. Because of our strong regional focus, our business as a whole could be significantly affected by changes in the economic, regulatory and other conditions in the regions where we transact business.

### Catastrophe losses could materially reduce our profitability or cash flow.

Our property and casualty insurance subsidiaries are subject to claims arising out of catastrophes that may have a significant impact on their results of operations and financial condition. We may experience catastrophe losses, which could have a material adverse impact on our business. Catastrophes can be caused by various events including hurricanes, earthquakes, tornadoes, wind, hail, fires, severe winter weather, sabotage, terrorist actions and explosion. The frequency and severity of catastrophes are inherently unpredictable.

The extent of gross losses from a catastrophe is a function of two factors: the total amount of insured exposure in the area affected by the event and the severity of the event. The extent of net losses depends on the amount and collectibility of reinsurance.

Although catastrophes can cause losses in a variety of property and casualty lines, homeowners and commercial multiple peril insurance have, in the past, generated the vast majority of our catastrophe-related claims. Our catastrophe losses have historically been principally weather-related, particularly snow and ice damage from winter storms.

-2-

We purchase catastrophe reinsurance as protection against catastrophe losses. Based upon our review of our reinsurers' financial statements and reputations in the reinsurance marketplace, we believe that the financial condition of our reinsurers is sound. However, reinsurance is subject to credit risks, including those resulting from over-concentration within the industry. The availability, scope of coverage and cost of reinsurance could be adversely affected by the losses incurred from the September 11, 2001 terrorist attacks and the perceived risks associated with possible future terrorist activities. We cannot currently estimate the impact of these events on us. We also cannot provide assurance that our current reinsurance will be adequate to protect us against future catastrophe losses or that reinsurance will continue to be available to us at commercially reasonable rates or with coverage provisions reflective of the risks underwritten in our primary policies.

### We may incur financial losses resulting from our participation in shared market mechanisms and mandatory and voluntary pooling arrangements.

As a condition to conducting business in several states, our property and casualty insurance subsidiaries are required to participate in mandatory property and casualty shared market mechanisms or pooling arrangements. These arrangements are designed to provide various insurance coverages to individuals or other entities that otherwise are unable to purchase such coverage. We cannot predict whether our participation in these shared market mechanisms or pooling arrangements will provide underwriting profits or losses to us. For the years ended December 31, 2003, 2002, and 2001, we incurred an underwriting loss from participation in these mechanisms and pooling arrangements of $26.9 million, $30.8 million, and $20.1 million, respectively. We may face similar losses in the future.

In addition, we may be adversely affected by liabilities resulting from our previous participation in certain voluntary assumed reinsurance pools, including accident and health reinsurance pools and certain property and casualty reinsurance pools. We discontinued our participation in the accident and health reinsurance pools in 1998, but remain subject to claims from periods in which we participated as well as for certain continuing obligations in a limited number of accident and health pools that we were prohibited from exiting in full. We have terminated participation in virtually all property and casualty voluntary pool business, but also remain subject to claims related to periods in which we participated. The accident and health and property and casualty assumed reinsurance businesses have suffered substantial losses during the past several years, particularly related to environmental and asbestos exposure for property and casualty coverages. Due to the inherent volatility in these businesses, possible issues related to the enforceability of reinsurance treaties in the industry and to the recent history of increased losses, we cannot provide assurance that our current reserves are adequate or that we will not incur losses in the future. Although we have discontinued participation in these reinsurance pools as described above, we are subject to claims related to prior years or from pools we could not exit in full. Our operating results and financial position may be harmed from liabilities resulting from any such claims.

### Our profitability could be adversely affected by periodic changes to our relationships with our agencies.

Our Property and Casualty segment reviews our agencies from time to time to identify those that do not meet our profitability standards or are not strategically aligned with our business. Following these periodic reviews, we may restrict such agencies' access to certain types of policies or terminate our relationship with them, subject to applicable contractual and regulatory requirements to renew certain policies for a limited time. For example, in 2001 we identified approximately 700 agencies with whom we either limited or terminated our relationship. We have realized a decline in our annual written premium during 2003 as a result of these actions and anticipate that our written premiums will continue to decline, although at a lower rate, in future periods. We expect our overall profitability to improve over time as a result of expected lower losses incurred, however, we cannot be sure that we will achieve the desired results from these measures, and our failure to do so could negatively affect our operating results and financial position.

-3-

### Risks Relating to Our Allmerica Financial Services and Asset Management Businesses

*Interest rate fluctuations could negatively affect our profitability.*

Some of our products, including guaranteed investment contracts, funding agreements, the general account options in our variable products, traditional whole and universal life insurance and fixed annuities expose us to the risk that changes in interest rates will reduce our "spread", or the difference between the amounts that we are required to pay under the contracts and the rate of return we are able to earn on our general account investments intended to support our obligations under the contracts. Declines in our spread from these products or other spread businesses we conduct could have a material adverse effect on our business or results of operations.

In periods of increasing interest rates, we may not be able to replace the assets in our general account investment portfolios with higher yielding assets needed to fund the higher crediting rates necessary to keep our interest sensitive products profitable. We therefore may have to accept a lower spread and thus lower profitability or face greater loss of existing contracts and related assets. In periods of declining interest rates, we may have to reinvest the cash we receive as interest or return of principal on our investments in lower yielding instruments then available. Moreover, borrowers may prepay fixed-income securities, commercial mortgages and mortgage-backed securities in our general account in order to borrow at lower market rates, which increases this risk. Because we are entitled to reset the interest rates on our general account supported life insurance and annuity products and guaranteed investment contracts only at limited, pre-established intervals, and since many of our policies have guaranteed minimum interest or crediting rates, our spreads could decrease and potentially become negative.

A decline in market interest rates available on investments could also reduce our return from investments of capital that do not support particular policy obligations, which could have a material adverse effect on our results of operations.

*Increases in interest rates may cause increased surrenders and withdrawal of insurance products.*

In periods of increasing interest rates, policy loans and surrenders and withdrawals of life insurance policies and annuity contracts may increase as policyholders seek to buy products with perceived higher returns. This process may lead to a flow of cash out of our businesses. These outflows may require investment assets to be sold at a time when prices for those assets are lower because of the increase in market interest rates, which may result in realized investment losses. The value of fixed income investments, in particular, tends to fluctuate in an inverse relationship to interest rates. A sudden demand among consumers to change product types or withdraw funds could lead us to sell assets at a loss to meet the demand for funds. In addition, unanticipated withdrawals and terminations, as well as adverse selection on the basis of age, may require us to accelerate the amortization of deferred policy acquisition costs. This would increase our current expenses.

*A decline or increase in volatility in the securities markets may negatively affect our business.*

Our investment-based and asset management products and services expose us to the risk that surrenders in variable life and annuity products and withdrawal of assets from other investment products will increase if, as a result of a continued market downturn, increased market volatility or other market conditions, customers become dissatisfied with their investments. A declining market also leads to lower account balances as a result of decreases in market value of assets under management. In many cases, our fees in these businesses are based on a percentage of the assets we manage and, if account values decline, our fee revenue declines.

These factors may lead to a flow of cash out of our businesses. These outflows may require investment assets to be sold at a time when prices for those assets are lower, which may result in realized investment losses. A sudden demand among consumers to change product types or withdraw funds could lead us to sell assets at a loss to meet the demand for funds. In addition, unanticipated withdrawals and terminations, as well as adverse selection on the basis of age, or guaranteed minimum death benefit exposure may require us to accelerate the amortization of deferred policy acquisition costs. This would increase our current expenses.

-4-

In addition, the lower account balances that result from a declining securities market particularly affect our variable annuity products that offer guaranteed minimum death benefits, or GMDB. Under certain market conditions, including those we currently face, the assets in an annuitant's account may be insufficient to satisfy our GMDB obligations at the time of an annuitant's death. In this case, we must satisfy the difference from other cash sources. In the event that a significant number of deaths of such annuitants occur at a time that account balances are decreased as a result of a market downturn which resulted in claims in excess of our GMDB reserve, our liquidity, level of statutory capital and earnings would be significantly and adversely affected. At December 31, 2003, our GMDB reserve under GAAP (Generally Accepted Accounting Principles) was $26.2 million. We cannot provide assurance that this reserve will prove adequate in light of subsequent events.

Additionally, on December 3, 2003, we implemented a hedging program for our in-force variable annuity policies with GMDB features. The program's purpose is to provide us with an economic hedge against increased GMDB claims which could arise from declines in the equity market below levels at December 3, 2003. Although we believe that moderate movements in the equity market will be substantially offset by our GMDB hedging program, we may incur losses as a result of adverse future performance and volatility in the equity market, as well as the failure of various hedging instruments to correlate with the investment performance of the underlying sub-accounts. Currently, we use equity index futures to hedge this investment risk. The unavailability of this instrument, or similar instruments in the future, could significantly impact the correlation of these instruments to the sub-accounts. The economic hedges are affected by adverse redemption and mortality patterns in our annuity contracts, which also could result in additional losses. These hedges do not reduce our cost from the net amount at risk existing at December 3, 2003.

### *Actual losses from claims against our life insurance subsidiaries may exceed their reserves for claims.*

For our life insurance and annuity products, we calculate reserves based on assumptions and estimates such as estimated premiums we will receive over the assumed life of each policy, the timing of the event covered by the insurance policy, the expected life of the insured or annuitant, the anticipated market performance of underlying investments, the amount of benefits or claims to be paid and the investment returns on the assets we purchase with the premiums we receive. We establish reserves based on assumptions and estimates of mortality and morbidity rates, policy and claim termination rates, benefit amounts, investment returns and other factors. Because setting reserves is inherently uncertain, we cannot provide assurance that our existing reserves or future reserves to support our obligations under our life and insurance annuity products will prove adequate in light of subsequent events. Our results of operations and financial condition could therefore be materially affected by adverse loss development for events that we insure.

### *We could be adversely affected by litigation regarding insurers' and broker/dealers' sales practices or changes in regulations or the regulatory environment.*

A number of civil jury verdicts have been returned against life and health insurers and broker/dealer distributors in the jurisdictions in which we do business. These cases involved the insurers' or distributors' sales practices or disclosures, alleged agent misconduct, failure to properly supervise agents, and other matters. Some of the lawsuits have resulted in the award of substantial judgments against the insurer or distributor, including material amounts of punitive damages. In some states, juries are given substantial discretion in awarding punitive damages in these circumstances. We, from time to time, are subject to litigation of this type.

The insurance, broker/dealer, investment management (particularly mutual funds and variable product separate accounts) and investment advisory industries are heavily regulated by federal and state laws. The success of our business could be affected by changes in such laws or regulations or the interpretation of such laws and regulations and the corresponding civil litigation environment.

### *We could be adversely affected by the decision to cease retail sales through our broker/dealer, VeraVest Investments, Inc. ("VeraVest").*

The registered representatives appointed by VeraVest are primarily comprised of advisors who made up our former Agency channel. The activities of these advisors after termination of these appointments could affect

-5-

persistency of the products previously sold by them, as well as additional payments or deposits made with respect to such products. It is difficult to predict the impact that this action, including any potential related litigation, will have on our future financial results.

*Fluctuations in currency exchange rates may adversely affect our financial condition.*

We have investments in securities denominated in foreign currencies. As of December 31, 2003, our investments in foreign currency denominated securities amounted to approximately $25 million, based on the exchange ratio prevailing on that date between the U.S. dollar and the relevant foreign currency. We also hold trust obligations backed by funding obligations denominated in foreign currencies. As a result, we are exposed to changes in exchange rates between the U.S. dollar and various foreign currencies, including the Japanese Yen, British Pound and the Euro. To the extent these exchange rates fluctuate in the future, our financial condition could be adversely affected.

We enter into foreign exchange swap, futures or options contracts, as well as compound foreign currency or interest rate swap contracts from time to time to mitigate risks from foreign currency fluctuations. However, we cannot provide assurance that these measures will be adequate, or that these risks will not adversely affect our business. Furthermore, swap contracts and similar transactions also expose us to credit risk with the counterparty to the transaction.

## Risk Relating to Our Business Generally

*Other market fluctuations and general economic, market and political conditions may also negatively affect our business and profitability.*

At December 31, 2003, we held approximately $8.2 billion of investment assets in categories such as fixed maturities, equity securities, mortgage loans and other long-term investments. Our investment returns, and thus our profitability, may be adversely affected from time to time by conditions affecting our specific investments and, more generally, by bond, stock, real estate and other market fluctuations and general economic, market and political conditions. Our ability to make a profit on insurance products, fixed annuities and guaranteed investment products depends in part on the returns on investments supporting our obligations under these products and the value of specific investments may fluctuate substantially depending on the foregoing conditions. We use a variety of strategies to hedge our exposure to interest rate and other market risk. However, hedging strategies are not always available and carry certain credit risks, and our hedging could be ineffective.

The uncertainties in the U.S. and international economic and investment climates adversely affected our businesses and profitability in 2003, and can be expected to continue to do so, unless conditions improve. These general uncertainties contributed to ratings downgrades in our business, which led us, in 2002, to cease new sales of our life insurance and annuity products. In 2003, we discontinued the retail operations of our broker/dealer, VeraVest.

Market conditions also affect the value of assets under our employee pension plans, including our Cash Balance Plan. The expense or benefit related to our employee pension plans results from several factors, including changes in the market value of plan assets, interest rates and employee compensation levels. For the year ended December 31, 2003, we recognized net expenses of $44.2 million related to our employee pension plans. Declines in the market value of plan assets and interest rates from levels at December 31, 2003 could negatively affect our results of operations. Additionally, in 2003, we contributed $25.0 million to our qualified pension plan. We may have to contribute additional funds to our benefit plans in future periods due to the inherent uncertainty surrounding the financial markets and their effect on plan assets.

In addition, debt securities comprise a material portion of our investment portfolio. The issuers of those securities, as well as borrowers under the loans we make, customers, trading counterparties, counterparties under

-6-

swaps and other derivative contracts and reinsurers, may be affected by the declining market. These parties may default on their obligations to us due to bankruptcy, lack of liquidity, downturns in the economy or real estate values, operational failure or other reasons. The uncertain trend in the U.S. and other economies has resulted in increased levels of investment impairments, as indicated by the $238.5 million of impairment charges we took in 2002 and the $61.6 million of impairment charges we took in 2003. We cannot assure you that further impairment charges will not be necessary in the future. Our ability to fulfill our debt and other obligations could be adversely affected by the default of third parties on their obligations owed to us.

### *We are a holding company and rely on our insurance company subsidiaries for cash flow; we may not be able to receive dividends from our subsidiaries in needed amounts.*

We are a holding company for a diversified group of insurance and financial services companies and our principal assets are the shares of capital stock of our subsidiaries. Our ability to make required debt service payments, as well as our ability to pay operating expenses and pay dividends to shareholders, depends upon the receipt of sufficient funds from our subsidiaries. The payment of dividends by our insurance company subsidiaries is subject to regulatory restrictions and will depend on the surplus and future earnings of these subsidiaries, as well as the regulatory restrictions. For example, during 2003, we received $25.0 million of dividends from our life business. These dividends were considered "extraordinary" and required approval from state regulators. Neither AFLIAC nor FAFLIC can pay future dividends except with the permission of the Massachusetts Insurance Commissioner. AFC's need for funds may be affected by its commitment with the Commonwealth of Massachusetts Insurance Commissioner to maintain a minimum risk-based capital ratio for AFLIAC of 100% of the Company Action Level, indefinitely. Our property and casualty businesses can make dividends to AFC of approximately $100 million without prior approval from the state regulators.

Because of the regulatory limitations on the payment of dividends from our insurance company subsidiaries, we may not always be able to receive dividends from these subsidiaries at times and in amounts necessary to meet our debt and other obligations. The inability of our subsidiaries to pay dividends to us in an amount sufficient to meet our debt service and funding obligations would have a material adverse effect on us. These regulatory dividend restrictions also impede our ability to transfer cash and other capital resources among our subsidiaries.

Our dependence on our insurance subsidiaries for cash flow exposes us to the risk of changes in their ability to generate sufficient cash inflows from new or existing customers or from increased cash outflows. Cash outflows may result from claims activity, surrenders, lapses or investment losses. Reductions in cash flow from our subsidiaries would have a material adverse effect on our business and results of operations.

### *Our businesses are heavily regulated and changes in regulation may reduce our profitability.*

Our insurance businesses are subject to supervision and regulation by the state insurance authority in each state in which we transact business. This system of supervision and regulation relates to numerous aspects of an insurance company's business and financial condition, including limitations on the authorization of lines of business, underwriting limitations, the ability to terminate agents, supervisory and liability responsibilities for agents and registered representatives, the setting of premium rates, the requirement to write certain classes of business which we might otherwise avoid or charge different premium rates, restrictions on the ability to withdraw from certain lines of business, the establishment of standards of solvency, the licensing of insurers and agents, concentration of investments, levels of reserves, the payment of dividends, transactions with affiliates, changes of control and the approval of policy forms. Most insurance regulations are designed to protect the interests of policyholders rather than stockholders and other investors.

-7-

State regulatory oversight and various proposals at the federal level may in the future adversely affect our ability to sustain adequate returns in certain lines of business or in some cases, such as Massachusetts private passenger automobile business, operate the line profitably. In recent years, the state insurance regulatory framework has come under increased federal scrutiny, and certain state legislatures have considered or enacted laws that alter and, in many cases, increase state authority to regulate insurance companies and insurance holding company systems. Products that are also "securities", such as variable life insurance and variable annuities, are also subject to federal and state securities laws and such products and their distribution by our broker/dealer are regulated and supervised by the Securities and Exchange Commission, the National Association of Securities Dealers, or NASD, and state securities commissions. Our business could be negatively impacted by adverse state and federal legislation or regulation, including those resulting in:

- decreases in rates;
- limitations on premium levels;
- increases in minimum capital and reserve requirements;
- benefit mandates;
- limitations on the ability to manage care and utilization;
- requirements to write certain classes of business;
- tax treatment of insurance and annuity products; and
- restrictions on underwriting.

In addition, broker/dealers are subject to regulations which cover all aspects of securities business, including:

- sales methods and supervision;
- trading practices among broker/dealers;
- use and safekeeping of customers' funds and securities;
- recordkeeping;
- compensation;
- and the conduct of directors, officers and employees.

These regulations serve to protect the customers and other third parties who deal with us and are designed to protect the integrity of the financial markets. If we are found to have violated an applicable regulation, administrative or judicial proceedings may be initiated against us which could result in censures, fines, civil penalties, the issuance of cease-and-desist orders, the deregistration or suspension of our broker/dealer activities, among other consequences. These actions could have a material adverse effect on our financial position and results of operations.

### We are rated by several rating agencies, and our ratings could adversely affect our operations.

Ratings have become increasingly important in establishing the competitive position of insurance companies. Our ratings are important in marketing the products of our insurance companies to our agents and customers, since rating information is broadly disseminated and generally used throughout the industry.

-8-

Our insurance company subsidiaries are rated by A.M. Best and Moody's, and certain of our insurance company subsidiaries are rated for their claims-paying ability by Standard & Poor's. These ratings reflect a rating agency's opinion of our insurance subsidiaries' financial strength, operating performance, strategic position and ability to meet their obligations to policyholders. These ratings are not evaluations directed to investors, and are not recommendations to buy, sell or hold our securities. Our ratings are subject to periodic review by the rating agencies and we cannot guarantee the continued retention or improvement of our current ratings.

During 2002, our ratings were lowered by A.M. Best, Moody's and Standard & Poor's. As a result of the ratings downgrades in 2002 of the life insurance companies, we determined not to continue new sales of proprietary products in the AFS segment and we experienced increased surrender rates in the life insurance and annuity business. In addition, we are no longer able to sell GIC products. These downgrades also caused counterparties to terminate certain swap agreements, which were replaced with alternative derivative instruments. Ratings downgrades have also adversely affected the cost and availability of any additional debt or equity financing, including financing of operating funds for AMGRO, our property and casualty premium financing subsidiary.

We secured third party guarantees in an effort to minimize the loss of our property and casualty commercial lines business as a result of the downgrades. These measures were primarily intended to reduce the risk of cancellation or non-renewal of these commercial policies in the near term.

On January 21, 2004, A.M. Best Co. upgraded the Company's property and casualty financial strength ratings to A- (Excellent) from B++ (Very Good) and upgraded the life companies' financial strength ratings to B+ (Very Good) from B- (Fair). In addition, the Company's debt ratings were upgraded to "bb+" from "bb" for senior debt, "bb-" from "b+" for capital securities and AMB-3 from AMB-4 for commercial paper. All ratings from A.M. Best have been assigned stable outlooks. Although we have recently received this improvement in our ratings, we cannot provide assurance that we will retain these ratings. Downgrades in future periods could adversely affect our results of operations and financial position.

*Negative changes in our level of statutory surplus could adversely affect our ratings and profitability.*

The capacity for an insurance company's growth in premiums is in part a function of its statutory surplus. Maintaining appropriate levels of statutory surplus, as measured by state insurance regulators, is considered important by state insurance regulatory authorities and the private agencies that rate insurers' claims-paying abilities and financial strength. Regulators may require that additional capital be contributed to increase the level of statutory surplus. Failure to maintain certain levels of statutory surplus could result in increased regulatory scrutiny, action by state regulatory authorities or a downgrade by private rating agencies.

The National Association of Insurance Commissioners, or NAIC, uses a system for assessing the adequacy of statutory capital for life and health insurers and property and casualty insurers. The system, known as risk-based capital, is in addition to the states' fixed dollar minimum capital and other requirements. The system is based on risk-based formulas (separately defined for life and health insurers and property and casualty insurers) that apply prescribed factors to the various risk elements in an insurer's business and investments to report a minimum capital requirement proportional to the amount of risk assumed by the insurer. We believe that any failure to maintain appropriate levels of statutory surplus would have an adverse impact on our ability to grow our property and casualty business profitably.

*We are subject to mandatory assessments by state guaranty funds; an increase in these assessments could adversely affect our results of operations and financial condition.*

All fifty states of the United States have insurance guaranty fund laws requiring life and property and casualty insurance companies doing business within the state to participate in guaranty associations. These associations are organized to pay contractual obligations under insurance policies issued by impaired or insolvent insurance companies. The associations levy assessments, up to prescribed limits, on all member insurers in a particular state on the basis of the proportionate share of the premiums written by member insurers in the lines of business in which the impaired or insolvent insurer is engaged. Mandatory assessments by state guaranty funds are used to cover losses to policyholders of insolvent or rehabilitated companies and can be partially recovered through a reduction in future premium taxes in many states, although the ability of our life insurance subsidiaries to recover

-9-

such assessments in the future will be greatly limited by the fact that we receive premiums, and thus pay premium taxes, only on existing business. During 2002, we had a total assessment of approximately $7.1 million levied against us. As of December 31, 2003, we have $9.2 million of reserves related to guaranty fund assessments. In the future, these assessments may increase above levels experienced in 2003. Future increases in these assessments depend upon the rate of insolvencies of insurance companies. An increase in assessments could adversely affect our results of operations and financial condition.

*Intense competition could negatively affect our ability to maintain or increase our profitability.*

We compete with a large number of other companies in our property and casualty segment. We compete, and will continue to compete, with national and regional insurers, mutual companies, specialty insurance companies, underwriting agencies and financial services institutions. In recent years, there has been substantial consolidation and convergence among companies in the financial services industry, particularly as the laws separating banking, insurance and securities have been relaxed, resulting in increased competition from large, well-capitalized financial services firms. Many of our competitors have greater financial, technical and operating resources than we do. In addition, competition in the property and casualty insurance markets has intensified over the past several years. This competition may have an adverse impact on our revenues and profitability.

A number of new, proposed or potential legislative or industry developments could further increase competition in our industry. These developments include:

- the enactment of the Gramm-Leach-Bliley Act of 1999, which could result in increased competition from new entrants to our markets;

- the implementation of commercial lines deregulation in several states;

- programs in which state-sponsored entities provide property insurance in catastrophe prone areas or other alternative markets types of coverage;

- changing practices caused by the Internet, which have led to greater competition in the insurance business in general, and

- proposals, from time to time, to provide for federal chartering of insurance companies.

In addition, we could face heightened competition resulting from the entry of new competitors and the introduction of new products by new and existing competitors. Increased competition could make it difficult for us to obtain new customers, retain existing customers or maintain policies in force by existing customers. It could also result in increasing our service, administrative, policy acquisition or general expense due to the need for additional advertising and marketing of our products. In addition, our administrative or management information systems expenditures could also increase substantially as we try to maintain our competitive position. We cannot provide assurance that we will be able to maintain our current competitive position in the markets in which we operate, or that we will be able to expand our operations into new markets. If we fail to do so, our business could be materially adversely affected.

*If we are unable to attract and retain qualified personnel, we may not be able to compete effectively and our operations could be impacted significantly.*

Our future success will be affected by our continued ability to attract and retain qualified executives, particularly those experienced in the property and casualty industry.

-10-

Effective with the 12/31/02 file - payable March 2003, the Outgo Rate limits will be waived for 2003. Therefore, if an Advisors Outgo Rate increase above one of the maximums, their current Trail Rate will not be reduced.

Please note that this change will impact the (4) Trail payments in 2003.

It is anticipated that the persistency limits as stated in the plan will be reinstated in 2004.

4.  Production Requirements

Effective with the 12/31/02 file - payable March 2003, if an Advisor's Trail rate in 2002 was established at the Presidents' Club level and in 2002 Presidents' Club level production is not achieved, the Advisor's Trail Rate will not be reduced. It will remain at the Presidents' Club level for 2003. Please note that a Leaders' level Producer who achieves Presidents' Club level in 2002 will be raised to the higher level.

Please note that this change will impact the (4) Trail payments in 2003.

It is anticipated that the production requirements as stated in the plan will be reinstated in 2004.

5.  Termination

Items # 2 & 3 above are null and void if the advisor terminates his/her employment, voluntarily or otherwise as of 1/1/03 or later. Therefore, the Advisor's Trail Rate will be adjusted based upon the advisor's actual Outgo Rate and actual production in 2002 as stated in the original program contract.

Looking forward, we will be setting new production requirements for future Trail Rate qualifications for 2004 and onward. These requirements will be based on any revised Leaders'/Presidents' qualifications.

If you have further questions, please contact either Phil Alston at ext. 2629 or Jennifer Goddard at ext. 7324