# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: December 31, 2003

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from: _____ to _____

Commission file number: 1-13754

# ALLMERICA FINANCIAL CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3263626** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **440 Lincoln Street, Worcester, Massachusetts** | **01653** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (508) 855-1000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value, together with Stock Purchase Rights | New York Stock Exchange |
| 7 5/8 % Senior Debentures due 2025 | New York Stock Exchange |

#### Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒   No ☐

Based on the closing sales price of June 30, 2003 the aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant was $933,661,967.

The number of shares outstanding of the registrant's common stock, $.01 par value, was 53,134,144 shares outstanding as of February 16, 2004.

#### DOCUMENTS INCORPORATED BY REFERENCE

Portions of Allmerica Financial Corporation's Proxy Statement of Annual Meeting of Shareholders to be held May 4, 2004 are incorporated by reference in Part III.

## EXHIBIT
## F

information on other litigation and claims may be found in Note 21, "Contingencies" on pages 102 and 103 of the Notes to the Consolidated Financial Statements included in Financial Statements and Supplementary Data of this Report on Form 10-K. In our opinion, based on the advice of legal counsel, the ultimate resolutions of such proceedings will not have a material effect on our financial position, although they could have a material effect on the results of operations for a particular quarter or annual period.

## RATING AGENCY ACTIONS

Insurance companies are rated by rating agencies to provide both industry participants and insurance consumers information on specific insurance companies. Higher ratings generally indicate the rating agencies' opinion regarding financial stability and a stronger ability to pay claims.

We believe that strong ratings are important factors in marketing our products to our agents and customers, since rating information is broadly disseminated and generally used throughout the industry. Insurance company financial strength ratings are assigned to an insurer based upon factors deemed by the rating agencies to be relevant to policyholders and are not directed toward protection of investors. Such ratings are neither a rating of securities nor a recommendation to buy, hold or sell any security.

The following tables provide information about our ratings at December 31, 2001, 2002 and 2003, and rating agency actions that occurred in 2002. Additionally, where applicable, we have included rating agency actions occurring in 2004.

## STANDARD & POOR'S RATINGS

| | *End of Year Rating December 2001* | *2002 Rating Agency Actions* | | | *End of Year Rating* | |
| --- | --- | --- | --- | --- | --- | --- |
| | | *August 2002* | *September 2002* | *October 2002* | *December 2002* | *December 2003* |
| **Financial Strength Ratings** | | | | | | |
| Property and Casualty Companies | AA- (Very Strong) | A+ (Strong) | A- (Strong) | BBB+ (Good) with a negative outlook | BBB+ (Good) with a negative outlook | BBB+ (Good) with a stable outlook |
| Life Companies | AA- (Very Strong) | A (Strong) | BB (Marginal) | B+ (Weak) with a negative outlook | B+ (Weak) with a negative outlook | B+ (Weak) with a positive outlook |
| **Debt Ratings** | | | | | | |
| AFC Senior Debt | A- (Strong) | BBB (Good) | BB (Marginal) | BB- (Marginal) | BB- (Marginal) | BB- (Marginal) with a positive outlook |
| AFC Capital Securities | BBB (Good) | BBB (Good) | B- (Weak) | B- (Weak) | B- (Weak) | B- (Weak) with a positive outlook |
| AFC Short-term Debt | A2 (Good) | A2 (Good) | B1 (Weak) | B (Weak) with a negative outlook | B (Weak) with a negative outlook | Not Rated |
| FAFLIC Short-term Debt and Financial Strength Ratings | A1+ (Strong) | A1+ (Strong) | B (Vulnerable) | B (Vulnerable) | B (Vulnerable) | Not Rated |

57

## MOODY'S RATINGS

| | End of Year Rating December 2001 | 2002 Rating Agency Actions | | | | End of Year Rating | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | March 2002 | July 2002 | September 2002 | October 2002 | December 2002 | December 2003 |
| **Financial Strength Ratings** | | | | | | | |
| Property and Casualty Companies | A1 (Good) | A1 (Good) | A2 (Good) | A3 (Good) | Baa3 (Adequate) with direction uncertain | Baa3 (Adequate) with direction uncertain | Baa2 (Adequate) with stable outlook |
| Life Companies | A1 (Good) | A1 (Good) | A3 (Good) | Ba1 (Questionable) | Ba3 (Questionable) with direction uncertain | Ba3 (Questionable) with direction uncertain | Ba1 (Questionable) with stable outlook |
| **Debt Ratings** | | | | | | | |
| AFC Senior Debt | A2 (Good) | A3 (Good) | Baa2 (Adequate) | Ba1 (Questionable) | B2 (Poor) | B2 (Poor) | Ba3 (Questionable) with stable outlook |
| AFC Capital Securities | A3 (Good) | Baa1 (Adequate) | Baa3 (Adequate) | Ba2 (Questionable) | Caa1 (Very Poor) with direction uncertain | Caa1 (Very Poor) with direction uncertain | B2 (Poor) with stable outlook |
| AFC Short-term Debt | P1 (Superior) | P2 (Strong) | P2 (Strong) | NP (Not Prime) | NP (Not Prime) | NP (Not Prime) | NP (Not Prime) |
| FAFLIC Short-term Debt and Financial Strength Ratings | P1 (Superior) | P1 (Superior) | P2 (Strong) | NP (Not Prime) | NP (Not Prime) | NP (Not Prime) | NP (Not Prime) |

## A.M. BEST'S RATINGS

| | End of Year Rating December 2001 | 2002 Rating Agency Actions | | | | End of Year Rating | | 2004 Rating Agency Actions January 2004 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | July 2002 | September 2002 | | October 2002 | December 2002 | December 2003 | |
| **Financial Strength Ratings** | | | | | | | | |
| Property and Casualty Companies | A (Excellent) | A (Excellent) | A- (Excellent) | | B++ (Very Good) under review with negative implications | B++ (Very Good) under review with negative implications | B++ (Very Good) under review with negative implications | A- (Excellent) with stable outlook |
| Life Companies | A (Excellent) | A- (Excellent) | B+ (Very Good) | | C++ (Marginal) under review with negative implications | C++ (Marginal) under review with negative implications | B- (Fair) | B+ (Very Good) with stable outlook |
| **Debt Ratings** | | | | | | | | |
| AFC Senior Debt | a- | bbb+ | bbb- | | bb+ | bb+ | bb | bb+ |

| | | | | under review with negative implications | under review with negative implications | | with stable outlook |
|---|---|---|---|---|---|---|---|
| AFC Capital Securities | bbb+ | bbb | bb | bb- under review with negative implications | bb- under review with negative implications | b+ | bb- with stable outlook |
| AFC Short-term Debt | AMB-1 | AMB-2 | AMB-3 | AMB-4 under review with negative implications | AMB-4 under review with negative implications | AMB-4 under review with negative implications | AMB-3 with stable outlook |

http://yahoo.brand.edgar-online.com/EFX_dll/EDGARpro.dll?FetchFilingHTML1?SessionID=vd1YI...　　6/13/2005

result of purchasing third party guarantees in 2003 were $4.9 million. In addition, we incurred $5.0 million in additional commission expenses related to the special commission program. These expenses are expected to decrease to $3.5 million combined in 2004 due to our A.M. Best rating upgrade. Additionally, as a result of the ratings downgrades in 2002 of our life insurance companies, we are no longer able to generate new sales of proprietary products in our AFS segment and experienced increased surrender rates in the life insurance and annuity business, particularly in the fourth quarter of 2002 and the first quarter of 2003. In addition, we are no longer able to sell our GIC products. These downgrades also caused counterparties to terminate certain swap agreements, which were replaced with alternative derivative instruments. Although we do not expect downgrades in our ratings, there can be no assurance that current ratings or downgrades that could occur would not have a material adverse affect on our results of operations and financial position.

Our holding company's current debt ratings, which are below investment grade, are expected to adversely affect the ability to obtain, or the cost and availability of credit lines, commercial paper, other debt and equity financing, and resulted in our non-renewal of our credit line in 2003.

### RECENT DEVELOPMENTS

In December 2003, Edward J. Parry, III was elected a director of AFC. Mr. Parry's term of office as a director of AFC expires in 2004. In addition, in February 2004, Joseph R. Ramrath was elected a director of AFC. Mr. Ramrath's term of office as a director of AFC expires in 2006.

### OTHER CONSIDERATIONS/ FORWARD-LOOKING STATEMENTS

We wish to caution readers that the following important factors, among others, in some cases have affected and in the future could affect our actual results and could cause our actual results for 2004 and beyond to differ materially from historical results and from those expressed in any forward-looking statements made by, or on our behalf. When used in Management's Discussion and Analysis, the words "believes", "anticipates", "expects" and similar expressions are intended to identify forward looking statements. See "Important Factors Regarding Forward-Looking Statements" filed as Exhibit 99-2 to our Annual Report on Form 10-K for the period ended December 31, 2003.

The following important factors, among others, in some cases have affected and in the future could affect our actual results, and cause actual results to differ materially from historical or projected results. While any of these factors could affect our business as a whole, we have grouped certain factors by the business segment to which we believe they are most likely to apply.

#### *Risks Relating to Our Property and Casualty Insurance Business*

We generate a significant portion of our total revenues and earnings through our property and casualty insurance subsidiaries. The results of companies in the property and casualty insurance industry historically have been subject to significant fluctuations and uncertainties. Our profitability could be affected significantly by (i) adverse catastrophe experience, severe weather or other unanticipated significant losses; (ii) adverse loss development or loss adjustment expense for events we have insured in either the current or in prior years; (iii) increases in costs, particularly those occurring after the time our products are priced and including construction, automobile, and medical and rehabilitation costs; and (iv) restrictions on insurance underwriting.

#### *Risks Relating to Our Financial Services and Asset Management Businesses*

Our businesses may be affected by (i) lower appreciation or decline in value of our managed investments or the investment markets in general, resulting in reduced variable product assets and related variable product management fees, lapses and increased surrenders, increased DAC amortization, as well as increased cost of guaranteed minimum death benefits; (ii) adverse trends in mortality and morbidity; (iii) possible claims relating to sales practices for insurance and investment products; (iv) earlier than expected withdrawals and changes in redemption patterns from our general account annuities, and other insurance products; (v) losses due to foreign currency fluctuations; (vi) the extent to which the performance of the various hedging instruments utilized in our GMDB hedging program do not correlate with the investment performance and underlying annuity sub-accounts; and (vii) the continued availability of equity index futures.

#### *Risks Relating to Our Business Generally*

Other market fluctuations and general economic, market and political conditions also may negatively affect our business and profitability. These conditions include (i) heightened competition, including the intensification of price competition, the entry of new competitors and the introduction of new products by new and existing competitors, or as the result of consolidation within the financial services industry and the entry of additional financial institutions into the insurance industry; (ii) adverse state and federal legislation or

# List of Company Ratings

**Company:** Allmerica Financial
**Domicile:** MA
**Established:** 2002

## A.M. Best Company Rating                                            B+ (6)

Very Good.  Assigned to companies that have, in our opinion, a good ability to meet their ongoing
obligations to policyholders.

## Standard & Poor's Financial Strength Rating                         BB (12)

An insurer rated 'BB' has MARGINAL financial security characteristics. Positive attributes exist, but
adverse business conditions could lead to insufficient ability to meet financial commitments.

## Moody's Financial Strength Rating                                   Ba1 (11)

Insurance companies rated Ba offer questionable financial security. Often the ability of these
companies to meet policyholder obligations may be very moderate and thereby not well safeguarded
in the future.

## Fitch Ratings' Insurer Financial Strength Rating                    BB (12)

Moderately weak. Insurers are viewed as moderately weak with an uncertain capacity to meet
policyholder and contract obligations. Though positive factors are present, overall risk factors are
high, and the impact of any adverse business and economic factors is expected to be significant.

## Weiss Safety Rating                                                 D (11)

Weak. The company currently demonstrates what we consider to be significant weaknesses which
could negatively impact policyholders. In an unfavorable economic environment, these weaknesses
could be magnified.

## Comdex - VitalSigns Composite Index                                 54

The Comdex gives the average percentile ranking of this company in relation to all other companies
that have been rated by the rating services.  The Comdex is the percentage of companies that are
rated lower than this company.

Watch list identifiers follow the ratings if the company is on the rating service's watch list.  The identifier
indicates a possible upgrade (w+), downgrade (w-), or unknown change (w).

The ratings on this report are current as of June 15, 2005.

EXHIBIT



 

WinFlex   VitalTerm   VitalUL   VitalLTC   VitalA


VitalSigns

**KEEPING CURRENT**
• What's New
• Update Ratings
• Name Changes

**ABOUT CARRIERS**
• Company List

**ADDITIONAL INFO**
› The Comdex
  · • Ratings Problem
• Ratings Explanations
• Network Tips
• Tech Support

**LEARN MORE**
• What's VitalSigns?
• System Requirements
• Brochure
• Tutorials
• Try a Demo
• Frequent Questions
• Pricing
• Order

**CONTACT INFO**
• Suggestions
• Product Manager
• Sales Contact
• Tech Contact

**HOME**
• Return to Home

## Comdex Ranking

🖶 Print Page

### The Comdex is Not a Rating

The Comdex is not a rating itself, but a composite of all the ratings that a company has received. The Comdex ranks the companies, on a scale of 1 to 100, in relation to other companies that have been rated by the services. The Comdex is an effort to reduce the confusion over ratings, which is caused by each ratings service using a different scale.

### How is the Comdex Calculated?

To calculate the Comdex, we first determine the percentiles for each rating service. We start by counting the total number of companies rated by the service. Next we count the number of companies in each rating category. From that data, we calculate the percentile for each rating category. For Example, let us take a sample rating service and calculate the percentiles. The Super Rating Service assigns ratings in five categories, A, B, C, D and E. It has rated a total of 50 companies as shown below. The percentiles would be calculated as follows:

| Ratings | Companies | Percentile |
|---------|-----------|------------|
| A | 5 | 100 |
| B | 10 | 90 |
| C | 15 | 70 |
| D | 10 | 40 |
| E | 10 | 20 |
|  | 50 |  |

We repeat this process and construct a table of percentiles for each of the rating services. Using these tables, we can now calculate the Comdex for a given company. We take each rating that the company has received, and look up the percentile in the table for that rating service. Then we average the percentiles and factor in the number of ratings received to give the Comdex.

**NOTE:** A company needs to be rated by at least two rating services to receive a Comdex. The Comdex is based on the ratings issued by the following rating services: A.M. Best, Standard & Poor's, Moody's Investors Service and Fitch.

WINFLEX - VITALTERM - VITALUL - VITALLTC - VITALANNUITY
VITALSIGNS - LLP FORMS - LIFELINK PRO
ABOUT US  CONTACT US  TECH SUPPORT  NEWS  EMPLOYMENT

EXHIBIT


H



**WinFlex     VitalTerm     VitalUL     VitalLTC     VitalA**



**KEEPING
CURRENT**
• What's New
• Update Ratings
• Name Changes

**ABOUT CARRIERS**
• Company List

**ADDITIONAL INFO**
• The Comdex
  › Ratings Problem
• Ratings Explanations
• Network Tips
• Tech Support

**LEARN MORE**
• What's VitalSigns?
• System Requirements
• Brochure
• Tutorials
• Try a Demo
• Frequent Questions
• Pricing
• Order

**CONTACT INFO**
• Suggestions
• Product Manager
• Sales Contact
• Tech Contact

**HOME**
• Return to Home

## The Comdex Solution

🖨 Print Page

### The Problem with Ratings

Ratings have become one of the most important pieces of information about a life insurance company. Ratings provide a convenient reference point from which to judge the financial health of a company. Ratings also provide a way to compare one company to another.

Unfortunately, ratings are not easy to understand. The biggest problem is that there is not a universal scale used by the rating services. Because rating services, in essence, are competing with each other, each service tries to differentiate itself from the others. Two services use the " A through F" scale that we used in school. However they do apply it very differently. The two other rating services use the same "triple-A" scale that they use in rating bonds.

There is also the problem of "crossover," where the same letter rating is used by two different rating companies and has two different meanings. For example, and "A+" from Best is the second highest rating that can be assigned, and is not considered an excellent rating. Comparisons of letter ratings between the rating services are useless.

### The Solution to the Problem

In order to clear up this confusion, it is necessary to take a step back from the letter ratings themselves. The actual letter rating that is assigned to a company is not as important as the number of companies that are rated higher or lower then the company.

A better way to look at the ratings is to look at the percentiles that the ratings represent. The percentile gives the percent of insurers that are ranked lower than a given company. If a company is in the 80th percentile, 20% of the companies are ranked higher and 80% are ranked lower. This is the common way of reporting test results for most national student testing. When considering a large number of students, the absolute test score is not as important as the percentile, the percentage of students that scored better and the percentage of students that scored worse.

We calculate a composite index, the Comdex, which is the average percentile of a company's ratings. The Comdex is not a rating itself. It is a composite of all of the ratings that the company has received. The Comdex gives the company's standing, on a scale of 1 to 100, in relation to other companies that have been rated by the services. It is an objective value based solely on the mathematical distribution of all of the companies that have been rated.

WINFLEX · VITALTERM · VITALUL · VITALLTC · VITALANNUITY
VITALSIGNS · LLP FORMS · LIFELINK PRO
ABOUT US · CONTACT US · TECH SUPPORT · NEWS · EMPLOYMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

| | | |
|---|---|---|
| DONALD P. SPEAKMAN, STEPHEN H. WEDEL, and MARK L. ROBARE, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-40077-FDS |
| v. | ) ) | |
| ALLMERICA FINANCIAL LIFE INS. & ANNUITY CO., FIRST ALLMERICA FINANCIAL LIFE INS. CO., and ALLMERICA FINANCIAL CORP., | ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' FED. R. CIV. P. RULE 26(a)(1) DISCLOSURES**

Plaintiffs Donald P. Speakman, Stephen H. Wedel, and Mark L. Robare ("Plaintiffs") make the following disclosures in accordance with Fed. R. Civ. Proc. 26(a)(1):

A.    **The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

1.    Plaintiffs, c/o Plaintiffs' Counsel

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

2.    James Bellner (address and telephone unknown)

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

- 1 -



EXHIBIT
I

3.    Phil Alston c/o Defendants' Counsel

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

4.    Mark Hug (Address and telephone unknown)

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

5.    Phil Gazzo (Address and telephone unknown)

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

6.    Edward J. Parry III c/o Defendants' Counsel

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

7.    Jay Kendall Huber c/o Defendants' Counsel

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

8.    Michael Angelini c/o Defendants' Counsel

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

9.    John O'Brien (Address and telephone unknown)

Formation and terms of the Trail Commission Program, plaintiffs' claims, defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

10.    Frederick Eppinger c/o Defendants' Counsel

Defendants' breaches, defendants' deceptive acts or practices, damages suffered by plaintiffs, response to defendants' counterclaims.

**B.    A copy of, or a description by category and location, of, all documents, data compilations, and tangible things that are in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Plaintiffs have the following category of documents:

1.    Terms of the Trail Commission Program and Promissory Note

2.    Pre-Trail Commission Agreement communications about the proposed Trail Commission Program

3.    Trail Commission quarterly and annual statement forms sent by defendants

4.    The annuities in the Trail Commission Program.

5.    Sales agreements entered into by plaintiffs and defendants.

6.    Defendants' discontinuation of the issuance of proprietary life insurance and annuity policies.

7.    Defendants' initiation and discontinuation of the sale of non-proprietary life insurance and annuity policies.

8.    Defendants' termination of the sales agreements with plaintiffs.

9.    Modifications of the terms of the Trail Commission Program

10.    Certain of defendants' filings with the Securities Exchange Commission

11.    Defendants' servicing problems

12.    Post-termination correspondence to owners of annuities

- 3 -

**C.**    **A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

Because the following disclosures are made before discovery has been undertaken, and a class has not yet been certified, plaintiffs make the 26(a)(1)(C) disclosures individually and reserve the right to amend or supplement these disclosures as the case proceeds. Additionally, the following amounts are exclusive of any right to pre-judgment interest, lost tax benefits, and reasonable attorneys' fees and expenses.

**1.    Breach of contract**

**a.    Expectancy damages**

Plaintiffs have suffered losses in the form of commissions that each of them would have received but for the breach by defendants.

i.    Donald P. Speakman

a).    Estimated average quarterly rate of return on the annuities that are part of the Trail Program for each quarter from 10/01/02-12/30/04.

i).    10/01/02-12/31/02    .06
ii).    1/1/03-3/31/03    (.05)
iii).    4/1/03-6/30/03    .14
iv).    7/1/03-9/30/03    .03
v).    10/01/03-12/31/03    .11
vi).    1/1/04-3/31/04    .02
vii).    4/01/04-6/30/04    0
vii).    7/01/04-9/30/04    (.02)
ix).    10/1/04-12/31/04    .10

b).    Average quarterly persistency rate from 3/31/01-9/30/02.

(.00686)

c).    Average quarterly commission rate from 3/31/01-9/30/02 including 7% (.07) pension contribution paid

- 4 -

on gross commissions
.107 /4 = .002675

d).    The aggregate account value as of 9/30/02 that is reflected on defendants' quarterly Trail Program statement, which is <u>exclusive</u> of Eligible Annuity Contracts (exchanges or replacements) that should have been included. These additional amounts will be determined as discovery takes place.

$84,941,324

e).    The estimated aggregate account values for each quarter from 10/01/02-12/31/04, absent defendants' breach. The calculation for the period 10/01/02-12/31/02 is based upon the actual aggregate account value for 9/30/02 that defendants provided (¶ d above) multiplied by the average quarterly persistency rate from 3/31/01-9/30/02 (¶b above), and then multiplied by the estimated average quarterly rate of return for the period 10/01/02-12/31/02 (¶ a(i) above). For the quarter 1/1/03-3/31/03, the starting aggregate account value is the revised aggregate account value using the above formula for the period 10/01/02-12/31/02. Then that amount is multiplied by the average quarterly persistency rate for the period 3/31/02-9/30/02 (¶b above) and then by the estimated average quarterly rate of return for the quarter 1/1/03-3/31/03 (¶a(ii) above). Subsequent quarters use the same methodology.

| | | |
|------|--------------------|--------------|
| i). | 10/01/02-12/31/02 | $90,655,462 |
| ii). | 1/1/03-3/31/03 | $86,713,490 |
| iii). | 4/01/03-6/30/03 | $99,531,336 |
| iv). | 7/01/03-9/30/03 | $103,220,545 |
| v). | 10/1/03-12/31/03 | $115,360,788 |
| vi). | 1/01/04-3/31/04 | $118,475,206 |
| vii). | 4/01/04-6/30/04 | $119,287,946 |
| viii). | 7/01/04-9/30/04 | $117,704,136 |
| ix). | 10/01/04-12/31/04 | $130,362,745 |

f).    The amount of commission that should have been received derived by multiplying the amounts in ¶ (e)

- 5 -

above by quarterly commission rate of .002675, the highest commission rate that would have been achieved in the absence of defendants' breach.

| | | |
|---|---|---|
| i). | 10/01/02-12/31/02 | $242,503 |
| ii). | 1/1/03-3/31/03 | $231,958 |
| iii). | 4/01/03-6/30/03 | $266,246 |
| iv). | 7/01/03-9/30/03 | $276,115 |
| v). | 10/1/03-12/31/03 | $308,590 |
| vi). | 1/01/04-3/31/04 | $316,921 |
| vii). | 4/01/04-6/30/04 | $319,095 |
| viii). | 7/01/04-9/30/04 | $314,858 |
| ix). | 10/01/04-12/31/04 | $348,720 |

g).     The actual quarterly gross commission received, as reflected on the quarterly statements sent by defendants.

| | | |
|---|---|---|
| i). | 10/01/02-12/31/02 | $231,685 |
| ii). | 1/1/03-3/31/03 | $208,202 |
| iii). | 4/01/03-6/30/03 | $230,949 |
| iv). | 7/01/03-9/30/03 | $234,094 |
| v). | 10/1/03-12/31/03 | $252,487 |
| vi). | 1/01/04-3/31/04 | $241,464 |
| vii). | 4/01/04-6/30/04 | $171,845 |
| viii). | 7/01/04-9/30/04 | $118,823 |
| ix). | 10/01/04-12/31/04 | $70,181 |

h).     The amount of lost commission, which is the difference between the actual commission received for each quarter from 12/31/02 to 12/31/04 as reflected on the quarterly statements sent by defendants (¶ g above) and the commission amounts for those respective quarters that should have been received in the absence of defendants' breach (¶ (f) above).

| | | |
|---|---|---|
| i). | 10/01/02-12/31/02 | $10,818 |
| ii). | 1/1/03-3/31/03 | $23,756 |
| iii). | 4/01/03-6/30/03 | $35,297 |
| iv). | 7/01/03-9/30/03 | $42,021 |
| v). | 10/1/03-12/31/03 | $56,103 |
| vi). | 1/01/04-3/31/04 | $75,457 |
| vii). | 4/01/04-6/30/04 | $147,250 |

|          |                   |           |
|----------|-------------------|-----------|
| viii).   | 7/01/04-9/30/04   | $196,035  |
| ix).     | 10/01/04-12/31/04 | $278,539  |

As to prospective periods, as that data becomes available, plaintiffs will supplement these responses.

ii.    Stephen Wedel

a).    Estimated average quarterly rate of return on the annuities that are part of the Trail Program for each quarter from 10/01/02-12/30/04.

|          |                   |         |
|----------|-------------------|---------|
| i).      | 10/01/02-12/31/02 | .06     |
| ii).     | 1/1/03-3/31/03    | (.05)   |
| iii).    | 4/1/03-6/30/03    | .14     |
| iv).     | 7/1/03-9/30/03    | .03     |
| v).      | 10/01/03-12/31/03 | .11     |
| vi).     | 1/1/04-3/31/04    | .02     |
| vii).    | 4/01/04-6/30/04   | 0       |
| vii).    | 7/01/04-9/30/04   | (.02)   |
| ix).     | 10/1/04-12/31/04  | .10     |

b).    Average quarterly persistency rate from 3/31/01-9/30/02.

.00785

c).    Average quarterly commission rate from 3/31/01-9/30/02 including 7% (.07) pension contribution paid on gross commissions

.107 /4 = .002675

d).    The aggregate account value as of 9/30/02 that is reflected on defendants' quarterly Trail Program statement.

$31,200,008

e).    The estimated aggregate account values for each quarter from 10/01/02-12/31/04, absent defendants' breach. The calculation for the period 10/01/02-12/31/02 is based upon the actual aggregate account

- 7 -

value for 9/30/02 that defendants provided (¶ d above) multiplied by the average quarterly persistency rate from 3/31/01-9/30/02 (¶b above), and then multiplied by the estimated average quarterly rate of return for the period 10/01/02-12/31/02 (¶ a(i) above). For the quarter 1/1/03-3/31/03, the starting aggregate account value is the revised aggregate account value using the above formula for the period 10/01/02-12/31/02. Then that amount is multiplied by the average quarterly persistency rate for the period 3/31/02-9/30/02 (¶b above) and then by the estimated average quarterly rate of return for the quarter 1/1/03-3/31/03 (¶a(ii) above). Subsequent quarters use the same methodology.

| | | |
|---|---|---|
| i). | 10/01/02-12/31/02 | $32,812,393 |
| ii). | 1/1/03-3/31/03 | $30,957,075 |
| iii). | 4/01/03-6/30/03 | $35,014,031 |
| iv). | 7/01/03-9/30/03 | $35,781,346 |
| v). | 10/1/03-12/31/03 | $39,405,514 |
| vi). | 1/01/04-3/31/04 | $39,878,105 |
| vii). | 4/01/04-6/30/04 | $39,565,062 |
| viii). | 7/01/04-9/30/04 | $38,469,387 |
| ix). | 10/01/04-12/31/04 | $41,984,142 |

f).    The amount of commission that should have been received derived by multiplying the amounts in ¶ (e) above by quarterly commission rate of .002675, the highest commission rate that would have been achieved in the absence of defendants' breach.

| | | |
|---|---|---|
| i). | 10/01/02-12/31/02 | $87,773 |
| ii). | 1/1/03-3/31/03 | $82,810 |
| iii). | 4/01/03-6/30/03 | $93,662 |
| iv). | 7/01/03-9/30/03 | $94,820 |
| v). | 10/1/03-12/31/03 | $105,410 |
| vi). | 1/01/04-3/31/04 | $106,674 |
| vii). | 4/01/04-6/30/04 | $105,836 |
| viii). | 7/01/04-9/30/04 | $102,906 |
| ix). | 10/01/04-12/31/04 | $112,307 |

g).    The actual quarterly gross commission received, as reflected on the quarterly statements sent by defendants.

- 8 -

i).     10/01/02-12/31/02      $74,842
ii).    1/1/03-3/31/03         $62,919
iii).   4/01/03-6/30/03        $68,363
iv).    7/01/03-9/30/03        Statement missing[1]
v).     10/1/03-12/31/03       Statement missing[2]
vi).    1/01/04-3/31/04        $49,182
vii).   4/01/04-6/30/04        $46,335
viii).  7/01/04-9/30/04        $34,691
ix).    10/01/04-12/31/04      $32,556

h).    The amount of lost commission, which is the difference between the actual commission received for each quarter from 12/31/02 to 12/31/04 as reflected on the quarterly statements sent by defendants (¶ g above) and the commission amounts for those respective quarters that should have been received in the absence of defendants' breach (¶ (f) above).

i).     10/01/02-12/31/02      $12,931
ii).    1/1/03-3/31/03         $19,291
iii).   4/01/03-6/30/03        $25,299
iv).    7/01/03-9/30/03        See above
v).     10/1/03-12/31/03       See above
vi).    1/01/04-3/31/04        $57,492
vii).   4/01/04-6/30/04        $59,501
viii).  7/01/04-9/30/04        $68,215
ix).    10/01/04-12/31/04      $79,751

As to prospective periods, as that data becomes available, plaintiffs will supplement these responses.

iii.    Mark Robare

a).    Estimated average quarterly rate of return on the annuities that are part of the Trail Program for each quarter from 10/01/02-12/30/04.

---

[1] After the statement is obtained in discovery, plaintiff Wedel will supplement this response.

[2] After the statement is obtained in discovery, plaintiff Wedel will supplement this response.

| i). | 10/01/02-12/31/02 | .06 |
| ii). | 1/1/03-3/31/03 | (.05) |
| iii). | 4/1/03-6/30/03 | .14 |
| iv). | 7/1/03-9/30/03 | .03 |
| v). | 10/01/03-12/31/03 | .11 |
| vi). | 1/1/04-3/31/04 | .02 |
| vii). | 4/01/04-6/30/04 | 0 |
| vii). | 7/01/04-9/30/04 | (.02) |
| ix). | 10/1/04-12/31/04 | .10 |

b).   Average quarterly persistency rate from 3/31/01-9/30/02.

(.009)

c).   Average quarterly commission rate from 3/31/01-9/30/02 including 7% (.07) pension contribution paid on gross commissions

.107 /4 = .002675

d).   The aggregate account value as of 9/30/02 that is reflected on defendants' quarterly Trail Program statement.

$20,250,499

e).   The estimated aggregate account values for each quarter from 10/01/02-12/31/04, absent defendants' breach.  The calculation for the period 10/01/02-12/31/02 is based upon the actual aggregate account value for 9/30/02 that defendants provided (¶ d above) multiplied by the average quarterly persistency rate from 3/31/01-9/30/02 (¶b above), and then multiplied by the estimated average quarterly rate of return for the period 10/01/02-12/31/02 (¶ a(i) above).  For the quarter 1/1/03-3/31/03, the starting aggregate account value is the revised aggregate account value using the above formula for the period 10/01/02-12/31/02. Then that amount is multiplied by the average quarterly persistency rate for the period 3/31/02-9/30/02  (¶b above) and then by the estimated average quarterly rate of return for the quarter 1/1/03-3/31/03 (¶a(ii)

- 10 -

above). Subsequent quarters use the same methodology.

|       |                   |              |
|-------|-------------------|--------------|
| i).   | 10/01/02-12/31/02 | $21,658,718  |
| ii).  | 1/1/03-3/31/03    | $20, 760,964 |
| iii). | 4/01/03-6/30/03   | $23,880,507  |
| iv).  | 7/01/03-9/30/03   | $24,818,294  |
| v).   | 10/1/03-12/31/03  | $27,796,241  |
| vi).  | 1/01/04-3/31/04   | $28,607,355  |
| vii). | 4/01/04-6/30/04   | $28,864,801  |
| viii).| 7/01/04-9/30/04   | $28,542,092  |
| ix).  | 10/01/04-12/31/04 | $31,678,868  |

f).    The amount of commission that should have been received derived by multiplying the amounts in ¶ (e) above by quarterly commission rate of .002675, the highest commission rate that would have been achieved in the absence of defendants' breach.

|       |                   |          |
|-------|-------------------|----------|
| i).   | 10/01/02-12/31/02 | $57,937  |
| ii).  | 1/1/03-3/31/03    | $55,535  |
| iii). | 4/01/03-6/30/03   | $63,880  |
| iv).  | 7/01/03-9/30/03   | $66,389  |
| v).   | 10/1/03-12/31/03  | $74,355  |
| vi).  | 1/01/04-3/31/04   | $76,525  |
| vii). | 4/01/04-6/30/04   | $77,213  |
| viii).| 7/01/04-9/30/04   | $76,350  |
| ix).  | 10/01/04-12/31/04 | $84,741  |

g).    The actual quarterly gross commission received, as reflected on the quarterly statements sent by defendants.

|       |                   |          |
|-------|-------------------|----------|
| i).   | 10/01/02-12/31/02 | $51,417  |
| ii).  | 1/1/03-3/31/03    | $33,956  |
| iii). | 4/01/03-6/30/03   | $32,295  |
| iv).  | 7/01/03-9/30/03   | $23,939  |
| v).   | 10/1/03-12/31/03  | $6,609   |
| vi).  | 1/01/04-3/31/04   | $5,933   |
| vii). | 4/01/04-6/30/04   | $5,575   |

- 11 -

|        |                    |                    |
|--------|--------------------|--------------------|
| viii). | 7/01/04-9/30/04    | $5,425             |
| ix).   | 10/01/04-12/31/04  | Statement missing[3] |

h).  The amount of lost commission, which is the difference between the actual commission received for each quarter from 12/31/02 to 12/31/04 as reflected on the quarterly statements sent by defendants (¶ g above) and the commission amounts for those respective quarters that should have been received in the absence of defendants' breach (¶ (f) above).

|        |                    |                    |
|--------|--------------------|--------------------|
| i).    | 10/01/02-12/31/02  | $6,520             |
| ii).   | 1/1/03-3/31/03     | $21,609            |
| iii).  | 4/01/03-6/30/03    | $31,585            |
| iv).   | 7/01/03-9/30/03    | $42,450            |
| v).    | 10/1/03-12/31/03   | $67,746            |
| vi).   | 1/01/04-3/31/04    | $70,592            |
| vii).  | 4/01/04-6/30/04    | $71,638            |
| viii). | 7/01/04-9/30/04    | $70,925            |
| ix).   | 10/01/04-12/31/04  | Statement missing  |

As to prospective periods, as that data becomes available, plaintiffs will supplement these responses.

**b.    In the alternative, reliance damages**

i.    Each of the plaintiffs has suffered loss in the form of the outstanding amounts allegedly due on each of their notes. As of 12/31/04, the alleged remaining principal amounts are outstanding:

|      |                    |                 |
|------|--------------------|-----------------|
| a).  | Donald P. Speakman | $1,946,069.98   |
| b).  | Stephen H. Wedel   | $721,161.67     |
| c).  | Mark L. Robare     | $550,880.91     |

ii.   Plaintiffs further seek the recovery of any offsets that defendants have taken from commissions outside the Trail Program, which information will be obtained in discovery.

---

[3] After the statement is obtained in discovery, plaintiff Robare will supplement this response.

  **c.**  **In the further alternative, definable, financial windfall made by defendants as a result of the breach.**

Defendants have made windfall gains as a result of the breach of contract. *See* ¶¶ C .1.a & b.

  **2.**  **M.G.L. Ch. 93A, § 11**

Plaintiffs have suffered the following losses caused by defendant's violation of Ch. 93A, section 11. *See* ¶¶ C.1a-c above. The above amounts are exclusive of any right to doubling or trebling of damages under Ch. 93A, § 11.

  **D.**  **Inspection and copying under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part of all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

  Not applicable

- 13 -

Respectfully submitted,

Stephen L. Hubbard
Robert W. Biederman
Mass. Bar No. 562279
David M. Grossman
**HUBBARD & BIEDERMAN, LLP**
1717 Main Street, Suite 4700
Dallas, Texas 75201
Telephone: (214) 857-6000
Facsimile: (214) 857-6001

Nancy Freeman Gans
Mass. Bar No. 184540
**MOULTON & GANS, P.C.**
33 Broad Street, Suite 1100
Boston, Massachusetts 02109-4216
Telephone: (617) 369-7979
Facsimile: (617) 369-7980

By:_____

ATTORNEYS FOR PLAINTIFFS

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via Fedex on this the ___/8t___ day of July, 2005, to the following:

Jonathan A. Shapiro
WILMER CUTLER PICKERING
 HALE and DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

ATTORNEYS FOR DEFENDANTS

_____
 STEPHEN L. HUBBARD

- 15 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

|  |  |  |
|---|---|---|
| DONALD P. SPEAKMAN, STEPHEN H. WEDEL, and MARK L. ROBARE, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 04-40077-FDS |
| v. | ) ) |  |
| ALLMERICA FINANCIAL LIFE INS. & ANNUITY CO., FIRST ALLMERICA FINANCIAL LIFE INS. CO., and ALLMERICA FINANCIAL CORP., | ) ) ) ) ) |  |
| Defendants. | ) |  |

**AFFIDAVIT IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**STATE OF TEXAS**         §
                          §
**COUNTY OF DALLAS**       §

Stephen L. Hubbard being duly sworn, deposes and says:

1.      My name is Stephen L. Hubbard.  I am over 21 years of age, of sound mind,

capable of executing this affidavit, and have personal knowledge of the facts stated herein and

they are all true and correct.

2.      I am a partner in the Law Firm of Hubbard & Biederman, L.L.P.  I am submitting this

affidavit in support of appointment of our firm as class counsel in connection with Plaintiffs' Motion

for Class Certification in the above captioned case.

EXHIBIT

J

3.      FED.R.CIV.P. 23(g) mandates four non-exclusive factors that the Court must

consider in the appointment of Class Counsel:

- The work counsel has done in identifying or investigating potential claims in the action;
- Counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in this action;
- Counsel's knowledge of the applicable law; and
- The resources counsel will commit to representing the class.

As set forth below, I believe that Hubbard & Biederman, LLP as Class Counsel for the Class and

Moulton & Gans, P.C. as Local Counsel have satisfied each of these factors.

4.      Hubbard & Biederman, L.L.P. is a Dallas, Texas based AV rated commercial and

consumer litigation firm experienced in complex litigation with a concentration in class action

litigation involving the insurance industry.  We have extensive experience in handling class

actions, other complex litigation, and claims of the type asserted in this action.  The firm has

successfully represented plaintiffs in numerous class actions throughout the country involving

life insurance companies, including *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D.

54, 63 (D. Mass. 1997).  Our most recent class action case was settled and approval granted in

November 2004 by the United States Federal District Court in Denver, Colorado styled *Guy*

*Dixon, Trustee for Gene B. Dixon, Jr. v. Security Life of Denver Insurance Company, et al.*; Civil

Action No. 03-D-806-(MJW).  Hubbard & Biederman, LLP's  firm resume is attached as

Exhibit "J-1."  Our local counsel Moulton & Gans, P.C., a Boston-based firm also has class

experience, as reflected on its firm resume attached as Exhibit "J-2."

5.      Hubbard & Biederman, LLP has done significant work over the last 20 months in

identifying, investigating and pursuing claims in this action including the review of substantial

documents, extensive informal interviews, and detailed legal research. To date, we have expended substantial time, effort and expense in preparing, filing and prosecuting this case. Our efforts have included drafting and filing the Complaint and Amended Complaint, responding to Defendants' Motions to Dismiss, preparing the Fed.R.Civ.P.26(a) Disclosures, substantive legal research and analysis, factual development, preparing and serving formal discovery requests, and continually communicating with our clients concerning the status of the case and related matters. We have met with Defendant and its counsel in person and on telephone conferences on several occasions.

6.      Hubbard & Biederman, LLP is familiar with and has knowledge of the applicable law.  In addition to retaining local counsel, my partner, Robert W. Biederman is licensed to practice law in Massachusetts. Hubbard & Biederman, LLP  is particularly well-suited to represent the Class given our experience in life insurance class action litigation and our knowledge of the industry and its practices.

7.      Hubbard & Biederman, LLP has sufficient resources to represent the Class and prosecute this litigation on behalf of the Class. Hubbard & Biederman, LLP has committed the necessary financial resources and experienced litigators to this case.

_____
STEPHEN L. HUBBARD

SUBSCRIBED AND SWORN TO BEFORE ME on this the __12__ day of July 2005 to certify which my hand and official seal.



DAPHNE OSTRANDER
Notary Public, State of Texas
My Commission Expires 07-06-07

_Daphne Ostrander_
Notary Public in and for the State of Texas

-3-

**HUBBARD & BIEDERMAN, L.L.P.**
**1717 MAIN STREET**
**SUITE 4700**
**DALLAS, TEXAS 75201**
**(214) 857-6000**
**(214) 857-6001 FAX**
**www.hblawfirm.com**

EXHIBIT

J-1

## THE FIRM

Hubbard & Biederman, LLP ("H&B LLP") is an AV rated civil litigation law firm providing legal representation in the areas of insolvency litigation, bankruptcy, commercial and civil litigation, including class actions.

H&B LLP has substantial experience in prosecuting and defending complex insurance and reinsurance issues from the perspective of consumer and business policyholders and from the unique perspective of insurance receivers and liquidators.   To avoid even the perception of a conflict of interest, H&B LLP does not represent insurance companies.

## Insolvency Experience

H&B LLP has successfully pursued asset marshaling litigation ranging from modest note and contract obligations to large fraud and director and officer liabilities suits involving hundreds of millions of dollars.

H&B LLP has over twenty years experience in insurance insolvency and related bankruptcy experience, again primarily from the perspective of representing various insurance commissioners, regulators and liquidator-receivers. H&B LLP has played an active role in many of the largest life and property/casualty liquidations. These representations include pursuing claims through negotiation and/or litigation against officers and directors, reinsurers, managing general agents and various related parties. The representation often includes sophisticated and technical issues involving reinsurance, real estate, bankruptcy and commercial law.

H&B LLP has often been called upon to analyze and work with forensic accountants, actuaries and other professionals to determine the merits of claims involving insolvent companies. The Firm has substantial experience in protecting the interests of policyholders in connection with competing interest of liquidators and bankruptcy proceedings of holding companies.

## Insolvency Matters

H&B LLP represented receivers/liquidators in the following significant cases:

- Executive Life Insurance Company

- National County Mutual Fire Insurance Company

- Early American Insurance Company and Commercial Standard Insurance Company

- Mobile County Mutual Insurance Company and Mobile Insurance Company

- Reliance Insurance Company.

2

**Consumer Experience**

H&B LLP has utilized its litigation and insurance expertise in representing policyholders in nationwide class actions against major insurance companies resulting in billions of dollars of relief in court sanctioned settlements. These cases required comprehensive knowledge of insurance, marketing and actuarial concepts along with knowledge of large suit dynamics.

H&B LLP often represents individual policyholders obtaining relief in unjust situations.

**Litigation Experience**
**(Class Actions)**

H&B LLP has represented policyholders as class counsel in the following significant cases:

- ***Wilson, et al. v. New York Life Insurance Company & New York Life Insurance Company and Annuity Corporation***, Supreme Court of the State of New York. Recovery for the class of approximately $656 Million.

- ***Michaels, et al. v. Phoenix Home Life***, Supreme Court of New York, Albany County. Recovery for the class of approximately $1 Billion.

- ***Jordan, et al. v. State Farm Life Insurance Company***, Circuit Court of McLean County, Illinois. Recovery for the class of approximately $200 Million.

- ***Garrett v. Metropolitan Life Insurance Company***, United States District Court, New York. Recovery for class of approximately $2 Billion.

- ***In Re: Prudential Insurance Company of America Sales Practices Litigation***, United States District Court for the District of New Jersey. Recovery for the class in excess of $2 Billion.

- ***Natal, et al. v. Transamerica Occidental Life Insurance Company***, California Superior Court, San Diego County. Recovery for the class of approximately $1.6 Billion.

- ***Duhaime, et al. v. John Hancock Mutual Life Insurance Company, et al***, United States District Court for the District of Massachusetts. Recovery for the class of approximately $416 Million.

- ***Picow, et al. v. Security Life and Trust Insurance Company***, Dallas County District Court, Dallas, Texas. Recovery for the class of in excess of $10 Million.

- ***Miller, et al. v. American General Life and Accident Insurance Company, et al.***, In the Circuit Court of Davidson County, Tennessee, Fifteenth Judicial District. Recovery for the class of approximately $246 Million.

- ***McNeil, et al. v. American General Life and Accident Insurance Company***, United States District Court, Middle District of Tennessee, Nashville Division. Recovery for the class of approximately $206 Million.

- ***Snell, et al. v. Allianz Life Insurance Company of North America, et al.***, United States District Court, District of Minnesota. Recovery for the class of approximately $53.4 Million.

- ***Grove, et al. v. Principal Mutual Life Insurance Company***, United States District Court, Southern District of Iowa, Central Division. Recovery for the class of approximately $374 Million.

- ***In Re: New England Mutual Life Insurance Company, Sales Practices Litigation***, United States District Court, District of Massachusetts. Recovery for the class of approximately $172 Million.

- ***Benacquisto, et al. v. IDS Life Insurance Company, et al.***, District Court of Minnesota, County of Hennepin, Fourth Judicial District. Recovery for the class of approximately $215 Million.

- ***Wemer, et al. v. The Ohio National Life Insurance Company and Ohio National Life Assurance Corporation***, United States District Court, Western District of Pennsylvania. Recovery for class of approximately $14.5 Million.

- ***Hearth, et al. v. First National Life Insurance Co. of America***, United States District Court, Middle District of Florida. Recovery for the class in excess of $1.3 Million.

- ***Gelfman, et al. v. Weeden Investors, L.P.***, Chancery Court, Delaware. Recovery for the class in excess of $7 Million.

- ***Dixon, et al. v. Security Life Insurance Co. of Denver***, United States District Court for Colorado. Recovery for the class in excess of $27 Million.

4

**Resume of Partners**

### STEPHEN L. HUBBARD

Stephen L. Hubbard is a partner in the law firm of Hubbard & Biederman, L.L.P., and has been a business litigator concentrating his practice in the insurance related matters since 1977. Mr. Hubbard was born in Dallas, Texas on February 28, 1950. He attended the University of Texas (B.A., 1974) and St. Mary's University School of Law (J.D., 1977). Mr. Hubbard's law school activities included: Research and Symposium Editor, St. Mary's Law School Journal, 1976-1977; Author: Note, "Re-apportionment-Potential Dilution of Minority Voting Strength," 7 St. Mary's Law Journal 447, 1975; Comment, "Medical Liability Insurance," 7 St. Mary's Law Journal 802, 1976; Instructor, Legal Research and Writing, St. Mary's Law School, 1976-1977.

Mr. Hubbard has been admitted to practice in Texas since 1977. He is also admitted to practice before the U.S. District Court for the Northern, Southern, Eastern and Western Districts of Texas and U.S. Court of Appeals for the Fifth and Eleventh Circuits. Mr. Hubbard is a member of the American Bar Association, the State Bar of Texas, the Dallas Bar Association and the Association of Trial Lawyers of America.

Mr. Hubbard has a wide range of experience in problem solving, both inside and outside of the litigation context. His litigation experience has included prosecution and defense of suits in various State and Federal Courts throughout the United States involving such areas as business torts, officer and director liability, partnership dissolution, construction, real estate, and general contract disputes. In addition to business litigation, Mr. Hubbard's practice includes extensive experience in insurance insolvency matters, including complex litigation and negotiations involving large insolvencies, reinsurance, and accounting disputes. His clients have included several state insurance commissioners, receivers and liquidators.

Having had primary responsibility for third party litigation, asset recovery and business restructuring in connection with Executive Life Insurance Company, National County Mutual Fire Insurance Company, Early American Insurance Company/Commercial Standard Insurance Company and Mobile County Mutual Insurance Company/Mobile Insurance Company, Mr. Hubbard has obtained substantial recoveries for his clients. Mr. Hubbard's litigation and negotiation efforts proved instrumental in recovering over $365 Million as counsel to the Rehabilitator and Liquidator of Executive Life Insurance Company. Mr. Hubbard's areas of responsibility in the above estates also included the investigation of and pursuit of multi-party reinsurance litigation, fraud and misrepresentation actions, along with complex real estate and corporate actions.

Mr. Hubbard has applied his insurance litigation background as class counsel in numerous class actions involving life insurance marketing practices, many of which have resulted in court-approved nationwide settlements. Moreover, Mr. Hubbard often

5

represents individuals needing assistance in pursuing their claims against their insurers. Among those cases in which Mr. Hubbard and his firm have been involved as class counsel are the following:  In Re: The Prudential Insurance Company of America Sales Practices Litigation, 962 F. Supp. 450 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998) cert. denied, 199 S.Ct. 890 (1999); Duhaime et al. v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54 (D. Mass. 1997).  Mr. Hubbard, and this firm, have been approved as Liaison Counsel in three securities fraud actions filed in the United States District Court for the Northern District of Texas, Dallas Division including: Bassman v. Union Pacific Corporation; Case No. 3-98-CV-2819-L; Branca v. Paymentech, Inc.; Case No. 3-97-CV-2507-L; and Gracy Fund, L.P. v. EEX Corp., Case No. 3-98-CV-1808-G.

## ROBERT W. BIEDERMAN

Robert W. Biederman is a partner in the law firm of Hubbard & Biederman, L.L.P. Mr. Biederman was born in Chicago, Illinois on October 22, 1952. He attended Sarah Lawrence College in Bronxville, New York (B.A. 1973) and Loyola University of Chicago School of Law (J.D. 1978). Mr. Biederman has been admitted to practice in Illinois since 1978; in Texas since 1985; in Massachusetts since 1992; and in California since June, 1995. He is admitted to practice before the U.S. District Court for the Northern, Southern, Eastern and Western Districts of Texas and the U.S. Court of Appeals for the Fifth Circuit. Mr. Biederman is a member of the American Bar Association, State Bar of Texas, and the Dallas Bar Association.

Mr. Biederman's practice has included insolvency work, both in bankruptcy and insurance receiverships. In the bankruptcy field, Mr. Biederman's practice has included an array of cases ranging from the successful reorganization of $50,000,000 plus real estate assets in Colorado; the representation of Executive Life Insurance Company Estate in the complex consensual reorganization of its publicly traded parent corporation; and the successful dismissals of multiple bankruptcies which sought to impede either the liquidation or reorganization of insurance receiverships. Mr. Biederman has spoken widely in the area involving bankruptcy and federal banking laws, and has published several articles: Co-Author, "Cases of First Impression: Prosecuting and Defending Against Motions for Temporary Restraining Order," Vol. 70, No. 9, Illinois Bar Journal, (May 9, 1982); Author, "Classification in Single Assets Bankruptcy Cases: Debtor and Lender Strategies", Real Estate Workouts and Asset Management (December 1994); Author, "Taming the Beast: Creditor Strategies Under Section 105(a) of the Bankruptcy Code," Bankruptcy Litigation, Vol. 3, No. 4, (Fall 1995).

In the insurance receivership cases, Mr. Biederman has focused principally on litigation involving asset recovery including the National County Mutual Fire Insurance Company and the Executive Life Insurance Company cases. This work has included handling a myriad of lawsuits involving reinsurance as well as claims against officers, directors, and professionals. These lawsuits have resulted in judgments and settlements resulting in tens of millions of dollars of recoveries to various insurance receivership estates. Additionally, Mr. Biederman is actively involved in litigation involving guaranty associations.

Mr. Biederman also has applied his insurance litigation background as co-counsel in the class actions involving life insurance marketing practices, many of which have resulted in court approved nationwide settlements. Among those cases in which Mr. Biederman and his firm have been involved as class counsel are the following: In Re: The Prudential Insurance Company of America Sales Practices Litigation, 962 F. Supp. 450 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998) cert. denied, 199 S.Ct. 890 (1999); Duhaime et al. v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54 (D. Mass. 1997); and Gelfman v. Weeden Investors L.P., 859 A2d 89 (Del. Ch. 2004). Mr. Biederman, and this firm, have been approved as Liaison Counsel in three securities fraud actions filed in

the United States District Court for the Northern District of Texas, Dallas Division including: <u>Bassman v. Union Pacific Corporation</u>; Case No. 3-98-CV-2819-L; <u>Branca v. Paymentech, Inc.</u>; Case No. 3-97-CV-2507-L; and <u>Gracy Fund, L.P. v. EEX Corp.</u>, Case No. 3-98-CV-1808-G.

**Resume of Associate**

### DAVID M. GROSSMAN

David M. Grossman is an associate in the law firm of Hubbard & Biederman L.L.P. Mr. Grossman was born in Tampa, Florida in 1968. He earned his B.A. in the Plan II Honors Program at the University of Texas in 1990 and his J.D. from the University of Texas School of Law in 1993. While attending the University of Texas School of Law, Mr. Grossman was a member of the Board of Advocates and was chosen to represent the school on its interscholastic moot court and mock trial teams.

Since 1996, Mr. Grossman has been engaged in a wide variety of commercial litigation in both state and federal courts, but has concentrated his practice in insurance and consumer class actions. He has extensive experience conducting complex discovery in large class action litigation.

Mr. Grossman was admitted to the Texas State Bar in 1993 and is also admitted to practice before the United States District Court for the Northern and Western Districts of Texas. He is a member of the American Bar Association, the Dallas Bar Association, the Consumer Law Section of the Texas Bar, and the Business Litigation Section of the Dallas Bar Association.

9

# MOULTON & GANS, P.C.

Year Established: 1997
33 Broad Street, Suite 1100
Boston, Massachusetts 02109-4216

Telephone: 617-369-7979
Telecopier: 617-369-7980

*General Civil and Criminal Trial and Appellate Practice in All
State and Federal Courts. Securities and Business Litigation,
Civil and Criminal Antitrust Litigation.*

## MEMBERS OF FIRM

**STEPHEN MOULTON** (1929 - 2001).

**NANCY FREEMAN GANS**, born Philadelphia, Pennsylvania, November 26, 1943; admitted to bar, 1970, Massachusetts; 1975, U.S. Supreme Court; 1996, U.S. District Court. *Education*: University of Rochester (B.A., with highest honors, 1965); Harvard University (J.D., 1970). Phi Beta Kappa. *Member*: Massachusetts Bar Association.

Areas of Concentration: Securities Fraud; Antitrust; Class Actions.

Email: nfgans@aol.com

Moulton & Gans, P.C. specializes in class action litigation, primarily under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA"). The firm has been appointed Lead Counsel in two previous cases and Local or Liaison Counsel in at least 20 cases, working closely with leading firms in the class action litigation field.

The firm has actively participated in obtaining recoveries of over $500 million for aggrieved shareholders, including at least the following settlements in PSLRA cases:

> In re Raytheon Company Securities Litigation, Case No. 99-12142 (D.Mass.), (after five years of litigation) $460 million ($210 million in case and $200 million in warrants from defendant Raytheon Company, and $50 million from defendant PricewaterhouseCoopers, LLP);

> In re Allaire Corporation Securities Litigation, Case No. 00-11972 (D.Mass.), $12.026 million;

> Kafenbaum v. GTECH Holdings Corporation, et al., Case No. 00-413 (D.R.I.), $10.25 million;

EXHIBIT


J2

In re Lycos Securities Litigation, Case No. 99-10394 (D. Mass.) $5.675 million;

In re Shiva Corporation Securities Litigation, Case No. 97-11159 (D.Mass.), $4.35 million;

In re Number Nine Visual Technology Corporation Litigation, Case No. 96-
million.