**Exhibit D**

CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| DONALD P. SPEAKMAN, STEPHEN H. WEDEL, and MARK L. ROBARE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs and Counterclaim Defendants,<br><br>v.<br><br>ALLMERICA FINANCIAL LIFE INS. & ANNUITY CO., FIRST ALLMERICA FINANCIAL LIFE INS. CO., and ALLMERICA FINANCIAL CORP.,<br><br>Defendants and Counterclaim Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 4:04-cv-40077-FDS |

**DEFENDANT ALLMERICA FINANCIAL LIFE INSURANCE & ANNUITY
COMPANY'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Rule 33.1, defendant

Allmerica Financial Life Insurance & Annuity Company ("AFLIAC") hereby objects and

responds to Plaintiffs' First Set of Interrogatories ("Interrogatories") as follows:

**GENERAL OBJECTIONS**

Each of AFLIAC's responses is subject to and incorporates the following general

objections. The assertion of the same, similar, or additional objections, or a partial response to

any individual Interrogatory is not intended to waive or supplant any of AFLIAC's general

objections.

1.      Given that the Court has not ruled on Plaintiffs' Motion for Class Certification,

AFLIAC objects to the Interrogatories to the extent they seek information concerning putative

1

CONFIDENTIAL

class members or Trail Program participants other than the three named plaintiffs, except where that discovery is relevant to address the appropriateness of class certification.

2.     AFLIAC objects to the Interrogatories to the extent they seek the "disclos[ure] of any personal or privileged information about an individual collected or received in connection with an insurance transaction" that is prohibited by Mass Gen. Laws ch. 175I, § 13 ("Chapter 175I"). As noted below, AFLIAC is responding to the Interrogatories in a manner that does not identify any individuals covered under Chapter 175I, but is designed to provide summary data and other information sufficient to show the requested information. If you contend that any response is inadequate due to the withholding of personal or privileged information under Chapter 175I, please contact counsel to address any such issues.

3.     Defendants AFLIAC, First Allmerica Financial Life Insurance Company ("FAFLIC"), and Allmerica Financial Corp. ("AFC") are separate entities. None of AFLIAC's responses herein shall constitute a waiver of any and all defenses, protections or rights accorded to the Defendants as separate entities, nor as an admission that AFLIAC as a separate entity possesses any documents or information referred to herein.

4.     AFLIAC objects to the Interrogatories to the extent they seek information relating to participants in the Trail Program who were based in New York because it does not do business in New York. To the extent any Interrogatory calls for information relating to Trail Program participants based in New York, AFLIAC's response is based on information held by FAFLIC.

5.     AFLIAC objects to the Interrogatories to the extent they seek information concerning communications that are protected or properly withheld from discovery under the attorney-client privilege.

2

CONFIDENTIAL

6.     AFLIAC objects to the Interrogatories to the extent they seek trial preparation or other information prepared in anticipation of, as a result of, or relating to litigation, or that is otherwise protected or properly withheld from discovery under the work-product doctrine or other applicable privilege or protection from disclosure.

7.     AFLIAC objects to the Interrogatories to the extent they purport to impose upon it any obligation beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules, including but not limited to any Interrogatory that seeks discovery beyond the scope of Federal Rule of Civil Procedure 26(b).

8.     AFLIAC objects to the Interrogatories to the extent they seek information that is a matter of public record, already in the Plaintiffs' possession, or is otherwise available to the Plaintiffs.

9.     AFLIAC objects to the definition of "Trail Agreement" on the ground that there was no single Trail Agreement, but rather there were various Trail Agreements with different terms and that over time these various agreements were modified in different respects.

10.    AFLIAC objects to the definition of "DAC Note" on the ground that the notes associated with the Trail Agreements were "Promissory Notes," and the term "DAC Note" is vague and ambiguous.

11.    AFLIAC objects to the Interrogatories pursuant to Federal Rule of Civil Procedure 33(d) to the extent they seek information that may be derived or ascertained from the business records of the Defendants that have been or will be produced to Plaintiffs in response to their requests for production of documents.

12.    None of the objections or responses contained herein is an admission concerning the existence of any documents or materials, the relevance or admissibility of any information or

3

CONFIDENTIAL

documents, or the truth or accuracy of any statement or characterization contained in Plaintiffs'

First Set of Interrogatories.

13.    AFLIAC's discovery and investigation of facts relevant to this litigation is

ongoing. For this reason and to avoid delay, AFLIAC's responses herein are made on the basis

of its investigation to date and upon information currently available to it. AFLIAC reserves the

right to amend, supplement, or modify its responses as further information becomes available

and is analyzed in accordance with Federal Rule of Civil Procedure 26(e).

## SPECIFIC OBJECTIONS AND RESPONSES

Subject to and without waiving the foregoing general objections, AFLIAC specifically

objects and responds to the Interrogatories as follows:

## INTERROGATORY NO. 1

IDENTIFY (a) all PERSONS who entered into the TRAIL AGREEMENT with
ALLMERICA LIFE; (b) whether they selected the variable or flat trail commission rate; (c) for
those selecting the variable rate, the actual rate used for each quarter since January 1, 2001; (d)
how DEFENDANTS arrived at the commission rate; and (e) the outgo rate for each PERSON for
each quarter since January 1, 2001.

## RESPONSE

Subject to and without waiving any of the foregoing general objections, AFLIAC

responds to Interrogatory No. 1 as follows:

AFLIAC's responses to subsections (a), (b), (c), and (e) are contained in the charts

attached as exhibits. With respect to subsection (a), AFLIAC further states that 98 participants

entered into Trail Agreements based on the variable trail commission rate option (including the

three named plaintiffs) and notes that the commissions paid thereunder varied by participant and

were calculated in a manner that over time were modified by agreement; and that 53 participants

entered into Trail Agreements based on the fixed commission rate option, which again resulted

in commission rates that varied by participant and over time were modified by agreement.

4

**CONFIDENTIAL**

With respect to subsection(c), AFLIAC further states that the chart attached as an exhibit includes the actual trail commission rates for *all* participants who signed Trail Agreements, not just those whose Trail Agreements were based on a variable trail commission rate term.

With respect to subsection (d), AFLIAC further states that prior to December 31, 2002, the Defendants calculated the trail commission rate in accordance with the different formulas set forth in the various Trail Agreements. Beginning with the December 31, 2002 file, the Defendants continued to use the various formulas set forth in the various Trail Agreements, but increased each of the trail rates by 5% or 7%. Accordingly, the 1.00% trail rate became 1.07%, the .75% trail rate became .80%, the .70% trail rate became .75%, the .65% trail rate became .70%, and the .55% trail rate became .60%. AFLIAC further states that there were additional modifications to the calculation of the trail commission rates under the various Trail Agreements as set forth in AFLIAC's response to Interrogatory No. 4.

## INTERROGATORY NO. 2

For each PERSON who entered into the TRAIL AGREEMENT, IDENTIFY (a) all those with DAC NOTES, (b) the original principal balance of each DAC NOTE, (c) the current balance of each DAC NOTE, (d) if the DAC Note is in default; and (e) any resolution of the default.

## RESPONSE

Subject to and without waiving any of the foregoing general objections, AFLIAC responds to Interrogatory No. 2 as follows:

AFLIAC states the participants who entered into the various Trail Agreements executed Promissory Notes with different amounts and differing payment terms. AFLIAC's responses to subsections (a), (b), (c), and (d) are contained in the charts attached as exhibits. With respect to subsection (d), AFLIAC further states that some, but not all, of those who entered into the various Promissory Notes defaulted on their Promissory Notes at different times and in different

5

amounts. Still others may default during the course of the litigation. With respect to subsection

(e), AFLIAC further states that there has been no resolution of any of the Promissory Notes that

are currently in default.

## INTERROGATORY NO. 3

As to each PERSON who entered into the TRAIL AGREEMENT, IDENTIFY (a) all
those terminated by ALLMERICA LIFE prior to December 31, 2002, and whether the
termination was for cause or not; (b) those who had resigned as a career agent of ALLMERICA
LIFE prior to December 31, 2002; (c) those who entered into a Broker's Agreement with
ALLMERICA LIFE effective as of January 1, 2003; (d) those who had been terminated by
ALLMERICA LIFE between January 1, 2003 and December 31, 2003, and whether the
termination was for cause or not; and (e) those who resigned as a broker with ALLMERICA
LIFE after January 1, 2003.

## RESPONSE

Subject to and without waiving any of the foregoing general objections, AFLIAC

responds to Interrogatory No. 3 as follows:

AFLIAC's response to Interrogatory No. 3 is contained in the chart attached as an

exhibit.[1]

## INTERROGATORY NO. 4

As to the TRAIL AGREEMENT (a) state all modifications to the terms of the TRAIL
AGREEMENT; (b) the date that each modification took effect, and if applicable, ended; (c)
IDENTIFY each PERSON affected by the modification; (d) state the reason for each
modification and the reason that it applied to the particular PERSON and not all PERSONS; and
(e) IDENTIFY all DOCUMENTS CONCERNING 4 (a) - (d).

## RESPONSE

AFLIAC objects to this Interrogatory on the ground that the term "modification" is vague

and ambiguous in the context of this Interrogatory. AFLIAC further objects to the Request that

it "identify all documents concerning 4 (a) – (d)," which is overbroad and unduly burdensome to

the extent it seeks information that is not relevant to the claims or defenses of the parties and

---

[1]    Please note that no Trail Program participants resigned as a career agent of Allmerica prior to
December 31, 2002.

CONFIDENTIAL

therefore not discoverable under Rule 26(b).

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 4 as follows:

As noted previously, the participants each entered into various Trail Agreements with different terms. Over time, some, but not all, of these Trail Agreements were modified by agreement, although the nature and consequence of those modifications varied by participant.

The modifications include the following:

1.  Effective with the December 31, 2002 file, Allmerica increased trail rates by 5% to 7%. Accordingly, the 1.00% trail rate became 1.07%, the .75% trail rate became .80%, the .70% trail rate became .75%, the .65% trail rate became .70%, and the .55% trail rate became .60%. However, this modification did not apply to any participant whose Registered Representative Agreement with VeraVest was terminated by either the participant or VeraVest for any reason on or after January 1, 2003. Moreover, this modification did not apply to any participant who was terminated prior to January 1, 2003. This modification was negotiated to reflect changing circumstances with respect to Allmerica's pension contributions into the retirement plan. This modification was discussed in a memorandum from Jim Bellner dated October 17, 2002 and a memorandum from Mark Hug dated January 31, 2003.

2.  Effective with the December 31, 2002 file, Allmerica agreed with some participants to waive the Outgo Rate limits for 2003 such that if a participant's Outgo Rate increased above one of the maximums, Allmerica did not reduce his or her trail rate. However, this modification applied only during 2003 (and thus applied only to the four trail payments for 2003). Moreover, this modification did not apply to any participant whose Registered Representative Agreement with VeraVest was terminated by either the participant or VeraVest for any reason on or after January 1, 2003. Furthermore, this modification did not apply to any participant who was terminated prior to January 1, 2003. This modification was agreed to in order to address changing circumstances concerning the shift in Allmerica's business away from the sale of proprietary life insurance and annuity products. This modification was discussed in a memorandum from Jim Bellner dated October 17, 2002 and a memorandum from Mark Hug dated January 31, 2003.

3.  Effective with the December 31, 2002 file, Allmerica agreed with some participants that they could remain at the President's Club Level trail rate if that participant's trail rate previously had been established at the President's Club Level but the participant did not achieve President's Club Level production in 2002. This modification applied only during 2003 (and thus impacted the four

CONFIDENTIAL

trail commission payments for 2003). Moreover, this modification did not apply to any participant whose Registered Representative Agreement with VeraVest was terminated by either the participant or VeraVest for any reason on or after January 1, 2003. Furthermore, this modification did not apply to any participant who was terminated prior to January 1, 2003. This modification was agreed to in order to address changing circumstances concerning the shift in Allmerica's business away from the sale of proprietary life insurance and annuity products. This modification was discussed in a memorandum from Jim Bellner dated October 17, 2002 and a memorandum from Mark Hug dated January 31, 2003.

4.    Effective with the December 31, 2003 quarterly payment (payable in March 2004), Allmerica agreed with some participants to establish a trail rate floor of .75% or the effective Fixed Trail Rate under Option B described in the Trail Agreement. Accordingly, if a participant's Outgo Rate exceeded the 10% threshold, his or her trail rate would not be reduced below .75% or the effective Fixed Trail Rate under Option B described in the Trail Agreement. However, this modification did not apply to any participants who had a Registered Representative Agreement with VeraVest that was terminated prior to October 27, 2003; for those participants the Trail Rate reverted back to the Trail Rate table that was in effect on January 31, 2003. This modification was agreed to in order to benefit participants who remained associated with Allmerica during the introduction of VeraVest Investments as an independent broker-dealer. This modification was discussed in a memorandum from Mark Hug dated November 12, 2003.

5.    Effective with the December 31, 2003 quarterly payment (payable in March 2004), Allmerica agreed with some participants who were paid at the President's Club Level in 2003 to continue to be paid at the President's Club Level in 2004. Allmerica agreed with still other participants who were paid at the Leaders' Level in 2003 and who achieved $325,000 of GDC in 2003 to be paid at the President's Club Level in 2004. Allmerica agreed with other participants that they would be paid at the Leaders' Level in 2004. However, these modifications did not apply to those participants who entered into Trail Agreements with the fixed trail rate. For participants who had a Registered Representative Agreement with VeraVest that was terminated prior to October 27, 2003, the participant's Trail Rate was adjusted based upon the participant's actual Outgo Rate in 2003 as stated in his or her Trail Agreement. This modification was agreed to in order to benefit participants who remained associated with Allmerica during the introduction of VeraVest Investments as an independent broker-dealer. This modification was discussed in a memorandum from Mark Hug dated November 12, 2003.

6.    Allmerica agreed to waive production requirements for 2004 and thereafter for those participants who entered into Trail Agreements with a variable commission rate. For participants who had a Registered Representative Agreement with VeraVest that was terminated prior to October 27, 2003, the participant's trail rate was adjusted based upon the participant's actual production in 2003 as stated in his or her Trail Agreement. This modification was agreed to in order to address

8

### CONFIDENTIAL

changing circumstances concerning the shift in Allmerica's business away from the sale of life insurance and variable annuities. This modification was discussed in a memorandum from Mark Hug dated November 12, 2003.

7.    Five participants who originally signed Trail Agreements are no longer parties to the various Trail Agreements that they signed.

AFLIAC reserves the right to supplement its response to Interrogatory No. 4 during or

after discovery.

## INTERROGATORY NO. 5

IDENTIFY any COMMUNICATION between DEFENDANTS and any PERSON during 1999 or 2000 CONCERNING (a) assumptions used to determine the amortization of DAC; (b) how downturns in the equity markets created a risk of partial or permanent impairment of the recovery of DAC; (c) the effect of the partial or permanent impairment of the recovery of DAC to the earnings or surplus of any of DEFENDANTS and the ratings assigned to any of DEFENDANTS by the rating agencies such as Standard & Poor's, Best's, and Moody's; (d) the effect of lowered ratings on the ability of DEFENDANTS to sell their proprietary life and annuity products; and (e) strategies to lessen the risk of the permanent or partial impairment of DAC.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that identification of "any

communication between Defendants and any Person" is overbroad, unduly burdensome, and

seeks information that is not relevant to the claims or defenses of the parties. AFLIAC further

objects to this Interrogatory on the ground that it is premature at this early stage of discovery.

AFLIAC further objects to this Interrogatory on the ground that the terms "risk," "assumptions,"

and "impairment" are not defined and thus are vague and ambiguous in the context of this

Interrogatory.

Subject to and without waiving the foregoing general and specific objections, AFLIAC

responds to Interrogatory No. 5 as follows:

AFLIAC states there were ongoing communications with individual participants. As

noted previously, these participants executed different contracts that were modified in various

US1DOCS 5212282v4

## CONFIDENTIAL

ways over time. AFLIAC cannot generalize regarding the substance of these communications

because the circumstances of these communications varied for each participant. AFLIAC further

denies that ratings compromised the participants' ability to obtain the benefit of the bargain in

the various Trail Agreements as those contracts were modified over time, especially given the

commissions that participants earned by replacing annuities that were subject to their Trail

Agreements. AFLIAC further states that the ability to maintain persistency varied from

participant to participant over time. For example, Donald Speakman's Outgo Rate in Q1 2003

was 5.3%. By contrast, Mark Robare's Outgo Rate in Q1 2003 was 27.1%. Similarly, Donald

Speakman's Outgo Rate in Q2 2004 was 28.16%. By contrast, Mark Robare's Outgo Rate in Q2

2004 was 6.13%.

AFLIAC further states that although key communications were individualized, there also

were public communications about Defendants' business. Some or all of the matters referenced

in subsections (a) – (e) of Interrogatory No. 5 were discussed in the Forms 10-K filed by AFC

with the Securities and Exchange Commission ("SEC") on March 29, 1999 and March 30, 2000.

In AFC's Form 10-K filed on March 29, 1999, some or all of these matters were discussed in

Items 1, 7, 7A, and 8; in the sections entitled "Management's Discussion and Analysis of

Financial Condition and Results of Operations" (including the subsection entitled "Forward-

Looking Statements") and "Notes to Consolidated Financial Statements"; and in Exhibit 99.2

entitled "Important Factors Regarding Forward-Looking Statements." In AFC's Form 10-K filed

on March 30, 2000, some or all of these matters were discussed in Items 1, 7, and 8; in the

sections entitled "Management's Discussion and Analysis of Financial Condition and Results of

Operations" (including the subsection entitled "Forward-Looking Statements") and "Notes to

Consolidated Financial Statements"; and in Exhibit 99.2 entitled "Important Factors Regarding

10

CONFIDENTIAL

Forward-Looking Statements." Some or all of the matters referenced in subsections (a) – (e) also

were discussed in AFC's Annual Reports for 1998 and 1999, which were filed in 1999 and 2000

respectively. In particular, some or all of these matters were discussed in the sections entitled

"Management's Discussion and Analysis of Financial Condition and Results of Operations"

(including the subsection entitled "Forward-Looking Statements") and "Notes to Consolidated

Financial Statements." Some or all of the matters referenced in subsections (a) – (e) also may

have been discussed in AFC's other SEC filings in 1999 and 2000 and during investor

conference calls in 1999 and 2000.

AFLIAC reserves the right to supplement its response to Interrogatory No. 5 during or

after discovery.

## INTERROGATORY NO. 6

IDENTIFY any COMMUNICATION between DEFENDANTS and any PERSON during
1999 or 2000 CONCERNING (a) assumptions used to determine the exposure to the GMDB
risk; (b) how downturns in the equity markets created an increase in GMDB risk, including how
a 1% change in the Standard & Poor's 500 index would affect the net amount of risk and
statutory surplus of ALLMERICA LIFE or FIRST ALLMERICA; (c) the effect of the increase
in the GMDB risk on earnings or surplus of any of DEFENDANTS, and the ratings assigned to
any of DEFENDANTS by the rating agencies such as Standard & Poor's, Best's, and Moody's;
and (e) strategies to lessen the GMDB risk.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that identification of "any

communication between Defendants and any Person" is overbroad, unduly burdensome, and

seeks information that is neither relevant to the claims or defenses in this litigation. AFLIAC

further objects to this Interrogatory on the ground that it is premature at this early stage of

discovery. AFLIAC further objects to this Interrogatory on the ground that the terms "rate,"

"assumptions," and "impairment" are not defined and thus are vague and ambiguous in the

context of this Interrogatory. AFLIAC further objects to this Interrogatory on the ground that

11

**CONFIDENTIAL**

there was no "GMBD risk" to agents or annuity holders.

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 6 as follows:

AFLIAC states that there were ongoing communications with individual participants. As noted previously, these participants executed different contracts that were modified in various ways over time. AFLIAC cannot generalize regarding the substance of these communications because the circumstances of those communications varied for each participant. AFLIAC further denies that ratings compromised the participants' ability to obtain the benefit of the bargain in the various Trail Agreements as those contracts were modified over time, especially given the commissions that participants earned by replacing annuities that were subject to their Trail Agreements. AFLIAC further states that the ability to maintain persistency varied from participant to participant over time. For example, Donald Speakman's Outgo Rate in Q1 2003 was 5.3%. By contrast, Mark Robare's Outgo Rate in Q1 2003 was 27.1%. Similarly, Donald Speakman's Outgo Rate in Q2 2004 was 28.16%. By contrast, Mark Robare's Outgo Rate in Q2 2004 was 6.13%.

AFLIAC further states that although key communications were individualized, there were public communications about Defendants' business. Some or all of the matters referenced in subsections (a) – (e) of Interrogatory No. 6 were discussed in the Forms 10-K filed by AFC with the SEC on March 29, 1999 and March 30, 2000. In AFC's Form 10-K filed on March 29, 1999, some or all of these matters were discussed in Items 1, 7, 7A, and 8; in the sections entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (including the subsection entitled "Forward-Looking Statements") and "Notes to Consolidated Financial Statements"; and in Exhibit 99.2 entitled "Important Factors Regarding Forward-

12

CONFIDENTIAL

Looking Statements." In AFC's Form 10-K filed on March 30, 2000, some or all of these

matters were discussed in Items 1, 7, and 8; in the sections entitled "Management's Discussion

and Analysis of Financial Condition and Results of Operations" (including the subsection

entitled "Forward-Looking Statements") and "Notes to Consolidated Financial Statements"; and

in Exhibit 99.2 entitled "Important Factors Regarding Forward-Looking Statements." Some or

all of the matters referenced in subsections (a) – (e) also were discussed in AFC's Annual

Reports for 1998 and 1999, which were filed in 1999 and 2000 respectively. In particular, some

or all of these matters were discussed in the sections entitled "Management's Discussion and

Analysis of Financial Condition and Results of Operations" (including the subsection entitled

"Forward-Looking Statements") and "Notes to Consolidated Financial Statements." Some or all

of the matters referenced in subsections (a) – (e) also may have been discussed in AFC's other

SEC filings in 1999 and 2000 and during investor conference calls in 1999 and 2000.

      AFLIAC reserves the right to supplement its response to Interrogatory No. 6 during or

after discovery.

**INTERROGATORY NO. 7**

      For any REQUEST FOR ADMISSIONS that you did not unconditionally admit, state the
factual basis for your failure to admit such request and IDENTIFY all DOCUMENTS that
support or CONCERN such basis.

RESPONSE

      Subject to and without waiving any of the foregoing general objections, AFLIAC

responds to Interrogatory No. 7 as follows:

-    Basis for Denial of Request for Admission No. 3 - One person who signed a Trail
  Agreement did not sign a Promissory Note.

-    Basis for Denial of Request for Admission No. 5 - The principal balance of the
  Promissory Notes as of September 22, 2004 was $20,233,286.42; this total does
  not include accrued interest, which accrued under terms that varied.

13

CONFIDENTIAL

- Basis for Denial of Request for Admission No. 6 - The Trail Agreements that were executed varied substantially from participant to participant, and those Trail Agreements were modified in various ways at differing times. By way of example, the Trail Agreements differed concerning the calculation of commissions for New York – based participants and participants based outside of New York; the percentage of business included in a given Trail Agreement; whether the participant's 401k/401a business was included in a given Trail Agreement; the deferral of trail commissions; the duration of the Trail Agreement; and the trail commission payment calculation (variable vs. fixed).

- Basis for Denial of Request for Admission No. 7 – The terms of the Promissory Notes differ across those participants in the Trail Program who chose to take a Promissory Note regarding the time to pay off their loans.

AFLIAC reserves the right to supplement its response to Interrogatory No. 7 during or after discovery.

**INTERROGATORY NO. 8**

STATE THE BASIS for the Third AFFIRMATIVE DEFENSE.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery.

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 8 as follows:

Plaintiffs' claims are barred by the doctrine of laches because, by Plaintiffs' own admission, Allmerica stopped selling proprietary life insurance and annuity products in the fall of 2002. Plaintiffs contend that this action was a breach of the various Trail Agreements. However, over time Plaintiffs agreed to various modifications to their Trail Agreements (many to address the changing business circumstances and involved terms that were more favorable than those that were previously negotiated) and did not bring suit against the Defendants until May 18, 2004 (almost two years later). Throughout this time, Allmerica was in ongoing communications with Plaintiffs and Plaintiffs accepted numerous modifications to their various

14

trail agreements to address the specific issues that they now seek to litigate. Moreover, during this period, Plaintiffs continued to accept payments from Allmerica above and beyond those necessary to pay their Promissory Notes. Plaintiffs' claims also are barred by the doctrine of laches for the reasons set forth in AFLIAC's responses to Interrogatory Nos. 9, 10, 11, and 13.

AFLIAC reserves the right to supplement its response to Interrogatory No. 8 during or after discovery.

## INTERROGATORY NO. 9

STATE THE BASIS for the Eighth AFFIRMATIVE DEFENSE.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery.

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 9 as follows:

Plaintiffs' claims are barred by their own breaches of contract and related misconduct as set forth in the Defendants' Counterclaims and AFLIAC's response to Interrogatory No. 13.

AFLIAC reserves the right to supplement its response to Interrogatory No. 9 during or after discovery.

## INTERROGATORY NO. 10

STATE THE BASIS for the Ninth AFFIRMATIVE DEFENSE.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery.

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 10 as follows:

CONFIDENTIAL

The nature and extent of the set-off is, by definition, plaintiff-specific and is difficult to evaluate until Plaintiffs respond to the Defendants' discovery requests. At this early stage of litigation, AFLIAC contends that Plaintiffs' claims are barred by the doctrine of set-off for two independent reasons. First, as set forth in Defendants' Counterclaims and in AFLIAC's response to Interrogatory No. 13, Plaintiffs Speakman, Wedel, and Robare have breached their Trail Agreements, their Career Agent Agreements, and with respect to Plaintiffs Speakman and Wedel, their Broker's Agreements and Independent Contractor Agreements for Registered Representatives. In addition, Plaintiff Robare is currently in default on his Promissory Note. These breaches of contract have caused damage to the Defendants. Even if Plaintiffs were to succeed on their breach of contract claim and claim for a violation of Chapter 93A, § 11, any resulting recovery would be set off by the damage that Defendants have suffered as a result of Plaintiffs' breaches of contract.

Second, on information and belief Plaintiffs Speakman, Wedel, and Robare have replaced hundreds of Allmerica annuities with annuities from other life insurance companies (including but not limited to Pacific Life Insurance Company, Linsco Private Ledger, American Skandia, Lincoln National Life Insurance Company, and AXA Life and Annuity Company) for which they have received substantial commissions. On information and belief, these "replacement commissions" are equal to or in excess of the amounts of commissions Plaintiffs allegedly would have received for these annuities under the Trail Program (and, at the very least, any such "replacement commissions" would be a set-off against any damages allegedly suffered by Plaintiffs).

AFLIAC reserves the right to supplement its response to Interrogatory No. 10 during or after discovery.

16

CONFIDENTIAL

## INTERROGATORY NO. 11

STATE THE BASIS for the Tenth AFFIRMATIVE DEFENSE, including, but not limited to, the amount of the alleged set-off.

<u>RESPONSE</u>

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery. AFLIAC further objects to this Interrogatory on the ground that the Defendants' Tenth Affirmative Defense is based on the doctrine of waiver, not the doctrine of set-off. (Please see AFLIAC's response to Interrogatory No. 10 for the basis of its affirmative defense based on the doctrine of set-off.)

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 11 as follows:

The nature and extent of the waiver is, by definition, plaintiff-specific and is difficult to evaluate until Plaintiffs respond to the Defendants' discovery requests. At this stage of litigation, AFLIAC contends that Plaintiffs' claims are barred by the doctrine of waiver for all the reasons stated in AFLIAC's response to Interrogatory Nos. 8, 9, 10, and 13. In addition, Plaintiffs' claims are barred by the doctrine of waiver to the extent that Plaintiffs agreed to the various modifications to the various Trail Agreements set forth in AFLIAC's response to Interrogatory No. 4. By accepting these modifications, Plaintiffs have waived any claims based on their Trail Agreements.

AFLIAC reserves the right to supplement its response to Interrogatory No. 11 during or after discovery.

## INTERROGATORY NO. 12

STATE THE BASIS for the Fifteenth AFFIRMATIVE DEFENSE.

17

CONFIDENTIAL

RESPONSE

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery.

Subject to and without waiving the foregoing general and specific objections, AFLIAC responds to Interrogatory No. 12 as follows:

Plaintiffs' claims under Mass Gen. Laws ch. 93A, § 11 are barred because this dispute arises in the context of Plaintiffs' employment relationship. The basis for this contention is set forth in the Defendants' Motion to Dismiss and supporting Memorandum of Law and Reply Brief. In addition to the reasons set forth in those documents, AFLIAC states that discovery will show that Plaintiffs' claims arise in the context of the parties' employment relationship, and thus cannot be maintained under Chapter 93A, § 11. Indeed, Plaintiff Stephen Wedel previously filed a lawsuit seeking recovery under the Pennsylvania Wage Act, which limits standing to employees.

AFLIAC reserves the right to supplement its response to Interrogatory No. 12 during or after discovery.

**INTERROGATORY NO. 13**

(a) STATE THE BASIS for DEFENDANTS' contention that PLAINTIFFS' [sic] breached the terms of the TRAIL PROGRAM, Career Agency Agreements, Broker's Agreement, and/or Independent Contractor Agreement for Registered Representative; (b) the date(s) the alleged breaches occurred; (c) how and when DEFENDANTS first discovered each alleged breach; and (d) IDENTIFY the DOCUMENTS that support this contention.

RESPONSE

AFLIAC objects to this Interrogatory on the ground that such contention discovery is premature at this early stage of discovery. AFLIAC further objects to this Interrogatory to the extent it seeks the "disclos[ure] of any personal or privileged information about an individual collected or received in connection with an insurance transaction," which is prohibited by

18

**CONFIDENTIAL**

Chapter 175I. AFLIAC is responding to this Interrogatory in a manner that does not identify any individuals covered under Chapter 175I, but is designed to provide summary data and other information sufficient to show the requested information. If you contend that this response is inadequate due to the withholding of personal or privileged information under Chapter 175I, please contact counsel to address any such issues.

Subject to and without waiving the foregoing general and specific objections, AFLIAC states that there can be no common response to Interrogatory No. 13 because the conduct giving rise to each Plaintiff's breaches are unique to them insofar as the conduct occurred and was discovered at different times, involved different customers, and require discovery (including responses to Defendants' outstanding party and non-party discovery requests) because some of the details of the alleged breaches are not within Defendants' control. Even without discovery, it is clear that Plaintiff Mark Robare (and certain other members of the putative class (as identified in response to Interrogatory No. 2) have defaulted on their Promissory Notes, and thereby breached the terms of their Trail Agreements. Mr. Robare agreed to make an upfront payment of $823,390.90 as a condition of his participation in the Trail Commission Program. This amount was a portion of the commissions he previously received from his sales of Eligible Annuity Contracts prior to January 1, 1996. Pursuant to the Promissory Note that Mr. Robare signed (and that was amended on March 2, 2001), Mr. Robare agreed to make quarterly payments of $28,795.70 to AFLIAC over a ten-year period to cover his obligation under the specific Trail Agreement that he signed. However, Mr. Robare has failed to make those payments. As of May 12, 2005, Mr. Robare was in default on the Promissory Note and owes AFLIAC $112,245.58.

Plaintiffs Donald Speakman, Stephen Wedel, and Mark Robare also have breached the terms of the Trail Agreement and other contracts with AFLIAC and VeraVest Investments, Inc.

19

**CONFIDENTIAL**

(Career Agent Agreement and, with respect to Plaintiffs Speakman and Wedel, the Broker's

Agreement and the Independent Contractor Agreement for Registered Representative)

(collectively, the "Allmerica Contracts"). The Allmerica Contracts expressly and impliedly

required Plaintiffs to use their best efforts to maintain the persistency of the Eligible Annuity

Contracts and prohibited Plaintiffs from unnecessarily encouraging their clients to surrender

Eligible Annuity Contracts. Additionally, the Allmerica Contracts prohibited Plaintiffs from

engaging in any activity that was not in the best interests of Allmerica or its affiliates, and

required Plaintiffs to comply with NASD rules and regulations and Allmerica policies.

Upon information and belief, the Plaintiffs have violated the Allmerica Contracts by

encouraging clients unnecessarily to surrender and/or replace the Eligible Annuity Contracts

(including, for example, where such surrenders and/or replacements may not have been suitable

or appropriate for the client); by taking actions to the detriment of Allmerica and its affiliates;

and by failing to comply with NASD rules and regulations and Allmerica policies. These

breaches involve circumstances that are specific to the breaching Plaintiff, and the various

unnecessary and/or unsuitable securities transactions that Allmerica alleges they solicited.

AFLIAC states that its breach of contract claims are based in part on the timing, trend, and

volume of replacement activity by Plaintiffs Speakman, Wedel, and Robare. For example, the

"Outgo Rate" for each of these Plaintiffs is abnormal compared to their own prior activity, and

contrasts starkly with that for all the other participants who executed Trail Agreements, as

demonstrated by the data that AFLIAC has provided in response to Interrogatory No. 1(e). For

example, Mr. Speakman's Outgo Rate in Q2 2004 was 28.16%, in Q3 2004 was 28.12%, in Q4

2004 was 23.0%, and in Q1 2005 was 12.8%. By contrast, Mr. Speakman's Outgo Rate for the

prior 3 years had never exceeded 6.49% and his average quarterly Outgo Rate from Q2 2001 to

**CONFIDENTIAL**

Q1 2004 was only 2.76%. Mr. Wedel's Outgo Rate in Q4 2002 was 14.5% and in Q1 2003 was 13.0%. By contrast, Mr. Wedel's Outgo Rate during the prior seven quarters had never exceeded 3.3% and his average quarterly Outgo Rate from Q1 2001 to Q3 2002 was only .24%. Mr. Robare's Outgo Rate in Q4 2002 was 9.1%, in Q1 2003 was 27.1%, in Q2 2003 was 14.5%, in Q3-2003 was 28.2%, in Q4 2003 was 54.31%, and in Q1 2004 was 11.89%. By contrast, Mr. Robare's Outgo Rate had never exceeded 3.1% in the prior seven quarters and his average quarterly Outgo Rate from Q1 2001 to Q3 2002 was only 1.55%. Significantly, the Outgo Rates for Messrs. Speakman, Wedel, and Robare are strikingly dissimilar to -- and during some periods five or six times that of -- the overall population of those had signed some form of Trail Agreement.

AFLIAC's breach of contract claims are also based, *inter alia*, on individual transactions and conduct that appear to be improper based on the information available to AFLIAC. Taking Mr. Speakman as an example, elderly customers have reported that Mr. Speakman made misleading and potentially disparaging comments in an effort to solicit them to replace their variable annuity contract with AFLIAC. It has been reported to Defendants that Mr. Speakman led these customers to believe that he recently testified in Washington D.C. about AFLIAC's "devious business practices." Within the last year AFLIAC has learned that Mr. Speakman solicited another elderly person to replace variable products sold by Allmerica with unduly aggressive products sold by another company, without disclosing important economic disadvantages despite requirements that such matters be explained and assessed. Other circumstances have been reported where Mr. Speakman's clients surrendered and replaced their Allmerica annuities based on his advice, even though he did not inform them that they would lose their death benefit if they did so. Mr. Speakman and/or his staff affirmatively solicited still

21

**CONFIDENTIAL**

other Allmerica customers to attend free seminars during which Mr. Speakman emphasized the

"major problems at Allmerica" or "very serious issues with Allmerica" to solicit surrenders

despite his duty to use his best efforts to maintain the persistency of the Eligible Annuity

Contracts as required by the terms of his Trail and other Agreements. (During one seminar Mr.

Speakman told Allmerica customers not to bother calling Allmerica's customer support hotline,

and encouraged the customers to purchase products from a different company.) This conduct has

continued; in April 2005 a customer reported that Mr. Speakman provided "bad" information

about Allmerica, which that customer concluded was an attempt to "scare" customers.

AFLIAC reserves the right to supplement its response to Interrogatory No. 13 during or

after discovery.

CONFIDENTIAL

<u>AS TO MATTERS KNOWN OR AVAILABLE TO ALLMERICA FINANCIAL LIFE
INSURANCE & ANNUITY COMPANY</u>:

I have reviewed the above responses and affirm that they are correct to the best of my personal
knowledge, and with respect to matters to which I do not have personal knowledge I believe the
responses to be true based on the due inquiry of others.

Signed and sworn to under the pains and penalties of perjury on this _____ day of August, 2005.


_____

Michael Reardon


<u>AS TO OBJECTIONS</u>:


/s/ Eric D. Levin
Andrea J. Robinson (BBO No. 556337)
Jonathan A. Shapiro (BBO No. 567838)
Eric D. Levin (BBO No. 639717)
Brett R. Budzinski (BBO No. 655238)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Allmerica Financial Life Insurance
& Annuity Company, First Allmerica Financial
Life Insurance Company, and Allmerica Financial Corp.*

Dated: August 8, 2005

23

CONFIDENTIAL

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on this 8th day of August, 2005:

By E-Mail

Nancy Freeman Gans
Moulton & Gans, P.C.
33 Broad Street
Boston, MA 02109-4216

By E-Mail

Stephen L. Hubbard
Robert W. Biederman
Hubbard & Biederman, LLP
1717 Main Street, Suite 4700
Dallas, TX 75201

/s/ Eric D. Levin
Eric D. Levin