# EXHIBIT A

Donald P. Speakman
11/02/2005

Page 1

```
 1                                    VOLUME: I

 2                                    PAGES: 1 to 292

 3                                    EXHIBITS: See Index

 4

 5                UNITED STATES DISTRICT COURT

 6            FOR THE DISTRICT OF MASSACHUSETTS

 7                    WORCESTER DIVISION

 8     - - - - - - - - - - - - - - - - - - x

 9     DONALD P. SPEAKMAN, STEPHEN H. WEDEL and

10     MARK L. ROBARE, Individually and On Behalf

11     of All Others Similarly Situated

12            Plaintiffs          Civil Action

13        v.                      No. 4:04-cv-40077-FDS

14

15     ALLMERICA FINANCIAL LIFE INS. &

16     ANNUITY CO., FIRST ALLMERICA FINANCIAL

17     LIFE INS. CO., and ALLMERICA FINANCIAL CORP.

18            Defendants

19     - - - - - - - - - - - - - - - - - - x

20            DEPOSITION of DONALD P. SPEAKMAN

21            Wednesday, November 2, 2005

22                   11:33 a.m.

23

24        Michelle Keegan, Court Reporter
```

Donald P. Speakman                                                                                          11/02/2005

Page 2

```
1   A P P E A R A N C E S :
2
3   HUBBARD & BIEDERMAN, LLP
4     By Stephen L. Hubbard, Esq.
5     1717 Main Street
6     Dallas, Texas 75201
7     (214) 857-6000
8     Counsel for the Plaintiffs
9
10  WILMER CUTLER PICKERING HALE AND DORR, LLP
11    By Jonathan A. Shapiro, Esq. and
12    Brett R. Budzinski, Esq. and
13    Jared C. Miller, Esq.
14    60 State Street
15    Boston, Massachusetts 02109
16    (617) 526-6344
17    Counsel for the Defendants
18
19  Also Present:
20    Mark H. Stepakoff, Allmerica Financial
21
22
23
24
```

Page 4

```
1              E X H I B I T S
2   No.                              Page
3   15      Document entitled "Advisor In    206
4           Force Trail Program"
5   16A     Switch Letter              263
6   16B     Replacement Notice         263
7
8
9
10
11  * Original exhibits returned to Mr. Shapiro *
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2   Deposition of:                 Direct
3   DONALD P. SPEAKMAN
4     By Mr. Shapiro                  5
5
6
7
8
9              E X H I B I T S
10  No.                          Page
11  1     Consulting Agreement        42
12  2     Set of Documents            60
13  3     Career Agent Agreement      82
14  4     Newsletter                 122
15  5     Newsletter                 132
16  6     Newsletter                 138
17  7     Newsletter                 140
18  8     Newsletter                 142
19  9     Newsletter                 143
20  10    Document entitled "Acapulco Seven"  166
21  11    Letter dated 3/26/99       176
22  12    Memorandum dated 3/2/00    186
23  13    Memorandum                 188
24  14    Document entitled "Fall Roadshow"   201
```

Page 5

```
1              P R O C E E D I N G S
2         DONALD P. SPEAKMAN
3   having been satisfactorily identified and duly sworn
4   by the Notary Public, was examined and testified as
5   follows:
6         DIRECT EXAMINATION
7   BY MR. SHAPIRO:
8     Q.  Good morning, Mr. Speakman.
9     A.  Good morning.
10    Q.  Could, for the record, you identify
11  yourself, full name and current address.
12    A.  Donald P. Speakman, 109 Saint Andrews Drive,
13  Pittsburgh, PA 15205.
14    Q.  I think I introduced myself to you a few
15  moments ago, but in case I wasn't clear, my name is
16  Jonathan Shapiro.  To the left of me is Brett
17  Budzinski and to the left of Brett is Jared Miller.
18  We represent the defendants in this lawsuit.
19        The defendants in this lawsuit are three
20  Allmerica businesses, Allmerica Financial
21  Corporation, Allmerica Financial Life Insurance &
22  Annuity Company and First Allmerica Financial Life
23  Insurance Company.  Are you familiar with those
24  businesses?
```

2 (Pages 2 to 5)

Donald P. Speakman                                                    11/02/2005

Page 266

1    Q. Other than Mr. Wirtz and Mr. Hubbard and
2  Mr. Biederman, do you have any other lawyers
3  presently?
4    A. Yes.
5    Q. The name of those other lawyers?
6        THE WITNESS: Is he talking about Rod?
7    Q. I'm just asking their names, sir. I'm not
8  asking about anyone in particular.
9    A. I have another attorney. I can't remember
10 his last name. It's been a long day.
11   Q. I know. Can you remember his first name?
12   A. Rod.
13   Q. Other than Rod last name unknown, do you
14 have any other attorneys?
15   A. No.
16   Q. For what purpose did you retain Rod?
17   A. For an issue with the NASD.
18   Q. What is the issue with the NASD?
19   A. We had an audit and I retained Rod.
20   Q. Who is the "we"?
21   A. My firm.
22   Q. Speakman Financial Group?
23   A. Uh-hmm. And Main Street.
24   Q. Does Rod also represent Main Street?

Page 267

1    A. I believe he does.
2    Q. When was the audit?
3    A. Approximately about a year ago.
4    Q. How did you first learn about the audit?
5    A. I'm sure we got some sort of notification.
6  Again, my brother Dave would have worked with the
7  Meckenstock organization, my broker/dealer. So Dave
8  probably told me. I don't remember specifically.
9    Q. Was this the first time that you or your
10 organization has been audited by the NASD?
11   A. Yes.
12   Q. Putting aside the NASD issue, have you ever
13 had -- Strike that.
14       Have you ever been the subject of an
15 inquiry from the SEC?
16   A. No.
17   Q. How about any state insurance regulator?
18   A. No.
19   Q. How about any state securities regulator?
20   A. Not that I'm aware of.
21   Q. How about any other state or federal agency?
22   A. Not that I'm aware of.
23   Q. Is this, sir, your first interaction with
24 NASD?

Page 268

1    A. No.
2    Q. What were your prior interactions with NASD?
3    A. I had one case from 1990, I think it was,
4  that ended up being a subject of discussion with the
5  NASD.
6    Q. Did you provide testimony with respect to
7  that one case?
8    A. I'm sure I did. I mean, it was 1990. But
9  yes.
10   Q. Who was your lawyer during that matter?
11   A. Jim something or other -- Chores, who now
12 works for the NASD.
13   Q. With Allmerica, correct?
14   A. Yeah.
15   Q. So Allmerica knew about that one?
16   A. Yeah.
17   Q. Did you notify Allmerica when you learned of
18 the current NASD audit?
19   A. No, I did not personally notify Allmerica.
20   Q. To your knowledge, did anyone notify
21 Allmerica on your behalf?
22   A. I have no idea.
23   Q. Did you ask anyone to?
24   A. No, I did not personally ask anyone to.

Page 269

1    Q. To your knowledge, what is the -- who --
2  Strike that.
3        To your knowledge, who is under scrutiny
4  by the NASD?
5        MR. HUBBARD: I object to the form of
6  the question. If anyone.
7    A. I don't understand the question.
8    Q. What's your understanding of the NASD
9  inquiry that you're presently involved in?
10       MR. HUBBARD: I object to the form of
11 the question.
12   A. My understanding is they wanted confirmation
13 that the exchanges that we were doing were in our
14 clients' best interests.
15   Q. Is that NASD inquiry still pending?
16   A. I'm not clear on that.
17   Q. Has anyone notified you that it has been
18 closed? And just answer yes or no.
19       MR. HUBBARD: If you would have to
20 reveal attorney-client confidences, I'd tell you not
21 to do that until you consult with your attorney
22 that's representing you there.
23   A. I'm not going to answer that.
24   Q. Let me establish a record. Sir, did you

68 (Pages 266 to 269)

Donald P. Speakman                                                          11/02/2005

Page 270

1  understand the question I asked?
2      A. Yes.
3      Q. Do you know the answer to the question?
4      A. I believe I do.
5      Q. Without revealing anything you've said to
6  Rod last name unknown or that Rod said to you, do
7  you know the status of the NASD inquiry? Yes or no.
8      A. Yes.
9      Q. Is the NASD inquiry of you still active?
10     A. I'm not answering that question.
11     Q. Okay.
12         MR. HUBBARD: If this will shorten
13  things --
14         MR. SHAPIRO: It won't shorten things.
15  I want to keep asking questions. Thank you, Steve.
16         MR. HUBBARD: Mr. Speakman, if he's
17  asking you to divulge attorney-client privileged
18  information, you shouldn't -- I advise you not to do
19  that.
20         MR. SHAPIRO: He already just refused to
21  answer, so you're a little late.
22         MR. HUBBARD: I'm not a little late.
23     Q. Do you know if anybody else is the subject
24  of the NASD inquiry?

Page 271

1      A. Yes.
2      Q. Who else?
3      A. Allmerica gave the NASD a list of all their
4  advisors. And I think -- My understanding is they
5  encouraged the NASD to investigate everybody.
6      Q. Do you know that the NASD has investigated
7  anyone other than yourself and Main Street?
8      A. Yes.
9      Q. Who else has the NASD investigated?
10         MR. HUBBARD: Well, Mr. Speakman, if
11  it's information that has been given to you by your
12  attorney, that's attorney-client privilege.
13         THE WITNESS: It is.
14         MR. HUBBARD: Then you shouldn't be
15  testifying to any of this. If it's information you
16  received from your attorney, that's privileged. And
17  he shouldn't even be asking you the questions.
18     A. I'm not going to answer any questions about
19  the NASD investigation.
20     Q. Hold on. We need to take them one at a
21  time.
22         MR. SHAPIRO: Just so we're clear for
23  the record, Mr. Hubbard, is it your position that
24  the name of someone who's the subject of an inquiry

Page 272

1  is privileged?
2         MR. HUBBARD: If he's been given that
3  information by his attorney, yes, of course it is.
4         MR. SHAPIRO: Sir, facts aren't
5  privileged. Communications are.
6         MR. HUBBARD: Wait a second. I don't
7  know -- I'm not going to let this witness testify to
8  attorney-client communication. If he has received
9  information from the NASD, he can testify to that.
10     Q. Sir, with which attorney did you have these
11  communications?
12     A. Rod.
13     Q. Are the others -- Strike that.
14         With whom have you discussed with in any
15  way, shape or form the NASD inquiry other than
16  Mr. Hubbard, Mr. Biederman or Mr. Rod?
17     A. Well, we have kind of an offshoot of the
18  Allmerica study group, all the people in the class
19  that are involved in this litigation, and we've had
20  phone conferences where we've discussed the NASD.
21     Q. Have lawyers been on each of those phone
22  conferences?
23     A. I don't know.
24     Q. When was the last time you discussed the

Page 273

1  NASD inquiry with your study group?
2      A. Six months ago, perhaps.
3      Q. Who was on the call?
4      A. I don't recall. There was 30 people on the
5  call.
6      Q. Who raised the topic?
7      A. I don't recall.
8      Q. Well, have you told anybody that you're the
9  subject of an NASD investigation?
10     A. Yes.
11     Q. Who have you told?
12     A. Other advisors.
13     Q. How about their names, sir?
14     A. It would be very similar to the list of
15  names I gave you the first time.
16     Q. Do you remember having a conversation with
17  anyone in particular about it?
18     A. I've talked to a lot of advisors about my
19  situation with the NASD.
20     Q. Why did you talk to the other advisors about
21  your situation with the --
22     A. So we could learn from each other. If we're
23  going through similar challenges, then we can
24  learn -- we can share ideas with each other.

Donald P. Speakman                                                                    11/02/2005

Page 274

1    Q. To your knowledge, are any other members of
the study group going through similar challenges?
3    A. Which study group are you referring to now?
4    Q. The one that you previously just referred to
5 as being among those with whom you've raised your
6 NASD situation.
7    A. I believe there are other Allmerica advisors
8 that are being -- have had various levels of inquiry
9 from the NASD. That's my understanding. I don't
10 know any factual information.
11    Q. Fair enough, sir. Did any of them tell you
12 that fact?
13    A. I believe -- I honestly -- This is not
14 attorney-client.
15    Q. Sure, sure.
16    A. I don't remember. But I know -- I have the
17 impression that the way other people were talking,
18 that I'm not the only one who's had an issue with
19 the NASD who worked for Allmerica.
20    Q. Did you testify before the NASD?
21    A. Yes.
22    Q. How many days, sir?
23    A. Two days.
24    Q. Did you tell any of your clients that you

Page 275

1 have, to use your term, an NASD situation?
2    A. Tell any clients. I'm not comfortable
3 saying no because I have some clients that I'm
4 fairly close with that I certainly could have -- I
5 asked different people to say prayers for me the day
6 of my hearing. I certainly could have asked some
7 clients to pray during my hearing so that I would
8 stay nice and calm.
9    Q. Other than asking clients to pray for you
10 with respect to the NASD testimony, can you think of
11 any other discussions you've had with clients about
12 the matter?
13    A. No, not off the top of my head.
14    Q. Did you disclose it on your U4?
15    A. Whatever has to be done on my U4 I feel
16 extremely confident has been done, if anything has
17 been required.
18    Q. Fair enough, sir. I'm not suggesting either
19 way. That's something you've delegated to someone
20 else, yes?
21    A. Yes. I don't believe that the inquiry that
22 I had with the NASD, because there was no
23 accusations made, that anything even belongs on a
24 U4.

Page 276

1    Q. Fair enough. And I'm not suggesting
2 otherwise. I'm just asking if it was on the U4.
3    To your knowledge, have any other former
4 Allmerica agents testified before the NASD?
5    A. I'm not sure.
6    Q. Have you told any of the other Allmerica
7 agents that you testified before the NASD?
8    A. Yes.
9    Q. Did you tell any of them the questions that
10 you were asked?
11    MR. HUBBARD: I object to the form of
12 the question.
13    A. No. What I shared -- No.
14    Q. Well, what did you share with them about
15 your NASD testimony?
16    A. Well, there was various documents showing
17 various studies that were done that displayed the
18 benefit of annuitization, of how annuity contracts
19 work, asset allocation, and I provided numerous
20 studies like that to the NASD.
21    At one point I offered them to people in
22 the study group, that if anybody thought they might
23 be going through similar things and they wanted some
24 of these studies, that I would be glad to provide

Page 277

1 them the studies. And I also encouraged them to
2 read the studies to make sure they were doing the
3 right thing for their clients.
4    Q. Did you discuss with any of the former
5 Allmerica agents how your NASD testimony went?
6    MR. HUBBARD: I object to the form of
7 the question. Mr. Speakman, you have separate
8 counsel for that proceeding. I'd feel very
9 uncomfortable with you being examined on all that
10 with your counsel not present.
11    I've let some of these questions go, but
12 at this point in time if you want to ask any
13 additional questions concerning NASD proceedings,
14 I'd request we do that with Mr. Rod Vincent present.
15    Q. What's your schedule look like next week,
16 Mr. Speakman?
17    MR. HUBBARD: We will confer -- I'll
18 confer with Mr. Speakman about that.
19    Q. Do you have availability next week?
20    MR. HUBBARD: We're not going to do it
21 on the record. If you want to talk with me about
22 it, we'll do it. That's it. We're not going to
23 have a discussion on the record about schedules.
24    MR. SHAPIRO: Just so the record is

70 (Pages 274 to 277)

Donald P. Speakman                                                                11/02/2005

Page 278

1  clear, are you going to instruct the witness not to
2  answer any more questions about the NASD whatsoever?
3       MR. HUBBARD: I just did. I just -- I
4  didn't instruct him. I told you that I feel
5  uncomfortable with you going into detailed questions
6  about a proceeding that his counsel is not present.
7  I think it's inappropriate of you. I think you're
8  asking questions that are inappropriate. From your
9  position, you shouldn't be asking those questions.
10      Q.  Sir, do the matters at issue in the NASD
11 situation have anything to do with the replacement
12 of Allmerica annuities?
13      A.  Yes.
14      MR. HUBBARD: I'll let you answer that
15 question. I'm going --
16      Q.  Were some of those annuities the subject of
17 the Trail Program upon which you've based your
18 federal court lawsuit?
19      A.  Correct.
20      Q.  Did you speak to Mr. Wedel about your NASD
21 testimony?
22      MR. HUBBARD: All right. I've got --
23 Both Mr. Speakman and I have to leave for the
24 airport.

Page 279

1       If you want to ask other detailed
2  questions about the NASD inquiry, which are highly
3  inappropriate -- You're obviously trying to get this
4  witness to answer questions without the assistance
5  of his counsel in that proceeding. I think it's
6  totally inappropriate, Jon. I don't know what
7  you're trying to do here.
8       If you want to continue this
9  questioning, we will provide or arrange a time when
10 his counsel can be present to represent him in
11 connection with that situation.
12      Q.  Mr. Speakman, has Allmerica asserted claims
13 against you in this lawsuit?
14      A.  They have a counterclaim. Is that what
15 you're referring to?
16      Q.  Sure. You're aware of that?
17      A.  Yeah. I read it.
18      Q.  Any part of that counterclaim, to your
19 knowledge, based on Allmerica's allegations that
20 you, Mr. Speakman, did not comply with regulatory
21 requirements?
22      MR. HUBBARD: I object to the form of
23 the question.
24      A.  My regulatory record is perfect.

Page 280

1       MR. HUBBARD: He's asking you about the
2  counterclaim without showing you the counterclaim.
3  So if you can recall, say yes or no or I don't
4  recall.
5       Q.  Do you recall that any part of the
6  counterclaim that Allmerica has asserted against
7  you, sir, concerns allegations that you did not
8  comply with your regulatory requirements?
9       A.  I would like to see the actual document if
10 we're going to talk about it.
11      Q.  Fair enough. Without the document -- I
12 realize you don't have it in front of you. Do you
13 have any knowledge on that topic without the
14 document?
15      A.  I've read the document.
16      Q.  Sure. Do you have any memory?
17      A.  Yes.
18      Q.  Okay. What's your memory?
19      MR. HUBBARD: You want him to
20 remember --
21      A.  Pertaining to what?
22      Q.  Has Allmerica asserted a claim against you
23 based in part on the allegation that you have not
24 complied with regulatory requirements?

Page 281

1       A.  I believe that that's part of their
2  counterclaim.
3       Q.  Okay. Have you told any of your clients
4  about your lawsuit against Allmerica?
5       A.  Yes.
6       Q.  About how many clients have you told?
7       A.  I have no idea. I mean, at various seminars
8  that we've had people have raised the question, Are
9  you suing Allmerica? If they've asked me that, I've
10 said, Yes.
11      Q.  So the record is clear, the only time you've
12 spoken to clients about your lawsuit against
13 Allmerica is in response to a question from a
14 client?
15      MR. HUBBARD: I object to the form of
16 the question.
17      A.  I didn't say that.
18      Q.  In fact, sir, did you put up on an overhead
19 slide a copy of the complaint that was filed against
20 Allmerica on your behalf?
21      A.  Yes.
22      Q.  Did you consider that important information
23 for your clients to know?
24      A.  Yes.

71 (Pages 278 to 281)

Donald P. Speakman                                                            11/02/2005

Page 286

1    Q. Do you ever tell the client if they don't
2  ask?
3    A. In most cases it's irrelevant.
4    Q. Do you ever tell the client if they don't
5  ask?
6    A. In most cases it's irrelevant.
7    Q. Sir, why don't we try it this way. It's a
8  yes or no question. Why don't you answer it yes or
9  no or I don't know, and then you can take as much
10 time as you'd like to explain your answer. Okay?
11     MR. HUBBARD: I object to the form of
12 the question. If you can answer it, do so. If not,
13 tell him you can't.
14   Q. Do you ever tell the client if they don't
15 ask what commissions you're earning from the sale of
16 a replacement annuity?
17   A. No.
18   Q. Fair to say, then, you certainly don't
19 provide that information in writing?
20     MR. HUBBARD: I object to the form of
21 the question.
22   A. No.
23   Q. No, you don't provide it in writing,
24 correct?

Page 287

1    A. Correct.
2    Q. Have you ever seen the movie "Wall Street,"
3  sir?
4    A. Yes.
5    Q. Have you ever broached the topic of the
6  movie "Wall Street" in one of your client seminars?
7    A. Yes.
8    Q. What does the movie "Wall Street" have to do
9  with the financial services you provide to your
10 clients?
11     MR. HUBBARD: I object to the form of
12 the question.
13   A. The "Wall Street" movie has nothing to do
14 with the services I provide my clients.
15   Q. What does the movie "Wall Street" have to do
16 with the financial interests of your clients in any
17 way?
18     MR. HUBBARD: I object to the form of
19 the question.
20   A. Probably none.
21   Q. Did you broach the topic of the movie "Wall
22 Street" in client seminars in an effort to maintain
23 persistency of annuity contracts underwritten by
24 Allmerica?

Page 288

1    A. No.
2      MR. HUBBARD: Jonathan, if we want to
3  catch our planes, we have to leave now.
4      MR. SHAPIRO: Fair enough. Two more
5  questions.
6    Q. Are you under any obligation today to do
7  your level best to maintain persistency of Allmerica
8  annuities?
9      MR. HUBBARD: I object to the form of
10 the question.
11   A. Repeat the question.
12   Q. Are you under any obligation today, sir, to
13 maintain persistency of Allmerica annuities?
14   A. I'm under an obligation to my clients and do
15 what is best for my clients.
16   Q. How about any obligations to Allmerica?
17   A. None.
18     MR. HUBBARD: I object to the form of
19 the question.
20   Q. Have you ever been?
21   A. When Allmerica provided a viable product
22 with a viable rated company with a viable asset
23 allocation model, absolutely.
24   Q. At what point in time, sir, did your

Page 289

1  obligation in that regard to Allmerica stop?
2      MR. HUBBARD: Objection to the form of
3  the question.
4    A. In my opinion, it changed dramatically
5  beginning in September of '02, whenever the ratings
6  dropped significantly and my clients started getting
7  very nervous.
8      MR. SHAPIRO: Okay. Well, I don't want
9  you to be late for your plane and I don't want you
10 to be late for your plane.
11     MR. HUBBARD: Okay.
12     MR. SHAPIRO: What we will do is if we
13 can have a conversation tomorrow by, say -- I know
14 you'll be back late tonight.
15     MR. HUBBARD: If I leave now I might be.
16     MR. SHAPIRO: -- 11:00 a.m. to talk
17 about the continuation of Mr. Speakman's
18 deposition --
19     MR. HUBBARD: That's fine.
20     MR. SHAPIRO: -- to make sure we have an
21 opportunity to do so prior to our class
22 certification deadline and also to discuss some of
23 these outstanding document issues.
24     MR. HUBBARD: We'll have a conference

73 (Pages 286 to 289)

Donald P. Speakman                                                                11/02/2005

Page 290

1    call with you.
2         MR. SHAPIRO:  Super.
3    BY MR. SHAPIRO:
4         Q.  And Mr. Speakman, if you can just do your
5    part in having a conversation with your attorney
6    about your availability because I know this lawsuit
7    is something of an inconvenience to you.  Is that
8    fair enough?
9         A.  No comment.
10        MR. HUBBARD:  We'll have a conversation.
11   Thank you.
12        (Whereupon the deposition
13        was adjourned at 5:53 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Page 291

1         E R R A T A  S H E E T
2         I, DONALD P. SPEAKMAN, do hereby certify that I
3    have read the foregoing transcript of my testimony,
4    and further certify that said transcript is a true
5    and accurate record of my testimony (with the
6    exception of the following corrections listed
7    below):
8    Page    Line          Correction
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
10   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
12   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
13   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
14   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
15   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
16   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
17   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
18   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
19   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
20
21        Signed under the pains and penalties of perjury
22   this        day of              , 2005.
23
24              DONALD P. SPEAKMAN

Page 292

1    COMMONWEALTH OF MASSACHUSETTS
2    SUFFOLK, SS.
3
4         I, Michelle Keegan, Registered Professional
5    Reporter and Notary Public in and for the
6    Commonwealth of Massachusetts, do hereby certify
7    that DONALD P. SPEAKMAN, the witness whose
8    deposition is hereinbefore set forth, was duly sworn
9    by me and that such deposition is a true record, to
10   the best of my ability, of the testimony given by
11   the witness.
12        I further certify that I am neither related to
13   or employed by any of the parties in or counsel to
14   this action, nor am I financially interested in the
15   outcome of this action.
16        In witness whereof, I have hereunto set my hand
17   and seal this 4th day of November, 2005.
18
19
20
21
22              Notary Public
23              My commission expires:
24              May 12, 2012

74 (Pages 290 to 292)