# EXHIBIT A

# EXHIBIT A

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.

ARBITRATION PANEL

| In the matter of the Arbitration between | NASDR Arb. No. 03-08688 |
|---|---|
| JORDAN P. GATES, CFP, CLU, ChFC, MSFS, CFS, LUTCF, | STATEMENT OF CLAIM |
| Claimant, | |
| v. | |
| VERAVEST INVESTMENTS, INC., ALLMERICA FINANCIAL, ALLMERICA INVESTMENT MANAGEMENT COMPANY and MICHAEL R. BURGOYNE, | |
| Respondents. | |

Pursuant to section 10100 *et seq.* of the Uniform Code of Arbitration, claimant Jordan P. Gates ("Gates") demands arbitration against Respondents Allmerica Financial ("Allmerica"), Allmerica Investment Management Company ("AIMCO"), VeraVest Investments, Inc. ("VeraVest") and Michael R. Burgoyne ("Burgoyne") (collectively, "Respondents") before the National Association of Securities Dealers, Inc. ("NASD"). For his Statement of Claim against Respondents, Gates alleges as follows:

**I. PARTIES**

1.1  Prior to his termination on December 31, 2002, claimant Gates was the Director of Financial Planning for the Pacific Northwest branch, a Financial Planner and a registered representative at Allmerica. Gates is registered with the NASD.

1.2  Respondent Allmerica is a member of the NASD. On January 1, 2003, Allmerica was renamed VeraVest.

444045-1

Page 1 -   STATEMENT OF CLAIMS

1   1.3 Respondent Burgoyne is a Managing Director, Financial Planner and a
registered representative at Allmerica. Burgoyne is registered with the NASD.

## II. BACKGROUND FACTS

2.1 Gates was employed by Allmerica from February 14, 1994 until his termination on December 31, 2002. Gates worked in the Lake Oswego, Oregon office of Allmerica throughout this time. Gates was the most profitable advisor, and was either the highest or second highest producer for the previous five years from 1997-2001 for the entire Pacific Northwest firm, which consisted of over 35 advisors. Gates was also highly regarded by Allmerica and his peers, and Gates was chosen by Allmerica to be a member of the national field faculty. Gates was asked to speak throughout the country and at most national conventions due to his financial planning expertise.

2.2 The Career Agent Agreement and Middle Management Agreement entered into by Gates and State Mutual Life Assurance Company of America and SMA Life Assurance Company, two companies owned by Allmerica Financial, provides for payment of commissions and fees earned up to the time of termination. [See Exhibits 1 and 2.] The Allmerica Investment Management Co. (AIMCO) Contract which Gates signed on February 14, 1994 stated that five (5) days written notice must be provided prior to any termination without cause. [Exhibit 3.] Gates did not receive the agreed-to five days written notice of termination.

2.3 On November 25, 2002, Gates received written notice that Allmerica was canceling his Allmerica Agent contract effective December 31, 2002, since the company was changing to a different method of compensation. Allmerica did the same for all of its advisors. The advisors were told that they would be offered a new contract as of January 1, 2003.

2.4 Gates was supervised by Burgoyne and Paul McClung ("McClung"). McClung is a Sales Supervisor who supervises the compliance activities of the Pacific Northwest

444045-1

Page 2 -    STATEMENT OF CLAIMS

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

branch. McClung's supervision was limited to compliance issues. In the early part of March, 2002, after the two former Co-Managing Directors left the firm to take positions with MetLife, Burgoyne and Gates were promoted to greater leadership positions. Burgoyne was promoted to Managing Director and Gates took on new responsibilities and tasks in the position of Director of Financial Planning. Soon after their promotions, animosity over management style developed between Burgoyne and Gates. Gates sent Burgoyne numerous emails stating Gates' concerns regarding Burgoyne on various management and work issues.

2.5 After animosity developed between Gates and Burgoyne, in June, 2002, Burgoyne began auditing Gates' correspondence. Burgoyne wrote a letter to Gates, and forwarded it to William Monroe ("Monroe"), the Chief Compliance Officer for Allmerica, and Larry Gerkiere ("Gerkiere"), the Regional President for Allmerica. The letter outlined nine apparent violations revealed by his audit. Eight out of the nine violations involved correspondence which had already been submitted to the compliance department of the company by Gates as required by company rules without receiving any negative comments from the department. No one had ever discussed problems with the correspondence with Gates prior to Burgoyne's audit. As a result of Burgoyne's audit Gates had to respond to home office, and was fined $2500 for the violations. Prior to the animosity which developed between Gates and Burgoyne, Allmerica never complained about Gates' performance with the company in the nine years that Gates was employed with Allmerica.

2.6 On October 22, 2002, at the request of his clients Chris and Cyndi Callahan and pursuant to standard Allmerica procedures, Gates completed a Check and Wire Fund Request Form to issue a check for $1000 from the Callahan's Allmerica Investment Brokerage Account payable to them so they could open a new account they were establishing to start a college fund for one of their children. [Exhibit 4.] On the request form, Gates requested the check be made payable to the Callahans (account registration) and

444045-1

Page 3 -    STATEMENT OF CLAIMS

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1  mailed to him at the office. Gates' intention was to deliver the check directly to the
2  Callahans at the time that he met with them to write the application for the college savings
3  plan.

4  2.7 Allmerica's home office mistakenly made the $1000 check payable to the
5  addressee (Gates) instead of the payee (the Callahans). [Exhibit 4.] When the check
6  arrived in Gates' office on November 12, 2002, Gates' assistant, Christa Roedel ("Roedel"),
7  saw that the check was issued from Allmerica Investments, and payable to Gates. Gates
8  received many different checks from various companies so it was standard practice for
9  Roedel to deposit the checks without showing them to Gates. Without showing the check to
10 Gates, she asked Gates in an email where to deposit it. He instructed her to deposit $800
11 into his personal account and $200 into his business account. [Exhibit 5.]

12 2.8 On December 2, 2002, Roedel discovered the home-office error when she
13 contacted Allmerica Investments to ask why the Callahan check had not arrived. At the
14 time, Gates was out of the country on vacation so Roedel contacted McClung. He told her
15 to contact Darren Parent, a manager at Allmerica's home office. After explaining the error to
16 Parent, Parent told Roedel not to worry about this incident because it was caused by a
17 home office error and it was reported immediately upon discovery. Parent also told Roedel
18 that the home office had made similar mistakes in the past and he knew how to correct it.
19 He said he would issue a new check to the client and Allmerica would debit $1,000 on
20 Gates' next compensation cycle. [Exhibits 6 and 7.] The matter was completely resolved by
21 Parent and Roedel before Gates even learned of any problem.

22 2.9 On December 4, 2002, Gates learned about the home-office mistake when he
23 checked his email while in Mexico. [See Exhibit 6.] Immediately on his return from vacation,
24 Gates discussed the matter with senior management at Allmerica. At least one senior
25 manager, William Monroe (the Chief Compliance Officer), had not been informed the
26 deposits into Gates' accounts were caused by a home-office error. After those
conversations, Gates believed the matter was resolved entirely.

444045-1

Page 4 -   STATEMENT OF CLAIMS

Case 4:04-cv-40077-FDS   Document 98   Filed 10/12/2006   Page 6 of 13

2.10  On December 12, 2002, Burgoyne and McClung told Gates that Allmerica had decided not to offer Gates a contract with VeraVest (new name for Allmerica after 1/1/03) on January 1, 2003, because of the Callahan check incident. Burgoyne said it was not his decision, but told Gates that he agreed with the decision. Burgoyne told Gates he could finish up and continue to write business through December 31, 2002, but said all appointments at the office should take place in the building's common conference room.

2.11  Minutes later Burgoyne addressed Gates alone and told him that Allmerica's Chief Counsel, Ellen Rosenberg, said Gates could either resign as of December 31, 2002 or he would be terminated with a "yes" answer on some section of Gates' U-5. Gates did not understand what Burgoyne meant by that. When Gates asked Burgoyne to explain the options, Burgoyne said he could not comment since these were the options provided by Rosenberg.

2.12  On the same day Gates was notified that his Allmerica contract would not be renewed, McClung fired all three of Gates' staff without Gates' knowledge or consent.

2.13  After December 12, 2002, Gates asked McClung several times to explain the ramifications of the options provided by Rosenberg. The only response McClung gave was that the questions on the U-5 had changed and the question Burgoyne was referring to was no longer on the U-5. McClung informed Gates that what Burgoyne meant to say was that Gates could either resign or be terminated without cause. Gates then attempted to get clarification of the ramifications of the Rosenberg options from Lynn Miller, office and human resource manager for the Lake Oswego office. Gates did not receive an answer from Miller. Instead, she and McClung asked Gates to put his questions in writing.

2.14  On December 16, 2002, Gates put his questions about his options in writing. [Exhibit 8.] The questions were never answered.

2.15  Prior to Gates' termination, McClung told Gates his U-5 would state that Gates had been terminated without cause regardless of which option Gates chose. Gates was

444045-1

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1  also told by Miller that he would not be terminated with cause. Gates continued to ask for
2  clarification of why he should chose one option over the other, but he never received an
3  explanation of the ramifications of the different options (resignation versus termination
4  without cause).

5      2.16  Between December 14, 2002 and December 31, 2002, clients who telephoned
6  the Lake Oswego office of Allmerica were informed that Gates no longer worked at
7  Allmerica, even though he was still employed there and wrote business up to and including
8  December 31, 2002.

9      2.17  On December 17, 2002, McClung sent letters to Gates' clients indicating Gates
10  no longer worked for Allmerica, and stated there were many other competent planners
11  available to service their financial needs. [Exhibit 9.] Moreover, McClung told Gates' clients
12  that he could not recommend Gates as a competent financial advisor.

13      2.18  Gates repeatedly requested orally and in writing that VeraVest release his U-5,
14  but he did not receive it until after the 30 days required by NASD rules. [Exhibit 10.]

15      2.19 On February 6, 2003 VeraVest Investments, Inc. filed and mailed a Form U-5
16  dated January 29, 2003. [Exhibit 11.] All of the following statements on the U-5 are either
17  false or misleading:

18          2.19.1  Under Section 3. FULL TERMINATION, VeraVest wrote:
19  "Reason- DISCHARGE". Explanation: *"CUSTOMER FUNDS DEPOSITED INTO*
20  *REGISTERED REPS PERSONAL BANK ACCOUNT. REP. CLAIMS DEPOSIT WAS*
21  *UNINTENTIONAL."*

22          2.19.2  Under Section 7A., VeraVest answered "Yes" to the question,
23  "*Currently is, or at termination was, the individual the subject of an investigation or*
24  *proceeding by a domestic or foreign governmental body or self-regulatory organization with*
25  *jurisdiction over Investment-related business?*"

26

444045-1

Page 6 -    STATEMENT OF CLAIMS

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

2.19.3 Under Section 7B., VeraVest answered "Yes" to the question, *"Currently is, or at the time of termination was, the individual under internal review for fraud or wrongful taking of property, or violating <u>investment-related</u> statutes, regulations, rules or industry standards of conduct."*

2.19.4 Under INVESTIGATION DRP, Section 1., VeraVest states that notice was received from *"NASD-SEATTLE"* that NASD was investigating the check incident with the Callahans.

2.19.5 Under Section 2., VeraVest stated that the NASD investigation was noticed on 12/19/2002.

2.19.6 Under Section 3., VeraVest stated, *"NASD REQUESTED FURTHER INFORMATION WHICH WAS PROVIDED IN A 12/20/02 LETTER FROM WILLIAM MONROE TO JEN GONYEA."*

2.19.7 To date, under Section 7A Number 4., VeraVest states the investigation is *"NOT YET RESOLVED"*.

2.19.8 INTERNAL REVIEW DRP, Section 3., VeraVest stated, *"AFTER PHONE CALL FROM REP'S ASSISTANT FIRM DISCOVERED CUSTOMER FUNDS HAD BEEN DEPOSITED INTO REP'S PERSONAL BANK ACCOUNT. REP CLAIMED DEPOSIT WAS UNINTENTIONAL."*

2.19.9 Under Section 7B Number 4., VeraVest stated, the internal review was concluded on 12/18/2002 (while true this statement contradicts its own statements set out in ¶ 2.19.3).

2.20 A true and accurate U-5 was critical for Gates' to quickly become licensed with a new quality broker/dealer, and it continues to negatively affect Gates' ability to be considered for opportunities from other broker/dealers to the present. Since being notified of his termination, Gates started negotiating with major broker/dealers. He assured them that his U-5 would be "clean". As a result of the false and misleading information contained

Page 7 -    STATEMENT OF CLAIMS

444045-1

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1 on the U-5, all employment offers with these broker/dealers were withdrawn. It took Gates
2 more than six months to finally get a broker/dealer to accept Gates with the false U-5 form
3 issued by VeraVest.

4     2.21   Gates was informed on or about February 20th that his group life insurance
5 had lapsed on December 31st, 2002, and that his grace period to reinstate this coverage
6 ended on January 31st, 2003, 20 days before he received notice. Gates has medical issues
7 that could prohibit him obtaining life insurance at affordable rates, and he most certainly
8 would have extended this valuable coverage.

9     2.22   On February 6, 2003 AIMCO mailed a U-5 which was dated January 29, 2003
10 accompanied with a letter dated January 29, 2003. The AIMCO U-5 falsely listed Gates'
11 termination date as December 11, 2003. This date is five days before McClung's letter went
12 out to Gates' clients stating that he no longer worked for Allmerica. The AIMCO U-5 falsely
13 states that Gates' termination was voluntary. [Exhibit 12.]

14     2.23   The AIMCO contract requires five days written notice by either party to
15 terminate the contract. Gates never received any written notice of an intent to terminate the
16 AIMCO contract.

17     2.24  Allmerica wrote to SEI on December 17, 2002 to transfer all of Gates' fee
18 business to another advisor at Allmerica even though Gates was not terminated until
19 December 31, 2002. [Exhibit 13.]

20     2.25  Gates was not paid for commissions earned on SEI business through the last
21 quarter of 2002, as required by his Agent Agreement.

22     2.26   Larry Gekiere, Sr., the Western Region President of Allmerica, as well as
23 Miller, McClung and Burgoyne, all told Gates that due to his past service and contribution to
24 the company, his files would be copied and provided to him at company expense, but were
25 never provided to Gates as promised. This failure to provide Gates with his client files
26 prevented him from servicing his clients.

444045-1

Page 8 -   STATEMENT OF CLAIMS

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

## III. CLAIMS

### A. BREACH OF CONTRACT

3.1  Gates re-alleges paragraphs 1.1 through 2.26 in their entirety.

3.2  Allmerica has contractual obligations to Gates under the Career Agent Agreement and AIMCO Agreements. The Career Agent Agreement obligations include the duty to pay commissions and fees earned, and to provide commission compensation based on an individual's vesting status at the time of termination. The AIMCO Agreement includes the duty to provide five days written notice prior to termination.

3.3  Allmerica breached its contractual obligations to Gates under the Career Agent Agreement by failing to pay commissions and fees earned by Gates through December 31, 2002 on his fee business, and by failing to timely pay vesting benefits owed to Gates. Allmerica continues to breach its contractual obligations to Gates by failing to pay all fees and commissions earned through December 31, 2002, in violation of the Agent Agreement. Gates' termination also caused the terms of his DAC loan to change, and prevented him from receiving lower interest charges and more favorable terms than were given to other advisors.

3.4  Allmerica also breached its obligations to Gates under the AIMCO contract by failing to provide Gates with five days written notice prior to termination, and by falsely stating the termination date on Gates' U-5 as December 11, 2002 and falsely stating that the termination was "voluntary".

3.5  Allmerica also breached its oral promise to provide Gates with copies of his client files, which prevented him from servicing his clients.

3.6  Allmerica's breaches of contract caused loss and damage to Gates in an amount to be proven at the time of hearing, but which is in excess of $200,000.00.

### B. DEFAMATION

3.7  Gates re-alleges paragraphs 1.1 through 3.6 in their entirety.

Page 9 - STATEMENT OF CLAIMS

444045-1

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

3.8   Both prior to and since the termination of Gates, Allmerica made false, defamatory statements regarding Gates, which Allmerica published to third parties, causing Gates harm as described below.

3.9   Allmerica engaged in libel *per se* by publishing an inaccurate and misleading U-5. The U-5 falsely states that Gates was and is currently under investigation and internal review for fraud or wrongful taking of property or violating investment related statutes, regulations, rules or industry standards of conduct. The U-5 also falsely infers that Gates intentionally misdirected client funds for his own personal benefit.

3.10   McClung, an executive manager with Allmerica, engaged in libel *per se* by writing letters to Gates' clients indicating that he no longer worked at Allmerica as of December 17, 2002. Under the doctrine of respondent superior, Allmerica is also liable for the acts of McClung.

3.11   From December 14, 2002 through December 31, 2002, Allmerica engaged in slander *per se* by informing Gates' clients who telephoned the Lake Oswego, Oregon office of Allmerica that Gates no longer worked at Allmerica.

3.12   McClung engaged in slander *per se* by telling Gates' clients that he is a poor investment advisor. These statements falsely impugn Gates' professional capabilities. Under the doctrine of respondent superior, Allmerica is also liable for the acts of McClung.

3.13   Burgoyne engaged in slander *per se* by falsely telling Allmerica advisors and staff that Burgoyne had to fire Gates because Gates deposited client funds into his own account, implying Gates was engaging in fraud and theft. These statements falsely impugn Gates' professional capabilities and falsely accuse him of criminal and fraudulent activity. Under the doctrine of respondent superior, Allmerica is also liable for the acts of the individual respondent Burgoyne.

3.14   David Gore ("Gore"), an investment advisor with Allmerica, engaged in slander *per se*. Gore was given business of Gates during the time Gates was told he could no

Page 10 -   STATEMENT OF CLAIMS

444045-1

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

longer write business for Allmerica. After Gore held the applications and checks totaling over $400,000 for 1 ½ to 2 months, Gore sent the checks back to Gates' clients and told the clients that Gore could not recommend proceeding with the sales of such products recommended by Gates because it would be unethical to do so. These statements falsely impugn Gates' professional capabilities and accuse Gates of improper unethical conduct. Under the doctrine of respondent superior, Allmerica is also liable for the acts of Gore.

3. 15  Allmerica's defamation adversely affected Gates' personal and professional reputation, causing him to incur economic losses in an amount to be proven at arbitration, and to suffer severe emotional distress. Gates is entitled to recover $300,000 in noneconomic damages for Allmerica's wrongful conduct.

**C.   INTERFERENCE WITH BUSINESS RELATIONS**

3.16   Gates re-alleges paragraphs 1 through 3.15 in their entirety.

3.17   Gates has protectable business relationships with individuals for whom he provides financial guidance.

3.18   Allmerica, Burgoyne, McClung and Gore interfered with Gates' relationships for an improper purpose and by improper means, including defaming Gates' professional reputation.

3.19   The wrongful interferences by Allmerica, Burgoyne, McClung and Gore have caused loss and damage to Gates in an amount to be proven at the time of hearing, but which is in excess of $200,000.00

**D.   INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS**

3.20   Gates re-alleges paragraphs 1 through 3.19 in their entirety.

3.21  Allmerica, Burgoyne, and its agents acted with knowledge that its conduct, omissions and false statements would cause Gates to suffer severe emotional distress, or knew that its acts and false statements were substantially certain to cause Gates to suffer severe emotional distress.

Page 11 -   STATEMENT OF CLAIMS

444045-1

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1      3.22  Allmerica's conduct, omissions and false statements caused Gates to
2  experience severe emotional distress.
3      3.23  Allmerica's acts, omissions and false statements constituted an extraordinary
4  transgression of the bounds of socially tolerable conduct.
5      3.24  As a result of Allmerica's acts, omissions and false statements, Gates
6  suffered severe emotional distress and anxiety, loss of reputation in the business
7  community, humiliation, embarrassment, sleeplessness, and mental pain and suffering, and
8  Gates is entitled to recover $300,000 in noneconomic damages for Allmerica's wrongful
9  conduct.

DATED this 8 day of December, 2003.

COSGRAVE VERGEER KESTER LLP

_____
Michael C. Lewton, OSB #87286

Page 12 -   STATEMENT OF CLAIMS

444045-1