


1503

Form 3443 (Rev. 7/89)

CAREER AGENT AGREEMENT

# STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA AND SMA LIFE ASSURANCE COMPANY

Principal Office: Worcester, Massachusetts 01605

State Mutual Life Assurance Company of America and SMA Life Assurance Company (herein referred to collectively as the Assurance Companies and individually as SMA and SMAL, respectively) do hereby appoint Jordan P. Gates of Lake Oswego, Oregon (Career Agent) their Agent to solicit applications for insurance and annuities and to submit such applications through the office of Calvin S. Sumner Harold D. West (General Agent), this appointment to be effective on October 1, 1993.

Career Agent accepts this appointment, subject to the terms and provisions set forth in this Agreement.

## WITNESSETH:

Career Agent will solicit applications for coverages offered by the Assurance Companies and for which he/she is duly licensed. Career Agent is authorized to collect and pay over to General Agent premiums on coverages solicited by him/her. Career Agent shall not delegate any authority granted under this Agreement and shall not appoint any solicitors or subagents to act on his/her behalf.

## TERRITORY AND CLASSES OF BUSINESS

Territory

**Section 1.** The district within which Career Agent may solicit insurance and annuity applications for the Assurance Companies is the district assigned to General Agent.

Permissible Activity

**Section 2.** Career Agent agrees that in the sale and service of insurance and annuities he/she will act only on behalf of the Assurance Companies and such of their affiliates as he/she is authorized to represent; and he/she will not engage in any other activity for remuneration or profit which requires his/her personal services without first obtaining the consent of the Assurance Companies. If the Assurance Companies make arrangements with another business entity to make any of its products available to Career Agents, this will constitute consent to Career Agent to enter into an arrangement with such entity to sell and service such products on its behalf. If, with the consent of the Assurance Companies, Career Agent engages in any personal service activities for remuneration or profit, he/she will, upon request of either Assurance Company, disclose the amount of time expended and the amount of income derived from such other activities.

## STATUS, DUTIES AND AUTHORITY

Relationship of Parties

**Section 3.** Nothing in this Agreement will be construed to create the relationship of employer and employee between either Assurance Company and Career Agent. Within the scope of his/her authority, Career Agent will be free to exercise his/her independent judgment as to the time, place and manner of solicitation and servicing of business underwritten by the Assurance Companies. However, he/she will have no authority to act in a manner which does not conform to applicable statutes, ordinances or governmental regulations pertaining to the conduct of the business or to reasonable rules adopted, from time to time, by the Assurance Companies.

Limitations on Authority

**Section 4.** Career Agent will have no authority to accept risks of any kind; to make, alter or discharge contracts of insurance or annuities; to waive forfeitures or exclusions; to fix any premium for hazardous or substandard risks; to alter or amend any papers received by him/her from either Assurance Company; to deliver any policy of insurance or any document, agreement or endorsement changing the amount of insurance coverage if Career Agent knows or has reason to believe that the insured is uninsurable; to collect any premium after the expiration of the policy grace period except in connection with a policy reinstatement; to accept payment of any premium unless the premium meets the minimum premium requirement for the policy established by the Assurance Company; or to contract any debt rendering or purporting to render either Assurance Company liable therefor, without express authority in writing from an authorized officer of said Assurance Company.

Implied Authority

**Section 5.** Career Agent will have no power or authority other than as expressly provided in this Agreement and no other power or authority shall be implied from the grant or denial of power specifically mentioned in this Agreement.

Duty of Compliance; Negative Obligations

**Section 6.** Career Agent agrees that he/she will not intentionally violate any applicable state or Federal law, ruling or regulation pertaining to the insurance business or any rule or regulation of either Assurance Company. Career Agent will not knowingly engage in any activity which is detrimental to the best interests of either Assurance Company or any of its affiliates. Neither while this Career Agent Agreement is in force nor for a period of two years following the termination of this Agreement will Career Agent directly or indirectly interfere with the relationship of either Assurance Company with any agent or broker.

Policy Termination and Replacement

While this Agreement remains in force, Career Agent agrees that he/she will not, directly or indirectly, replace or induce or attempt to induce any policyholder to terminate or replace any policy issued by either Assurance Company except when permitted by the rules of the Assurance Company. For a period of two years following termination of this Agreement, Career Agent agrees that he/she will not, directly or indirectly, replace or induce or attempt to induce any policyholder serviced through the office of the General Agent to terminate or replace any policy issued by either Assurance Company.

EXHIBIT 1

PAGE 1 OF 8

## SOLICITATION OF INSURANCE AND ANNUITIES

Submission of Applications; Delivery of Policies; Rejected Business

**Section 7.** Career Agent will submit through General Agent all Assurance Company policy applications solicited by him/her, whether or not it appears the proposed insured is an acceptable risk under the rules of the Assurance Company. Career Agent will deliver, or cause to be delivered, in accordance with the rules of the Assurance Companies all policies issued on applications submitted by him/her and will return to General Agent any policy which is declined by the applicant or which cannot be delivered within the time permitted by the Assurance Company's rules. If an application is declined by the Assurance Company or is accepted at a rate higher than standard which is not acceptable to the applicant, with the Assurance Company's permission Career Agent may place the coverage with another insurance company.

Limitation on Solicitation

**Section 8.** Career Agent will not solicit any insurance or annuities in any jurisdiction in which he/she is not licensed nor will he/she solicit by mail or otherwise any insurance or annuities outside the district assigned to General Agent without first receiving consent of the Assurance Companies and ascertaining that he/she is properly licensed to solicit such insurance or annuities.

Advertising Material, Rate Books, Forms, etc.

**Section 9.** The Assurance Companies, through General Agent, will make available to Career Agent a supply of canvassing and advertising materials, stationery, books, records and forms necessary or suitable to properly solicit insurance and annuities. Career Agent will not print, publish or distribute any advertisement, circular, statement or document relating to the business of the Assurance Companies or use any title or language descriptive of his status without the prior approval of the Assurance Companies.

Policyowner Service Aids

Solely to assist Career Agent in rendering service to policyowners, Career Agent may use whatever aids, such as data cards, computer printouts, etc. as may be available. All such aids, whether furnished by the Assurance Companies or otherwise – including any copies thereof – shall be the property of the Assurance Companies.

Illustrations and Proposals

Career Agent will not furnish any prospective insured or policyowner an illustration of the financial or other aspects of a policy or a proposal for a policy of either Assurance Company unless the same has been either furnished by the Assurance Companies or prepared from computer software or other material furnished or approved by the Assurance Companies. Any illustration or proposal delivered by Career Agent will conform to standards of completeness and accuracy established by the Assurance Companies. If the proposal or illustration was not furnished by the Assurance Companies, Career Agent will retain in his/her records for availability to the Assurance Companies a copy thereof or the means to duplicate the same. Any computer software or materials furnished by either Assurance Company will be and remain its property.

Return of Manuals, etc.

Upon termination of this Agreement, Career Agent will return to the Assurance Companies all manuals, computer software, policyholder data cards, policyholder files, stationery and business cards and other material which, by the terms of this Section or otherwise, is the property of the Assurance Companies or either of them.

Accounting for Funds Collected

**Section 10.** In accordance with the rules of the Assurance Companies, Career Agent will account for and remit immediately through General Agent all funds received or collected by him/her for or on behalf of either Assurance Company without deduction for any commissions, fees, or other claim he/she may have against either Assurance Company and will make such reports and file such substantiating documents and records as the Assurance Companies or General Agent may require.

Liability for Refund of Commissions and Fees

**Section 11.** If either Assurance Company pays Career Agent commissions or fees in advance of receipt of the premium on which the payment is based, the amount by which the payment to Career Agent exceeds, at any time, the amount attributable to the premiums paid will constitute a personal debt of Career Agent payable on demand. If either Assurance Company returns premiums on a policy for any reason whatsoever (other than as a part of claim settlement) or rescinds or cancels a policy for any reason whatsoever or if a policyholder exercises a right to surrender the policy for return of all premiums paid, Career Agent will pay on demand the amount of any commissions received on the premiums returned.

## COMPENSATION

Basis of Compensation

**Section 12.** Career Agent's compensation will be a combination of commissions and fees payable on premiums for individual and group life, health and annuity policies placed with the Assurance Companies. The amount of commissions and fees payable for individual insurance and annuity policies will be determined by the further provisions of this Agreement and the published rules of the Assurance Companies. The amount of commissions and fees payable on group life and health insurance and group annuity policies solicited by Career Agent will be specified in separate agreements related solely to that class of business.

Commissions payable on premiums on a policy resulting from conversion, exchange, replacement or the exercise of an option to purchase additional insurance will be determined by Assurance Companies' rules in effect at the time of the conversion, exchange, replacement or exercise of the option.

EXHIBIT 1

PAGE 2 OF 8

 

**Published Rules Affecting Compensation**

The Assurance Companies may, by published rule, limit the amount of premium on which commissions or fees are payable and limit, defer, or exclude commissions or fees because of the nature of the transaction, discretionary nature of the premium or other circumstances.

**Payor**

All compensation due Career Agent under this Agreement or under any other agreement with either Assurance Company will be paid by SMA as the common paymaster.

**Time of Payment of Commissions**

**Section 13.** A premium will not be considered paid until it has been received by the Assurance Company at its Principal Office. On premiums paid or allocated prior to the 15th day of the month, commissions and fees will be paid on the 5th day of the following month. On premiums paid or allocated subsequent to the 15th day of the month, commissions and fees will be paid on the 20th day of the following month.

## TERMINATION AND ITS EFFECT ON COMMISSIONS AND FEES

**Termination for Cause**

**Section 14.** This Agreement may be terminated for cause and without notice if Career Agent:

(a) misappropriates any funds belonging to or received on behalf of either Assurance Company or any of its affiliates; or
(b) withholds any funds or other property belonging to either Assurance Company after the same should have been reported and transmitted to said Assurance Company or after a demand has been made for the same; or
(c) commits any willful or dishonest act which injures either Assurance Company; or
(d) commits any intentional act which violates any applicable Fair Trade Practices Act and thereby injures either Assurance Company; or
(e) intentionally performs any act prohibited by law or intentionally omits any act required by law with the result that either Assurance Company is subject to disciplinary action; or
(f) willfully violates any of the provisions of this Agreement.

**Forfeiture of Commissions and Fees**

**Section 15.** No commissions or fees will be paid following termination of this Agreement, if it is terminated for cause, nor will commissions or fees continue to be paid after termination of this Agreement if Career Agent breaches any of its terms or conditions by the commission of an act prohibited by its terms.

**Termination Without Cause**

**Section 16.** Notwithstanding the foregoing, and whether or not there is a breach of this Agreement, either party may terminate this Agreement during its first year by giving 10 days' notice in writing to the other party of the intention to do so and thereafter by giving 30 days' notice in writing to the other party of the intention to do so. Without limiting their rights under the foregoing, the Assurance Companies hereby give notice of their intention to terminate this Agreement if and when eligible commissions on all Assurance Companies' products solicited by Career Agent in any two consecutive calendar years are less than the minimum required to qualify under the lowest Production Class, as defined in Exhibit A.

**Effect of Certain Terminations**

**Section 17.** If this Agreement terminates without breach of any of its provisions by Career Agent:

(a) by reason of the death of Career Agent; or
(b) by reason of the permanent Total Disability of Career Agent; or
(c) by reason of retirement of Career Agent under the Career Agents' Retirement Plan established and maintained by the Assurance Companies; or
(d) by reason of employment of Career Agent by either Assurance Company or any of its affiliates in some capacity other than as a Career Agent;

commissions will continue to be paid to Career Agent only as provided in the Exhibits attached hereto.

After termination of this Agreement by reason of the permanent Total Disability of Career Agent, if Career Agent recovers from said disability, this Agreement may be reinstated. If Career Agent recovers from disability and this Agreement is not reinstated, commissions will be payable on premiums paid thereafter only if they would have been payable if Section 18 had applied on termination.

**Effect of Other Terminations Without Cause**

**Section 18.** If this Agreement terminates without breach of any of its provisions by Career Agent for any reason other than as set forth in Section 17, commissions will continue to be paid to Career Agent only as provided in the Exhibits attached hereto.

EXHIBIT 1
PAGE 3 OF 8 

## GENERAL PROVISIONS

Right of Set-Off

**Section 19.** The Assurance Companies, for their own benefit, for the benefit of their affiliates and for the benefit of the General Agent, will have a lien on any commissions and fees payable under this Agreement, whether or not the commissions are now due or hereafter become due, and may apply any such monies to the satisfaction of indebtedness to any of said persons to the extent permitted by law.

Non-waiver of Breach

**Section 20.** Waiver of any breach of any provision of this Agreement will not be construed as a waiver of the provision or of the right of the Assurance Companies to enforce said provision thereafter.

Assignability

**Section 21.** This Agreement is not transferable. Without the consent of the Assurance Companies, no rights or interest in or to commissions or fees will be subject to assignment, other than a collateral assignment of commissions and fees, and any attempted absolute assignment, sale or transfer of this Agreement or of any commissions or fees without the written consent of the Assurance Companies will immediately make this Agreement void and be a release to the Assurance Companies in full of any and all of their obligations hereunder.

Error and Omissions Coverage

**Section 22.** Career Agent agrees to maintain errors and omissions insurance coverage meeting the Assurance Companies' minimum coverage requirements and to furnish the Assurance Companies proof of such coverage upon request. If any lawsuit is brought against the Assurance Companies, or either of them, as a result of any alleged action, error or omission of Career Agent and if (1) Career Agent has maintained errors and omissions coverage which complies with the Assurance Companies' minimum requirements, and (2) the alleged action, error or omission of Career Agent was not committed intentionally or with dishonest, fraudulent or criminal intent, Career Agent agrees to reimburse the Assurance Companies for all costs of the lawsuit, including attorney's fees, and all damages resulting therefrom up to the Assurance Companies' Career Agent liability limit. The minimum coverage requirements and Career Agent liability limit will be set forth in a bulletin or announcement published by the Assurance Companies and are subject to change at any time. Distribution of the bulletin or announcement in the usual manner will constitute notice to Career Agent. If any lawsuit is brought against either Assurance Company as a result of any alleged Career Agent action, error or omission and if Career Agent (1) did not maintain at least the required minimum errors and omissions coverage, or (2) did maintain such coverage but Career Agent's action, error or omission was committed intentionally or with dishonest, fraudulent or criminal intent, Career Agent agrees to reimburse the Assurance Companies for all costs of the lawsuit, including attorney's fees, and all damages resulting therefrom unless the court determines the suit to be groundless and without merit.

Reservation of Right to Change

**Section 23.** The Assurance Companies reserve the right at any time to change the terms and conditions of this Agreement, including but not limited to, the rates of commissions and fees, or to discontinue the payment of any commissions and fees described in the Exhibits attached hereto. The Assurance Companies may act through SMA and a notice of change given in the name of SMA will bind or benefit (as the case may be) SMAL, even though not named, unless the notice specifies otherwise.

Effective Date of Change

**Section 24.** Any change will become effective on the date specified in a notice or, if later, 30 days after the notice is given to Career Agent. However, the requirement to give advance notice shall not apply if the change becomes necessary or expedient by reason of legislation or the requirements of any governmental body and, in the opinion of the Assurance Companies, it is not reasonably possible to meet the 30 day requirement. Changes will not be retroactive and will apply only to units of coverage solicited on or after the effective date of the change. Notice of any change may be given by an SMA or SMAL bulletin or announcement and distribution of the bulletin or announcement in the usual manner will constitute notice to Career Agent.

General Agent

**Section 25.** General Agent means the General Agent identified on the face page or any other General Agent in charge from time to time of a general agency office to which Career Agent is assigned.

Definitions

**Section 26.** As used in this Agreement, including the Exhibits attached hereto:

"Replacement" means a transaction in which a new life or disability insurance policy or a new annuity contract is to be purchased, and by reason of the transaction, all or a portion of any existing life or disability insurance policy or any existing annuity contract has been or is to be lapsed, forfeited, reduced in face amount, surrendered, assigned to the replacing insurer, placed on a reduced paid-up basis or under another nonforfeiture provision or terminated, or subjected to borrowing or withdrawals, whether in a single sum or under a schedule of borrowing or withdrawals over a period of time.

"Total Disability" means the inability of the Career Agent, because of injury or sickness, to perform the duties of any occupation for which he/she is reasonably fitted by training, education or experience. During the first 24 months of total disability, Career Agent will be considered to have met the foregoing requirement if he/she is unable to perform the duties of his/her regular occupation and is not performing the duties of any other occupation. Total disability will be considered permanent after it has existed 6 months and thereafter while it continues.

"Flexible premium policy" means an individual insurance or annuity policy under which the policyowner may unilaterally vary the amount and timing of premium payments.

"Fixed premium policy" means an individual insurance or annuity policy under which the amount of premium, the timing of the premium payment, or both, is fixed in advance.

EXHIBIT 1
PAGE 4 OF 8




"Unit of Coverage" means all benefits of a policy which have the same date of issue, except as modified by Assurance Company published rules. Usually all the benefits specified in the policy Schedule of Benefits and in each Supplementary Schedule of Benefits constitute a unit of coverage.

"Policy Year", as to each unit of coverage, means a period of 1 year commencing on its date of issue and each anniversary thereof.

"Monthaversary", as to each unit of coverage, means its date of issue and the corresponding day of each month thereafter.

"Basic premium", for each unit of coverage, means the sum of the basic or target premiums for each benefit in the unit, as determined from the Assurance Company's Rate Manual.

"Excess premium" means premium paid in any policy year in excess of basic or target premium.

"Agreement" means this entire agreement, including all Exhibits and commission and fee schedules attached thereto. Other Exhibits issued hereafter will become a part of this Agreement on their effective date.

Notice

**Section 27.** Whenever this Agreement requires a notice to be given, the requirement will be considered to have been met, in the case of notice to the Assurance Companies, if delivered or mailed postage prepaid to General Agent at the agency office or to a Vice President in SMA's Individual Insurance Operation and, in the case of notice to Career Agent, if left at the usual place for him/her to pick up mail within the agency office, or by mailing postage prepaid, to Career Agent's last home address known to SMA or to such other address as may be designated by Career Agent.

Captions

**Section 28.** Captions are used for informational purposes only and no caption shall be construed to affect the substance of any provision of this Agreement.

Effectiveness; Entire Contract; Prior Agreements

**Section 29.** This Agreement contains the entire contract between the parties. Upon execution it will replace all previous agreements between Career Agent and the Assurance Companies, or either of them, relating to the solicitation of insurance and annuity policies except as the previous agreement relates to the payment of commissions and fees on policies solicited prior to the effective date of this Agreement. For purposes of determining vestings on termination, the date of the earliest prior Career Agent Agreement executed by Career Agent during his current period of continuous service with the Assurance Companies will be considered, the date of this Agreement. It is hereby understood and agreed that any other agreement or representation, commitment, promise or statement of any nature, whether oral or written, relating to or purporting to relate to the relationship of the parties is hereby rendered null and void.

IT IS UNDERSTOOD THAT THIS IS AN "AT WILL" RELATIONSHIP WHICH MAY BE TERMINATED BY EITHER PARTY WITHOUT CAUSE OR REASON AS PROVIDED FOR IN SECTION 16.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate to take effect on its effective date.

State Mutual Life Assurance Company Of America
and
SMA Life Assurance Company

By: Richard V. Granger
asst. Vice President

Jordan P. Saf
Career Agent

Approved: [signature]
General Agent
Harold D. West, CLU

EXHIBIT 1
PAGE 5 OF 8

FORM 02035 (12/81)

CAREER AGENT (Per Cent of Premium) (a)

State Mutual Life Assurance Company of America WORCESTER, MASS 01653
SMA Life Assurance Company

INDIVIDUAL LIFE INSURANCE

**COMMISSION SCHEDULE-CA1**
**INDIVIDUAL NON-EMPLOYEE BENEFIT PLANS**

| POLICY FORM | POLICY YEAR 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| LIFE | % | % | % | % |
| Whole Life, Exec95 | 50 | 12 | 10 | 5 |
| TERM POLICIES | % | % | % | % |
| EXECTERM II | 50 | 10 | 8 | 3 |
| FLEXTERM | 50 | 12 | 10 | 5 |
| Yearly Ren. Term (5 Years) (non-convertible) | 15 | 5 | 0 | 0 |
| Conversions at Attained Age | (b) | (b) | (b) | (b) |

| | POLICY YEAR 1 | 2-10 | 11+ |
|---|---|---|---|
| EXCEPTIONAL LIFE / PAYROLL EXCEPTIONAL / VARI-EXCEPTIONAL LIFE | % | % | % |
| Up to Basic Premium | 50 (c) | 4 | 2 |
| On excess | 4 | 4 | 2 |

RIDERS

Guaranteed Insurability, Acc. Death Benefit, Waiver of Premium, Term Riders (incl. FLEXTERM), Payor — Same rate and period as the policy to which attached

**COMMISSION SCHEDULE - CA3**
**INDIVIDUAL EMPLOYEE BENEFIT PLANS**

| POLICY FORM | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| TERM POLICIES | % | % | % | % |
| Conversions at Attained Age | (b) | (b) | (b) | (b) |

| | POLICY YEAR 1 | 2-10 | 11+ |
|---|---|---|---|
| EXCEPTIONAL RETIREMENT LIFE | % | % | % |
| Up to Basic Premium | 50 | 4 | 2 |
| On excess | 4 | 4 | 2 |

RIDERS

Guaranteed Insurability, Acc. Death Benefit, Waiver of Premium, Term Riders (incl. FLEXTERM) — Same rate and period as the policy to which attached

**FOOTNOTES TO SCHEDULES CA1 AND CA3**

(a) If the Insured is over age 70 nearest birthday, commissions applicable to the first policy year of any life insurance policy will be based upon the premium which would have been payable if the Insured had been age 70.

(b) Same as rate for policy to which converted.

(c) Exceptional Life II—35%.

EXHIBIT 1
PAGE 6 OF 8

## INDIVIDUAL DISABILITY INCOME INSURANCE

**COMMISSION SCHEDULE-CA2**
(Per Cent of Premium)

| | POLICY YEAR | | | | | |
|---|---|---|---|---|---|---|
| DISABILITY INCOME* | 1 | 2 | 3 | 4 | 5 | 6 |
| New Issues | 50% | 20% | 10% | 10% | 10% | – |
| Exercise of Additional Insurance Option | 20% | 20% | 20% | 20% | 20% | 20% |

*Includes Disability Income, Overhead Expense and Disability Buy-Out Policies and All Riders. For Step-Rate Disability Income Policies, an additional commission of 20% of the entire policy premium (excluding rider premiums) is payable in the policy year of the one-step increase in premium.

## INDIVIDUAL ANNUITIES

**COMMISSION SCHEDULE - CA4**

Flexible Premium Annuity Policies
5% of each premium.

Single Premium Annuity Policies
3% of the Single Premium.

EXHIBIT 1
PAGE 7 OF 8



March 11, 1994

Jordan P. Gates
Allmerica Financial
Kruse Woods 2
5335 S.W. Meadows Rd., Suite 390
Lake Oswego, OR 97035-3229

Re: Amendment to Career Agent Agreement
Effective October 1, 1993

Dear Mr. Gates:

Vesting provisions of your Career Agent Agreement are based on the length of service as a Career Agent for State Mutual.

In view of your prior service as a Career Agent, vesting upon termination of your State Mutual contract is amended to the following extent: should the agreement terminate without breach of any of its provisions after May 1, 1997, commissions will be paid on premium applicable to the first and second policy years, but should the agreement terminate without breach of any of its provisions after May 1, 2002, commissions will be paid on any premium applicable to the commission paying period of fixed premium policies and on any premiums allocated to a unit of coverage prior to the 6th policy anniversary of flexible premium policies.

If this is in accord with your understanding of our arrangement, please sign and return a copy of this letter. Until we receive your signed copy, this amendment will not be valid.

Sincerely,

James E. Bellner
Second Vice President
Field Financial Serives

cc: General Agents

Agreed:

By ______________________
Agent's Name

EXHIBIT 1
PAGE 8 OF 8

440 Lincoln Street, Worcester, Massachusetts 01653, Phone 508 855-1000, Fax 508 853-6332
ıtual Life Assurance Company of America • SMA Life Assurance Company • Allmerica Investments, Inc. • Allmerica Investment Management Company, Inc.
ımerica Investment Trust • Allmerica Trust Company, N.A. • Allmerica Funds • Hanover Insurance Company • 440 Financial Group of Worcester, Inc.

MM 4
MIDDLE MANAGEMENT AGREEMENT

STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA
and
SMA LIFE ASSURANCE COMPANY
Principal Office: Worcester, Massachusetts 01605

State Mutual Life Assurance Company of America and SMA Life Assurance Company (herein referred to collectively as the Assurance Companies and individually as State Mutual and SMA Life, respectively) do hereby appoint Jordan Gates (herein referred to as Manager) a member of the middle management team in the General Agency office in charge of Calvin Sumner / Harold West, this appointment to be effective on 6/1/94.

This appointment is made by the Assurance Companies and accepted by the Manager on the terms and conditions herein set forth.

DUTIES AND RESPONSIBILITIES

Section D1. Manager will perform the duties and functions agreed to with General Agent. As they exist on the date of this appointment, they are specified in a letter agreement signed by Manager. These duties and functions may be changed from time to time by a notice in writing from General Agent to Manager.

Manager will perform his duties under the supervision and direction of General Agent.

COMPENSATION

Section D2. The initial compensation, or method of determining the same, will be set forth in a letter agreement signed by Manager and State Mutual. The compensation and the method of determining compensation may be changed from time to time by a notice in writing from General Agent to Manager. If the change is occasioned by a change in the duties or responsibilities of Manager, it will become effective on the date of change in duties or responsibilities; otherwise, the change will be effective on the date specified in the notice, or if later, for the pay period which commences at least 30 days after the notice is delivered to Manager. A pay period is a period of one-half month commencing on the 1st or 16th of each calendar month.

EXHIBIT 2
PAGE 1 OF 6

Compensation consists of salary or incentives or both as specified in the letter agreement. Compensation based on incentives (also called plan compensation) will be measured by first year commissions paid in the second preceding pay period.

DEFINITIONS

Section D3. As used in the letter agreement.

AFYC means the percentage specified hereinafter of first year commissions earned less the specified percentage of any first year commissions charged back.

CA means an agent who is party to a Career Agent Agreement with the Assurance Companies other than a Career Agent who is retired, a member of middle management, a career agent emeritus, or a career agent specialist.

CB means a trainee who is party to a Career Builder Supplement Agreement with the Assurance Companies.

FST means a trainee who is party to an FST Supplement Agreement with the Assurance Companies.

Contract year, as to a CB, FST or CA, means a period of 12 months commencing on the effective date of the CB, FST or CA Agreement or on any anniversary thereof. Each of the 12 months of a contract year is referred to as contract month.

The specified percentage of first year commissions used to determine AFYC are

| Class of Business | Applicable Percentage |
|---|---|
| Individual Fixed Premium Life and Disability Income Policies | 100 |
| Individual Flexible Premium Life Policies | 100 |
| SMA Life - Single Premium and Flexible Premium Annuities | 40 |
| State Mutual RIFA Deposits | 40 |

EXHIBIT 2
PAGE 2 OF 6

| | |
|---|---|
| SMA Equities Products | 30 |
| Policies of Other Insurers Under Contractual Arrangements With State Mutual | 25 |
| State Mutual Group Insurance and Group Annuities | 15 |

PAYMENT OF COMPENSATION

Section D4. Payment of compensation for a pay period will be due on the 5th day following the expiration of the pay period.

All compensation will be paid to Manager by State Mutual as the common paymaster.

EXHIBIT 2
PAGE 3 OF 6

## GENERAL PROVISIONS

DUTY OF COMPLIANCE; NEGATIVE OBLIGATIONS

Section G1. Manager agrees that he/she will not intentionally violate any applicable state or Federal law, ruling or regulation pertaining to the insurance business or any rule or regulation of either Assurance Company. Manager will not knowingly engage in any activity which is detrimental to the best interests of either Assurance Company or any of its affiliates.

While this Agreement is in force and for a period of two years thereafter, Manager agrees that he/she will not, directly or indirectly, induce or attempt to induce any agent or employee of the Assurance Companies to terminate their relationship with the Assurance Companies.

POLICY TERMINATION AND REPLACEMENT

Section G2. While this Agreement remains in force, Manager agrees that he/she will not, directly or indirectly, replace or induce or attempt to induce any policyholder to terminate or replace any policy issued by either Assurance Company except when permitted by the rules of the Assurance Company. For a period of two years following termination of this Agreement, Manager agrees that he/she will not, directly or indirectly, replace or induce or attempt to induce any policyholder of the Assurance Companies to terminate or replace any policy issued by either Assurance Company.

As used in this Agreement, "replace" means a transaction in which a new life or disability insurance policy or a new annuity contract is to be purchased, and by reason of the transaction, all or a portion of any existing life or disability insurance policy or any existing annuity contract has been or is to be lapsed, forfeited, reduced in face amount, surrendered, assigned to the replacing insurer, placed on a reduced paid-up basis or under another nonforfeiture provision or terminated, or subjected to borrowing or withdrawals, whether in a single sum or under a schedule of borrowing or withdrawals over a period of time.

EXHIBIT 2
PAGE 4 OF 6

TERMINATION Section G3. This Agreement will terminate automatically upon termination of Manager's Career Agent Agreement with the Assurance Companies. Prior thereto, it will terminate upon notice of either party to the other, which notice must be given 30 days in advance of its effective date unless given because of violation of any of the terms or conditions of this Agreement. If the Assurance Companies terminate this Agreement on notice of 30 days duration or longer, they may relieve Manager of his duties but without affecting his compensation.

NOTICE Section G4. Whenever this Agreement requires a notice to be given, the requirement will be considered to have been met, in the case of notice to the Assurance Companies, if delivered or mailed, postage paid, to the General Agent or to a Vice President in State Mutual's Individual Insurance Operation and in the case of Manager, deposited at the usual place for him/her to pick up mail within the General Agency office or delivered or mailed postage paid, to Manger at his/her last known home address or to such other address as may be designated by Manger.

GENERAL AGENT Section G5. General Agent means, at any time, the general agent who is then in charge of the general agency office.

CAPTIONS Section G6. Captions are for informational purposes only and no caption shall be construed to affect the substance of any provision.

IT IS UNDERSTOOD THAT THIS IS AN "AT WILL" EMPLOYMENT RELATIONSHIP WHICH MAY BE TERMINATED BY EITHER THE ASSURANCE COMPANIES OR BY MANAGER WITHOUT CAUSE OR REASON AS PROVIDED FOR IN SECTION 6.

IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate, to take effect on the date specified herein.

STATE MUTUAL LIFE ASSURANCE COMPANY
OF AMERICA
and
SMA LIFE ASSURANCE COMPANY

By: ______________________
Vice President

______________________
Manager

Approved:

______________________
General Agent

EXHIBIT 2
PAGE 6 OF 6

**ALLMERICA INVESTMENT MANAGEMENT COMPANY, INC.**
Home Office: 440 Lincoln Street
Worcester, Massachusetts 01653

**Financial Planner Agreement**

This Agreement is entered into by Allmerica Investment Management Company, Inc. ("AIMCO"), 440 Lincoln Street, Worcester, Massachusetts 01653, Calvin S. Sumner/Harold D. West, 5335 S.W. Meadows Rd., Suite 390, Lake Oswego, OR 97035 (District Manager") and **Jordan P. Gates**, 5335 S.W. Meadows Rd., Suite 390, Lake Oswego, OR 97035 ("Financial Planner") effective on Feb. 14, 1994.

In consideration of the mutual benefits to be derived from this Agreement, the parties hereto agree as follows:

1. Financial Planner is authorized by this Agreement to solicit clients and provide financial planning services on behalf of AIMCO through District Manager in the geographic area specified in Section 2. Financial Planner agrees to collect personal and financial data from clients and prepare and personally present a Financial Plan based upon this data. The Financial Plan may contain, in appropriate circumstances depending upon a client's financial objectives and needs, advice on one or more of the following subjects: net worth projections, income tax planning, cash flow analysis, education funding, retirement planning, estate planning and risk management. Financial Planner will also assist a client in defining financial objectives. Financial Planner agrees to promote the business of AIMCO.

2. The Financial Planner will represent AIMCO on a non-exclusive basis in the following geographic area:

   **The State of Oregon, Seattle and the county of Clarke in the State of Washington, with headquarters in Lake Oswego, Oregon.**

   *AIMCO reserves the right in its sole discretion to change this area, to withdraw from any part of such area, or to appoint other Financial Planners and representatives in all or any part of such area.*

3. At all times during the term of this Agreement, Financial Planner will maintain an independent contractor relationship with AIMCO and District Manager; nothing contained in this Agreement will be construed to create the relationship of employer and employee. Financial Planner will be free to exercise his or her own judgment as to whom he or she will solicit as clients and as to the time, place and manner of solicitation and presentation of a Financial Plan. However, Financial Planner agrees to comply with federal and state laws and regulations and the guidelines and Compliance Manual adopted by AIMCO from time to time. AIMCO reserves the right to review all plans prepared by the Financial Planner. That review may be conducted either before or after the plan is presented to the client at AIMCO's discretion.

EXHIBIT 3
PAGE 1 OF 5

4. Financial Planner represents that he or she meets the following minimum requirements established by AIMCO:

   a. Three years of experience in the insurance and/or financial services industry;

   b. Satisfactory completion of at least one of the following training programs:

      i. Life Underwriter ("CLU");

      ii. Chartered Financial Consultant ("ChFC");

      iii. Certified Financial Planner ("CFP");

      iv. State Mutual Life Assurance Company of America training program: Career Development Program; or

      v. Any equivalent program, if approved in writing by AIMCO.

   c. Applicable state life and health insurance license qualification, and licensing as an agent of State Mutual Life Assurance Company of America and SMA Life Assurance Company;

   d. Registration as a registered representative of Allmerica Investments, Inc. with the National Association of Securities Dealers ("NASD") as a result of successfully passing the following exams:

      i. Either both the Series 6 (Investment Company/Variable Contracts Limited Representative Exam) OR the Series 7 (General Securities Representative Exam); AND

      ii. Series 63 (Uniform Securities Agent state law exam) if applicable;

      iii. Series 65 (Uniform State Investment Adviser Law Examination) if applicable; AND

      iv. The Variable Contract Exam (where applicable under state law);

   e. A personal history which would not require answering "yes" to any item on the attached Securities Proceedings Law Questionnaire.

   Satisfaction of the foregoing minimum requirements is a condition precedent to the effectiveness of this Agreement.

5. Financial Planner will purchase Errors and Omissions liability insurance in a form and substance acceptable to AIMCO, with liability limits as established by AIMCO from time to time, to cover his or her financial planning activities under this Agreement. Financial

EXHIBIT 3
PAGE 2 OF 5

Planner will provide AIMCO with evidence of such insurance coverage at the time of execution of this Agreement, once every twelve months thereafter and whenever AIMCO reasonably requests a change in said insurance coverage. AIMCO reserves the right to request a change in such insurance coverage from time to time in accordance with Section 15 of this Agreement. Financial Planner will notify AIMCO and the District Manager within five business days of learning that such insurance coverage is to be terminated or will not be renewed.

This Agreement will automatically terminate when Financial Planner's insurance coverage terminates, if Financial Planner has not replaced such insurance coverage by the date of termination.

6. Financial Planner will fully disclose to clients any conflict of interest, including but not limited to, the fact that Financial Planner is a registered representative of Allmerica Investments, Inc. and a life insurance agent of State Mutual Life Assurance Company of America and SMA Life Assurance Company. Financial Planner will deliver or cause to be delivered all disclosure brochures and other materials to clients as specified in the AIMCO Compliance Manual.

7. Financial Planner is not authorized by AIMCO and agrees not to provide any of the following services:

   a. custodial services of any kind including but not limited to holding customer funds and/or securities;

   b. recommendations as to when to buy or sell securities in light of changing market conditions; or

   c. discretionary services including but not limited to exercising discretionary authority over a client's funds or securities under any circumstances.

8. Financial Planner will promptly obtain all records required by AIMCO, as set forth in the AIMCO Compliance Manual, and deliver such records to District Manager.

   Any books, papers, correspondence and records which may be retained by Financial Planner shall become and remain the property of AIMCO and shall be immediately turned over to AIMCO upon termination of this Agreement. Any books, papers, correspondence and records retained by Financial Planner will be available for inspection in the local office by officers or duly authorized representatives of AIMCO for examination and audit purposes. AIMCO agrees to assume overall responsibility for the adequacy of compliance and recordkeeping pursuant to the "Office Records and Procedure" section of the Compliance Manual.

9. Financial Planner will promptly collect fees, whether initial deposit or balance, from clients and deliver such fees to District Manager. AIMCO will pay District Manager a percentage of the money collected in accordance with the Agreement between District Manager and AIMCO. District Manager will pay Financial Planner for the services provided under this Agreement for fee-based planning in accordance with the attached Schedule.

EXHIBIT 3
PAGE 3 OF 5

10. AIMCO from time to time will furnish a supply of solicitation and advertising documents, stationery, books, records and forms for doing business as a Financial Planner. Financial Planner will not print, publish or distribute any other advertisement, circular, statement or document relating to the business or services of AIMCO, or use on stationery, business cards or advertisements any title or language descriptive of his or her status, unless approved in writing by AIMCO.

11. This Agreement may be terminated immediately without notice if Financial Planner:

    a. terminates his or her relationship with or is terminated by State Mutual Life Assurance Company of America, SMA Life Assurance Company or Allmerica Investments, Inc.;

    b. withholds or misappropriates any receipts, monies or contracts received in connection with his or her activities with AIMCO or any other State Mutual Company;

    c. commits any willful or dishonest act which in the opinion of AIMCO will harm AIMCO in any manner; or

    d. fails to comply with any of the provisions of this Agreement.

12. Financial Planner or AIMCO may terminate this Agreement with or without cause upon five days written notice.

13. If this Agreement is terminated, Financial Planner will be entitled to his or her portion of any fees received from clients for Financial Plans completed prior to the date of termination. Financial Planner will not receive any amounts if Financial Planner terminates or is terminated prior to completion of financial planning services with respect to particular clients. Financial Planner agrees that District Manager may apply any fees due Financial Planner on termination, to any amounts Financial Planner owes AIMCO.

14. If any lawsuit is brought against AIMCO as a result of a negligent act of Financial Planner, all costs, including attorneys' fees, and all damages resulting from such acts, will be paid by Financial Planner. Negligent acts shall be construed to mean errors and omissions that occur during the exercise of Financial Planner's individual scope of authority.

    If any lawsuit is brought against AIMCO as a result of any willful and wrongful act of Financial Planner, all costs, including attorneys' fees, and all damages resulting from such action, will be paid by Financial Planner. Willful and wrongful acts shall be construed to mean either a violation of the provisions of Section 7 or a dishonest, fraudulent or malicious act committed by Financial Planner.

    Whenever it appears that Financial Planner may be liable to AIMCO under this section, AIMCO will promptly notify Financial Planner. If permissible under the rules of practice of the court in which the lawsuit is brought, AIMCO may, in its discretion, file the necessary pleadings to make Financial Planner a party to the lawsuit. Regardless of the outcome of the lawsuit, AIMCO will have no liability for legal fees, expenses, or costs of any kind incurred by Financial Planner. Financial Planner will promptly notify AIMCO and his or her errors and omissions liability carrier if any lawsuit is brought against Financial Planner.

EXHIBIT 3
PAGE 4 OF 5

Not withstanding the above, Financial Planner will not be liable to AIMCO for any amounts in excess of the liability limits of Financial Planner's errors and omissions coverage if such insurance coverage is maintained in accordance with Section 5 of this Agreement and if the acts giving rise to the lawsuit or proceeding were not willful and wrongful as defined above.

15. AIMCO reserves the right to change from time to time the terms and provisions of this Agreement. Any such change will become effective on the date specified in the written notice of such change, but not less than twenty days after the date written notice is given. The requirement that written notice be given at least twenty days prior to the effective date shall not apply if the change is necessary because of state or federal legislation or the requirements of any governmental body and/or AIMCO believes that it is not reasonably possible to comply with the twenty day requirement.

16. Financial Planner will have no power or authority to act on behalf of AIMCO, other than as expressly provided in this Agreement; and no other power or authority shall be implied from the grant or denial of power specifically mentioned in this Agreement.

17. This Agreement is not assignable. No rights, amounts or interests arising out of this Agreement shall be subject to assignment, other than a collateral assignment. Any attempted assignment, sale or transfer, without the written consent of AIMCO will immediately make this Agreement void and will release AIMCO in full from any and all of its obligations under this Agreement.

18. This Agreement constitutes the entire Agreement between the parties and may not be amended, except as provided in Section 15, by a written agreement signed by all the parties.

19. This Agreement will not be effective until accepted and signed by an Officer of AIMCO in the Home Office.

2-10-94
Date

Jordan P. Gates
Jordan P. Gates, Financial Planner

2-10-94
Date

By: Calvin S. Sumner
Calvin S. Sumner, District Manager

2-10-94
Date

By: Harold D. West
Harold D. West, District Manager

Allmerica Investment Management Company, Inc.

2/14/94
Date

By: Lila M. Ztecha

Assistant Vice President
Title

EXHIBIT 3
PAGE 5 OF 5

# FAX FAX FAX

**FACSIMILE TRANSMITTAL**
**Allmerica Financial**
**440 Lincoln Street**
**Worcester, MA 01653**
**Main Telephone Number: (508) 855-1000**
**Fax Number: (508) 855-3523**
**Fax Location: Law Department**

Date: March 13, 2003

Total number of pages: 3 (including this cover sheet)

---

To: Mark LeCoq

Fax# (503) 796-2900

---

From: Ellen Rosenberg, Esq.
Office of the General Counsel – N435
Tel # (508) 855-4847
Fax # (508) 855-3523

---

MESSAGE: Mark,

As you requested.

ER

---

**Confidentiality Note:** This fax is intended for the exclusive use of the addressee and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any dissemination, use, distribution or copying is strictly prohibited. If you have received this fax in error, please notify me by telephone or via return fax and destroy the original and all copies.

EXHIBIT 4
PAGE 1 OF 3

Ryan Callahan

Allmerica Investments, Inc.

440 Lincoln Street
Worcester, MA 01653

**Check & Wired Funds Request Form**

***All requests must be received by 1:30 pm EST for same day processing.***

☐ *Check here if form has already been faxed and processed by FIIBG.*

**TO: FIIBG - NY Operations** **FAX: 800-856-0344**

**FIIBG ACCOUNT NUMBER:** A F S - 5 6 3 0 1 3

**DOLLAR AMOUNT: $** 1,000.00

x **CHECK REQUEST:**

**Issue to: (Check One)** x Account Registration ___ Third Party Name (Requires LOA signed by all authorized parties.)

*Third Party Name:*

**Mail to:** ___ Address of Record X Third Party Address (Requires LOA signed by all authorized parties.)

*Third Party Address:*
Allmerica Financial
c/o Jordan Gates
5665 SW Meadows Rd, Ste. 200
Lake Oswego, OR 97035

**Deliver Via: (Check One)** x Regular Mail ___ Overnight Mail ($10.00 fee is charged to the account.)

___ **WIRED FUNDS REQUEST: ($15.00 fee is charged to the account.)**

Bank Name:
ABA Number:
For the Account of:
Account Number:
For Further Credit to:
Account Number:

**Agent/Requestor Name:** Jordan P. Gates (Please print.) **Phone Number:** (503) 684-3161

☒ **Agent/Requestor Signature:** Jordan P. Gates **Date:** 10-22-02

CBS009 (6/02)

X Chris Callahan
CHRIS CALLAHAN

X Cyndi Callahan
CYNDI CALLAHAN

EXHIBIT 4
PAGE 2 OF 3

Callahan AFS-5 13

National Financial Services LLC

VOUCHER

NO. 310180444

| DATE | SECURITY DESCRIPTION | TYPE | AMOUNT |
|---|---|---|---|
| 11/04 | CREDIT BALANCE | | 1,000.00 |
| ACCOUNT NO. | AFS5630131 | TOTAL | 1,000.00 |

DETACH THIS PORTION BEFORE CASHING CHECK

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT. CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM.

THE BANK OF NEW YORK DELAWARE
NEWARK, DELAWARE

National Financial Services LLC
200 Liberty Street, One World Financial Center
New York, NY 10281

NO. 310180444

62-35/311

November 04, 2002

PAY One Thousand Dollars and 00 Cents

EXACTLY *$1,000.00 *

Not Valid After 90 Days

TO THE ORDER OF

0004319
ALLMERICA FINANCIAL
C/O JORDAN GATES
5665 SW MEADOWS ROAD SUITE 200
LAKE OSWEGO OR 97035

National Financial Services LLC

AUTHORIZED SIGNATURES

⑈310180444⑈ ⑆031100351⑆ ⑈0300974219⑈

EXHIBIT 4
PAGE 3 OF 3

Read from top to bottom

**From:** Christa Roedel
**Sent:** Tuesday, November 12, 2002 10:00 AM
**To:** Jordan Gates
**Subject:** Credit balance check

You rec'd a "Credit Balance" from National Financial Services LLC (our brokerage) for $1,000. What would you like me to do with it?
Christa

Christa K. Roedel, RFC
Financial Services Representative
Allmerica Financial
5665 SW Meadows Rd. #200
Lake Oswego, OR 97035
503.684.3161 ext. 284

---

**From:** Jordan Gates
**Sent:** Tuesday, November 12, 2002 1:26 PM
**To:** Christa Roedel
**Subject:** RE: Credit balance check

Keep $200 for our account and write Sheri a check for $800 and give it to me today. Thanks

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**
**5665 S.W. Meadows Road #200**
**Lake Oswego, OR 97035**
(503) 684-3161 Office
**(503) 684-3163 Fax**
**(503) 299-7474 Page**

---

**From:** Christa Roedel
**Sent:** Wednesday, November 13, 2002 4:33 PM
**To:** Jordan Gates
**Subject:** RE: Credit balance check

Jordan,
I put this in katie's inbox to take to the bank today, but obviously she didn't make it! So, it will get to the bank tomorrow…just wanted you to know.
Thanks
Christa

---

**From:** Jordan Gates
**Sent:** Wednesday, November 13, 2002 11:13 PM

EXHIBIT 5
PAGE 1 OF 6

**To:** Christa Roedel
**Subject:** RE: Credit balance check

I promised Sheri that I would get her a check for $800 today so I came in late to write it out of the checking account.

So consider this done.

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**
**5665 S.W. Meadows Road #200**
**Lake Oswego, OR 97035**
(503) 684-3161 Office
**(503) 684-3163 Fax**
**(503) 299-7474 Page**

---

**From:** Christa Roedel
**Sent:** Thursday, November 14, 2002 8:40 AM
**To:** Jordan Gates
**Subject:** RE: Credit balance check

The other check is NOT yet deposited, so PLEASE do not have Sheri cash that check until Saturday…not TODAY and not TOMORROW….just want to make sure it clears…otherwise you may get overdraft charges.
Thanks
Christa

---

**From:** Jordan Gates
**Sent:** Thursday, November 14, 2002 9:51 AM
**To:** Christa Roedel
**Subject:** RE: Credit balance check

I believe she plans on depositing it today to pay some bills. Can you make a deposit today and get it posted? Otherwise, I will do it or have Katie do it.

Thanks

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**

EXHIBIT 5
PAGE 2 OF 6

5665 S.W. Meadows Road #200
Lake Oswego, OR 97035
(503) 684-3161 Office
(503) 684-3163 Fax
(503) 299-7474 Page

EXHIBIT 5
PAGE 3 OF 6

End of section

Read from bottom UP

Jordan,
Like I said in my email yesterday, I had put that check in Katie's box on Tuesday night to do on Wed., but then she didn't come in at all. I asked her (via email) to make sure this check gets to the bank today instead.
It makes it hard when we're up against a clock of checks written without funds in the account it's written on…it makes me really uncomfortable when you (or Roger Miller, or John Sandilands) does that!!! ☹

Christa

-----Original Message-----
**From:** Jordan Gates
**Sent:** Thursday, November 14, 2002 9:51 AM
**To:** Christa Roedel
**Subject:** RE: Credit balance check

I believe she plans on depositing it today to pay some bills. Can you make a deposit today and get it posted? Otherwise, I will do it or have Katie do it.

Thanks

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**
**5665 S.W. Meadows Road #200**
**Lake Oswego, OR 97035**

(503) 684-3161 Office
**(503) 684-3163 Fax**
**(503) 299-7474 Page**

EXHIBIT 5
PAGE 4 OF 6

-----Original Message-----
**From:** Christa Roedel
**Sent:** Thursday, November 14, 2002 8:40 AM
**To:** Jordan Gates
**Subject:** RE: Credit balance check

The other check is NOT yet deposited, so PLEASE do not have Sheri cash that check until Saturday…not TODAY and not TOMORROW….just want to make sure it clears…otherwise you may get overdraft charges.
Thanks
Christa

-----Original Message-----
**From:** Jordan Gates
**Sent:** Wednesday, November 13, 2002 11:13 PM
**To:** Christa Roedel
**Subject:** RE: Credit balance check

I promised Sheri that I would get her a check for $800 today so I came in late to write it out of the checking account.

So consider this done.

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**
**5665 S.W. Meadows Road #200**
**Lake Oswego, OR 97035**

(503) 684-3161 Office
**(503) 684-3163 Fax**
**(503) 299-7474 Page**

EXHIBIT 5
PAGE 5 OF 6

-----Original Message-----
**From:** Christa Roedel
**Sent:** Wednesday, November 13, 2002 4:33 PM
**To:** Jordan Gates
**Subject:** RE: Credit balance check

Jordan,
I put this in katie's inbox to take to the bank today, but obviously she didn't make it! So, it will get to the bank tomorrow…just wanted you to know.
Thanks
Christa

-----Original Message-----
**From:** Jordan Gates
**Sent:** Tuesday, November 12, 2002 1:26 PM
**To:** Christa Roedel
**Subject:** RE: Credit balance check

Keep $200 for our account and write Sheri a check for $800 and give it to me today.
Thanks

Jordan P. Gates, CFP, ChFC, CLU, CFS, MSFS
**Director of Financial Planning**
**Allmerica Investment Management Company**
**5665 S.W. Meadows Road #200**
**Lake Oswego, OR 97035**

(503) 684-3161 Office
**(503) 684-3163 Fax**
**(503) 299-7474 Page**

-----Original Message-----
**From:** Christa Roedel

EXHIBIT 5
PAGE 6 OF 6