**EXHIBIT C**

1

2

3

4

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.

5

ARBITRATION PANEL

6

7

In the matter of the Arbitration between

JORDAN P. GATES, CFP, CLU, ChFC, MSFS, CFS, LUTCF,

Claimant,

v.

VERAVEST INVESTMENTS, INC., VERAVEST INVESTMENT ADVISORS, INC., ALLMERICA FINANCIAL CORPORATION, dba ALLMERICA FINANCIAL SERVICES, ALLMERICA INVESTMENT MANAGEMENT COMPANY, ALLMERICA FINANCIAL LIFE INSURANCE AND ANNUITY COMPANY, and MICHAEL R. BURGOYNE,

Respondents.

NASD Dispute Resolution
No. 03-08688

CLAIMANT'S MOTION TO AMEND
STATEMENT OF CLAIM AND
MEMORANDUM IN SUPPORT

8

9

10

11

12

13

14

15

16

17

18

19

**I. MOTION**

20

21       Pursuant to section 10328 *et seq.* of the NASD Code of Arbitration, claimant Jordan

22   P. Gates ("claimant") requests the arbitration panel allow the filing of claimant's Second

23   Amended Statement of Claim.  In support of this motion, claimant relies on the following

24   Memorandum in Support and the accompanying Declaration of Michael K. Walton and

25   proposed Second Amended Statement of Claim.

26   / / /

Page 1 – CLAIMANT'S MOTION TO AMEND STATEMENT OF CLAIM AND
MEMORANDUM IN SUPPORT

## II. MEMORANDUM IN SUPPORT

### Claimant Moves to Amend His Statement of Claim Pursuant to NASD Code of Arbitration Procedure, Rule 10328(c)

Pursuant to NASD Rule 10328(c), the panel must approve claimant's request to amend his statement of claim. Leave to amend should be granted in this case because respondents only recently provided claimant with discovery that supports the addition of claims for spoliation, violation of the Unlawful Trade Practices Act, and punitive damages. *See* Declaration of Michael C. Lewton (Lewton Dec). These new claims should come as no surprise to respondents, and respondents will suffer no prejudice as the hearing in this matter is still more than three months away. Justice requires allowing claimant to amend based on this newly obtained discovery.

### III. Conclusion

For the foregoing reasons, claimant respectfully asks this panel to grant leave to amend his statement of claim with the proposed (enclosed) Second Amended Statement of Claim.

Dated this 27th day of July, 2005.

COSGRAVE VERGEER KESTER LLP


Michael C. Lewton, OSB No. 87286
Michael K. Walton, OSB No. 99122
Amity L. Clausen, OSB No. 04260
Telephone: 503-323-9000
Fax: (503) 323-9019
E-mail: mlewton@cvk-law.com
Of Attorneys for Jordan P. Gates
Trial Attorney: Michael C. Lewton

287523

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1       CERTIFICATE OF SERVICE

2       I hereby certify that I served a true and correct copy of the foregoing CLAIMANT'S

3  MOTION TO AMEND STATEMENT OF CLAIM AND MEMORANDUM IN SUPPORT on the

4  date indicated below by

5       ☐    mail with postage prepaid, deposited in the US mail at Portland, Oregon,

6       ☐    hand delivery,

7       ☐    facsimile transmission,

8       ☒    overnight delivery,

9

10      Attached to this certificate is the printed confirmation of receipt of the document(s)

11  generated by the transmitting machine. I further certify that said copy was placed in a

12  sealed envelope delivered as indicated above and addressed to said attorneys at the

13  addresses listed below:

14  Michael G. Donovan
    Manchel & Brennan, P.C.
15  199 Wells Avenue, Suite 301
    Newton, MA 02459
16

17      Of Attorneys for Respondents

18      DATED: July 27, 2005

19                                        MICHAEL K. WALTON

20

21

22

23

24

25

26

Page 1 – CERTIFICATE OF SERVICE                          287523

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1

2

3

4

NATIONAL ASSOCIATION OF SECURITIES DEALERS REGULATION, INC.

5

ARBITRATION PANEL

6

In the matter of the Arbitration between

7

JORDAN P. GATES, CFP, CLU, ChFC,
MSFS, CFS, LUTCF,

8

|   |   |
|---|---|
| NASD Dispute Resolution No. 03-08688 | |

9

Claimant,

10

v.

11

VERAVEST INVESTMENTS, INC.,
VERAVEST INVESTMENT ADVISORS, INC.,
ALLMERICA FINANCIAL CORPORATION,
dba ALLMERICA FINANCIAL SERVICES,
ALLMERICA INVESTMENT MANAGEMENT
COMPANY, ALLMERICA FINANCIAL LIFE
INSURANCE AND ANNUITY COMPANY, and
MICHAEL R. BURGOYNE,

SECOND AMENDED STATEMENT OF CLAIM

12

13

Hearing Date:  October 17, 2005
Location:  Portland, Oregon

14

15

16

Respondents.

17

18

_____

19

20    Pursuant to section 10100 *et seq.* of the Uniform Code of Arbitration, claimant

21    Jordan P. Gates ("Gates") demands arbitration against Respondents.  For his Statement of

22    Claim against Respondents, Gates alleges as follows:

23                                              **PARTIES**

24        1.1    During all material times prior to his termination from Allmerica Investments,

25    Inc. (Allmerica Investments) and Allmerica Investment Management Company (AIMCO),

26    Gates was employed as a registered representative and financial planner in the Lake

Page 1 – SECOND AMENDED STATEMENT OF CLAIM                                    286198

1   Oswego branch. Gates was and is registered with the National Association of Securities

2   Dealers (NASD).

3       1.2    During all material times, Allmerica Investments was a member of the NASD.

4   On or about January 1, 2003, Allmerica Investments, was renamed VeraVest Investments,

5   Inc. (VVI)

6       1.3    During all material times, AIMCO was a member of the NASD. On or about

7   January 1, 2003, AIMCO was renamed VeraVest Investment Advisors, Inc. (VVIA)

8       1.4    During all material times, Allmerica Financial Corporation (AFC) dba

9   Allmerica Financial Services (AFS), was the parent company of Allmerica Investments and

10  AIMCO. These entities held themselves out as Gates' employer.

11      1.5    During all material times, Allmerica Financial Life Insurance and Annuity

12  Company (AFLIAC) was a sister company of Allmerica Investments and AIMCO. During all

13  material times, AFLIAC held itself out as Gates' employer.

14      1.6    During all material times, Michael Burgoyne (Burgoyne) was the Managing

15  Director of the Northwest branch of the Allmerica and/or Veravest Respondents and was

16  acting within the course and scope of that employment. Burgoyne was and is registered

17  with the NASD.

18      1.7    During all material times, Ellen Rosenberg (Rosenberg) was an attorney

19  working for one or more of the Allmerica and/or Veravest Respondents. During all material

20  times, Rosenburg was acting within the course and scope of that employment. She also

21  represented claimant.

22      1.8    During all material times, David Gore ("Gore") was a registered representative

23  working for one or more of the Allmerica Respondents. During all material times, Gore was

24  acting within the course and scope of his employment with one or more of the Allmerica

25  Respondents.

26  / / /

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8ᵗʰ Floor
Portland, OR 97205
(503) 323-9000

1                    **GATES' CONTRACTS WITH ALLMERICA**

2        2.1    Gates was employed by corporate respondents from November 23, 1993 until

3    his termination on December 31, 2002.  During his tenure with the Allmerica Respondents,

4    Gates became one of the most successful financial advisors in Allmerica's Northwest

5    region, which consisted of over 35 registered representatives.  Gates had developed a

6    substantial client base to which he provided financial planning and asset management

7    services.

8        2.2    During his employment with Allmerica respondents, Gates entered into four

9    separate contracts.  [Exhibits 1-4]  One or more of those contracts provided, in part, that if

10    Gates was terminated, he would be entitled to his portion of any commissions or fees

11    earned prior to the date of his termination.

12                    **GATES' EMPLOYMENT PRIOR TO 2002**

13        3.1    Prior to 2002, the Northwest region of Allmerica was managed by Cal Sumner

14    ("Sumner") and Harold West ("West").  During this period, Sumner, who supervised Gates

15    and acted as his local compliance officer, took little, if any, exception to Gates' work product

16    or work practices.

17        3.2    In early 2002, Sumner and West resigned from Allmerica and accepted

18    positions with Met Life, a competitor in the financial services industry.

19        3.3    During this period of time, Sumner and West approached Gates as well as

20    Burgoyne and others with an offer for Gates to go to Met Life.  Gates rejected the offer, in

21    part because Allmerica promised him greater management responsibilities for shaping the

22    future course of the Northwest region.

23        3.4    Allmerica filed a lawsuit against Sumner and West seeking to prevent

24    Sumner and West from recruiting advisors from Allmerica to Met Life.

25    / / /

26    / / /

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8ᵗʰ Floor
Portland, OR 97205
(503) 323-9000

1              **GATES' DISCIPLINE BY ALLMERICA**

2        4.1     After Sumner and West left Allmerica, Allmerica promoted Burgoyne to the

3    position of Managing Director of the Northwest Region.  Gates was given significant

4    additional managerial responsibilities and a significant pay increase.  Burgoyne told Gates

5    and by his words and his actions informed other Allmerica employees that Gates was a

6    significant part of the management team of the Northwest region.

7        4.2     During the spring of 2002, Gates attempted to collaborate with Burgoyne

8    regarding various management decisions.  After a short period of time, Burgoyne began to

9    ignore Gates' input regarding management issues.

10       4.3     On a weekly basis, Paul McClung, the local compliance officer, routinely

11   audited advisors' correspondence to clients.  For some inexplicable reason, prior to July

12   2005, Burgoyne re-audited only Gates' correspondence to clients.  On July 25, 2002,

13   Burgoyne wrote a letter to Gates which admonished him for nine alleged minor violations of

14   NASD and Allmerica rules.  The letter was copied to William Monroe (Monroe), corporate

15   respondents' Chief Compliance Officer and Larry Gerkiere (Gerkiere), corporate

16   respondents' Regional President, and others.   Gates was ordered to fly, at his expense, to

17   Allmerica's home office in Massachusetts in order to defend himself in front of regional and

18   national management.   At about that same time, respondents conducted a full audit of all

19   Gates' files.

20       4.4     Gates was **later** notified by Allmerica compliance officers that he was to be

21   fined $2,500 based on the minor violations.

22              **BURGOYNE'S FURTHER AUDITS**

23       5.1     Unbeknownst to Gates, in Burgoyne's August 2002 management report,

24   Burgoyne told Gerkiere that he intended to remove Gates from the management team.

25       5.2     In late October 2002, Burgoyne had Greg Railsback, para-planner, conduct a

26   secret audit of one of Gates' financial plans in an attempt to discover compliance violations.

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1    5.4    While Burgoyne secretly was having audits conducted on Gates' files in order

2   to build a case for Gates' termination, Burgoyne was publicly stating and writing to Gates

3   commending him for his expertise in financial planning and training.

4    5.5    On November 25, 2002, Gates received written notice that Allmerica was

5   canceling his Allmerica contracts effective December 31, 2002 but that he would be offered

6   a new contract with Veravest as of January 1, 2003.  Other employees received the same

7   notice.

8                    **CALLAHAN CHECK INCIDENT**

9    6.1    On October 22, 2002, Chris and Cyndi Callahan, clients of Gates, told Gates

10   they wished to take a withdrawal of $1,000 from their existing brokerage account in order to

11   establish a 529 plan for their son.  Gates' assistant, Christa Roedel ("Roedel"), **properly**

12   completed a Check and Wire Fund Request Form ("Check Request Form").  Because the

13   Callahans were going to complete the paperwork for the new account at Gates' office, the

14   Check Request Form requested the check be made payable to the account registrants (the

15   Callahans) but sent to the Lake Oswego office in care of Gates [Exhibit 5].

16   6.2    On or about November 4, 2002, respondent's home office erroneously issued

17   a check made payable to "Allmerica Financial, c/o Jordan Gates."  [Exhibit 6].  The

18   Callahan's name was not on the check.  There were no other obvious markings on the

19   check or the attached voucher identifying the check as being client funds.

20   6.3    The check was not signed by either the chief compliance officer or

21   respondent's president which is a violation of company policy which requires their

22   signatures on checks made payable and/or mailed to anyone other than the account owner.

23   6.4    The check arrived at Gates' office on or about November 12, 2002.  For

24   unknown reasons and in violation of **company** policy the check was not **kept by the new**

25   **business department and a copy of the check given to Gates**.  Rather, the original

26   check was forwarded to Gates' office assistant who, in turn, showed the check to Christa

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8ᵗʰ Floor
Portland, OR 97205
(503) 323-9000

1   Roedel, Gates' experienced practice manager.  Roedel looked at the check and thought it

2   was payable to Gates.  Thinking the check belonged to Gates, Roedel **emailed Gates**

3   **informing him he had received a check for $1,000 and asked him how to deposit the**

4   **funds**.  Gates never saw the check.  Gates responded to Roedel's email advising her to

5   deposit $800 into his personal account and $200 into his business account.  Roedel, in turn,

6   gave that instruction to the office assistant.

7       6.5     **In early December 2002, when Roedel was reviewing pending business,**

8   she realized the Callahan check had not arrived from the home office.  When she called the

9   home office to ask why the check had not arrived, she discovered the processing error.

10      6.6     At the time the mistake was discovered, Gates was out of the country.

11  Roedel **immediately** explained the error to McClung, who told her to contact Darren Parent,

12  the manager at Allmerica's broker/dealer.  McClung communicated the error to Burgoyne.

13      6.7     Roedel explained the error to Parent.  Parent told Roedel not to worry

14  because the error was caused by a home office operation and was reported immediately

15  upon discovery.  Parent also told Roedel that home office had made similar mistakes in the

16  past and it was easily resolved.  He told Roedel a new check would be issued to the client

17  and respondent would debit $1,000 on Gates' next compensation cycle.  [Exhibits 7 and 8]

18      6.8     On Wednesday, December 4, 2002, Gates learned about respondents

19  processing error and the resulting mis-deposit when he checked his email while in Mexico.

20      6.9     Burgoyne and McClung accused Roedel of fraud and the commission of a

21  crime.

22      6.10    On Friday, December 6, 2002, Gates sent Burgoyne an email complaining

23  about the accusations against and treatment of Roedel.  **In this email, Gates informed**

24  **Burgoyne that due to Burgoyne's harassment of Roedel, Gates intended to speak**

25  **with the regional president, Gekiere, regarding Burgoyne's inappropriate actions.**

26

Page 6 – SECOND AMENDED STATEMENT OF CLAIM                                286198

1      6.11   On Monday, December 9, 2004, Burgoyne wrote to Monroe, Gekeire, and

2  McClung that "unfortunately it appears that it is time to terminate for cause, Jordan Gates."

3  **Burgoyne also recommended that Roedel be terminated for cause because of the**

4  **Callahan check incident.** Despite the fact Burgoyne understood the deposit of client funds

5  to have been a mistake started by the home office, Burgoyne accused Gates of

6  commingling funds. Burgoyne also contended there were complaints Gates had sexually

7  harassed and intimidated Roedel. [Exhibit 9]

8      6.12   On December 9, 2002, Gates first day back from vacation, Gates participated

9  in a telephone call with Burgoyne, Gekiere, McClung, Bill Monroe and others which may

10  have included Rosenberg. Monroe acknowledged during the call that the error was caused

11  by respondent's home office.

12      6.13   Gates is informed and believes that Burgoyne communicated with McClung

13  and respondent's management regarding using the error started by home office as a pretext

14  for firing Gates.

15                    **ABSENCE OF DOCUMENTS**

16      7.1   Despite the fact that certain documents reference that communications took

17  place leading up to Gates' termination, including communications between Allmerica

18  managers and attorneys, Allmerica has not produced any documents relating to such

19  communications. Allmerica has not included documents pertaining to such communications

20  on its privilege log.

21      7.2   Allmerica has not produced any documents relating to allegations of sexual

22  harassment or intimidation, despite such allegations allegedly being the subject of

23  investigation by Allmerica personnel.

24      7.3   Allmerica destroyed electronic versions of documents which precede

25  December 9, 2002, in violation of SEC, NASD and its own document retention rules.

26  ///

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1                              GATES' TERMINATION FROM ALLMERICA

2          8.1     On the morning of December 12, 2002, Burgoyne and McClung met with

3    Gates and told him that upper management decided Gates would not be offered a new

4    contract with VeraVest on January 1, 2003, as previously promised.  **Burgoyne informed**

5    **Gates that it was not his decision to decline to offer a new contract to Gates, but that**

6    **he did agree with the decision.**

7          8.2     Burgoyne told Gates he would remain an employee up through December 31,

8    2002, during which time he could continue to write business.

9          8.3     **Between December 13, 2002 and December 31, 2002, the Allmerica**

10   **receptionist was instructed to tell Gates' clients that Gates no longer worked for**

11   **Allmerica.**

12         8.4     Gates is informed and believes that, between December 13, 2002 and

13   December 31, 2002, Gates' access to Allmerica's computer system was canceled.

14         8.5     Before December 31, 2002, McClung sent letters to Gates' clients indicating

15   Gates no longer worked for Allmerica.

16         8.6     At least one representative told one of Gates' clients that he would never

17   have invested the client's money as recommended by Gates because the investment was a

18   very risky adventure, outrageous, and not in the client's best interest.  These statements

19   were made when the representative did not know any information about the client or what

20   the client wanted.  The representative also told the client that there was "a lot going on"

21   concerning Gates but he "could not talk about it."  The representative's statements were

22   made in a tone of voice and in such a matter that was calculated to suggest to the client that

23   Gates was unethical and there was something more going on behind the scenes about

24   improper conduct on Gates' part.

25         8.7     On or about December 20, 2002, Monroe wrote to the NASD and stated that

26   Allmerica had completed its investigation of Gates.  Monroe stated that Allmerica concluded

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1   the deposit of client funds into Gates' account was unintentional.  Monroe stated that

2   despite the investigation concluding Gates was without fault, Burgoyne wanted Gates fired

3   and, because of this, Gates was terminated.  [Exhibit 10]

4                                    **GATES' DEFAMATORY U-5'S**

5          9.1     On December 12, 2002, minutes after Gates' meeting with Burgoyne and

6   McClung, Burgoyne spoke with Gates alone.  Burgoyne told Gates he had spoken with

7   Allmerica's Chief Counsel, Ellen Rosenberg.  Burgoyne said Rosenberg was giving Gates

8   an ultimatum:  (1) Gates could either resign as of December 31, 2002 or (2) he could be

9   terminated with a "Yes" answer on some section of Gates' U-5.

10         9.2     Gates did not understand what Burgoyne meant when he referred to the U-5.

11  Gates asked Burgoyne to explain the options in more detail.  Burgoyne said he could not

12  comment further since the options were provided by Rosenberg.

13         9.3     During the next two weeks, Gates asked McClung several times to explain

14  the Rosenberg options.  McClung told Gates Burgoyne was mistaken and that the question

15  on the U-5 had changed and what Burgoyne meant to say was that Gates could either

16  resign or be terminated *without* cause.

17         9.4     Gates then attempted to get further clarification of the ramifications of the

18  Rosenberg options from Lynn Miller, office and human resource manager for the Lake

19  Oswego office.  Gates did not receive an answer from Miller.  Instead, she and McClung

20  told Gates to put his questions in writing.

21         9.5     On December 16, 2002, Gates wrote to Gekiere and Burgoyne regarding the

22  Rosenberg options.  [Exhibit 11]  Gates' email was circulated by Lynn Miller to Mark Hug,

23  Bill Monroe, Phil Gazzo, and Paul McClung.  No one ever answered Gates' questions.

24         9.6     Gates was looking for work.  Therefore, it was important to him to have the

25  Form U-5 matter resolved and released as quickly as possible.  Over the next month, Gates

26  repeatedly requested orally and in writing that respondents release his U-5.

Page 9 – SECOND AMENDED STATEMENT OF CLAIM                                    286198

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1    9.7    Gates also requested confirmation that he was fully vested and he would

2  continue receiving renewal compensation.  Allmerica responded that he was not vested and

3  would not receive the compensation in contradiction to a written promise that was made to

4  Gates nearly ten years earlier.  It took respondents nearly nine months to acknowledge

5  Gates was vested and entitled to the compensation

6    9.8    On February 5, 2003, VVI, formerly Allmerica Investments filed and mailed a

7  Form U-5 dated January 29, 2003 which exceeded the 30 day limit required by NASD rules.

8  [Exhibit 12]    Gates believes the U-5 was drafted by Rosenberg after consulting with

9  Burgoyne, Monroe, and McClung.

10    9.9    All of the following statements on that U-5 are either false or misleading:

11    9.9.1    Under Section 3. FULL TERMINATION, VeraVest Investments wrote:

12  "Reason- DISCHARGE".  Explanation: *"CUSTOMER FUNDS DEPOSITED INTO*

13  *REGISTERED REPS PERSONAL BANK ACCOUNT.  REP. CLAIMS DEPOSIT WAS*

14  *UNINTENTIONAL."*  Gates is informed and believes that Rosenberg and Veravest

15  Investments, Inc. worded the U-5 in an attempt to mislead third parties into believing that

16  Respondents' had concluded the deposit of the fund was intentional.  In fact, Respondents'

17  investigation had concluded otherwise.  Moreover, this statement fails to tell the whole story

18  about the error that was started by respondents and that could have been prevented

19  entirely if respondents had complied with their own internal rules.

20    9.9.2    Under Section 7A., VeraVest Investments, Inc. answered "Yes" to the

21  question, *"Currently is, or at termination was, the individual the subject of an <u>investigation</u> or*

22  *<u>proceeding</u> by a domestic or foreign governmental body or <u>self-regulatory organization</u> with*

23  *jurisdiction over <u>Investment-related</u> business?"*  Gates is informed and believes that

24  Rosenberg worded the U-5 in an attempt to mislead third parties into believing that the

25  NASD had an ongoing fraud investigation **concerning Gates.  In fact, the NASD never**

26  **initiated nor conducted any investigation on Gates.**

Page 10 – SECOND AMENDED STATEMENT OF CLAIM                    286198

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8TH Floor
Portland, OR 97205
(503) 323-9000

1          9.9.3   Under Section 7B., VeraVest Investments, Inc. answered "Yes" to the

2     question, "*Currently is, or at the time of termination was, the individual under internal review*

3     *for fraud or wrongful taking of property, or violating* *investment-related* *statutes, regulations,*

4     *rules or industry standards of conduct.*" Gates is informed and believes that Rosenberg

5     worded the U-5 in an attempt to mislead third parties into believing that Respondents' were

6     pursuing an ongoing, internal investigation. In fact, Section 7B Number 4. states the

7     internal review was concluded on December 18, 2002.

8          9.9.4   Under Section 1. INVESTIGATION DRP, Rosenberg falsely states that

9     notice was received from "*NASD-SEATTLE*" that NASD was investigating the check

10    incident with the Callahans.

11         9.9.5   Under Section 2., Rosenberg falsely states that the NASD

12    investigation was noticed on 12/19/2002.

13         9.9.6   Under Section 3., Rosenberg falsely states, "*NASD REQUESTED*

14    *FURTHER INFORMATION WHICH WAS PROVIDED IN A 12/20/02 LETTER FROM*

15    *WILLIAM MONROE TO JEN [KEN] GONYEA.*"

16         9.9.7   To date, under Section 7A Number 4., VeraVest Investments, Inc.

17    falsely states the investigation is "*NOT YET RESOLVED*".

18         9.9.8   Under Section 3. INTERNAL REVIEW DRP, VeraVest Investments,

19    Inc. falsely states, "*AFTER PHONE CALL FROM REP'S ASSISTANT FIRM DISCOVERED*

20    *CUSTOMER FUNDS HAD BEEN DEPOSITED INTO REP'S PERSONAL BANK*

21    *ACCOUNT.  REP CLAIMED DEPOSIT WAS UNINTENTIONAL.*"

22         9.10   On February 5, 2003, VVIA, formerly AIMCO, mailed a U-5 which was dated

23    January 29, 2003 accompanied with a letter dated January 29, 2003, **49 days after the**

24    **alleged termination date**, another violation of the NASD's 30 day rule.  That U-5

25    incorrectly lists Gates' termination date as December 11, 2002.  The U-5 states Gates'

26

Page 11 – SECOND AMENDED STATEMENT OF CLAIM                              286198

1   termination was voluntary, rather than for cause, and does not reference the deposit of

2   client funds or the investigation.  [Exhibit 13]

3       9.11   Roedel was immediately issued a "clean" U-5, **dated January 7, 2003**, which

4   did not mention her involvement in the Callahan processing error.  [Exhibit 14]

5       9.12   Subsequent to Veravest Investment Inc.'s issuance of the false and

6   defamatory U-5, Gates has demanded changes to the language.  On February 14, 2003,

7   Veravest Investment, Inc. amended the U-5 to delete its affirmative response to Section 7A

8   (that Gates is the subject of an investigative proceeding by a self regulatory organization).

9   Veravest Investment, Inc. admitted the first U-5 was false.  The remaining false answers,

10   however, remained unchanged.  [Exhibit 15]

11       9.13   Veravest Investment, Inc. has issued several subsequent U-5's which

12   continue to falsely report that Gates was terminated for cause for depositing money into his

13   personal account.  The subsequent U-5's also continue to allege there is an ongoing

14   internal investigation by Respondents **that continues today**.  [Exhibit 16]

15       9.14   Veravest Investment, Inc. had numerous opportunities to correct the false and

16   misleading statements.

17       9.15   A prompt, true and accurate U-5 was critical for Gates to becoming employed

18   by or affiliated with a new broker/dealer.  Since being notified of his termination, Gates

19   started negotiating with various broker/dealers.  As a result of the false and misleading

20   information contained on the U-5, all employment offers with these broker/dealers were

21   withdrawn.

22                   **POST-TERMINATION**

23       10.1   Gates was informed on or about February 20th that his group life insurance

24   had lapsed on December 31, 2002, and that his grace period to reinstate this coverage

25   expired on January 31, 2003, 20 days before he received notice.  Gates has medical issues

26

Page 12 – SECOND AMENDED STATEMENT OF CLAIM        286198

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1    that could prohibit him obtaining life insurance at affordable rates, and he most certainly

2    would have extended this valuable coverage.

3        10.2    Gates was promised copies of his client files.  He was repeatedly told by

4    Miller, McClung and Gekiere that copies of Gates' files would be made **for him at the**

5    **company's expense.**  Numerous follow-up requests were made by Gates over the next

6    year.  More than nine months after his termination, Respondents finally notified Gates his

7    files would not be copied.

8        10.3    Allmerica wrote to SEI on December 17, 2002 requesting the transfer of all of

9    Gates' fee business to another advisor at Allmerica even though Gates was not terminated

10   until December 31, 2002.  [Exhibit 17]  As a result of this transfer, Gates was not paid for

11   commissions earned on SEI business through the last quarter of 2002, as required by his

12   Agreements with the Allmerica Respondents.

13                                        **CLAIMS**

14   **A.    DEFAMATION**

15       11.1    Gates re-alleges paragraphs 1.1 through 10.3 in their entirety.

16       11.2    Respondents their employees and representatives made false, defamatory

17   statements regarding Gates, which Allmerica published to third parties, causing Gates harm

18   as described below.

19       11.3    The Allmerica Respondents engaged in libel *per se* by publishing a false and

20   misleading U-5.  The U-5 falsely states that Gates was and is currently under investigation

21   and internal review for fraud or wrongful taking of property or violating investment related

22   statutes, regulations, rules or industry standards of conduct.  The U-5 also falsely implies

23   that Gates was terminated for cause because he intentionally misappropriated client funds.

24       11.4    The Allmerica Respondents, by and through its employees and

25   representatives, further defamed Gates by falsely informing Gates' clients that he was no

26   longer employed by Allmerica and that he was a poor investment advisor.

Page 13 – SECOND AMENDED STATEMENT OF CLAIM                          286198

1    11.5   Burgoyne engaged in slander *per se* by falsely telling Allmerica advisors and

2    staff that Burgoyne had to fire Gates because Gates deposited client funds into his own

3    account, without a full explanation of all circumstances surrounding the error, implying

4    Gates was engaging in fraud and theft.  These statements falsely impugn Gates'

5    professional capabilities and falsely accuse him of criminal and fraudulent activity.  Under

6    the doctrine of respondent superior, the Allmerica Respondents are liable for the acts of the

7    individual respondent Burgoyne.

8    11.6   David Gore ("Gore"), an investment advisor with Allmerica, engaged in

9    slander *per se.*  Gore was given business of Gates during the time Gates was confused

10   about whether he could write business for respondents.  After Gore held the applications

11   and checks totaling over $400,000 for 1 ½ to 2 months, Gore sent the checks back to

12   Gates' clients. He then had the conversation summarized in paragraph 8.6, above. These

13   statements falsely impugn Gates' professional capabilities and accuse Gates of improper

14   and unethical conduct.  Under the doctrine of respondent superior, the respondents are

15   liable for the acts of Gore.

16   11.7   Respondents' defamation adversely affected Gates' personal and

17   professional reputation, causing him to incur economic losses in an amount to be proven at

18   arbitration, and to suffer severe emotional distress.  Gates is entitled to recover $2,250,000

19   in damages for Allmerica's wrongful conduct.

20   **B.   BREACH OF CONTRACT**

21   12.1   Gates re-alleges paragraphs 1.1 through 11.7 in their entirety.

22   12.2   Allmerica has contractual obligations to Gates pursuant to his agreements

23   with Respondents.  The Career Agent Agreement obligations include the duty to pay

24   commissions and fees earned, and to provide commission compensation based on an

25   individual's vesting status at the time of termination.

26

Page 14 – SECOND AMENDED STATEMENT OF CLAIM                    286198

1     12.3    Allmerica breached its contractual obligations to Gates under the agreements

2   by failing to pay commissions and fees earned by Gates through December 31, 2002 on his

3   fee business, and by failing to timely pay vesting benefits owed to Gates.  Allmerica

4   continues to breach its contractual obligations to Gates by failing to pay all fees and

5   commissions earned through December 31, 2002, in violation of the agreements.

6     12.4    While employed by respondents, Gates participated in respondent AFLICA's

7   Advisors In Force Trail Program (AIFTP).

8        12.4.1  For certain variable annuity products marketed and sold by AFLIAC

9   prior to January 1, 1996,  AFLICA offered its agents continuous trail commissions in

10   exchange for promissory notes that obligated the agents to repay the product's outstanding

11   deferred acquisition costs (DAC).

12        12.4.2 Trail commissions were applied to pay the agent's DAC note

13        obligations.  Excess trail commissions were paid to the agents.

14        12.4.3 The terms of the AIFTP provided, in part, that agents terminated "for

15        cause" were not obligated to pay the DAC notes.

16        12.4.4 Despite the AIFTP terms and despite respondents' position that Gates

17        was terminated for cause," respondents breached the AIFTP by required Gates to

18        continue paying his DAC note after December 31, 2002.

19     12.5    Allmerica also breached its oral promise to provide Gates with copies of his

20   client files, which prevented him from servicing his clients.

21     12.6    Allmerica's breaches of contract caused loss and damage to Gates in an

22   amount to be proven at the time of hearing.

23   **C.     INTERFERENCE WITH BUSINESS RELATIONS**

24     13.1    Gates re-alleges paragraphs 1 through 12.5 in their entirety.

25     13.2    Gates has protectable business relationships with individuals for whom he

26   provides financial advice and investment management services.

Page 15 – SECOND AMENDED STATEMENT OF CLAIM                286198

1      13.3     Respondents, by and through their employees and agents, interfered with

2  Gates' relationships for improper purposes and by improper means, including defaming

3  Gates' professional reputation.

4      13.4     Gates is entitled to recover $2,250,000 in damages for Respondents'

5  wrongful interferences.

6      **INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS**

7      14.1     Gates re-alleges paragraphs 1 through 13.4 in their entirety.

8      14.2     Respondents, by and through their employees and agents, acted with

9  knowledge that its conduct, omissions and false statements would cause Gates to suffer

10  severe emotional distress, or knew that its acts and false statements were substantially

11  certain to cause Gates to suffer severe emotional distress.

12      14.3     Respondents' acts, omissions and false statements constituted an

13  extraordinary transgression of the bounds of socially tolerable conduct.

14      14.4     As a result of Respondents' acts, omissions and false statements, Gates

15  suffered severe emotional distress and anxiety, loss of reputation in the business

16  community, humiliation, embarrassment, sleeplessness, and mental pain and suffering, and

17  Gates is entitled to recover $2,250,000 in damages for Respondents' wrongful conduct..

18      **E.     SPOLIATION OF EVIDENCE**

19      15.1     Gates re-alleges paragraphs 1.1 through 14.5 in their entirety.

20      15.2     Respondents are required by NASD and SEC regulations to maintain certain

21  documents, including documents relating to Respondents' investigation regarding the

22  Callahan check incident, the termination of Gates, Respondents' reporting to the NASD,

23  and the drafting of Gates' U-5's.

24      15.3     Respondents knew or should have known that such documents were

25  important to Gates' investigation and prosecution of his claims against Respondents and

26

Page 16 – SECOND AMENDED STATEMENT OF CLAIM                    286198

1   therefore owed Gates a duty to retain these documents throughout the pendency of Gates'

2   arbitration.

3       15.4    Respondents breached their duty to Gates by intentionally or negligently

4   destroying documents.

5       15.5    Respondents' spoliation is a substantial factor in causing injury to Gates.

6   **F.    VIOLATION OF UNLAWFUL TRADE PRACTICES ACT**

7       16.1    Gates re-alleges paragraphs 1.1 through 15.5 in their entirety.

8       16.2    Respondents have violated ORS 646.608(c), which provides that "a person

9   engages in an unlawful practice when in the course of the person's business, vocation or

10  occupation the person does any of the following:… (c) causes likelihood of confusion or of

11  misunderstanding as to affiliation, connection, or association with, or certification by,

12  another."

13      16.3    Respondents have violated ORS 646.608(h), which provides that "a person

14  engages in an unlawful practice when in the course of the person's business, vocation or

15  occupation the person does any of the following:… (h) disparages the real estate, goods,

16  services, property or business of a customer or another by false or misleading

17  representations of fact."

18      16.4    Respondents have violated ORS 646.608(u), which provides that "a person

19  engages in an unlawful practice when in the course of the person's business, vocation or

20  occupation the person does any of the following:… (u) engages in any other unfair or

21  deceptive conduct in trade or commerce."

22      16.5    Respondents' willful violations are a substantial factor in causing injury to

23  Gates.

24      16.6    Pursuant to ORS 646.638, attorney fees and punitive damages are

25  recoverable.

26  / / /

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8ᵗʰ Floor
Portland, OR 97205
(503) 323-9000

1    **G.    INJUNCTIVE RELIEF**

2        17.1   Gates re-alleges paragraphs 1.1 through 16.6 in their entirety.

3        17.2   Gates has suffered, and will continue to suffer, irreparable injury as a result of

4    the false and misleading misstatements on his U-5.

5        17.3   Because Gates' U-5 must be transmitted to future prospective employers,

6    Gates will continue to suffer future damages which are not readily ascertainable.

7        17.4   Gates requests a mandatory injunction issue amending Gates' U-5 to remove

8    the false and misleading misstatements.

9    **H.    NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES**

10        18.1   Gates re-alleges paragraphs 1.1 through 17.4 in their entirety.

11        18.2   Gates hereby gives notice of his intent to seek punitive damages against

12    Respondents.

13        WHEREFORE, Claimant Gates prays for the following relief:

14        1.   Judgment in favor of Gates and against Respondents;

15        2.   Economic and non-economic damages in the amount of $2,250,000.

16        3.   Attorney fees and costs and in amount to be proven at arbitration;

17        4.   An injunction removing the false and misleading misstatements

18        on Gates' U-5;

19        5.   For such other and further relief as the panel deems just and equitable.

20        DATED this 27th day of July, 2005.

21                      COSGRAVE VERGEER KESTER LLP

22

23                       Michael C. Lewton, OSB No. 87286
                                   Michael K. Walton, OSB No. 99122

24                       Telephone: 503-323-9000
                                   Fax: (503) 323-9019

25                       E-mail: mlewton@cvk-law.com
                                   Of Attorneys for Claimant

26                       Trial Attorney: Michael Lewton

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1                          CERTIFICATE OF SERVICE

2          I hereby certify that I served a true and correct copy of the foregoing SECOND

3    AMENDED STATEMENT OF CLAIM on the date indicated below by

4          ☐      mail with postage prepaid, deposited in the US mail at Portland, Oregon,

5          ☐      hand delivery,

6          ☐      facsimile transmission,

7
     ☒      overnight delivery,
8

9          Attached to this certificate is the printed confirmation of receipt of the document(s)

10   generated by the transmitting machine.  I further certify that said copy was placed in a

11   sealed envelope delivered as indicated above and addressed to said attorney(s) at the

12   address(es) listed below:

13   Michael Donovan
     Manchel & Brennan, PC
14   199 Wells Avenue, Suite 301
     Newton, MA  02459
15
           Of Attorneys for Respondents
16
           DATED:  July 27, 2005
17
                                            _____
18                                          Michael K. Walton, OSB No. 99122

19

20

21

22

23

24

25

26

Page 1 – CERTIFICATE OF SERVICE                                    286196

**EXHIBIT D**

NATIONAL ASSOCIATION OF SECURITIES DEALERS

DISPUTE RESOLTUION

In the matter of the Arbitration between

JORDAN P. GATES,

    Claimant,

      v.

VERAVEST INVESTMENTS, INC.,
VERAVEST INVESTMENT ADVISORS,
INC., ALLMERICA FINANCIAL
CORPORATION, DBA ALLMERICA
FINANCIAL SERVICES, ALLMERICA
FINANCIAL LIFE INSURANCE AND
ANNUITY COMPANY and
ALLMERICA INVESTMENT
MANAGEMENT COMPANY, and
MICHAEL R. BURGOYNE,

    Respondents.

Case No. 03-08688



**RESPONDENTS' OPPOSITION TO CLAIMANT'S SECOND MOTION TO
AMEND STATEMENT OF CLAIM**

    Respondents VeraVest Investments, Inc. ("VeraVest Investments"), VeraVest

Investment Advisors, Inc. ("VeraVest Advisors"), Allmerica Financial Corporation dba

Allmerica Financial Services ("AFC"), Allmerica Investment Management Company

("AIMCO"), Allmerica Financial Life Insurance and Annuity Company ("Allmerica

Life") (collectively, "Allmerica") and Michael Burgoyne, submit this memorandum in

opposition to Claimant Jordan Gates' ("Gates") Second Motion to Amend Statement of

Claim (the "Motion").

    Gates now demands that the Panel permit him to amend his Statement of Claim --

for the second time -- <u>after</u> the close of discovery and <u>after</u> the Respondents have moved

for summary judgment on all of his existing claims. Gates also disingenuously suggests that his proposed second amended Statement of Claim would merely add **four** new causes of action to his existing Statement of Claim. The actual amended pleading he proposes, however, in addition to doubling the number of claims, essentially rewrites the entire Statement of Claim. The existing Statement of Claim currently ends at Paragraph 3.24, Gates' proposed amendments would extend the allegations through Paragraph 18.2 -- with almost every existing sentence deleted or substantially rewritten. Even beyond the proposed new causes of action, Gates has surreptitiously added a brand new theory of breach of contract and increased his claimed damages from $200,000-$300,000 per count to $2,250,000 per count.

Legally, Gates' proposed amendments should not be permitted because they suffer from futility, undue delay, and serious prejudice to Allmerica. In addition, on a practical level, allowing Gates' to amend his Statement of Claim would undoubtedly delay -- *but not change* -- the resolution of this patently meritless case. For example, Allmerica would be forced to assert substantial counterclaims for the first time, discovery would have to be reopened, new deadlines for dispositive motions would have to be established, and the hearing would have to be rescheduled to a later date. The Panel should deny Gates' eleventh-hour request to amend his Statement of Claim.

## I.    LEGAL STANDARD

"The propriety of a motion to amend is generally determined by ascertaining the presence of any of the following four factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party." Jones v. Beacham, 2004 WL 1598799, at *1 (D.Or. July 15, 2004) (citing Griggs v. Pace American Group, Inc., 170

F.3d 877, 880 (9th Cir.1999), and Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1991)).  These factors, however, are "not given equal weight."  Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir.1995).  Most courts cite prejudice to the opposing party as the most important factor.  See, e.g., Jordan v. Los Angeles County, 669 F.2d 1311 (9th Cir. 1982); Brawer v. United States, 848 F.2d 1242 (9th Cir. 1988) (unpublished).  However, "[f]utility of amendment can, by itself, justify the denial of a motion for leave to amend."  Bonin, 59 F.3d at 845.  Finally, "[t]he timing of a motion to amend following discovery, and with a pending summary judgment motion, weighs heavily against allowing leave."  Bennett v. Misner, 2004 WL 2091473, at *2 (D.Or. Sept. 17, 2004) (citing Schlacter-Jones v. General Telephone, 936 F.2d 435, 443 (9th Cir.1991)).

## II.  ARGUMENT

Gates' Motion must be denied because amending the Statement of Claim after the close of discovery and after the Respondents have moved for summary judgment unfairly prejudices the Respondents.  The Motion also should be denied because Gates' futile amendments are clearly unable to survive a summary judgment motion and could easily have been brought prior to this late date.

### A.  GATES' PROPOSED AMENDMENTS ARE FUTILE BECAUSE THEY ARE UNSUSTAINABLE AS A MATTER OF LAW.

#### 1.  Gates Cannot Maintain a Claim Under UTPA.

Gates' Motion asks the Panel to authorize the addition of a claim under the Oregon Unfair Trade Practices Act ("UTPA").  Although Gates does not explain the basis for this claim in detail, it is clear that it focuses on the Respondents' communications with Gates and his clients.  UTPA is a consumer protection statute; its purpose is to provide "restitution for economic loss suffered by a *consumer* as the result of a deceptive

3

trade practice." Gross-Haentjens v. Leckenby, 38 Or.App. 313, 317, 589 P.2d 1209, 1210 (1979) (emphasis added). Unsurprisingly, therefore, in order to have standing under the UTPA, a claimant must first be a "consumer." Thus, in Allegro Corp. v. Only New Age Music. Inc., the court granted summary judgment on a UTPA claim on the grounds that the moving party was not a "consumer" with respect to the events at issue. 2003 WL 23571745, at *15-16 (D. Or. Jan. 23, 2003). See also Oregon Laborers-Employer Health & Welfare Trust Fund v. Phillip Morris, Inc., 17 F. Supp. 2d 1170, 1179-80 (D. Or. 1998), aff'd, 185 F.3d 957 (9th Cir.1999) (granting judgment on the pleadings because plaintiff not a consumer). Gates is undisputedly not bringing his claims as a "consumer" -- he was an independent contractor in business with the Respondents, not a consumer of their goods or services -- and so cannot maintain any claim under UTPA.

Even if Gates were a consumer, and assuming that Allmerica's alleged statements to Gates or the clients at issue amounted to "unfair or deceptive conduct" -- which they do not -- his claim would still have to be dismissed because UTPA has a strict one year statute of limitations. See ORS 646.638(6) (actions brought under UTPA "shall be commenced with one year from the discovery of the unlawful method, act or practice"). Since Gates was well aware of all the relevant facts when he filed his first claim in 2003 -- his existing contract and defamation claims address Allmerica's communications with him and his clients -- his proposed amendment is untimely. Thus, both because Gates is not a consumer and because his claim is untimely, Gates cannot maintain a claim under UTPA and his motion to amend to add an UTPA claim must therefore be denied.

### 2. There Is No Cause of Action for "Spoliation."

Gates' Motion asks the Panel to add a claim for "spoliation of evidence." The Motion, however, does not identify even one relevant document that has been destroyed, instead relying on speculation and legal mistakes. Allowing Gates to add a claim for "spoliation" would only waste the time, resources, and money of the NASD, the Panel and the Respondent to no purpose -- neither Oregon nor Massachusetts recognizes such a claim. See Fletcher v. Dorchester Mutual Insurance Company, 437 Mass. 544, 551-52 (2002).[1] The Massachusetts Supreme Judicial Court explained that inventing such a tort would be unwise since it "could not be proved without multiple levels of speculation" about damage and causation. Fletcher, 437 Mass. at 551.

> Without knowing the content and weight of the spoliated evidence, it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. The jury could only speculate as to what the nature of the spoliated evidenced was and what effect it might have had on the outcome of the underlying litigation.

Fletcher, 437 Mass. at 552 (quoting Cedars-Sinai Med. Ctr. v. Superior Court, 954 P.2d 511 (Cal. 1998)).

Since the tort of spoliation does not exist in Oregon or Massachusetts, Gates is therefore asking this Panel to create a novel cause of action just for him. Even if this Panel was authorized to create new torts -- it is not -- the Panel should not do so in this case because Gates' proposed pleading shows that he cannot maintain such a claim.

---

[1]  A search of Westlaw shows that there is no reported Oregon case recognizing a cause of action for spoliation. In this context, Massachusetts law will very likely control on this subject because Allmerica's records are primarily located in Massachusetts and document retention policies are set there.

Gates' proposed Statement of Claim does not offer any reason to believe that there are any relevant missing documents. Instead, Gates guesses that there must be (unknown) documents missing "relating to Respondents' investigation regarding the Callahan check incident, the termination of Gates, Respondents reporting to the NASD and the drafting of Gates' U-5s." The respondents have produced hundreds of documents on these topics, so Gates' only basis for a spoliation claim is his speculation that if the Respondents' employees had (oral) communications about the events leading up to the decision to terminate him, there should be more documents, recording every such discussion. Gates bases this speculation on the further claim that unnamed NASD and SEC "regulations" require the Respondents to make and maintain more written records. Gates fails to identify any such "regulation" for the simple reason that none exist. NASD and SEC recordkeeping regulations are aimed at broker-dealers' correspondence with the public and their market activities -- not their internal Human Resources functions.

Gates' proposed pleading, moreover, does not -- and cannot -- identify a "missing" document relevant to his underlying claims, let alone allege facts that could show such a hypothetical document was intentionally destroyed to harm him. This is unsurprising since the facts (e.g., the Callahan check incident, Gates' termination and U-5, and Allmerica's communications with the NASD) are essentially undisputed -- the parties' dispute is over the *legal effect* of these events. Gates has not just failed to identify the documents he claims are "missing" or to explain their relevance -- *there can be no "missing" documents which would prove the legal conclusions Gates alleges.* Thus, Gates has neither a legal nor a factual basis for his allegation of spoliation, and any attempt to add such a claim is clearly futile. If such a claim were allowed to proceed,

Allmerica would need to conduct discovery before it could have a fair opportunity to defend against such a vague and ambiguous claim.

### 3.  Gates New DAC Loan Claim Is Futile.

Although not mentioned in his Motion, Gates proposed amended Statement of Claim adds a new contract claim as well.  Gates claims that his repayment obligations under a promissory note he signed -- promising to repay a loan Allmerica made him ("the DAC loan") -- were excused by the terms of a written agreement because he was terminated for cause.[2]  See Proposed Amended Statement of Claim at ¶ 12.4.  Gates' surreptitious addition of this new contract claim related to his DAC loan promissory note is groundless.  Although Gates -- unsurprisingly -- fails to attach a copy of the relevant contract, he makes the nonsensical claim that he does not owe payments on his DAC promissory note precisely *because he was terminated for cause*.  According to Gates, the relevant contract rewarded him by waiving repayment of his loan if he arranged to be terminated "for cause" -- a preposterously favorable contract for an agent.  See Proposed Amended Statement of Claim at ¶12.4.3.  In fact, Gates has no basis for such a bizarre claim since no such term appears anywhere in the relevant contracts.  See Exhibit A (Agent In-Force Annuity Trail Commission Agreement) and Exhibit B (DAC loan promissory note).  Since the Agent In-Force Annuity Trail Commission Agreement and the DAC loan promissory note do **not** contain any "forgiveness-in-case-of-termination-for-cause" terms, the Panel would inevitably grant dismissal or summary judgment on this proposed theory in any event.  Thus, Gates' proposed amendment is clearly futile.

---

[2] As discussed below, in Section II.B, Allmerica will be forced to file a counterclaim in response to this claim if Gates Motion is allowed.  Since Gates' description of the DAC loan program is inaccurate and incomplete, an accurate description of the program would form part of Allmerica's compulsory counterclaim on this subject.

### 4. Gates New Claim for Punitive Damages Is Meritless.

Gates also asks permission to bring a claim for punitive damages. The only one of Gates' substantive claims, however, to include a request for punitive damages is his proposed UTPA claim.[3] Since, as shown above, this UTPA claim is meritless, Gates' punitive damages claim must therefore must fail along with it.

Even assuming that this claim for punitive damages related to a valid underlying claim, it is also procedurally defective. Under Oregon law, a party can claim punitive damages only if he provides affidavits and supporting documentation which set forth specific facts in support of his claim. See ORS 31.725. Because Gates fails to provide any affidavits or documentation which could support a claim for punitive damages; this proposed cause of action would be quickly dismissed if the Panel chose to allow the amendment.

### 5. Gates New Claim for Injunctive Relief Fails with His Meritless Defamation Claim.

Gates final new claim asks for an injunction amending Gates' U-5 to remove the statements he alleges are defamatory. It is therefore completely dependent on his existing claim for defamation. Since Gates' defamation claim is unsupportable as a matter of law, as explained in the Respondents' pending motions for summary judgment, this claim is equally dismissible and thus futile.

---

[3] Gates doubtless restricted his claim in this way because the Oregon Supreme Court has held that punitive damages are not available for claims of breach of contract or torts where damages where allegedly inflicted by speech or expressive conduct. See Farris v. United States Fidelity & Guaranty Company, 284 Or. 453, 466 (1978) (breach of contract); Wheeler v. Green, 286 Or. 99, 119 (1979) (defamation); Hall v. May Dep't Stores, 292 Or. 131 (1981) (intentional infliction of emotional distress); Huffman and Wright Logging Co. v. Wade, 317 Or. 445, 455,56 (1993) (discussing intentional infliction of emotional distress and interference with contractual relations).

### B.    RESPONDENTS WOULD BE SEVERELY PREJUDICED BY GATES' PROPOSED AMENDMENTS.

Allowing Gates to re-amend his Statement of Claim at this late date will unfairly penalize the Respondents by forcing them to spend additional time and unnecessary legal fees to dismiss Gates' (untenable) new causes of action. The Panel and the parties will have to reopen discovery, schedule new deadlines for Respondents to file (new) motions to dismiss and/or for summary judgment, and, inevitably, reschedule the hearing, now only two months away. These additional costs constitute an unfair and substantial prejudice to the Respondents -- especially since they are meritless and untimely.

Gates delayed filing his Second Motion to Amend until July 27, 2005, immediately after the discovery deadline passed. Gates' eleventh-hour filing of this Motion means that the Respondents spent substantial time and money drafting summary judgment motions for his existing Statement of Claim in order to comply with the Panel's deadline for dispositive motions. A decision to allow Gates to re-amend his pleading at this late date would mean the Respondents' efforts on these motions had been largely wasted.[4] Not only might the Panel find the Respondents pending summary judgment motions were now moot, but the Respondents would certainly be forced to draft and file more summary judgment motions aimed at these new claims. For just these reasons, "[t]he timing of a motion to amend following discovery, and with a pending summary judgment motion, weighs heavily against allowing leave." Bennett v. Misner, 2004 WL 2091473, at *2 (D.Or. Sept. 17, 2004) (citing Schlacter-Jones v. General Telephone, 936 F.2d 435, 443 (9th Cir.1991)). See also Jordan v. Los Angeles County, 669 F.2d 1311

---

[4] The Respondents therefore request that if the Panel grants Gates' Motion, it require him to pay the Respondents' attorneys fees incurred in prepared the now-pending summary judgment motions.

(9th Cir. 1982), vacated on other grounds, 459 U.S. 810 (1982) (necessity of new discovery constitutes sufficient prejudice to deny motion to amend).

If the Panel allows Gates' Motion, the Respondents will also be prejudiced because their past discovery will be substantially incomplete or compromised. The Respondents' discovery will be incomplete because they have not had the opportunity to conduct discovery on any of Gates' four new counts and numerous new allegations. For instance, the Respondents' would have a right to discovery on each of the four proposed counts, Gates' new theory of liability under the DAC loan promissory note, the sexual harassment investigation of Gates, his new versions of the allegedly defamatory statements, etc. Important parts of the Respondents' past discovery would also be rendered useless because Respondents asked for documents and information about specific paragraphs of Gates existing Statement of Claim. If Gates' proposed re-amendments are allowed, changing not just the numbering, but the substance of the majority of the allegations, it is impossible to say with certainty how Gates' existing discovery responses can be applied to a re-amended Statement of Claim. Thus, the Respondents would likely have to redo this portion of their discovery.

Finally, Gates' proposed amendments, if allowed, would also force the Respondents to assert counterclaims relating to the DAC loan program. Since Gates' proposes to add a claim denying his repayment obligations under the DAC loan promissory note, Allmerica will have no choice but to file a compulsory counterclaim against Gates for monies owed under the DAC loan promissory note. Gates will also likely demand discovery on this counterclaim.

10

Thus, if the Panel allows Gates' Motion, the Panel will be forced to postpone the

hearing and authorize significant additional discovery and a new dispositive motion

deadline.[5] The Respondents would be required to expend significant time and money on

yet another round of discovery, and further dispositive motions. Since there is little time

between now and the existing hearing dates, the Panel would also be forced to reschedule

the hearing, inconveniencing all parties and putting off the final resolution of Gates'

meritless claims.

C.    **GATES UNDULY DELAYED BRINGING HIS NEW CLAIMS.**

Gates improperly delayed his proposed amendments. Although counsel for Gates

has submitted an affidavit asserting that the proposed amendments are so late because

Gates only recently obtained discovery alerting him to these claims, this statement is

neither admissible nor believable. See Declaration of Michael K. Walton ("Walton

Affidavit") at ¶ 5. Neither Gates' Motion nor the Walton Affidavit contain any

explanation for why these claims could not have been brought previously or any

specification of what "facts" changed this analysis. Instead, the Walton Affidavit offers

only the conclusory legal opinion that these new claims were not available until "recent

discovery." Affidavits, however, are supposed to offer facts, not conclusory opinions,

and opinions going to legal conclusions are particularly disfavored since it is *the Panel's*

job to make the ultimate legal decisions. See Spectra Novae, Ltd. v. Waker Associates,

Inc., 140 Or.App. 54, 59, 914 P.2d 693 (1996) (legal conclusions in affidavits do not

create an issue of material fact sufficient to defeat a summary judgment motion); Shane

---

[5] The only alternative would be to allow the proceeding to sink into a trial by ambush in which both parties
were substantially ignorant about the basis for significant parts of the operative Statement of Claim and the
entire Counterclaim. That sort of chaos serves no one well, least of all the Panel.

11

v. Greyhound Lines, Inc., 868 F.2d 1057, 1061 (9th Cir.1989) (conclusory allegations in affidavit cannot defeat motion for summary judgment).

Examining Gates new claims for waiver of the DAC loan repayment and UTPA, moreover, reveals that they easily could have been brought in 2003, when he first filed. In 2003, Gates was well aware of both the terms of the DAC loan program and with Allmerica's requirement that Gates pay his DAC loan obligations. Allmerica, moreover, has not recently produced documents relating to the DAC loan since it was not previously a part of this litigation. Contrary to the Walton Affidavit, then, no "recent discovery" could have alerted Gates to this claim. Gates' UTPA claim, which asserts that Allmerica's statements to its customers "disparage[ed]" him, is merely a repackaging of his existing defamation claim on that same subject. Gates does not -- and cannot -- offer any reason why he could not have included an UTPA claim in 2003. Similarly, Gates' can offer no reason why his claims for injunctive relief (related to his existing defamation claim) and punitive damage (stemming from his related UTPA claim) could not have been brought in 2003.

## CONCLUSION

WHEREFORE, the Respondents respectfully request that this Arbitration Panel deny Gates' untimely, prejudicial and meritless Motion to Amend.

VERAVEST INVESTMENTS, INC.,
VERAVEST INVESTMENT ADVISORS,
INC., ALLMERICA FINANCIAL
CORPORATION, DBA ALLMERICA
FINANCIAL SERVICES, ALLMERICA
FINANCIAL LIFE INSURANCE AND
ANNUITY COMPANY, AND ALLMERICA
INVESTMENT MANAGEMENT
COMPANY.

By Their Attorneys,

Steven L. Manchel
Michael G. Donovan
William J. Brennan
Manchel & Brennan, P.C.
199 Wells Avenue, Suite 301
Newton, MA 02459
(telephone) (617) 796-8920
(facsimile) (617) 796-8921

Dated: August 12, 2005

Certificate of Service

I, William J. Brennan, Esquire, hereby certify that on this day, I served a true copy of the above document via Federal Express upon Michael C. Lewton, Cosgrave Vergeer Kester LLP, 805 SW Broadway, 8th Floor, Portland, OR 97205.

William J. Brennan

Dated: August 12, 2005

13